**No. 13-15188**

---

### IN THE UNITED STATES COURT OF APPEALS
### FOR THE NINTH CIRCUIT

---

CHINATOWN NEIGHBORHOOD ASSOCIATION, a nonprofit corporation and ASIAN AMERICANS FOR POLITICAL ADVANCEMENT, a political action committee,

Plaintiffs-Appellants,

v.

EDMUND G. BROWN, Jr., Governor of the State of California; *et al*.,

Defendants-Appellees,

THE HUMANE SOCIETY OF THE UNITED STATES; *et al*.,

Intervenors-Defendants-Appellees.

---

On Appeal from the United States District Court
For the Northern District of California
Case No. 4:12-cv-03759 PJH
The Honorable Phyllis J. Hamilton, District Judge.

---

OPENING BRIEF OF APPELLANT (PRELIMINARY INJUNCTION APPEAL)

---

Joseph M. Breall
Jill L. Diamond
BREALL & BREALL, LLP
1550 Bryant Street, Suite 575
San Francisco, California 94103
(415) 345-0545

Counsel for Plaintiffs-Appellants CHINATOWN NEIGHBORHOOD ASSOCIATION and ASIAN AMERICANS FOR POLITICAL ADVANCEMENT.

## <u>CORPORATE DISCLOSURE STATEMENT (FRAP 26.1)</u>

Pursuant to Fed. R. App. P. 26.1, Plaintiff-Appellant CHINATOWN NEIGHBORHOOD ASSOCIATION, a nonprofit corporation, states that there is no parent corporation or publicly held corporation that owns ten percent or more of its stock.

# **TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT ......................................................... i

TABLE OF AUTHORITES ..................................................................... iv

INTRODUCTION ............................................................................1

STATEMENT OF JURISDICTION.........................................................3

STATEMENT OF ISSUES ....................................................................4

STATEMENT OF ADDENDUM OF PRIMARY AUTHORITY ...........................5

STATEMENT OF THE CASE.................................................................5

STATEMENT OF FACTS ......................................................................6

SUMMARY OF THE ARGUMENT ...................................................18

ARGUMENT ...............................................................................19

I.      Standard of Review ........................................................19

II. Legal Standard for Preliminary Injunctions.......................................20

III. The District Court Erroneously Failed to Apply the "Serious Questions" Test to Plaintiffs' Claims ....................................................................21

IV. Plaintiffs Demonstrated a Likelihood of Success/ Raised Serious Questions on the Merits of Their Claims.........................................................23

A. The District Court Erroneously Failed to Apply Strict Scrutiny to Plaintiffs' Equal Protection Claim................................................................23

B. The District Court Failed to Apply the Proper Legal Standard to Plaintiffs' Commerce Clause Claim.............................................................38

C. The Shark Fin Law Violates the Supremacy Clause and is Preempted by Federal Law .................................................................................................45

D. Plaintiffs Have Demonstrated a Likelihood of Success/Raised Serious Questions on the Merits of Their 42 U.S.C. § 1983 Claim .........................51

V. The Shark Fin Law Has Caused Plaintiffs to Suffer Irreparable Harm..............53

VI. An Injunction is in the Public Interest and the Balance of the Hardships Tips in Plaintiffs' Favor .......................................................................................55

VII. Conclusion.......................................................................................................57

# TABLE OF AUTHORITIES

## CASES

*Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011)------ 21, 22

*Am. Passage Media Corp. v. Cass Commc'n, Inc.,* 750 F.2d 1470 (9th Cir. 1985) --
   20

*Batson v. Ky.*, 476 U.S. 79 (1986)---------------------------------------------------------24

*Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.,* 476 U.S. 573 (1986)

   ------------------------------------------------------------------------------38, 39, 40

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993) -37

*City of Charleston v. A Fisherman's Best, Inc.*, 310 F.3d 155 (4th Cir. 2002)  --- 45,
   47, 48, 50

*Citicorp Servs., Inc. v. Gillespie*, 712 F. Supp. 749 (9th Cir. 1989) ------------ 42, 54

*Cooley v. Bd. of Wardens*, 12 How. 299 (1852)---------------------------------------40

*Daily Herald Co. v. Munro*, 838 F.2d 380 (1988) ----------------------------------52

*Dennis v. Higgins*, 498 U.S. 439 (1991)--------------------------------------------- 52, 53

*Doran v. Salem Inn, Inc.*, 422 U.S. 922 (1975)---------------------------------------55

*Earth Island Inst. v. U.S. Forest Serv.*, 351 F.3d 1291 (9th Cir. 2003)--------------20

*Elrod v. Burns*, 427 U.S.---------------------------------------------------------------- 53, 54

*Enyart v. Nat'l. Conference of Bar Exam'rs, Inc.,* 630 F.3d 1153 (9th Cir. 2011) ---
   55

*Ex Parte Virginia*, 100 U.S. 339 (1880) --------------------------------------------- 51

*Farris v. Seabrook*, 677 F.3d 858 (9th Cir. 2012)------------------------------------- 20

*Fid. Fed. Savings & Loan Assn. v. de la Cuesta*, 458 U.S. 141 (1982) ------------- 46

*Flexible Lifeline Sys. Inc., v. Precision Lift, Inc.*, 654 F.3d 989 (9th Cir. 2011) --- 20

*Hughes v. Okla.*, 441 U.S. 322 (1979) ------------------------------------------ 42, 43, 44

*Hunter v. Regents of the Univ. of Cal.*, 190 F.3d 1061 (9th Cir. 1999) ------------- 34

*Hunter v. Underwood*, 471 U.S. 222 (1985) -------------------------------------------- 32

*Huron Portland Cement Co. v. Detroit*, 362 U.S. 440 (1960) ------------------------- 41

*Kassel v. Consol. Freightways Corp.*, 450 U.S. 662 (1981) ---------------------- 41, 42

*Klein v. City of San Clemente*, 584 F.3d 1196 (9th Cir. 2009) ------------------ 28, 29

*Kleppe v. N.M.*, 426 U.S. 529 (1976) ------------------------------------------------ 19, 20

*L.A. Mem'l Coliseum Comm'n. v. Nat'l Football League*, 634 F.2d 1197 (9th Cir. 1980) ----------------------------------------------------------------------------- 23, 56, 57

*Lacoste v. La. Dept. of Conservation*, 263 U.S. 545 (1924) -------------------------- 43

*Loving v. Va.*, 388 U.S. 1 (U.S. 1967) ------------------------------------------------- 23

*Martin v. Int'l Olympic Comm.*, 740 F.2d 670 (9th Cir. 1984) ----------------------- 34

*Melendres v. Arpaio*, 695 F.3d 990 (9th Cir. 2012)------------------------------------ 54

*Minn. v. Clover Leaf Creamery Co.*, 449 U.S. 456 (1981)----------------------------- 41

*Mitchum v. Foster*, 407 U.S. 225 (1972) ----------------------------------------- 51, 53

*Nat'l Assn. of Optometrists & Opticians v. Harris,* 682 F.3d 1144 (9th Cir. 2012) --------------------------------------------------------------------------------------43

*Nat'l Wildlife Fed'n v. Coston*, 773 F.2d 1513 (9th Cir. 1985) ---------------------- 21

*Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190 (1983)-------------------------------------------------------------------------------- 46

*Pers. Adm'r v. Feeney,* 442 U.S. 256 (1979)--------------------------------------------- 29

*Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970) ------------------------------- passim

*Raymond Motor Transp., Inc. v. Rice*, 434 U.S. 429 (1978)---------------------- 40, 42

*Rendish v. City of Tacoma*, 123 F.3d 1216 (9th Cir. 1997) ---------------------------- 20

*Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc*., 944 F.2d 597 (9th Cir. 1991) ---------------------------------------------------------------------------- 54

*Republic of Phil. v. Marcos*, 862 F.2d 1355 (9th Cir. 1988)---------------------- 21, 38

*Rogers v. Lodge*, 458 U.S. 613 (1982)---------------------------------------------------- 26

*Sammartano v. First Judicial Dist. Court*, 303 F.3d 959 (9th Cir. 2002)--23, 55, 56

*Southeastern Fisheries Ass'n v. Chiles*, 979 F.2d 1504 (11th Cir. 1992) ----------- 48

*U.S. v. Tex. Educ. Agency*, 564 F.2d 162 (5th Cir. 1977) ----------------------------- 26

*Valladolid v. Nat'l City*, 976 F.2d 1293 (9th Cir. 1992)-------------------------------- 26

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977) -29, 32, 33,

*Washington v. Davis*, 426 U.S. 229 (1976) ------------------------------------------ 24, 33

*Winter v. N.R.D.C., Inc.*, 555 U.S. 7 (2008) ----------------------------------------- 21, 22

*Yakima Valley Mem. Hosp. v. Wash. State Dep't of Health,* 654 F.3d 919 (9th Cir. 2011)-------------------------------------------------------------------------------------------- 38

*Yick Wo v. Hopkins*, 118 U.S. 356 (1886)----------------------------26, 29, 30, 31, 32

### CONSTITUTIONAL PROVISIONS

U.S. Const., amend. XIV, § 1 ("Equal Protection Clause")--------------------- passim

U.S. Const., art. I § 8, cl. 3 ("Commerce Clause")------------------------------ passim

U.S. Const., art. VI, cl. 2 ("Supremacy Clause")-------------------------------- passim

### STATUTES AND REGULATIONS

28 U.S.C. § 1292(a)(1)------------------------------------------------------------ 4

28 U.S.C. § 1331 ----------------------------------------------------------------- 3

28 U.S.C. § 1343(a)(3)------------------------------------------------------------ 3

42 U.S.C. § 1983 ------------------------------------------------------------ passim

16 U.S.C. § 3372(a)(1) ("Lacey Act") --------------------------------------- 11, 35

Magnuson-Stevens Fisheries Management Act ("MSA")---------------------- passim

   16 U.S.C. § 1811(a) --------------------------------------------------------48

   16 U.S.C. § 1856(a) --------------------------------------------------------50

   50 C.F.R. § 600.1201(c) ----------------------------------------------------58

   50 C.F.R. § 600.1203-------------------------------------------------- 46, 49

   50 C.F.R. § 600.1203(a)(1) -----------------------------------------------10

   50 C.F.R. § 600.1203(a)(2) -----------------------------------------------10

   50 C.F.R. § 600.1203(a)(3) -----------------------------------------------10

   50 C.F.R. § 600.1203(a)(5) ------------------------------------------- 10, 46

   50 C.F.R. § 600.1204-------------------------------------------------- 46, 49

   50 C.F.R. § 600.1204(b) --------------------------------------------------10

   50 C.F.R. § 600.1204(c) --------------------------------------------------10

   50 C.F.R. § 600.1204(e) ------------------------------------------- 10, 46

Cal Fish & Game Code § 2021 --------------------------------------------- 5, 8

Cal Fish & Game Code § 2021(b)----------------------------------------- 5, 39, 49

Cal Fish & Game Code § 2021(e)--------------------------------------------- 8

Cal Fish & Game Code § 2021.5----------------------------------------------- 5

Cal Fish & Game Code § 2021.5(a)(1) --------------------------------------- 9

Cal Fish & Game Code § 2021.5(a)(2) --------------------------------------- 8

Cal Fish & Game Code § 2021.5(b)(1)---------------------------------------9, 36

Cal. Fish & Game Code § 7704(c) --------------------------------------------11

Cal. Fish & Game Code §12000-------------------------------------------- 8

Or. Rev. Stat. § 509.160 --------------------------------------------------------- 16, 36

## RULES

Fed. R. App. P. 4(a)(1)(A) ------------------------------------------------------ 4
Ninth Circuit Rule 28-2.7 ------------------------------------------------------- 5

## LEGLISLATIVE MATERIALS

A.B. 376, 2011 Leg. (Ca. 2011) ("AB 376") --------------------------------- 5, 10, 25
    AB 376 § 1---------------------------------------------------------------------9, 12
    AB 376 § 1(d) ---------------------------------------------------------------- 9
    AB 376 § 1(f)------------------------------------------------------------- 9, 10, 25
    AB 376 § 1(g) --------------------------------------------------------- 14, 15
A.B. 853, 2011 Leg. (Ca. 2011) ("AB 853") ------------------------------------- 5
H.R. 5461, 106th Cong. (2000) (enacted)-----------------------------------------49

## OTHER AUTHORITIES

Council Regulation No. 1185/2003, 2003 O.J. (L 167) 1 (EC) (EU ban)-- 11, 12, 35

Mark Kinver, *MEPs Vote to Close Shark Finning Loopholes*, BBC NEWS SCIENCE
    & ENVIRONMENT (November 22, 2012), http://www.bbc.co.uk/news/science-
    environment-204 ------------------------------------------------------------12

Monterey Bay Aquarium Seafood Watch, Spiny Dogfish, WWW.MONTEREY
    BAY AQUARIUM.ORG,
    http://www.montereybayaquarium.org//cr/SeafoodWatch/web/sfw_factsheet.asp
    x?fid=188 (last accessed February 19, 2013) ---------------------------------35

United States Environmental Protection Agency, Consumption Advice: Joint
    Federal Advisory for Mercury in Fish, WATER.EPA.GOV,
    http://water.epa.gov/scitech/swguidance/fishshellfish/outreach/factsheet.cfm (last
    accessed February 19, 2013) -------------------------------------------------31

## **INTRODUCTION**

The Chinese cultural practice of consuming shark fin soup and, by implication, the segment of the Chinese community that is represented by Plaintiffs-Appellants ("Plaintiffs"), have been misrepresented as cruel, inhumane and anti-environment.  This erroneous characterization was codified by the state of California in the enactment of the overbroad and discriminatory law banning the possession, sale, offer for sale, trade and distribution of shark fins ("Shark Fin Law" or "Law").  The mischaracterization was further reinforced by the legally flawed decision of the district court denying Plaintiffs' motion for a preliminary injunction to enjoin the harm to Plaintiffs caused by the Shark Fin Law.  Through this appeal, Plaintiffs ask the Court to analyze their claims pursuant to the proper legal tests and standards.

In the abstract, the purported goals of the Shark Fin Law are laudable: preventing the cruel practice of shark finning; protecting threatened species; and furthering the public health.  Plaintiffs support these goals.  They are firmly against shark finning, which is antithetical to traditional Chinese cultural values of harmony, respect and minimizing waste of resources.  Plaintiffs oppose the taking of fins from endangered or threatened shark species and they do not want to consume any food that is seriously harmful to their health.  Plaintiffs would support a law that was truly tailored to further such objectives.  For example, had

the Shark Fin Law been written to ban imports of sharks from countries that do not enforce anti-finning regulations, this case would not be before this Court. In fact, Plaintiffs would support a ban on imported fins from any country that does not meet the United States' fishing standards, provided that Plaintiffs were permitted to use fins from sharks legally caught in highly regulated United States waters and in the waters of comparably regulated nations.

As it stands, the Shark Fin Law is a grossly overbroad restriction that was intended to target and suppress the uniquely Chinese cultural practice of consuming shark fin soup. The Law is replete with contradictions and not tailored to further its purported goals. It does not ban shark fishing but instead criminalizes the general trade and possession of fins from *lawfully fished sharks* without criminalizing the use of the rest of the shark. The Law makes no allowances for shark fins obtained through sustainable fishing practices. The Law purports to protect the public from exposure to methlymercury but does not place restrictions on consumption of other apex predators with high concentrations of the same toxin or on consumption of the remainder of the shark.

There is no non-discriminatory legitimate reason for California's enactment of such a contradictory and unduly burdensome statute. It is clear that proponents of the Law were attempting to end a minority cultural practice they considered distasteful and irrelevant. Instead of drafting and promoting rational policy,

legislators and supporters of the Law attacked the cultural practices of Chinese Californians.  Lawmakers and other proponents of the Law have stated repeatedly that the main goal of the Law is to target and end the demand for shark fin soup. This can only mean targeting a Chinese cultural practice without regard for the constitutional implications.

The Shark Fin Law is also an unconstitutional restriction on interstate commerce.  It regulates extraterritorially and its furtherance of any legitimate local goals is outweighed by the burden on interstate and foreign trade.  The Law violates the Supremacy Clause and is preempted by federal law.  The enforcement of the unconstitutional Shark Fin Law deprives Plaintiffs of their civil rights and causes them unjustifiable and irreparable cultural and economic harm.  These injuries warrant a preliminary injunction to enjoin the provisions of the Law and prevent further violations of Plaintiffs' constitutional and statutory rights.

## STATEMENT OF JURISDICTION

Plaintiffs appeal from the United States District Court, Northern District of California's ("district court") order denying Plaintiffs' motion for preliminary injunction.  The district court had jurisdiction under 28 U.S.C. § 1343(a)(3) and under 28 U.S.C. § 1331 because Plaintiffs raised questions under the United States Constitution and 42 U.S.C. § 1983 ("§ 1983").  The order denying Plaintiffs'

3

motion for a preliminary injunction is an appealable interlocutory decision pursuant to 28 U.S.C. § 1292(a)(1).

The district court issued its order on January 2, 2013 and the Notice of Appeal was filed on January 30, 2013. The appeal is timely under Fed. R. App. P. 4(a)(1)(A).

## STATEMENT OF ISSUES

1.     Whether the district court erred in failing to evaluate Plaintiffs' claims pursuant to the sliding scale "serious questions" test for preliminary injunctions.

2.     Whether the district court used the incorrect standard of legal scrutiny to analyze Plaintiffs' success on the merits of their claim that the Shark Fin Law violates U.S. Const., amend. XIV, § 1 ("Equal Protection Clause ").

3.     Whether the district court committed reversible error in determining that Plaintiffs could not succeed on the merits of their claim that the Shark Fin Law violates Plaintiffs' rights under U.S. Const., art. I § 8, cl. 3 ("Commerce Clause").

4.     Whether the district court misinterpreted and misapplied the law in determining that Plaintiffs could not succeed on the merits of their claim that the Shark Fin Law U.S. Const., art. VI, cl. 2 ("Supremacy Clause").

5.      Whether the district court committed reversible error in determining that enforcement of the Shark Fin Law does not violate Plaintiffs' rights under § 1983.

6.    Whether, absent a preliminary injunction to enjoin the Shark Fin Law,

Plaintiffs will suffer irreparable harm.

7.    Whether a preliminary injunction is in the public interest and the balance of

the hardships in granting or denying a preliminary injunction tips in Plaintiffs'

favor.

## STATEMENT OF ADDENDUM OF PRIMARY AUTHORITY

Pursuant to Ninth Circuit Rule 28-2.7, the primary authorities pertinent to

this case are contained in the Addendum to Opening Brief of Appellant.

## STATEMENT OF THE CASE

This case concerns California legislation banning and criminalizing shark

fins.  On October 7, 2011, California State Assembly Bills 376 and 853 were

signed into law and the main provisions took effect on January 1, 2012.  These

bills amended the California Fish & Game Code by adding §§ 2021 and 2021.5,

the Shark Fin Law. [1]  *See* A.B. 376, 2011 Leg. (Ca. 2011) ("AB 376"); Cal. A.B.

853, 2011 Leg. (Ca. 2011) ("AB 853").  Subject to limited exceptions, the Shark

Fin Law generally makes it "unlawful for any person to possess, sell, offer for sale,

trade, or distribute a shark fin" in California."  Cal. Fish & Game Code § 2021(b).

---

[1] Hereinafter, "Shark Fin Law" refers to AB376, AB853 and Cal. Fish & Game
Code §§ 2021 and 2021.5 collectively.

On July 13, 2013, Plaintiffs filed their Complaint for Declaratory and Injunctive Relief against Defendants Edmund Brown, Governor of the State of California, Kamala Harris, Attorney General of the State of California, and Charles H. Bonham, Director, California Department of Fish and Game (collectively, "Government Defendants") alleging that the Shark Fin Law violates Section 1 of the Fourteenth Amendment to the U.S. Constitution, violates Article 1, Section 8, Clause 3 of the U.S. Constitution, violates Article VI, Clause 2 of the U.S. Constitution, and violates 42 U.S.C. § 1983. Excerpts of Record ("ER") 243-56. On August 9, 2012, Plaintiffs filed their Motion for Preliminary Injunction. ER 128-55. On September 14, 2012, the district court granted the motion for leave to intervene brought by Intervenor-Defendants the Humane Society of the United States, the Asian Pacific American Ocean Harmony Alliance ("APAOHA") and the Monterey Bay Aquarium Foundation (collectively, "Intervenor-Defendants" and collectively with Government Defendants, "Defendants"). ER 260, Dist. Ct. Dkt., #17. On January 2, 2013, the Honorable Phyllis J. Hamilton, United States District Judge issued her Order Denying Motion for Preliminary Injunction. ER 001-15.

## STATEMENT OF FACTS

The consumption of shark fin soup is an ancient culinary tradition that is unique to Chinese culture. ER 225. This tradition has been traced back to China's

Ming Dynasty circa 1400 A.D. when shark fin soup was served by the Chinese emperor as symbol of respect for his guests. ER 228. References to the consumption of shark fins and the significance of shark fin soup can be found in famous historical Chinese texts such as the *Compendium of Materia Medica* written by the renowned herbalist, Li Shizhen, during the Ming Dynasty era. ER 225.

Shark fin soup has evolved into a key traditional dish for Chinese ceremonial banquets, special events, and holiday festivals. ER 228, 231. Shark fin ("chì") is one of "The Big 4" precious foods in Chinese culture, a group which also includes abalone, sea cucumber and fish maw, all of which are symbolic foods served on special occasions. ER 225, 228. Shark fin soup is a cultural delicacy of utmost importance at a traditional Chinese wedding banquet. *Id*. It is customary to serve eight dishes at Chinese wedding banquets because the word "eight" in Chinese sounds similar to the word for "good luck" and shark fin soup is amongst these eight traditional dishes. ER 228. Shark fin soup symbolizes prosperity and is an offering that indicates honor, generosity and respect for one's guests. ER 216, 225, 228-29, 231.

In Chinese culture there is a strong virtue of "sharing your fortune" with others, which is realized through sharing one's good food with relatives and friends. ER 229. Many Chinese elders who immigrated to California did so to

build a future for their children and serving shark fin soup at their children's or grandchildren's wedding banquet is their way of showing love, generosity and accomplishment. *Id*.

Shark fin soup is also served at Chinese holiday and festival banquets. ER 231. It is an important dish at family feasts to celebrate the Chinese New Year and is also eaten at banquets during the Mid-Autumn Festival and the Winter Festival. *Id*. Furthermore, shark fins have long been regarded in China as a cure-all tonic, an aphrodisiac, and a weapon in the battle against aging. *Id*.

The implementation of California's Shark Fin Law completely outlawed the possession, sale, offer for sale, trade and distribution of shark fins in California, a product that has no significant end use other than Chinese shark fin soup. *See* Cal Fish & Game Code § 2021. Violation of the Shark Fin Law is a misdemeanor offense, subject to a one thousand dollar fine and six months imprisonment. *See* Cal. Fish & Game Code §12000. The provisions of the Shark Fin Law have been implemented over the course of an eighteen-month period with limited time exemptions for shark fins possessed prior to January 1, 2012 when the main provision of the Law took effect. *See* Cal Fish & Game Code §§ 2021(e), 2021.5(a)(2). By July 1, 2013, the Shark Fin Law will be fully implemented. *See id*. The Law contains exceptions to the blanket general prohibitions stating:

> [a]ny person who holds a license or permit issued by the department to take or land sharks for recreational or commercial

8

> purposes may possess, including for purposes of consumption or taxidermy, or may donate to a person licensed or permitted pursuant to Section 1002, a shark fin or fins consistent with that license or permit.

Cal Fish & Game Code § 2021.5(a)(1).  The Law also requires that

> [t]he Ocean Protection Council [("OPC")] shall submit an annual report to the Legislature that lists any shark species that have been independently certified to meet internationally accepted standards for sustainable seafood … including chain of custody standards.

*Id.* at § 2021.5(b)(1)

The Shark Fin Law was ostensibly passed to address three main concerns: (1) the practice of shark finning; (2) the sustainability of sharks; and (3) public health concerns about methylmercury content in shark fins.  *See* AB 376 § 1. Proponents of the Shark Fin Law have repeatedly asserted that California is the largest market for shark fins outside of Asia and that, by targeting and suppressing this market, they can further the underlying goals of the Shark Fin Law.  AB 376 § 1(f); ER 089, 115, 201, 203.  The actual size of the United States' market for shark fins has been described by one expert as "less than 1% of the global trade in shark fins."  ER 223.

The first of the stated goals underlying the Shark Fin Law, stopping the act of "shark finning", refers to a barbaric practice by which the fin is removed from a live shark and then the shark is released back into the ocean to die.  *See* AB 376 § 1(d).  Shark finning is widely recognized in the United States and abroad as

inhumane and environmentally wasteful.  The Shark Fin Law was promoted as a

mechanism to stop the practice of finning.  *See* AB 376 § 1(f); ER 201, 203.

California Assemblyman Paul Fong, co-author of the Shark Fin Law, issued a

press release stating that "AB 376 bans shark finning, a process where the fins and

tails are cut from living sharks, and the remainder of the fish, which is often still

alive, is thrown back into the ocean."  ER 201.  California Assemblyman Jared

Huffman, co-author of the Shark Fin Law, further stated that "[r]emoving [sharks]

by this senseless act of finning can seriously destabilize the food chain.  To save

them from extinction, our bill targets the demand for these shark fins by banning

their sale and possession in California."  ER 203.

The practice of shark finning is strictly prohibited under United States law,

California law, and the laws of many foreign countries.  The federal Magnuson-

Stevens Fisheries Conservation and Management Act ("MSA") makes it unlawful

to "engage in shark finning …", §§ 50 C.F.R. 600.1203(a)(1); 600.1204(a), and to

"possess shark fins without the corresponding carcasses while on board a U.S.

fishing vessel…" or to "land shark fins without the corresponding carcasses…" 50

C.F.R. § 600.1203(a)(2),(3); *see also* 50 C.F.R. § 600.1204(b),(c).  The MSA also

makes it unlawful to "possess, purchase, offer to sell, or sell shark fins taken,

landed, or possessed in violation of this section …" 50 C.F.R. § 600.1203(a)(5);

*see also* 50 C.F.R. § 600.1204(e).

The Lacey Act adds further federal protections to prevent the distribution of shark fins obtained through illegal finning by making it "unlawful for any person to import, export, transport, sell, receive, acquire, or purchase any fish or wildlife or plant taken, possessed, transported, or sold in violation of any law, treaty, or regulation of the United States …" 16 U.S.C. § 3372(a)(1). On the whole, these federal regulations are considered by scientists to be strong and sufficient to protect sharks fished in the United States. ER 167, 223, 235.

As a result of these stringent regulations, and the accompanying strict penalties, United States fishermen do not engage in the practice of shark finning. ER 163, 170, 212, 175, 205. It is also physically dangerous for fishermen to remove fins from live sharks, another deterrent to shark finning. ER 235.

Shark finning is prohibited by California state law. Pursuant to Cal. Fish & Game Code § 7704(c):

> [e]xcept as permitted by this code or by regulation of the commission, it is unlawful to sell, purchase, deliver for commercial purposes, or possess on any commercial fishing vessel registered pursuant to Section 7881 any shark fin or shark tail or portion thereof that has been removed from the carcass…

The laws of many foreign jurisdictions, such as the European Union ("EU") and Taiwan also ban shark finning. *See* Council Regulation No. 1185/2003, 2003 O.J.

(L 167) 1 (EC) (EU ban);[2] *see also* ER 235.  Although shark finning is illegal in United States waters and in many foreign jurisdictions, the Shark Fin Law makes no distinction between fins from sharks that are harvested in accordance with state, federal, and comparable foreign regulations and fins from sharks that were obtained from unregulated countries.

Supporters of the Shark Fin Law have also asserted that the Law is necessary to ensure the sustainability of the global shark population.  ER 089, 201, 203; *see also* AB 376 § 1.  Sustainability concerns are relevant only to certain species.  ER 043, 222, 167, 235-36.  Of the approximately four to five hundred species of sharks, fewer than ten species have an Appendix I Convention on International Trade and Endangered Species classification, meaning that they cannot be fished or sold in any country.  ER 235-36.  According to the National Oceanic and Atmospheric Administration ("NOAA") Fisheries Service, although there are species-specific restrictions on shark fishing, "there are currently no shark species listed under the U.S. Endangered Species Act."  ER 043.  Commonly harvested species of sharks found in United States waters, such as the spiny dogfish and the blacktip shark, maintain healthy and even abundant population levels.  ER 167, 172, 222.  Despite this species health variability, California's Shark Fin Law

---

[2] On November 22, 2012, the EU further strengthened their shark finning ban, closing the last major loophole in the law.  Mark Kinver, *MEPs Vote to Close Shark Finning Loopholes*, BBC NEWS SCIENCE & ENVIRONMENT (November 22, 2012), http://www.bbc.co.uk/news/science-environment-20445297

makes no allowance for fins from non-threatened shark populations.

Sustainable shark fishing is practiced by fishermen in the United States and "[t]he United States currently has one of the most progressive systems of shark fisheries management and conservation in the world." ER 222. Spiny dogfish fisheries have been certified as sustainable by the Marine Stewardship Council ("MSC") on both the Atlantic and Pacific coasts. ER 053-54, 167, 172-73. The MSC stated that the spiny dogfish fishery "is well-managed and sustainable, the target stock is healthy and commercial fishermen are harvesting the stock appropriately." ER 054. NOAA oversees management plans for shark fisheries. ER 043. According to NOAA:

> NOAA Fisheries manages the commercial and recreational shark fishing in the Atlantic Ocean and works with three regional fishery management councils to conserve and sustainably manage sharks in the Pacific Ocean … By conducting research, assessing stocks, working with U.S. fisherman, and implementing restrictions when necessary, NOAA Fisheries successfully manages shark populations to maintain productive and sustainable fisheries.

*Id*. Sustainable shark fishing is also practiced in government shark research fisheries in which government observers are onboard the fishing boats. ER 205. United States fishermen are subject to strict permit requirements, quotas, and bag and size limits to prevent overfishing and ensure sustainability. ER 163, 170, 172, 175, 212, 222-23, 205.

Aside from criminalizing the fin, the Law does not place any additional

13

restrictions on the shark fishing industry or on the trade and possession of other parts of the shark to stop overfishing.  Sharks are fished for multiple markets, not only for the use of their fins.  ER 172, 205.  For example, for the U.S. Atlantic spiny dogfish, the fin and tail trade comprises only three percent of the overall market for this shark.  ER 172.  The major spiny dogfish trade is in the back meat which is sold to Europe for fish and chips (twenty-eight percent of the overall market) and in the sale of spiny dogfish as all-natural fertilizer (thirty-nine percent of the overall market).  *Id.*  Under the Shark Fin Law, the use of approximately ninety-five percent of the shark is still legal: people can eat shark steaks, make products from shark oil, and craft goods from sharkskin.  ER 181.  Yet, under the Shark Fin Law, subject to very limited exceptions, the fin of the very same shark cannot be possessed, sold, traded or distributed in California.

California fishermen often discard fins from lawfully caught sharks since they cannot sell, distribute, or trade the fins in California, and possession of the fins by a non-fisherman is unlawful.  ER 163, 170, 212, 223.  This creates environmental waste.  ER 167-68, 223, 236.

Like many other varieties of seafood consumed by humans, shark fins have been the subject of asserted health concerns about methylmercury content.  AB 376 § 1(g); ER 092-93.  According to a declaration submitted by Intervenor-Defendants in the district court, methylmercury "bioaccumulate[s] in apex

14

predators such as sharks, swordfish, and tuna." ER 092. One of the asserted policy interests underlying the Shark Fin Law was the protection of the public health from risks of exposure to concentrated methylmercury in fins. AB 376 § 1(g). The Shark Fin Law placed no restrictions on the consumption of other apex predators or on the consumption of other parts of the shark to prevent methylmercury exposure.

Proponents of the Shark Fin Law clearly articulated that the intent of the Law was to target and end the Chinese practice of consuming shark fins. Assemblyman Huffman referenced targeting the "demand" for fins, which could only mean the Chinese market for shark fin soup since this is the only significant end product for shark fins. *See* ER 203. When asked about the implications of the Shark Fin Law on Chinese culture, Assemblyman Fong replied, "the Chinese culture used to promote foot binding on women." ER 180. In a press release from Assemblyman Fong's office, he is also quoted as stating "[j]ust like it was unhealthy to bind women's feet, this practice [of consuming shark fin soup] needs to end." ER 184. At an official press conference held on May 6, 2011 at which Assemblyman Fong and other Shark Fin Law supporters discussed the Law, Peter Knights, Executive Director of WildAid, a nonprofit organization that promoted the Law, stated:

> It's very difficult to regulate something that's going out on a boat
> in Indonesia in the middle of the ocean. It's very easy to regulate

> if something is happening in Chinatown here.  Very easy to go
> 'round to restaurants and find out who's having what.

ER 192.

Detractors of shark fin soup have also downplayed the significance of the dish.  ER 089-90, 111.  In a declaration supporting Intervenor-Defendants' in the district court, Peter Knights was dismissive of a deeply rooted Chinese cultural practice, asserting that "the fin itself adds no flavor or medicinal or nutritional value" and that consumers will simply find a replacement dish.  ER 089-90.

Prior to the enactment of the Shark Fin Law, California Senator Leland Yee proposed modifying the Law to allow the Chinese to continue their tradition of shark fin soup while still addressing the asserted concerns of the proponents of the Law.  ER 056.  The State of Oregon passed this type of compromise legislation by including an exception in its shark fin ban for the fins of spiny dogfish.  *See* Or. Rev. Stat. § 509.160(2)(a).  California lawmakers rejected compromise legislation and stated that the Chinese would just have to live with the Law.  ER 056.

There is conflicting evidence regarding support for the Shark Fin Law in the Chinese community.  A survey cited by Plaintiffs and conducted by Bay Area Chinese language news station, KTSF Channel 26, asked in both English and Chinese, "Are you in favor of the shark fin ban?"  ER 040.  This survey received 24,778 responses, with 15,783 people (63.7 percent of the survey group) answering "no."  *Id.*  Defendants rely on an English language survey of 216 Chinese

Californians for their assertion that seventy percent of Chinese Californians support the Shark Fin Law. ER 112. Defendants also claim it is significant that Assemblyman Fong is of Chinese descent and that Intervenor-Defendant APAOHA is an organization of Asian Americans who support the Law. ER 072, 112-13.

By criminalizing shark fins, the Shark Fin Law will suppress centuries old Chinese cultural practices involving shark fin soup. ER 157, 229. Chinese Californians are no longer able to serve this symbolic, traditional and important dish at events such as weddings and festivals. *See id.* Restaurants catering to Chinese patrons are also hugely impacted by the Law; although restaurants can currently serve their pre-January 1, 2012 supply of fins, as of July 1, 2013, restaurants will be completely barred from serving the dish at their customers' important events and they have already lost significant revenue because of the Shark Fin Law. *See* ER 161, 238, 240, 242.

The Shark Fin Law also impacts merchants buying, selling and trading shark fins. Small business owners, such as owners of Chinese grocery stores, for whom shark fin sales are an essential component of their businesses can no longer buy and sell shark fins, which is hugely detrimental. ER 214, 217. The Law also impacts the business of importers, who trade shark fins in interstate and foreign commerce. ER 165, 233, 240. Some importers deal almost exclusively in shark

fins and have done so for many years.  ER 165, 233.  They will lose their entire livelihoods.  *Id.*  Importers who buy and sell shark fins along with other goods also risk the loss of a large percentage of their sales, which seriously threatens the viability of their businesses.  ER 165, 233, 240.  Shark fins can no longer pass through California to be sold in other states or abroad, restricting the sale of fins outside of California.  *See* ER 165, 205, 233, 240.

## SUMMARY OF THE ARGUMENT

The district court committed reversible error by denying Plaintiffs' motion for a preliminary injunction.  Based on its improper application and analysis of the law and the facts in this case, the district court held that Plaintiffs could not meet the standard for a preliminary injunction.  In reaching this conclusion, the district court erred in seven ways, each of which requires reversal.

*First*, the district court committed reversible error in failing to fully analyze Plaintiffs' claims pursuant to the "serious questions" sliding scale test for preliminary injunctions.

*Second*, the district court committed reversible error by failing to apply strict scrutiny to Plaintiffs' Equal Protection claim that the Shark Fin Law discriminates against people of Chinese national origin.

*Third*, the district court committed reversible error by finding that Plaintiffs could not succeed on the merits of their claim that the Shark Fin Law creates a

18

cognizable burden on interstate commerce and committed reversible error by failing to fully analyze Plaintiffs' Commerce Clause claim pursuant to the standard articulated in *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970).

*Fourth*, the district court committed reversible error in ruling that the Shark Fin Law does not violate the Supremacy Clause and that the Shark Fin Law is not preempted by federal law.

*Fifth*, the district court committed reversible error by misapplying the law in its analysis of Plaintiffs' § 1983 claim and failing to recognize that, by enforcing an unconstitutional law, Defendants have violated Plaintiffs' rights under § 1983.

*Sixth*, the district court committed reversible error in declining to consider the irreparable constitutional harm suffered by Plaintiffs as a result of the Shark Fin Law and by misinterpreting the standard for irreparable business harm.

*Seventh*, the district court committed reversible error in declining to fully analyze whether an injunction is in the public interest and whether the balance of the hardships tips in Plaintiffs' favor.

## ARGUMENT

## I.  Standard of Review

Because this is an appeal of the denial of a preliminary injunction, the Court must employ three distinct standards of review.  *See Klein v. City of San Clemente*, 584 F.3d 1196, 1200 (9th Cir. 2009).  First, and most relevant to this appeal, this

Court reviews de novo issues of law. *Id.*; *see also Flexible Lifeline Sys. Inc., v. Precision Lift, Inc.*, 654 F.3d 989, 984 (9th Cir. 2011) ("If the district court is alleged to have relied on an erroneous legal premise, we review the underlying issues of law de novo.") (quoting *Earth Island Inst. v. U.S. Forest Serv.*, 351 F.3d 1291, 1298 (9th Cir. 2003))); *Farris v. Seabrook*, 677 F.3d 858, 864 (9th Cir. 2012). This de novo standard governs the central question in this case: whether the district court committed reversible legal error in denying Plaintiffs' motion for preliminary injunction in Plaintiffs' challenge to the validity of California's Shark Fin Law. As the district court used the incorrect legal standard and misapplied the law on the underlying issues, this Court should reverse. *See Rendish v. City of Tacoma*, 123 F.3d 1216, 1219 (9th Cir. 1997) (citing *Am. Passage Media Corp. v. Cass Commc'n, Inc.,* 750 F.2d 1470, 1472 (9th Cir. 1985)).

Second, the Court will overturn the district court's factual determinations if they are clearly erroneous. *Klein*, 584 F.3d at 1200. Third, the district court's balancing of the various factors that figure into the preliminary injunction calculus is reviewed for abuse of discretion. *See id*. The district court abused its discretion by failing to consider and balance all the relevant facts in its preliminary injunction analysis, further warranting reversal of the district court's decision.

## II.  <u>Legal Standard for Preliminary Injunctions</u>

The legal test for granting a preliminary injunction requires finding that a plaintiff is "likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. N.R.D.C., Inc.*, 555 U.S. 7, 20 (2008). The alternative "serious questions" preliminary injunction test is a sliding scale analysis when viewed in light of the "balance of hardships" component. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-32 (9th Cir. 2011). The serious questions test dictates that, when the other *Winter* factors have been met, "a preliminary injunction is appropriate when a plaintiff demonstrates . . . that serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor." *Id.* at 1134-35. "Serious questions need not promise a certainty of success, nor even present a probability of success, but must involve a 'fair chance of success on the merits.'" *Republic of Phil. v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988) (quoting *Nat'l Wildlife Fed'n v. Coston*, 773 F.2d 1513, 1517 (9th Cir. 1985)).

## III.   The District Court Erroneously Failed to Apply the "Serious Questions" Test to Plaintiffs' Claims

Despite articulating the elements of the "serious questions" sliding scale analysis for preliminary injunctions, the district court failed to analyze Plaintiffs' claims pursuant to this test. This constitutes reversible legal error. *See Cottrell*, 632 F.3d at 1135 ("Because it did not apply the 'serious questions' test, the district

21

court made an error of law in denying the preliminary injunction.").  Although the district court preliminarily and summarily stated that Plaintiffs did not meet the "serious questions" test, ER 009, in its actual analyses of Plaintiffs' individual claims, the district court solely evaluated the "likelihood of success on the merits" as an isolated factor, only employing the preliminary injunction standard articulated in *Winter*, 555 U.S. at 20.  *See* ER 009-13.  The district court did not consider whether Plaintiffs had raised "serious questions" on the merits for the purposes of a sliding scale analysis.  In light of the recently reaffirmed validity of the "serious questions" sliding scale approach to preliminary injunctions in the Ninth Circuit, the district court's failure to conduct this analysis was clearly erroneous.  *See Cottrell*, 632 F.3d at 1135.

Because the "serious questions" test is a sliding scale evaluation if Plaintiffs raised serious questions on any of their claims (a determination not made clear in the district court's decision), the balance of the hardships must necessarily be considered.  *See Cotrell*, 632 F.3d at 1131-32.  Yet the district court never explicitly engaged in balancing the hardships of the Shark Fin Law; its only brief discussion is conflated with the "public interest" prong of the preliminary injunction test.  ER 014.  While the "balance of the hardships" and the "public interest" factors may be considered in tandem, they are more adequately addressed as separate elements where there is a public interest at issue such as constitutional

22

harm.  *Sammartano v. First Judicial Dist. Court*, 303 F.3d 959, 974 (9th Cir.

2002).  The district court also failed to consider Plaintiffs' claims of cultural harm

as a hardship.  *See* ER 014; *infra* Section VI.  A de minimis analysis of the balance

of the hardships that neglects the parties' claims is insufficient and constitutes

reversible legal error.  *L.A. Mem'l Coliseum Comm'n. v. Nat'l Football League*,

634 F.2d 1197, 1203 (9th Cir. 1980).

**IV.  <u>Plaintiffs Demonstrated a Likelihood of Success/ Raised Serious Questions on the Merits of Their Claims</u>**

### A. The District Court Erroneously Failed to Apply Strict Scrutiny to Plaintiffs' Equal Protection Claim

The district court applied the wrong standard of scrutiny to evaluate

whether Plaintiffs demonstrated a likelihood of success on the merits of their claim

that the Shark Fin Law discriminates against Californians of Chinese national

origin in violation of the Equal Protection Clause.  Statutes that discriminate based

on national origin or race are subject to a strict scrutiny analysis dictating that the

challenged discrimination "must be necessary to the accomplishment of some

permissible state objective." *Loving v. Va.*, 388 U.S. 1, 11 (1967).  The district

court erred in determining that the Shark Fin Law is not discriminatory and erred

in reviewing Plaintiffs' Equal Protection claim using the lesser standard of rational

basis scrutiny.  *See* ER 010.  This warrants reversal by this Court.

According to the district court, the Shark Fin Law needed only to pass a rational basis test because Plaintiffs did not demonstrate that the Law was enacted to further a discriminatory purpose.  ER 010.  Pursuant to well-settled precedent, even if a law does not discriminate on its face, it is still subject to strict legal scrutiny if is shown to have an invidious discriminatory purpose.  *Washington v. Davis*, 426 U.S. 229, 241-242 (1976) ("A statute, otherwise neutral on its face, must not be applied so as to invidiously discriminate on the basis of race.").   The disparate impact of a statute on a protected class is an important factor in the discriminatory purpose analysis.  *Id.*  As the Supreme Court stated in *Davis*:

> Necessarily, an invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the law bears more heavily on one race than another.

*Id.*; *see also Batson v. Ky.*, 476 U.S. 79, 94 (1986) (prima facie case of purposeful discrimination demonstrated when "the totality of the relevant facts gives rise to an inference of discriminatory purpose.").   In addition to disparate impact, courts also analyze whether facially neutral laws have an underlying discriminatory intent.  *Davis*, 426 U.S. at 242.  However, discriminatory effect "may for all practical purposes demonstrate unconstitutionality because in various circumstances the discrimination is very difficult to explain on nonracial grounds."  *Id.* at 242.

The district court acknowledged the disparate impact of the Shark Fin Law on Chinese Californians, *see* ER 010, but misapplied the law in evaluating

Plaintiffs' claim of discriminatory intent.  It is clear from the public statements made by the proponents and drafters of the Law that the Shark Fin Law was intended to target a custom unique to Chinese Californians.  While the district court recognized that Plaintiffs provided evidence of discriminatory intent, it found that the evidence was insufficient because it was "anecdotal" and unrelated to the legislative reasons for passing the Shark Fin Law.  ER 009.

In evaluating whether Plaintiffs had provided sufficient evidence of discriminatory intent, the district court erred in its assessment of a crucial component of Plaintiffs' claim: that targeting the market for shark fin is synonymous with targeting a Chinese cultural tradition.  The only significant end product for shark fins is shark fin soup and shark fin soup is only important in Chinese culture.  ER 225.  Any assertion that the "market" for shark fins does not refer to a Chinese cultural tradition would be disingenuous.  The Law's co-authors, the Law's proponents, and the text of AB 376 all emphasized that the purpose of the Law was to target the shark fin market in California.  AB 376 § 1(f); ER 089, 115, 201, 203.  Even the district court's decision refers to "regulating local market conditions" (emphasis in original), ER 011, which can mean nothing other than regulating the cultural traditions of Chinese Californians.  Viewed from this perspective, there is no question that the Shark Fin Law was intended to

25

discriminate against Chinese Californians.  The district court committed reversible error in finding otherwise.

The district court also misapplied the law in its conclusory dismissal of Plaintiffs' discriminatory intent evidence as "anecdotal."  *See* ER 009.  Plaintiffs' evidence was not comprised of mere anecdotes unrelated to the passage of the Shark Fin Law, but instead consisted of direct statements from the Law's supporters and lawmaker co-authors showing intent to suppress a Chinese cultural practice.  ER 180, 184, 203, 192.  To require Plaintiffs to show further evidence of intent holds Plaintiffs to an impermissible standard that can only mean requiring that the law be facially discriminatory.  Such a standard vitiates the constitutional analysis of invidious underlying discrimination in neutrally facial laws.  *See Yick Wo v. Hopkins*, 118 U.S. 356, 369 (1886) (analyzing ordinances for "unjust and illegal discrimination … which, though not made expressly by the ordinances is made possible by them.").  In the Ninth Circuit "discriminatory intent need not be proved by direct evidence."  *Valladolid v. Nat'l City*, 976 F.2d 1293, 1298 (9th Cir. 1992) (quoting *Rogers v. Lodge*, 458 U.S. 613, 618 (1982)).  Even assuming Plaintiffs intent evidence is not "direct", it nonetheless supports a totality of the circumstances finding of underlying discriminatory purpose.  *See id.*

A discriminatory intent is not to be confused with an evil motive.  *See U.S. v. Tex. Educ. Agency*, 564 F.2d 162, 174 (5th Cir. 1977) (discriminatory intent may

exist even if actions prompted by benign motive). Even if the motives behind the Law included safeguarding sharks and protecting the public health, it should not justify proscribing a practice only engaged in by a minority while allowing similar practices (such as use of the rest of the shark and consumption of other seafood containing mercury) engaged in by a broader segment of the population. Indeed, the fact that minorities may be politically low hanging fruit only increases their need for judicial protection. A discriminatory intent in the name of a good cause remains a discriminatory intent.

To justify its finding that there was no discriminatory intent underlying the Shark Fin Law, the district court also stated that "Plaintiffs' own evidence shows that only a small percentage of Chinese-Americans eat shark fin soup regularly, and that approximately half of Chinese-Americans actually support the Shark Fin Law." ER 009-10. This was a clearly erroneous assessment of the evidence. The district court appeared to be adopting a questionable argument made by Defendants. *See* ER 112. This argument was based on a transcript of a press conference held by proponents of the Shark Fin Law. ER 185-197. The transcript was submitted by Plaintiffs as evidence of discriminatory statements made by proponents of the Law and of the animus towards the Chinese tradition of shark fin soup. *See* ER 191-93. Reflected in the transcript is one speaker's unsubstantiated statistics about support for the Law that should not have been accepted as reliable

27

statistical fact by the district court.  *See* ER 186.  Plaintiffs submitted a conflicting

survey conducted by a Chinese television network showing that only 36.3 percent

of the surveyed population supported the Shark Fin Law.  ER 040.  In its

discussion of support for the Shark Fin Law, the district court completely failed to

mention Plaintiffs' proffered survey statistics evidencing that opposition to the

Shark Fin Law was the predominant view in the Chinese community.[3]

Presupposing the factual validity of these out-of-context statistics about

Chinese support for the Law, they are irrelevant to the analysis of underlying

discriminatory intent.  The facts, also mentioned by the district court, that

Assemblyman Fong is Chinese and Intervenor-Defendant APAOHA is an Asian

organization, are similarly irrelevant.  *See* ER 010.  The Equal Protection legal

analysis does not call for a consideration of whether certain members of the

Chinese Californian community choose not to consume shark fin soup and support

a law banning shark fins.  Nor do these facts obscure the undeniable tradition of

shark fin soup in Chinese culture.  The district court erred in considering them as a

probative factor in evaluating Plaintiffs' claims of discriminatory intent.

Even assuming that Plaintiffs could not show that discriminatory intent

underlay the passage of the Shark Fin Law, the instant case is also one in which

---

[3] The district court's decision does not reflect any consideration whatsoever of the responsive evidence submitted in conjunction with Plaintiffs' Reply to Opposition to Motion for Preliminary Injunction.  *See* ER 001-15.

"impact alone can unmask an invidious classification." *See Pers. Adm'r v. Feeney,* 442 U.S. 256, 275 (1979). The district court's acknowledgement "that the Law may end up having a disparate impact on a group of Chinese Americans", ER 010, was a grossly understated assessment of the evidence. The Shark Fin Law's sole non-commercial effect is to suppress a Chinese cultural tradition. Defendants presented no evidence to the contrary.[4] The impact of the Law extends even beyond "disparate" because it has a *singular* noncommercial effect on the Chinese. Standing alone, this overwhelming effect on Chinese Californians constitutes evidence of discriminatory purpose. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977) ("Sometimes a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action even when the government legislation appears neutral on its face."). The district court erred in failing to recognize that the extreme effect of the Shark Fin Law on Chinese Californians is sufficient to meet the legal standard for invidious discrimination and merit the application of strict scrutiny.

Relevant to the disparate impact analysis, when an unequal and unjust application of a facially neutral law disproportionately affects one group, the law is discriminatory in violation of the Equal Protection Clause. *See Yick Wo*, 118 U.S.

---

[4] Instead, Defendants recognize that "shark fin may be an 'ancient,' 'important', and 'key traditional dish' in Chinese culture." ER 113.

at 373-74 (holding unconstitutional facially neutral San Francisco ordinance imposing arbitrary restrictions on wooden laundries that only affected Chinese laundry owners). The Shark Fin Law, when viewed in the larger context of regulations on the shark trade, is an unequal and arbitrary application of the law. The Shark Fin Law prohibits Chinese Californians from using fins from lawfully fished sharks while having no regulatory impact on the use of the other parts of the *exact same* sharks. It is the height of discriminatory application of the law to criminalize the use of the fin from legally caught sharks, while the remaining approximately ninety-five percent of the shark may be legally used for shark oil, shark meat, sharkskin, and other products.[5] The exemptions of the Shark Fin Law also permit California fishermen to continue to possess (and eat) shark fins but forbid a Chinese Californian to use the same fins in traditional shark fin soup. This is a denial of equal justice against which the Supreme Court cautioned in *Yick Wo*:

> Though the law itself be fair on its face and impartial in appearance, yet, if it is applied and administered by public authority with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances, material to their rights, the denial of equal justice is still within the prohibition of the Constitution.

---

[5] In the declaration of Stuart Sandin submitted in the district court by Intervenor-Defendants, Sandin stated "[b]y harvesting only the fins, the practice [of finning] wastes much of the meat that could be harvested for human consumption." ER 093. It is entirely hypocritical to claim that retaining the fin while discarding the remainder of the shark creates unnecessary waste, and then to allegedly address this problem by banning (and effectively mandating waste of) the fin while permitting use of the rest of the shark.

118 U.S. at 373-74.  Aside from insensitive majority distaste for a distinctly Chinese cultural practice indicating invidious discrimination, there is no explanation for the prohibition on the use of shark fins obtained from lawfully and sustainably fished sharks.

It is also an unequal application of the law to ban shark fins based on concerns about methylmercury content without placing similar restrictions on the remainder of the shark and on other more widely consumed apex predators such as tuna and swordfish.  There is no valid nondiscriminatory basis for banning one type of seafood but continuing to allow consumption of other types of seafood carrying the same contaminant.  This discrepancy is further indication that the Law violates the Equal Protection Clause.[6]  As the *Yick Wo* Court stated:

> No reason for this discrimination is shown, and the conclusion cannot be resisted, that no reason exists for it except hostility to the race and nationality to which the petitioners belong, and which in the eye of the law is not justified.  The discrimination is, therefore, illegal, and the public administration which

---

[6] The United States Environmental Protection Agency advises pregnant women and children who are particularly susceptible to mercury to "not eat Shark, Swordfish, King Mackerel or Tilefish."  United States Environmental Protection Agency, *Consumption Advice: Joint Federal Advisory for Mercury in Fish*, WATER.EPA.GOV, http://water.epa.gov/scitech/swguidance/fishshellfish/outreach/factsheet.cfm (last accessed February 19, 2013).  Despite these warnings about multiple species of fish, shark fin consumption alone is inexplicably criminalized in the supposed interest of furthering the public health.

> enforces it is a denial of the equal protection of the laws and a
> violation of the *Fourteenth Amendment of the Constitution*.

118 U.S. at 374. While the passage of the Shark Fin Law may not have been

driven by the same degree of animus towards the Chinese that motivated the city of

San Francisco's discrimination against Chinese laundry owners in *Yick Wo*, the

situation is analogous. The enactment of the Shark Fin Law evidences an unequal

application of the law on the basis of promoting the public health, prohibiting a

specific Chinese traditional dish while permitting other cultures to consume more

common foods also high in methylmercury without fear of criminal prosecution.[7]

The district court failed to recognize that the existence of a legitimate

motive alongside a discriminatory purpose does not nullify a constitutional

violation. *See Hunter v. Underwood*, 471 U.S. 222, 232 (1985). To meet their

burden of proof that the Law is discriminatory and merits a strict scrutiny analysis,

Plaintiffs must only show that discriminatory purpose was one factor in enactment

of the Law; the discriminatory purpose need not even be the dominant factor. *See*

*Arlington Heights*, 429 U.S. at 265-66. This principle was articulated by the

Supreme Court in *Arlington Heights*:

---

[7] The asserted public health rationale for the Law is also highly suspect as the
statute only protects those who clearly do not want it while failing to protect those
who do not even know they supposedly need it. In this context, to ban a practice
deeply rooted in Chinese culture and then claim one is doing it for the benefit of
the Chinese reveals a cynicism that should invite caution about all claims made in
support of the Law.

[*Washington v. Davis*] does not require a plaintiff to prove that the challenged action rested solely on racially discriminatory purposes. Rarely can it be said that a legislature or administrative body operating under a broad mandate made a decision motivated solely by a single concern, or even that a particular purpose was the "dominant" or "primary" one. In fact, it is because legislators and administrators are properly concerned with balancing numerous competing considerations that courts refrain from reviewing the merits of their decisions, absent a showing of arbitrariness or irrationality. But racial discrimination is not just another competing consideration. When there is a proof that a discriminatory purpose has been a motivating factor in the decision, this judicial deference is no longer justified.

*Id*.

Plaintiffs do not contend that the enactment of the Shark Fin Law was driven entirely by national origin animus. But even assuming some legitimacy of the environmental and public health goals accepted by the district court as the underlying reasons for enactment of the Shark Fin Law, ER 010, strict scrutiny is nonetheless warranted if Plaintiffs demonstrate any coexistent discriminatory purpose. *See Arlington Heights*, 429 U.S. at 265-66. Plaintiffs' irrefutable evidence that the Law was intended to "target" a market for goods only used in a Chinese cultural practice confirms the existence of this illegitimate discriminatory purpose that led to the Law's enactment. Judicial deference towards California lawmakers' decision to pass the Shark Fin Law is not warranted and strict scrutiny applies. *See id.*

33

Because Plaintiffs have established both discriminatory intent and overwhelming disparate impact, Plaintiffs have shown that a discriminatory purpose underlay the passage of the Shark Fin Law. In the face of this discriminatory purpose, the district court's application of the rational basis test to Plaintiffs' Equal Protection claim is legally unsupportable. Instead, the district court should have analyzed Plaintiffs' discrimination claim using a strict scrutiny standard. This legal error warrants reversal by this Court.

Applying the correct legal standard of strict scrutiny to Plaintiffs' Equal Protection claim, the Shark Fin Law cannot pass constitutional muster. A law that arbitrarily discriminates against any class of persons may be justified only if there is a compelling societal interest. *Martin v. Int'l Olympic Comm.*, 740 F.2d 670, 677 (9th Cir. 1984). Strict scrutiny also requires that the law be narrowly tailored to further the compelling interest. *Hunter v. Regents of the Univ. of Cal.*, 190 F.3d 1061, 1063 (9th Cir. 1999).

The Shark Fin Law is not narrowly tailored to further a compelling government interest. Instead, the Law is grossly overbroad when it comes to the interests that Defendants purport to advance. As to the anti-finning interest, while Plaintiffs acknowledge that the ethical treatment of sharks is a legitimate goal, sharks fished in the United States are already fully protected from the inhumane practice of finning under state and federal laws, including but not limited to, the

34

MSA, the Lacey Act and the California Fish & Game Code.  The same is true for sharks fished in the waters of many foreign nations.  *See e.g.* Council Regulation No. 1185/2003, 2003 O.J. (L 167) 1 (EC), ER 235.  Concerns about fins imported from countries that do not prohibit live finning could be easily and properly addressed by a more narrowly tailored ban on imports from such countries.

The Law is not narrowly tailored to address concerns about alleged over-fishing.  The Law makes no allowance for fins from sustainably fished sharks from species with healthy populations.  Plaintiffs have provided significant evidence that not all species of sharks are threatened or dwindling in number and that sustainable shark fishing is practiced in the United States and Canada.  *See* ER 167, 172-73, 205, 222.  The MSC has certified sustainable North American shark fisheries.  ER 053-54, 167, 172-73.  Intervenor-Defendant Monterey Bay Aquarium's website states:

> A small number of shark populations in North America are managed more responsibly and have healthier populations. These "Good Alternatives" are common thresher and shortfin mako sharks caught in California and Hawaii, and spiny dogfish from British Columbia.

Monterey Bay Aquarium Seafood Watch, *Spiny Dogfish*, WWW.MONTEREY BAY AQUARIUM.ORG, http://www.montereybayaquarium.org//cr/SeafoodWatch/web/sfw_factsheet.aspx?fid=188 (last accessed February 19, 2013).  The Shark Fin Law could have been

written to exclude non-threatened sustainably fished species from the blanket

prohibitions on shark fins, similar to the Oregon shark fin law that exempted spiny

dogfish fins.[8] *See* Or. Rev. Stat. § 509.160(2)(a).  However, lawmakers failed to

narrowly tailor the Law to make allowances for fins from sustainably fished

sharks.

The Shark Fin Law also raises questions as to the extent to which the

asserted interests in over-fishing and the public health are truly "compelling."

Because the Law does not place any further restrictions on shark fishing, or on the

consumption of other apex predators high in methylmercury content, it is difficult

to accept that these interests are compelling for the purposes of strict scrutiny.  To

truly further the purported compelling interests, the Law should have criminalized

possession of all shark parts in California, banned shark fishing entirely, and

criminalized consumption of other parts of the shark as well as other apex

predators such as tuna and swordfish.

In an analogous strict scrutiny analysis of the constitutionality of a facially

neutral Hialeah, Florida city ordinance that burdened petitioner's religious

practices, the Supreme Court stated:

---

[8] By including a provision in the Shark Fin Law requiring the OPC to submit an
annual report listing certified sustainable shark species to the Legislature, the
Law's drafters appear to acknowledge the existence of sustainable shark fishing.
*See* Cal. Fish & Game Code § 2021.5(b)(1).  Yet the provisions of the Shark Fin
Law do not contemplate any exception for fins from species listed in the OPC
report.

The legitimate governmental interests in protecting the public
health and preventing cruelty to animals could be addressed by
restrictions stopping far short of a flat prohibition of all Santeria
sacrificial practice.  If improper disposal, not the sacrifice itself,
is the harm to be prevented, the city could have imposed a
general regulation on the disposal of organic garbage.  It did not
do so.  Indeed counsel for the city conceded at oral argument
that, under the ordinances, Santeria sacrifices would be illegal
even if they occurred in licensed, inspected, and zoned
slaughterhouses… Under similar analysis, narrower regulation
would achieve the city's interest in preventing cruelty to animals.
… If the city has a real concern that other methods [of slaughter]
are less humane, however, the subject of the regulation should be
the method of slaughter itself, not a religious classification that is
said to bear some general relation to it."

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 538-39

(1993).  The same reasoning applies to the Shark Fin Law.  California lawmakers

could have, and should have, passed a constitutional narrowly tailored law to

address the environmental and health concerns asserted by the Law's supporters,

while still allowing the Chinese to continue their cultural practices with shark fins

from a humane and sustainable fishing source.  However, lawmakers refused to

consider proposals from Senator Yee for a narrowly tailored law.  ER 056.  Instead

they passed the Shark Fin Law, an overbroad discriminatory ban that cannot

survive strict scrutiny.

It is clear that the Shark Fin Law is discriminatory against Chinese

Californians and should be subject to a strict scrutiny analysis.  Plaintiffs have

demonstrated a likelihood of success/raised serious questions on the merits of their

Equal Protection claim and exceeded the minimum standard of a "fair chance of success" on this claim. *See Marcos*, 862 F.2d at 1362. The district court committed legal error in finding that Plaintiffs could not succeed on the merits of this claim and on this basis the Court should reverse.

### B. The District Court Failed to Apply the Proper Legal Standard to Plaintiffs' Commerce Clause Claim

The district court also erred in its legal analysis of whether Plaintiffs could succeed on the merits of their Commerce Clause claim. The Commerce Clause authorizes Congress to "regulate Commerce with foreign Nations, and among the several States." State statutes that usurp Congressional commerce power by discriminating on their face against out-of-state commerce are virtually *per se* violations of the Commerce Clause. *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.,* 476 U.S. 573, 579 (1986). Facially neutral statutes that regulate evenhandedly and impose only incidental burdens on interstate commerce can nonetheless violate the Commerce Clause when the "burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Pike*, 397 U.S. at 142; *see also Yakima Valley Mem. Hosp. v. Wash. State Dep't of Health,* 654 F.3d 919, 933 (9th Cir. 2011) ("Although the dormant Commerce Clause primarily targets discrimination against out-of-state economic activity, under *Pike* it prohibits all unjustifiable burdens on interstate commerce."). For both facially discriminatory and facially neutral statutes, "the critical consideration is the overall

effect of the statute on both local and interstate activity." *Brown-Forman,* 476 U.S. at 579.

As a facially neutral statute, the Shark Fin Law's effect on interstate commerce is analyzed pursuant to the *Pike* test. *See* 379 U.S. at 142. The district court accurately cited the *Pike* standard but misapprehended the underlying legal principles and failed to correctly apply the legal test. *See* ER 012. First, the district court erred by summarily dispensing of Plaintiffs' Commerce Clause claim without any basis for its finding that Plaintiffs could show "no cognizable burden on interstate commerce" caused by the Shark Fin Law. *See id.* Second, Defendants did not demonstrate valid "local putative benefits" required by *Pike* justifying the burden on commerce. *See* 379 U.S. at 142. Third, the district court committed reversible error by failing to conduct the burden to benefit analysis of Plaintiffs' Commerce Clause claim that was articulated by the Supreme Court in *Pike*. *See id*; ER 012.

By prohibiting all interstate trade of shark fins involving the state of California, the Shark Fin Law directly regulates interstate commerce. The Law self-proclaims its restrictions on commerce by making it unlawful for anyone to "possess, sell, offer for sale, trade, or distribute a shark fin" in California. Cal. Fish & Game Code § 2021(b). Plaintiffs provided ample evidence showing that the shark fin trade spans multiple states and foreign countries. ER 165, 205, 233,

240.  By banning sales of shark fins to and from California, the Shark Fin Law improperly restricts commerce by removing California from this national and global marketplace.  *See Raymond Motor Transp., Inc. v. Rice*, 434 U.S. 429, 440 (1978) ("[T]he Commerce Clause prevents the States from erecting barriers to the free flow of interstate commerce.") (citing *Cooley v. Bd. of Wardens*, 12 How. 299 (1852))).

The Shark Fin Law not only regulates direct interstate commerce with California, it also affects extraterritorial sales of shark fins.  Under the Law, shark fins cannot even pass through California in the stream of commerce to be sold in other states or countries, in effect regulating commerce outside of California's borders.  This type of extraterritorial regulatory reach is impermissible under the Commerce Clause.  *See Brown-Forman,* 476 U.S. at 582 (liquor law that effectively regulated out of state transactions violated the Commerce Clause).  Defendants have even asserted that the core purpose of the Shark Fin Law is to target a market for shark fins obtained from sharks fished in waters outside of California's jurisdiction, an argument adopted by the district court.  ER 010-11, 073, 079-80.  Restated, the Shark Fin Law was aimed at regulating shark fishing and the shark fin trade *outside* of the state of California in violation of the Commerce Clause.

Plaintiffs' evidence of interstate and foreign trade of shark fins viewed in combination with the Shark Fin Law's explicit restrictions and out-of-state regulatory effect renders it implausible that the Law does not burden interstate commerce. The district court erred in failing to recognize this burden. Because Plaintiffs have demonstrated the existence of a burden on interstate commerce, the district court committed further reversible error by failing to conduct a complete analysis of Plaintiffs' Commerce Clause claim under the *Pike* test to determine if Plaintiffs could succeed on that claim. *See* 397 U.S. at 142.

When a statute burdens interstate commerce, the *Pike* test necessarily mandates consideration of the putative local benefits of the statute. 397 U.S. at 142. In a Commerce Clause analysis, a statute serves a valid purpose when it concerns the "health, life and safety" of the state's citizens. *Huron Portland Cement Co. v. Detroit*, 362 U.S. 440, 443 (1960). However, regulations purportedly enacted in furtherance of these legitimate purposes are not per se valid. *See Kassel v. Consol. Freightways Corp.*, 450 U.S. 662, 670 (1981); *c.f. Minn. v. Clover Leaf Creamery Co.,* 449 U.S. 456, 471 (1981) ("When legislating in areas of legitimate local concern, such as environmental protection and resource conservation, States are nonetheless limited by the Commerce Clause."). As articulated by the Supreme Court:

> But the incantation of a purpose to promote the public health or safety does not insulate a state law from Commerce Clause

41

> attack.  Regulations designed for that salutary purpose nevertheless may further the purpose so marginally, and interfere with commerce so substantially, as to be invalid under the Commerce Clause.

*Kassel*, 450 U.S. at 670.  The benefits of the challenged statute must not be merely speculative or so marginally furthered as to be illusory.  *See Raymond Motor Transp.*, 434 U.S. at 447-48 (speculative highway safety interests in regulating truck size did not outweigh substantial burden on commerce); *Citicorp Servs., Inc. v. Gillespie*, 712 F. Supp. 749, 754 (9th Cir. 1989) (statute regulating disbursement of checks in escrow accounts that did not regulate ninety-five percent of checks in escrow did not further purported interest of eliminating risk and could not pass *Pike* test muster).

Given that the Shark Fin Ban allows California fishermen to continue to eat shark fins and places no legal restrictions on the consumption of the remaining ninety-five percent of the shark or on other apex predators, the Shark Fin Law only marginally protects the public health and is not defensible on the grounds that it prevents public exposure to methylmercury.  *See Raymond Motor Transp.*, 434 U.S. at 444-45 (highway safety justifications undercut by numerous exceptions to oversized truck statute).  Instead, furtherance of the public health is an illusory goal that is not justifiable in practical effect when viewed in the larger context of permitted seafood consumption.  *See Hughes v. Okla.*, 441 U.S. 322, 336 (1979) ("When considering the purpose of a challenged statute, this Court is not bound by

'[the] name, description or characterization given it by the legislature or the courts of the State,' but will determine for itself the practical impact of the law.") (quoting *Lacoste v. La. Dept. of Conservation*, 263 U.S. 545, 550 (1924))). *But see Nat'l Assn. of Optometrists & Opticians v. Harris,* 682 F.3d 1144, 1155 (9th Cir. 2012) (court need only analyze putative benefits not actual benefits and statute illusory if state fails to make colorable claim). Because of the contradictions created by the continuing legality of shark meat and other seafood, the purported public health goal is not a valid local benefit as contemplated by the *Pike* test.

The putative benefits of shark conservation and eradicating global finning are admirable but also arguably illusory when viewed in terms of "practical implications." *See Hughes*, 441 U.S. at 336. The demand for shark fins in the United States is negligible (less than one percent of the global market) and the Shark Fin Law will not have a significant impact on shark fin demand worldwide. ER 223. In fact, the Law could damage conservation and anti-finning efforts because purchasers of shark fins who can no buy from California may turn to less humane and unsustainable sources. *Id.*

Protecting sharks outside of California waters from population decline and finning are not *local* benefits for the purposes of a Commerce Clause analysis. It is well-settled that states have a legitimate interest in their own natural resources and a broad right to regulate wild animals within their borders. *Hughes*, 441 U.S. at

337 (in Commerce Clause analysis, conservation of fish within state waters is legitimate local purpose); *see also Kleppe v. N.M.*, 426 U.S. 529, 545 (1976) ("States have broad trustee and police powers over wild animals in their jurisdictions."). The out-of-state interests putatively advanced by the Law, protection of sharks in foreign waters and overfishing outside of California, affect wildlife outside of the state's borders and cannot be asserted as local benefits for the purposes of a legal analysis. *See Kleppe*, 426 U.S. at 545-46 (no state power over wildlife outside state's jurisdiction).

Even assuming that the Shark Fin Law furthers legitimate putative local benefits, because the Law clearly burdens interstate commerce the district court should have balanced the putative benefits with the Law's burden on commerce to determine if the burden is excessive. *See Pike*¸ 379 U.S. at 142. The Shark Fin Law's prohibition on all shark fin commerce, regardless of the species of shark, method of catch, and certification status of the fishery is clearly an unwarranted and excessive burden. The goals of stopping unsustainable and inhumane shark fishing practices and the goal of furthering the public health could have been promoted with a lesser impact on interstate activities by the enactment of a more precise law.

A full analysis under the *Pike* test demonstrates that Plaintiffs have demonstrated a likelihood of success/raised serious questions on the merits of their

Commerce Clause claim.  The district court failed to properly and completely analyze Plaintiffs' claim pursuant to the correct legal standards.  This constitutes reversible error.

### C. The Shark Fin Law Violates the Supremacy Clause and is Preempted by Federal Law

The district court erred in holding that the Shark Fin Law does not violate the Supremacy Clause and is not preempted by federal law.  *See* ER 012-13.  The Supremacy Clause establishes that the U.S. Constitution and federal law takes precedence over state law and state constitutions.  U.S. Const., art. VI, cl. 2. Preemption of state regulation may be express or implied.  "Implied preemption occurs where Congress, through the structure or objectives of federal law, has impliedly precluded state regulation in the area."  *City of Charleston v. A Fisherman's Best, Inc.*, 310 F.3d 155, 169 (4th Cir. 2002).  State laws need not directly conflict with federal laws to be preempted.  *Id.*  Instead, preemption may occur when there exists

> a "scheme of federal regulation . . . so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it," because "the Act of Congress may touch a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject," or because "the object sought to be obtained by the federal law and the character of obligations imposed by it may reveal the same purpose."

*Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 203-204 (1983) (quoting *Fid. Fed. Savings & Loan Assn. v. de la Cuesta*, 458 U.S. 141, 153 (1982)).

The federal MSA contains explicit uniform regulations governing shark fishing and banning shark finning. *See e.g.* 50 C.F.R. §§ 600.1203; 600.1204. These statutes make it unlawful for anyone to fin a shark, land fins from sharks without carcasses and to "possess, purchase, offer to sell, or sell shark fins taken, landed, or possessed in violation of this section …" 50 C.F.R. § 600.1203(a)(2); *see also* § 600.1204(e). Pursuant to these regulations, it *is completely lawful* to land, possess, purchase and sell fins from legally fished sharks with corresponding carcasses. *See id.*

Sharks are also managed pursuant to federal fisheries management plans. According to NOAA:

> NOAA Fisheries manages the commercial and recreational shark fisheries in the Atlantic Ocean and works with three regional fishery management councils to conserve and sustainably manage sharks in the Pacific Ocean. By conducting research, assessing stocks, working with U.S. fishermen, and implementing restrictions when necessary, NOAA Fisheries successfully manages shark populations to maintain productive and sustainable fisheries.

ER 043. Theses federal sustainable management plans were created so that "fishermen can harvest sharks, providing benefits to both the U.S. fishing industry and seafood consumers." *Id.*

The Fourth Circuit addressed a preemption challenge to a restriction on the fishing industry that is instructive. *See Charleston*, 310 F.3d 155. In *Charleston*, the city of Charleston, South Carolina adopted a resolution restricting fishing boats engaged in pelagic longline fishing from docking, selling, purchasing or unloading fish at the Charleston Maritime Center. *Id.* at 159. The resolution also prohibited the sale, purchase, processing, or unloading of any billfish or swordfish. *Id.*

The Fourth Circuit held that the city's resolutions conflicted with federal fisheries laws. *Charleston*, 310 F.3d at 173. Specifically, federal regulations contemplated the use of longline fishing gear to catch pelagic fish, meaning that the city's regulation was "diametrically opposed" to the federal law. *Id.* A Federal Management Plan ("FMP") intended by Congress to create national standards also governed fishing of pelagic species. *Id.* at 172. Although the Charleston resolution only pertained to a specific location in the city, the resolution banned docking of vessels fishing in federal waters in compliance with federal regulations (and trade of these vessels' catches), effectively regulating fishing in federal waters and infringing upon federal law. *Id.* at 173-75. In determining that this triggered the preemption doctrine, the *Charleston* court stated:

> When an FMP is in effect and a fisherman has harvested fish in federal waters and is headed for shore to land his cargo, the state cannot exercise its authority over state waters for the purpose or effect of preventing him from landing at an available facility. Federal and state authority is in conflict and the Supremacy Clause requires that the federal law prevails. The Congressional

> policy of commitment to a national regulatory system is honored. Congress does not intend Balkanization of our coastlines. Were this not so a state or municipal sovereign owning a dock can effectively bring to its knees an industry engaged in bringing ashore fish caught in federal waters -- Boston could shut down codfishing and a California seaport can idle the tuna fleet.

*Id.* at 177.

While the Shark Fin Law does not explicitly regulate docking of fishing vessels, the situation addressed by the Fourth Circuit is analogous.[9]   The federal government intends federal waters to be controlled entirely by federal law. *Charleston*, 310 F.3d at 175 (citing 16 U.S.C. § 1811(a) ("United States claims … sovereign rights and exclusive fishery management authority over all fish … within the exclusive economic zone.")). Shark fishing in the exclusive economic zone ("EEZ") (federal waters) is regulated by the MSA. However, the Shark Fin Law attempts to regulate the shark fishing industry in federal waters by prohibiting fishermen from trading and selling their full federally legal catch in California. By imposing these restrictions, the Shark Fin Law undercuts federal regulatory authority that is intended to be exclusive. *See Southeastern Fisheries Ass'n v. Chiles*, 979 F.2d 1504, 1509 (11th Cir. 1992) ("We think Congress outlined a fairly complete and pervasive federal scheme in the Magnuson Act, and believe

---

[9] To a certain extent, the Shark Fin Law does regulate the docking of fishing vessels. Because they cannot sell valuable components of their catch in California, fishermen are effectively prevented from docking on the California coast to engage in their otherwise legal trade in shark fins.

Congress must have intended to occupy the field of fishery management within the EEZ.").  As the Shark Fin Law infringes upon regulation of a field reserved exclusively for the federal government, field preemption applies to invalidate the Law.

The MSA also contains provisions permitting and regulating the trade and sale of shark fins from sharks caught in accordance with federal law.  50 C.F.R. §§ 600.1203; 600.1204.  The Shark Fin Law explicitly prohibits the trade and sale of the same fins.  Cal Fish & Game Code § 2021(b).  This California prohibition on the fins of sharks fished in international and federal waters positions the Shark Fin Law in direct conflict with federal law, triggering the federal preemption doctrine. *See Charleston*, 310 F.3d at 173.  By forcing California fishermen to discard the fins from lawfully caught sharks (barring retention for personal possession), the Shark Fin Law also directly conflicts with the policy of waste minimization underlying the MSA provisions outlawing shark finning.  *See* H.R. 5461, 106th Cong. (2000) (enacted) (shark fin prohibition intended "to eliminate the wasteful and unsportsmanlike practice of shark finning").

In addition to the MSA, the federal government directly manages the shark fishing industry through management plans.  ER 043.  According to NOAA, these shark management plans are designed specifically to promote sustainability while allowing sharks to be harvested for seafood consumers.  *Id.*  By banning trade of

fins altogether, the Shark Fin Law infringes upon these management plans and thwarts the underlying guiding principles of ensuring species sustainability while permitting lawful trade.  This creates a divergence between state law and federal management plans.  Pursuant to the Supremacy Clause, federal policies must prevail.  *See Charleston*, 310 F.3d at 177.  The district court erred in finding otherwise.

In its rejection of Plaintiffs' Supremacy Clause argument, the district court referenced MSA authority providing for state jurisdiction over state waters.  ER 013 (citing *see e.g.* 16 U.S.C. § 1856(a))[10].  The District court also cited 50 C.F.R. § 600.1201(c), the implementing regulation for the federal law banning shark finning, which states that "[n]othing in this regulation supercedes [sic] more restrictive state laws or regulations regarding shark finning in state waters." *See* ER 013.  These provisions are not relevant to the Shark Fin Law because the Law does not actually regulate shark finning in state waters.  Instead, as Defendants have repeatedly asserted, the Shark Fin Law is a regulation specifically enacted to criminalize shark fins from sharks fished outside of California waters.  The district

---

[10] The District court noted that this code section grants states "limited concurrent authority over fishing in federal laws."  ER 013.  This section does provide conditions under which a state can regulate a fishing vessel outside of state boundaries but this provision only applies to vessels registered in the state and when state regulations do not conflict with federal law or fisheries management plans.  16 U.S.C. § 1856(a)(3).

court committed reversible error in relying on these irrelevant principles to invalidate Plaintiffs' Supremacy Clause claim.

### D. Plaintiffs Have Demonstrated a Likelihood of Success/Raised Serious Questions on the Merits of Their § 1983 Claim

The district court erred in finding that Plaintiffs could not succeed on the merits of the claim under § 1983. *See* ER 013. This code section states:

> [e]very person who under color of any statute … of any State … subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws…

The Supreme Court stated that the intent of enacting § 1983 was

> to interpose the federal courts between the States and the people, as guardians of the people's federal rights – to protect the people from unconstitutional action under color of state law, "whether that action be executive, legislative, or judicial."

*Mitchum v. Foster*, 407 U.S. 225, 240 (1972) (quoting *Ex Parte Virginia*, 100 U.S. 339, 346 (1880)).

The district court held that Plaintiffs had not demonstrated a likelihood of success on their § 1983 claims because government officials had not enforced the Shark Fin Law in a discriminatory manner against Chinese Californians. ER 013. According to the district court, because the Shark Fin Law is evenhandedly enforced against Chinese Californians and California fishermen and causes these

fishermen harm, Plaintiffs could not demonstrate a violation of § 1983. *Id.* The district court's reasoning employs an incorrect legal standard. § 1983 does not require proof of unequal enforcement of a statute that is otherwise unconstitutional and serves as a predicate unconstitutional action. To the contrary, if Plaintiffs can demonstrate that the Shark Fin Law violates their constitutional rights and Defendants enforce the Law under color of state law, Plaintiffs need not show that there was further discrimination in the actual act of enforcement. *See Daily Herald Co. v. Munro*, 838 F.2d 380, 383, 389 (1988) (Government officials enforcement of unconstitutional exit poll statute was violation of § 1983). [11]

The district court's holding also erroneously contemplates that Plaintiffs' § 1983 claim is solely derived from their Equal Protection claim. *See* ER 013. Plaintiffs also base their § 1983 claim on the violation of their rights under the Commerce Clause. ER 254; *see also Dennis v. Higgins*, 498 U.S. 439, 447 (1991) ("That the right at issue here is an implied right under the Commerce Clause does not diminish its status as a 'right, privilege, or immunity' under § 1983."). As applied to a Commerce Clause violation, the crux of Plaintiffs' § 1983 claim is that the Law deprives Plaintiffs of their "right to engage in interstate trade free from

---

[11] The district court's holding was also factually incorrect and an abuse of discretion. Discriminatory enforcement is inherent in the Shark Fin Law because fishermen are exempted from the prohibition on possession of shark fins, whereas Chinese Californians cannot possess the same fins.

restrictive state regulation." *See Dennis*, 498 U.S. at 448. The district court failed to conduct any analysis of this deprivation of rights under § 1983.

Plaintiffs have demonstrated that the Shark Fin Law violates their constitutional rights and that the Government Defendants, "under color of state law", enforce the Law to deprive Plaintiffs of these constitutional rights. This is the exact type of unconstitutional *legislative* action implemented by a government official that § 1983 was enacted to remedy. *See Mitchum*, 407 U.S. at 240. The district court committed legal error in holding that Plaintiffs could not demonstrate a likelihood of success on the merits of their § 1983 claim warranting reversal by this Court.

**V.    The Shark Fin Law Has Caused Plaintiffs to Suffer Irreparable Harm**

The district court declined to fully consider whether the Shark Fin Law had caused Plaintiffs irreparable harm "because plaintiffs have not established a likelihood of success on their constitutional claims." ER 014. Application of the proper legal standards reveals that Plaintiffs should succeed on the merits of these claims. The district court committed reversible legal error when it failed to consider the irreparable harm caused to Plaintiffs by the Shark Fin Law.

As the district court acknowledged, in a preliminary injunction analysis "it is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" ER 014 (citing *see Elrod v. Burns*, 427 U.S. 347,

373 (1976); *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012)); *see also*

*Citicorp Servs., Inc.*, 712 F. Supp. at 756 (presumption of irreparable harm from

Commerce Clause violation). Plaintiffs' constitutional injuries entitle them to this

presumption. Plaintiffs have also alleged specific facts sufficient to demonstrate

irreparable harm. As Chinese Californians, Plaintiffs are now unable to engage in

important traditions involving shark fin soup. ER 157, 229. This is cultural harm

that cannot be remedied absent an injunction to restrain enforcement of the Shark

Fin Law. Yet the district court declined to consider this harm aside from noting

that certain Asian Americans support the Shark Fin Law and implying that this

weakens Plaintiffs' claims of cultural harm. ER 014. This is a legally untenable

position.

The district court's ruling that Plaintiffs would not suffer irreparable harm to

their businesses absent enjoinment of the Shark Fin Law was also erroneous. *See*

ER 014. Plaintiffs demonstrated that they have suffered business injuries, beyond

pure nominal economic damage, that constitute irreparable harm for purposes of

preliminary injunctive relief. *See Rent-A-Center, Inc. v. Canyon Television &*

*Appliance Rental, Inc*., 944 F.2d 597, 603 (9th Cir. 1991) (intangible business

injuries such as damage to goodwill constitute irreparable harm); *Citicorp Servs.,*

*Inc.*, 712 F. Supp. at 754 (loss of goodwill and reputation that accompanies loss of

business constitutes irreparable harm). Interim relief is also appropriate if a

plaintiff can show "that absent preliminary relief they would suffer a substantial loss of business and perhaps even bankruptcy." *Doran v. Salem Inn*, *Inc.*, 422 U.S. 922, 932 (1975).  Absent a preliminary injunction, importer Plaintiffs, whose businesses are almost entirely built on the buying, selling and trading of shark fins risk loss of business goodwill, complete financial ruin and loss of their livelihoods of many years.  ER 165, 233.  Merchant Plaintiffs for whom shark fin trade constitutes a major component of their business also face serious risks to their businesses' viability.  ER 214, 217, 240.  Restaurateurs face significant financial losses as well as loss of business goodwill since they can no longer provide a culturally significant service to their customers.  ER 161, 238, 240, 242.  The district court acknowledged Plaintiffs' claims that they would lose their livelihoods, yet still found that Plaintiffs had not suffered irreparable harm.  ER 014.  This clearly erroneous assessment was contrary to the law and an abuse of the district court's discretion warranting reversal.

## VI.    <u>An Injunction is in the Public Interest and the Balance of the Hardships Tips in Plaintiffs' Favor</u>

The district court properly recognized that "it is generally in the public interest to prevent a violation of a party's constitutional rights."  ER 014 (citing *Sammartano*, 303 F.3d at 974).  The public also has an irrefutable interest in eliminating discrimination.  *See Enyart v. Nat'l. Conference of Bar Exam'rs, Inc.*,

630 F.3d 1153, 1167 (9th Cir. 2011) (affirming grant of preliminary injunction). The district court nonetheless held that it did not have to address the constitutional public interest factor of the preliminary injunction test because Plaintiffs had not shown that they would succeed on the merits of their constitutional claims. ER 014. Because Plaintiffs have in fact demonstrated a likelihood of success/raised serious questions on the merits of these claims, the district court reached this conclusion in error.

When viewed as a component of the balance of the hardships analysis, the public interest in remedying constitutional violations within the state of California outweighs the asserted public interests in protecting resources outside of California's borders. The constitutional harms caused by the Law also outweigh the arguably illusory interest of promoting the public health. This is particularly true for a grossly overbroad statute such as the Shark Fin Law. *See Sammartano*, 303 F.3d at 909 (public interest in constitutional rights outweighed appellees' asserted interest when appellees had made virtually no showing "to support the claimed need for the [challenged courthouse] Rules *as they are now written*.") (emphasis added)).

The balance of the hardships analysis also requires consideration of "plaintiff's threatened injury." *L.A. Mem'l,* 634 F.2d at 1197. The district court

failed to consider the arguably most significant primary injury to Plaintiffs: the

cultural harms caused by the Shark Fin Law.  Instead the district court only stated:

> Plaintiffs have not shown that the future inability to obtain shark
> fins by the relatively small percentage of the population that
> actually wants to do so, or the loss of profits by a small group of
> merchants, importers, or restauranteurs [sic], outweighs the
> interests of the Legislature in protecting the marine ecosystem by
> eliminating a product that drives the pernicious practice of
> finning.

ER 014.  In *L.A. Mem'l*, this Court deemed insufficient a district court's similar

cursory balance of the hardships analysis that failed to consider the alleged harms

to one of the parties.  634 F.2d at 1203.

Significant to the balance of the hardships test, Plaintiffs have demonstrated

a likelihood of success/raised serious questions on their claims of constitutional

harms.  These harms have resulted in serious hardships to Plaintiffs that the district

court erroneously neglected to consider.  The district court also discounted any

injury to Plaintiffs from the Shark Fin Law as affecting only a small portion of the

population.  ER 014.  The fact that only a certain segment of the public is impacted

is not a valid legal consideration in this analysis, particularly when there are civil

rights violations and constitutional harms to the affected group.

## VII.   Conclusion

California's Shark Fin Law is an overbroad statute that discriminates against

Chinese Californians, improperly regulates interstate commerce, violates the

Supremacy Clause and deprives Plaintiffs of their civil rights.  Plaintiffs

demonstrated a likelihood of success/raised serious questions on the merits of their

claims, will suffer irreparable harm absent the enjoinment of the Shark Fin Law,

demonstrated that an injunction is in the public interest and that the balance of the

hardships tips in Plaintiffs' favor.  The district court erred in its legal analyses and

in its misapplication of legal standards and tests in its assessment of Plaintiffs'

claims and of the evidence.  The serious errors in the district court's preliminary

injunction order require that the district court's ruling be reversed.


 Dated:  February 25, 2013                         Respectfully submitted,

                                                   BREALL & BREALL, LLP
                                                   Joseph M. Breall
                                                   Jill L. Diamond

                                                   By:  s/ Joseph M. Breall_____
                                                         Joseph M. Breall

                                                   Attorneys for Plaintiffs-Appellants

## <u>STATEMENT OF RELATED CASES</u>

Pursuant to Ninth Circuit Rule 28-2.6, Plaintiffs-Appellants confirm that they are not aware of any related cases pending in this Court.

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Fed. R. App. P. 32(a)(7)(c) and Ninth Circuit Rule 32-1, the undersigned certifies that the attached opening brief is proportionally spaced, has a type face of 14 points or more and contains 13,933 words, exclusive of the matters that may be omitted under Rule 32(a)(7)(B)(iii).


Dated: February 25, 2013                    By:  s/ Joseph M. Breall
                                                  Joseph M. Breall

                                             Attorney for Plaintiffs-Appellants

## **CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on February 25, 2013.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.


s/ Joseph M. Breall

No. 13-15188

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

CHINATOWN NEIGHBORHOOD ASSOCIATION, a nonprofit corporation and ASIAN AMERICANS FOR POLITICAL ADVANCEMENT, a political action committee,

Plaintiffs-Appellants,

v.

EDMUND G. BROWN, Jr., Governor of the State of California; *et al*.,

Defendants-Appellees,

THE HUMANE SOCIETY OF THE UNITED STATES; *et al*.,

Intervenors-Defendants-Appellees.

---

On Appeal from the United States District Court
For the Northern District of California
Case No. 4:12-cv-03759 PJH
The Honorable Phyllis J. Hamilton, District Judge.

---

## ADDENDUM TO APPELLANTS' OPENING BRIEF

---

Joseph M. Breall
Jill L. Diamond
BREALL & BREALL, LLP
1550 Bryant Street, Suite 575
San Francisco, California 94103
(415) 345-0545

Counsel for Plaintiffs-Appellants CHINATOWN NEIGHBORHOOD ASSOCIATION and ASIAN AMERICANS FOR POLITICAL ADVANCEMENT

# **TABLE OF CONTENTS**

Key Provisions of the United States Constitution ....................................................1

    U.S. CONST. amend. XIV, § 1. ...........................................................1

    U.S. CONST. art.1, § 8, cl. 3. .............................................................2

    U.S. CONST. ART.VI, CL. 2. ...............................................................3

Key Provisions of Federal Statutes ..........................................................................4

    42 U.S.C. § 1983 .................................................................................4

Magnuson-Stevens Fisheries Conservation and Management Act .........................5

    16 U.S.C. § 1811 .................................................................................5

    16 U.S.C. § 1856................................................................................6

    50 C.F.R. § 600.1201..........................................................................8

    50 C.F.R. § 600.1203..........................................................................9

    50 C.F.R. § 600.1204........................................................................11

Lacey Act, 16 U.S.C. § 3372 ..................................................................................13

United States Congress Resolution .........................................................................14

    H.R. 5461, 106th Cong. (2000) (enacted) .......................................14

Provisions of California Fish & Game Code ..........................................................15

    California Fish & Game Code § 2021................................................15

    California Fish & Game Code § 2021.5.............................................16

    California Fish & Game Code § 7704................................................17

    California Fish & Game Code § 12000..............................................18

Provisions of California Assembly Bills .................................................................19

    A.B. 376, 2011 Leg. (Ca. 2011) ......................................................19

    A.B. 853, 2011 Leg. (Ca. 2011) ......................................................21

Provisions of Oregon State Statute .........................................................................22

    Or. Rev. Stat. § 509.160 ...................................................................22

European Union Council Regulation .......................................................................23

    Council Regulation No. 1185/2003, 2003 O.J. (L 167) 1 (EC) ................23

i

**Key Provisions of the United States Constitution**

**"Equal Protection Clause"**

**U.S. CONST. amend. XIV, § 1.**

Section. 1. All persons born or naturalized in the United States and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

**"Commerce Clause"**

**U.S. CONST. art.1, § 8, cl. 3.**

In Pertinent Part:

The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defense and general Welfare of the United States; but all Duties, Imposts and Excises shall be uniform throughout the United States;

To borrow Money on the credit of the United States;

To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes.

**"Supremacy Clause"**

**U.S. CONST. art.VI, cl. 2.**

This Constitution, and the laws of the United States which shall be made in pursuance thereof; and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the Constitution or laws of any State to the contrary notwithstanding.

**Key Provisions of Federal Statutes**

**42 U.S.C. § 1983**

Civil action for deprivation of rights

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

**Magnuson-Stevens Fisheries Conservation and Management Act**

**16 U.S.C. § 1811**

In Pertinent Part:

United States sovereign rights to fish and fishery management authority

(a) In the exclusive economic zone

Except as provided in section 1812 of this title, the United States claims, and will exercise in the manner provided for in this chapter, sovereign rights and exclusive fishery management authority over all fish, and all Continental Shelf fishery resources, within the exclusive economic zone.

**Magnuson-Stevens Fisheries Conservation and Management Act**

**16 U.S.C. § 1856**

In Pertinent Part:

(a) **In general**

(1) Except as provided in subsection (b) of this section, nothing in this chapter shall be construed as extending or diminishing the jurisdiction or authority of any State within its boundaries.

(2) For the purposes of this chapter, except as provided in subsection (b) of this section, the jurisdiction and authority of a State shall extend—

(A) to any pocket of waters that is adjacent to the State and totally enclosed by lines delimiting the territorial sea of the United States pursuant to the Geneva Convention on the Territorial Sea and Contiguous Zone or any successor convention to which the United States is a party;

(B) with respect to the body of water commonly known as Nantucket Sound, to the pocket of water west of the seventieth meridian west of Greenwich; and

(C) to the waters of southeastern Alaska (for the purpose of regulating fishing for other than any species of crab) that are—

(i) north of the line representing the international boundary at Dixon Entrance and the westward extension of that line; east of 138 degrees west longitude; and not more than three nautical miles seaward from the coast, from the lines extending from headland to headland across all bays, inlets, straits, passes, sounds, and entrances, and from any island or group of islands, including the islands of the Alexander Archipelago (except Forrester Island); or

(ii) between the islands referred to in clause (i) (except Forrester Island) and the mainland.

(3) A State may regulate a fishing vessel outside the boundaries of the State in the following circumstances:

(A) The fishing vessel is registered under the law of that State, and

(i) there is no fishery management plan or other applicable Federal fishing regulations for the fishery in which the vessel is operating; or

(ii) the State's laws and regulations are consistent with the fishery management plan and applicable Federal fishing regulations for the fishery in which the vessel is operating.

(B) The fishery management plan for the fishery in which the fishing vessel is operating delegates management of the fishery to a State and the State's laws and regulations are consistent with such fishery management plan. If at any time the Secretary determines that a State law or regulation applicable to a fishing vessel under this circumstance is not consistent with the fishery management plan, the Secretary shall promptly notify the State and the appropriate Council of such determination and provide an opportunity for the State to correct any inconsistencies identified in the notification. If, after notice and opportunity for corrective action, the State does not correct the inconsistencies identified by the Secretary, the authority granted to the State under this subparagraph shall not apply until the Secretary and the appropriate Council find that the State has corrected the inconsistencies. For a fishery for which there was a fishery management plan in place on August 1, 1996 that did not delegate management of the fishery to a State as of that date, the authority provided by this subparagraph applies only if the Council approves the delegation of management of the fishery to the State by a three-quarters majority vote of the voting members of the Council.

(C) The fishing vessel is not registered under the law of the State of Alaska and is operating in a fishery in the exclusive economic zone off Alaska for which there was no fishery management plan in place on August 1, 1996, and the Secretary and the North Pacific Council find that there is a legitimate interest of the State of Alaska in the conservation and management of such fishery. The authority provided under this subparagraph shall terminate when a fishery management plan under this chapter is approved and implemented for such fishery.

**Magnuson-Stevens Fisheries Conservation and Management Act**

**50 C.F.R. § 600.1201**
Relation to other laws.

(a) The relation of this subpart to other laws is set forth in §§ 600.514 and 600.705 and in paragraphs (b) and (c) of this section.

(b) Regulations pertaining to shark conservation and management for certain shark fisheries are also set forth in this subpart and in parts 635 (for Federal Atlantic Ocean, Gulf of Mexico, and Caribbean shark fisheries), 648 (for spiny dogfish fisheries), and 660 (for fisheries off West Coast states and in the western Pacific) of this chapter governing those fisheries.

(c) Nothing in this regulation supersedes more restrictive state laws or regulations regarding shark finning in state waters.

(d) A person who owns or operates a vessel that has been issued an Atlantic Federal commercial shark limited access permit or a spiny dogfish permit is subject to the reporting and recordkeeping requirements found at parts 635 and 648 of this chapter, respectively.

**Magnuson-Stevens Fisheries Conservation and Management Act**

**50 C.F.R. § 600.1203**
Prohibitions.

(a) In addition to the prohibitions in §§ 600.505 and 600.725, it is unlawful for any person to do, or attempt to do, any of the following:

(1) Engage in shark finning, as provided in § 600.1204(a) and (i).

(2) Possess shark fins without the corresponding carcasses while on board a U.S. fishing vessel, as provided in § 600.1204(b) and (j).

(3) Land shark fins without the corresponding carcasses, as provided in § 600.1204(c) and (k).

(4) Fail to have all shark fins and carcasses from a U.S. or foreign fishing vessel landed at one time and weighed at the time of the landing, as provided in § 600.1204(d).

(5) Possess, purchase, offer to sell, or sell shark fins taken, landed, or possessed in violation of this section, as provided in § 600.1204(e) and (l).

(6) When requested, fail to allow an authorized officer or any employee of NMFS designated by a Regional Administrator access to and/or inspection or copying of any records pertaining to the landing, sale, purchase, or other disposition of shark fins and/or shark carcasses, as provided in § 600.1204(f).

(7) Fail to have shark fins and carcasses recorded as specified in § 635.30(c)(3) of this chapter.

(8) Fail to have all shark carcasses and fins landed and weighed at the same time if landed in an Atlantic coastal port, and to have all weights recorded on the weighout slips specified in § 635.5(a)(2) of this chapter.

(9) Fail to maintain a shark in the form specified in §§ 600.1204(h) and 635.30(c) of this chapter.

(b) (1) For purposes of this section, it is a rebuttable presumption that shark fins landed by a U.S. or foreign fishing vessel were taken, held, or landed in violation

9

of this section if the total weight of the shark fins landed exceeds 5 percent of the total dressed weight of shark carcasses on board or landed from the fishing vessel.

(2) For purposes of this section, it is a rebuttable presumption that shark fins possessed by a U.S. fishing vessel were taken and held in violation of this section if the total weight of the shark fins on board, or landed, exceeds 5 percent of the total dressed weight of shark carcasses on board or landed from the fishing vessel.

**Magnuson-Stevens Fisheries Conservation and Management Act**

**50 C.F.R. § 600.1204**
Shark finning; possession at sea and landing of shark fins

(a)(1) No person aboard a U.S. fishing vessel shall engage in shark finning in waters seaward of the inner boundary of the U.S. EEZ.

(2) No person aboard a foreign fishing vessel shall engage in shark finning in waters shoreward of the outer boundary of the U.S. EEZ.

(b) No person aboard a U.S. fishing vessel shall possess on board shark fins harvested seaward of the inner boundary of the U.S. EEZ without the corresponding carcass(es), as may be determined by the weight of the shark fins in accordance with § 600.1203(b)(2), except that sharks may be dressed at sea.

(c) No person aboard a U.S. or foreign fishing vessel (including any cargo vessel that received shark fins from a fishing vessel at sea) shall land shark fins harvested in waters seaward of the inner boundary of the U.S. EEZ without corresponding shark carcasses, as may be determined by the weight of the shark fins in accordance with § 600.1203(b)(1).

(d) Except as provided in paragraphs (g) and (h) of this section, a person who operates a U.S. or foreign fishing vessel and who lands shark fins harvested in waters seaward of the inner boundary of the U.S. EEZ shall land all fins and corresponding carcasses from the vessel at the same point of landing and shall have all fins and carcasses weighed at that time.

(e) A person may not purchase, offer to sell, or sell shark fins taken, landed, or possessed in violation of this section.

(f) Upon request, a person who owns or operates a vessel or a dealer shall allow an authorized officer or any employee of NMFS designated by a Regional Administrator access to, and/or inspection or copying of, any records pertaining to the landing, sale, purchase, or other disposition of shark fins and/or shark carcasses.

(g) A person who owns or operates a vessel that has been issued a Federal Atlantic commercial shark permit and who lands shark in an Atlantic coastal port must have all fins weighed in conjunction with the weighing of the carcasses at the vessel's

11

first point of landing. Such weights must be recorded on the "weighout slips" specified in § 635.5(a)(2) of this chapter.

(h) A person who owns or operates a vessel that has been issued a Federal Atlantic commercial shark permit and who lands shark in or from the U.S. EEZ in an Atlantic coastal port must comply with regulations found at § 635.30(c) of this chapter.

(i) No person aboard a vessel that has been issued a Federal Atlantic commercial shark permit shall engage in shark finning.

(j) No person aboard a vessel that has been issued a Federal Atlantic commercial shark permit shall possess on board shark fins without the fins being naturally attached to the corresponding carcass(es), although sharks may be dressed at sea.

(k) No person aboard a vessel that has been issued a Federal Atlantic commercial shark permit shall land shark fins without the fins being naturally attached to the corresponding carcass(es).

(l) A dealer may not purchase shark fins, from an owner or operator of a fishing vessel issued a Federal Atlantic commercial shark permit who lands shark in an Atlantic coastal port, unless such fins were naturally attached to the corresponding carcass at the time of landing and their combined wet weight is less than 5 percent of the dressed weight of the corresponding carcass(es).

**Lacey Act**

**16 U.S.C. § 3372 (1982)**

In Pertinent Part:

Prohibited acts

 (a) Offenses other than marking offenses

It is unlawful for any person—

> (1) to import, export, transport, sell, receive, acquire, or purchase any fish or wildlife or plant taken, possessed, transported, or sold in violation of any law, treaty, or regulation of the United States or in violation of any Indian tribal law;

> (2) to import, export, transport, sell, receive, acquire, or purchase in interstate or foreign commerce—

> (A) any fish or wildlife taken, possessed, transported, or sold in violation of any law or regulation of any State or in violation of any foreign law.

**United States Congress Resolution**

In Pertinent Part:

H.R. 5461, 106th Cong. (2000) (enacted)
SHARK FINNING PROHIBITION ACT
106th Congress

An Act

To amend the Magnuson-Stevens Fishery Conservation and Management Act to eliminate the wasteful and unsportsmanlike practice of shark finning.

Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled.

**Provisions of California Fish & Game Code**

**California Fish & Game Code § 2021**

  (a) As used in this section "shark fin" means the raw, dried, or otherwise processed detached fin, or the raw, dried, or otherwise processed detached tail, of an elasmobranch.

  (b) Except as otherwise provided in subdivisions (c), (d), and (e), it shall be unlawful for any person to possess, sell, offer for sale, trade, or distribute a shark fin.

  (c) Any person who holds a license or permit pursuant to Section 1002 may possess a shark fin or fins consistent with that license or permit.

  (d) Any person who holds a license or permit issued by the department to take or land sharks for recreational or commercial purposes may possess a shark fin or fins consistent with that license or permit.

  (e) Before January 1, 2013, any restaurant may possess, sell, offer for sale, trade, or distribute a shark fin possessed by that restaurant, as of January 1, 2012, that is prepared for consumption.

**California Fish & Game Code § 2021.5**

 (a) Notwithstanding Section 2021, all of the following provisions apply:

   (1) Any person who holds a license or permit issued by the department to take or land sharks for recreational or commercial purposes may possess, including for purposes of consumption or taxidermy, or may donate to a person licensed or permitted pursuant to Section 1002, a shark fin or fins consistent with that license or permit.
   (2) Before July 1, 2013, any person may possess, sell, offer for sale, trade, or distribute a shark fin possessed by that person, as of January 1, 2012.
   (3) Nothing in Section 2021 prohibits the sale or possession of a shark carcass, skin, or fin for taxidermy purposes pursuant to Section 3087.
   (b) (1) The Ocean Protection Council shall submit an annual report to the Legislature that lists any shark species that have been independently certified to meet internationally accepted standards for sustainable seafood, as defined in Section 35550 of the Public Resources Code, and adopted by the Ocean Protection Council pursuant to Section 35617 of the Public Resources Code, including chain of custody standards.
   (2) A report to be submitted pursuant to paragraph (1) shall be submitted in compliance with Section 9795 of the Government Code.

16

**California Fish & Game Code § 7704**

DIVISION 6. FISH, ARTICLE 2. General Provisions

(a) It is unlawful to cause or permit any deterioration or waste of any fish taken in the waters of this state, or brought into this state, or to take, receive or agree to receive more fish than can be used without deterioration, waste, or spoilage.

(b) Except as permitted by this code, it is unlawful to use any fish, or part thereof, except fish offal, in a reduction plant or by a reduction process.

(c) Except as permitted by this code or by regulation of the commission, it is unlawful to sell, purchase, deliver for commercial purposes, or possess on any commercial fishing vessel registered pursuant to Section 7881 any shark fin or shark tail or portion thereof that has been removed from the carcass. However, thresher shark tails and fins that have been removed from the carcass and whose original shape remain unaltered may be possessed on a registered commercial fishing vessel if the corresponding carcass is in possession for each tail and fin.

**California Fish & Game Code § 12000**

(a)Except as expressly provided otherwise in this code, any violation of this code, or of any rule, regulation, or order made or adopted under this code, is a misdemeanor.

(b)Notwithstanding subdivision (a), any person who violates any of the following statutes or regulations is guilty of an infraction punishable by a fine of not less than one hundred dollars ($100), or more than one thousand dollars ($1,000), or of a misdemeanor:

(1)Subdivision (a) of Section 6596.

(2)Section 7149.8.

(3)Section 7360.

(4)Sections 1.14, 1.17, 1.18, 1.62, 1.63, and 1.74 of Title 14 of the California Code of Regulations.

(5)Sections 2.00 to 5.95, inclusive, and 7.00 to 8.00, inclusive, of Title 14 of the California Code of Regulations.

(6)Sections 27.56 to 30.10, inclusive, of Title 14 of the California Code of Regulations.

(7)Sections 40 to 43, inclusive, of Title 14 of the California Code of Regulations.

(8)Sections 307, 308, and 311 to 313, inclusive, of Title 14 of the California Code of Regulations.

(9)Sections 505, 507 to 510, inclusive, and 550 to 553, inclusive, of Title 14 of the California Code of Regulations.

(10)Sections 630 to 630.5, inclusive, of Title 14 of the California Code of Regulations.

18

**Provisions of California Assembly Bills**

**A.B. 376, 2011 Leg. (Ca. 2011) ("AB 376")**

Shark fins.

Existing law makes it unlawful to possess any bird, mammal, fish, reptile, or amphibian, or parts thereof, taken in violation of any of the provisions of the Fish and Game Code, or of any regulation made under it.

This bill, except as specified, would make it unlawful for any person to possess, sell, offer for sale, trade, or distribute a shark fin, as defined.

The bill, by creating a new crime, would impose a state-mandated local program.

The California Constitution requires the state to reimburse local agencies and school districts for certain costs mandated by the state. Statutory provisions establish procedures for making that reimbursement.

This bill would provide that no reimbursement is required by this act for a specified reason.


THE PEOPLE OF THE STATE OF CALIFORNIA DO ENACT AS FOLLOWS:

SECTION 1.  The Legislature finds and declares all of the following:

(a) Sharks, or elasmobranchs, are critical to the health of the ocean ecosystem.

(b) Sharks are particularly susceptible to decline due to overfishing because they are slow to reach reproductive maturity and birth small litters, and cannot rebuild their populations quickly once they are overfished.

(c) Sharks occupy the top of the marine food chain. Their decline is an urgent problem that upsets the balance of species in ocean ecosystems and negatively affects other fisheries. It constitutes a serious threat to the ocean ecosystem and biodiversity.

(d) The practice of shark finning, where a shark is caught, its fins cut off, and the carcass dumped back into the water, causes tens of millions of sharks to die each year. Sharks starve to death, may be slowly eaten by other fish, or drown because most sharks need to keep moving to force water through their gills for oxygen.

(e) Data from federal and international agencies show a decline in shark populations worldwide.

(f) California is a market for shark fin and this demand helps drive the practice of shark finning. The market also drives shark declines. By impacting the demand for shark fins, California can help ensure that sharks do not become extinct as a result of shark finning.

19

(g) Shark fin often contains high amounts of mercury, which has been proven dangerous to consumers' health.

SECTION 2.  Section 2021 is added to the Fish and Game Code, to read:

2021.  (a) As used in this section "shark fin" means the raw, dried, or otherwise processed detached fin, or the raw, dried, or otherwise processed detached tail, of an elasmobranch.

(b) Except as otherwise provided in subdivisions (c), (d), and (e), it shall be unlawful for any person to possess, sell, offer for sale, trade, or distribute a shark fin.

(c) Any person who holds a license or permit pursuant to Section 1002 may possess a shark fin or fins consistent with that license or permit.

(d) Any person who holds a license or permit issued by the department to take or land sharks for recreational or commercial purposes may possess a shark fin or fins consistent with that license or permit.

(e) Before January 1, 2013, any restaurant may possess, sell, offer for sale, trade, or distribute a shark fin possessed by that restaurant, as of January 1, 2012, that is prepared for consumption.

**A.B. 853, 2011 Leg. (Ca. 2011)**

An act to add Section 2021.5 to the Fish and Game Code, relating to sharks.

Sharks.

Existing law makes it unlawful to possess any bird, mammal, fish, reptile, or amphibian, or parts thereof, taken in violation of any of the provisions of the Fish and Game Code, or of any regulation made under it.

This bill would create exemptions from a shark fin prohibition proposed by AB 376. The bill would require the Ocean Protection Council to submit an annual report to the Legislature that lists any shark species that have been independently certified to meet internationally accepted standards for sustainable seafood, as provided. The provisions of the bill would become operative only if AB 376 is enacted and takes effect on or before January 1, 2012.

THE PEOPLE OF THE STATE OF CALIFORNIA DO ENACT AS FOLLOWS:

SECTION 1.    Section 2021.5 is added to the Fish and Game Code, to read:

2021.5. (a) Notwithstanding Section 2021, all of the following provisions apply:

(1) Any person who holds a license or permit issued by the department to take or land sharks for recreational or commercial purposes may possess, including for purposes of consumption or taxidermy, or may donate to a person licensed or permitted pursuant to Section 1002, a shark fin or fins consistent with that license or permit.

(2) Before July 1, 2013, any person may possess, sell, offer for sale, trade, or distribute a shark fin possessed by that person, as of January 1, 2012.

(3) Nothing in Section 2021 prohibits the sale or possession of a shark carcass, skin, or fin for taxidermy purposes pursuant to Section 3087.

(b) (1) The Ocean Protection Council shall submit an annual report to the Legislature that lists any shark species that have been independently certified to meet internationally accepted standards for sustainable seafood, as defined in Section 35550 of the Public Resources Code, and adopted by the Ocean Protection Council pursuant to Section 35617 of the Public Resources Code, including chain of custody standards.

(2) A report to be submitted pursuant to paragraph (1) shall be submitted in compliance with Section 9795 of the Government Code.

SECTION 2.    This act shall become operative only if Assembly Bill 376 of the 2011-12 Regular Session is enacted and takes effect on or before January 1, 2012.

**Provisions of Oregon State Statute**

**Or. Rev. Stat. § 509.160**

Prohibition on possession, sale, trade or distribution of shark fins; exceptions.

  (1) As used in this section:

(a) "Shark fin" means the raw or dried fin or tail of a shark.

(b) "Spiny dogfish" means a shark belonging to the family Squalidae in the order Squaliformes that has two spines, one anterior to each dorsal fin, and that does not have an anal fin.

(2) A person may not possess, sell or offer for sale, trade or distribute a shark fin in this state.

(3) This section does not apply to:

(a) A person who possesses, sells or offers for sale, trades or distributes a shark fin from a spiny dogfish that was legally taken or landed under rules adopted by the State Department of Fish and Wildlife and in accordance with federal regulations;

(b) A person who holds a license or permit issued by the State Department of Fish and Wildlife under the commercial fishing laws to take a shark and who possesses, sells or offers for sale, trades or distributes a shark fin consistent with the terms of that license or permit; and

(c) A fish processor who holds a license under the commercial fishing laws, who possesses and processes a shark obtained from a person described in paragraph (a) of this subsection and who sells or offers for sale, trades or distributes the shark fin consistent with the terms of the license of that fish processor.

22

**European Union Council Regulation**

In Pertinent Part:

**Council Regulation No. 1185/2003, 2003 O.J. (L 167) 1 (EC) (EU ban)**

Article 3

Prohibitions

1. It shall be prohibited to remove shark fins on board vessels, and to retain on board, tranship or land shark fins.

2. It shall be prohibited to purchase, offer for sale or sell shark fins which have been removed on board, retained on board, transhipped or landed in contravention of this Regulation.