13-15188

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

---

**CHINATOWN NEIGHBORHOOD ASSOCIATION; et al.,**

                              Plaintiffs-Appellants,

    **v.**

**EDMUND G. BROWN JR., Governor of the State of California, in his official capacity; et al.,**

                    Defendants-Appellees,

**THE HUMANE SOCIETY OF THE UNITED STATES; et al.,**

                              Intervenors-Defendants-
                                    Appellees.

---

On Appeal from the United States District Court
for the Northern District of California

No. 4:12-cv-03759 PJH
The Honorable Phyllis J. Hamilton, Judge

### ANSWERING BRIEF OF APPELLEES

KAMALA D. HARRIS
Attorney General of California
DOUGLAS J. WOODS
Senior Assistant Attorney General
TAMAR PACHTER
Supervising Deputy Attorney General
REI R. ONISHI
Deputy Attorney General

ALEXANDRA ROBERT GORDON
State Bar No. 207650
Deputy Attorney General
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA  94102-7004
  Telephone:  (415) 703-5509
  Fax:  (415) 703-5480
  Email:
  Alexandra.RobertGordon@doj.ca.gov
  *Attorneys for Defendants-Appellees*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................ 1

JURISDICTIONAL STATEMENT ............................................. 2

STATEMENT OF ISSUES ......................................................... 2

STATEMENT OF THE CASE ..................................................... 3

STATEMENT OF FACTS ........................................................... 7

    I.    The Shark Fin Prohibition ............................................. 7

        A.    Legislative Findings ........................................... 7

        B.    The Statutes ....................................................... 8

SUMMARY OF ARGUMENT .................................................... 9

ARGUMENT ............................................................................. 11

    I.    Standard of Review ..................................................... 11

    II.    The District Court Properly Determined That Plaintiffs
        Failed To Demonstrate Any Likelihood of Success on the
        Merits ........................................................................ 12

        A.    The Shark Fin Prohibition Does Not Violate the
            Equal Protection Clause ................................... 12

            1.    The Shark Fin Prohibition is facially neutral
                and plaintiffs have not demonstrated
                discriminatory purpose ...................... 14

            2.    The Shark Fin Prohibition is rationally
                related to a legitimate governmental
                purpose ................................................ 21

        B.    The Shark Fin Prohibition Does Not Violate the
            Commerce Clause ............................................. 26

            1.    The Shark Fin Prohibition does not
                 discriminate against interstate commerce .......... 28

            2.    The Shark Fin Prohibition does not regulate
                extraterritorially ................................. 29

i

## TABLE OF CONTENTS
### (continued)

Page

3.  *Pike* balancing is not required, but even if it were, it weighs in favor of validity.................... 31

a.  The Shark Fin Prohibition does not place a substantial burden on interstate commerce. ............................... 32

b.  Because there is no burden on interstate commerce, *Pike* balancing is not required. ............................. 36

c.  Even under *Pike* balancing, the Shark Fin Prohibition serves a legitimate local purpose and its benefits outweigh any burden on interstate commerce. ............................... 37

C.  The Shark Fin Prohibition Is Not Preempted by Federal Law ................................ 43

D.  Plaintiffs' 42 U.S.C. Section 1983 Claim Fails............ 49

III.  Because Plaintiffs Failed to Demonstrate Any Likelihood of Success on the Merits, the District Court Properly Denied the Motion for Preliminary Injunction ....................... 50

A.  The District Court Employed the Correct Legal Standard ...................... 50

B.  Plaintiffs Cannot Meet Their Burden to Demonstrate Irreparable Harm, or Demonstrate That the Balance of Harms and the Public Interest Weigh in Favor of an Injunction................................... 52

CONCLUSION........................................... 55

STATEMENT OF RELATED CASES....................................... 56

APPENDIX................................................ 60

ii

# TABLE OF AUTHORITIES

**Page**

CASES

*A&M Records, Inc. v. Napster, Inc.*
239 F.3d 1004 (9th Cir. 2001) ...................................................... 11, 52

*Alliance for the Wild Rockies v. Cottrell*
632 F.3d 1131 (9th Cir. 2011) ..................................................... 50, 51

*Am. Trucking Ass'ns v. City of Los Angeles*
559 F.3d 1046 (9th Cir. 2009) .......................................................... 11

*Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*
476 U.S. 573 (1986).......................................................... 27, 28, 31

*C & A Carbone, Inc. v. Town of Clarkstown, N.Y.*
511 U.S. 383 (1994)................................................................. 26, 34

*Chem. Specialties Mfrs. Ass'n v. Allenby*
958 F.2d 941 (9th Cir. 1992) ........................................................... 45

*Church of Lukumi Babalu Aye, Inc. v. Hialeah*
508 U.S. 520 (1993)................................................................. 17, 22

*City of Charleston, S.C. v. A Fisherman's Best, Inc.*
310 F.3d 155 (4th Cir. 2002) ........................................................... 47

*City of Cleburne v. Cleburne Living Ctr.*
473 U.S. 432 (1985).......................................................................... 12

*Clark v. Jeter*
486 U.S. 456 (1988).......................................................................... 13

*Cramer v. Brown*
No. CV-3130-JFW (C.D. Cal. September 12, 2012) ........................ 34

*CTS Corp. v. Dynamics Corp. of America*
481 U.S. 69, 92 (1987) ............................................................... 38, 42

iii

**TABLE OF AUTHORITIES**
(continued)

**Page**

*Dandridge v. Williams*
397 U.S. 471 (1970)................................................................ 25

*Darensburg v. Metro. Transp. Comm'n*
636 F.3d 511 (9th Cir. 2011) ...................................... 15, 18

*DISH Network Corp. v. FCC*
653 F.3d 771 (9th Cir. 2011) ............................................ 51

*Exxon Corp. v. Governor of Md.*
437 U.S. 117 (1978)................................................................ 34

*FCC v. Beach Communications Inc.*
508 U.S. 307 (1993)................................................................ 24

*Fed. Trade Comm'n v. Affordable Media, LLC*
179 F.3d 1228 (9th Cir. 1999) ........................................ 54

*Fla. Lime & Avocado Growers, Inc. v. Paul*
373 U.S. 132 (1963)........................................ 44, 45, 46

*Freedom Holdings Inc. v. Spitzer*
357 F.3d 205 (2d Cir. 2004) ............................................ 30

*Freeman v. Allstate Life Ins. Co.*
253 F.3d 533 (9th Cir. 2001) ............................................ 11

*General Motors Corp. v. Tracy*
519 U.S. 278 (1997)................................................................ 33

*Gerling Global Reinsurance Corp. of Am. v. Low*
240 F.3d 739 (9th Cir. 2001) ............................................ 30

*Goldie's Bookstore, Inc. v. Superior Court of State of Cal.*
739 F.2d 466 (9th Cir. 1984) ............................................ 53

iv

# TABLE OF AUTHORITIES
## (continued)

Page

*Golinski v. U.S. Office of Pers. Mgt*
    824 F. Supp. 2d 968 (N.D. Cal. 2012)................................................ 16

*Great Atl. & Pac. Tea Co. v. Cottrell*
    424 U.S. 366 (1976)............................................................................. 51

*Healy v. Beer Inst.*
    491 U.S. 324 (1989)............................................................. 26, 29, 30

*Heller v. Doe*
    509 U.S. 312 (1993)....................................................................... 21, 23

*Hispanic Taco Vendors of Washington v. City of Pasco*
    994 F.2d 676 (9th Cir. 1993) ................................................ 18, 20, 26

*Hunter v. Underwood*
    471 U.S. 222 (1985).............................................................................. 20

*Husain v. Olympic Airways*
    316 F.3d 829 (9th Cir. 2002) ............................................................ 11

*Illinois Rest. Ass'n v. City of Chicago*
    492 F. Supp. 2d 891 (N.D. Ill. 2007)......................................... 31, 37

*Jones v. Rath Packing Co.*
    430 U.S. 519 (1977)............................................................................. 44

*Lee v. City of Los Angeles*
    250 F.3d 668 (9th Cir. 2001) ............................................................ 20

*Maine v. Taylor*
    477 U.S. 131 (1986)....................................................................... 27, 43

*Maryland v. King*
    133 S. Ct. 1 (2012)............................................................................... 53

# TABLE OF AUTHORITIES
## (continued)

Page

*Massachusetts v. EPA*
   549 U.S. 497 (2007)...................................................................... 40

*Merrifield v. Lockyer*
   547 F.3d 978 (9th Cir. 2008) .................................................... 22, 38

*Mourning v. Family Publ'n Serv., Inc.*
   411 U.S. 356 (1973)...................................................................... 24

*Nat'l Ass'n of Optometrists & Opticians v. Harris*
   682 F.3d 1144 (9th Cir. 2012) ............................................... passim

*Nat'l Elec. Mfrs. Ass'n v. Sorrell*
   272 F.3d 104 (2d Cir. 2001) ......................................................... 36

*Nat'l Paint Coatings Ass'n v. City of Chicago*
   45 F.3d 1124 (7th Cir. 1995) ....................................................... 36

*New Orleans v. Dukes*
   427 U.S. 297 (1976) ......................................................... 24, 41, 42

*Oregon Waste Sys., Inc. v. Dep't of Envtl. Quality*
   511 U.S. 93 (1994)........................................................................ 28

*Pac. Gas & Electric Co. v. State Energy Res. Cons. & Dev. Comm.*
   461 U.S. 190 (1983)...................................................................... 45

*Pac. Merchant Shipping Ass'n v. Goldstene*
   639 F.3d 1154 (9th Cir. 2011) ..................................................... 40

*Pacific Nw. Venison Producers v. Smitch*
   20 F.3d 1008 (9th Cir. 1994) ................................................. passim

*People v. Sakai*
   56 Cal. App. 3d 531 (1970) .......................................................... 40

## TABLE OF AUTHORITIES
### (continued)

Page

*People v. Weeren*
  26 Cal. 3d 654 (1980) ................................................................ 34, 46

*Pers. Adm'r of Mass. v. Feeney*
  442 U.S. 256 (1979)................................................................... 16, 19

*Peterson v. Highland Music, Inc.*
  140 F.3d 1313 (9th Cir. 1998) .................................................. 44, 49

*Pharm. Research and Mfrs. of America v. Walsh*
  538 U.S. 644 (2003)......................................................................... 45

*Pharm. Research v. Concannon*
  249 F.3d 66 (1st Cir. 2001).............................................................. 31

*Pike v. Bruce Church, Inc.*
  397 U.S. 137 (1970)................................................................... passim

*Pimentel v. Dreyfus*
  670 F.3d 1096 (9th Cir. 2012) ......................................................... 51

*Raymond Motor Transp., Inc. v. Rice*
  424 U.S. 429 (1978)......................................................................... 35

*Retail Clerks Int'l Ass'n v. Schermerhorn*
  375 U.S. 96 (1963).......................................................................... 45

*Reynolds v. Buchholzer*
  87 F.3d 827 (6th Cir. 1996) ............................................................. 28

*Rice v. Santa Fe Elevator Corp.*
  331 U.S. 218 (1947)................................................................... 44, 45

*Romer v. Evans*
  517 U.S. 620 (1996)................................................................... 12, 13

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Sampson v. Murray*
415 U.S. 61 (1974).................................................................... 52

*Save Our Sonoran, Inc. v. Flowers*
408 F.3d 1113 (9th Cir. 2005) ............................................... 54

*Schweiker v. Wilson*
450 U.S. 221 (1981)................................................................. 25

*St. Francis College v. Al–Khazraji*
481 U.S. 604 (1987)................................................................. 14

*Ting v. AT&T*
319 F.3d 1126 (9th Cir. 2003) ......................................... 46, 49

*UFO Chuting of Haw., Inc. v. Smith*
508 F.3d 1189 (9th Cir. 2007) ......................................... 37, 41

*United States v. Approximately 64,695 Pounds of Shark Fins*
520 F.3d 976 (9th Cir. 2008) ................................................. 48

*United States v. Cameron*
888 F.2d 1279 (9th Cir. 1989) ............................................... 44

*United States v. Carolene Prods. Co.*
304 U.S. 144 (1938)................................................................. 21

*United States v. McDougall*
25 F. Supp. 2d 85 (N.D.N.Y. 1998) ..................................... 43

*United States v. Nuesca*
945 F.2d 254 (9th Cir. 1991) ................................................. 15

*United States v. Stevens*
130 S. Ct. 1577 (2010)............................................................ 22

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Village of Arlington Heights v. Metro. Hous. Dev. Corp.*
429 U.S. 252 (1977)...................................................................... passim

*Washington v. Davis*
426 U.S. 229 (1976)........................................................... 14, 16, 20

*West v. Atkins*
487 U.S. 42 (1988)........................................................................ 50

*Williamson v. Mazda*
131 S. Ct. 1131 (2011)................................................................. 48

*Winter v. Natural Res. Def. Council, Inc.*
555 U.S. 7 (2008)........................................................ 26, 50, 51, 52

*Witt v. Dep't of Air Force*
527 F.3d 806 (9th Cir. 2008) ........................................................ 22

*Yick Wo v. Hopkins*
118 U.S. 356 (1886).................................................................... 17

STATUTES

2011 California Stat., ch. 524
§ 1 ................................................................................ passim

California Fish and Game Code
§ 1002 ............................................................................... 8
§ 2021 ......................................................................... passim
§ 2021.5 ...................................................................... passim

## TABLE OF AUTHORITIES
### (continued)

**Page**

Code of Federal Regulations
    § 1203 ............................................................................ 47
    § 1204 ............................................................................ 48
    § 600 .............................................................................. 47
    § 600.1201 ................................................................ 34, 46
    § 600.1203 ...................................................................... 48
    § 600.1204 ...................................................................... 47

United States Code, Title 16
    §§ 1801-1882 ........................................................... 38, 47
    §§ 1801-1884 ................................................................. 43
    § 1802 ............................................................................ 46
    § 1811 ............................................................................ 46
    § 1856 ...................................................................... 34, 46
    § 1857 ............................................................................ 48
    § 3372 ............................................................................ 43

United States Code, Title 42
    § 1983 ..................................................................... passim

CONSTITUTIONAL PROVISIONS

United States Constitution Article I
    § 8 ................................................................................. 26

United States Constitution
    Fourteenth Amendment .................................................. 12

## INTRODUCTION

California Fish and Game Code sections 2021 and 2021.5 (the "Shark Fin Prohibition") outlaw the possession, sale, and trade of shark fins in California. Plaintiffs attempted to enjoin enforcement of this important legislation, and the district court properly denied their motion for preliminary injunction.

By virtually eliminating the California market for shark fin, California intended to promote shark conservation, the health of the marine ecosystem, and the public health and safety. The Shark Fin Prohibition is based on evidence and legislative findings that the demand for shark fin causes the finning and death of tens of millions of sharks every year, and that the resultant decline of shark populations has devastating ecological consequences. It is also based on evidence and legislative findings that shark fin contains high levels of mercury and is therefore unsafe to eat.

Plaintiffs allege that the Shark Fin Prohibition violates the Equal Protection, Commerce, and Supremacy Clauses of the U.S. Constitution because it "targets" the cultural practices of a subset of Chinese Americans, and because it makes it more difficult for merchants who wish to continue engaging in the lucrative shark fin trade to do so. These claims are meritless. The Shark Fin Prohibition does not implicate the Equal

1

Protection, Commerce, or Supremacy Clauses, let alone violate them.  It is facially neutral, does not discriminate on the basis of any protected classification, or against interstate commerce, does not regulate extraterritorially, does not conflict with federal law, and is rationally related to a legitimate governmental interest in protecting the public health and safety and the environment.  The district court thus properly determined that plaintiffs cannot prevail on the merits of their claims.

## JURISDICTIONAL STATEMENT

Defendants agree with plaintiffs' Jurisdictional Statement.

## STATEMENT OF ISSUES

1.      Did the district court properly determine that plaintiffs have no likelihood of success on the merits of their claim that the Shark Fin Prohibition facially violates the Equal Protection Clause?

2.      Did the district court properly determine that plaintiffs have no likelihood of success on the merits of their claim that the Shark Fin Prohibition facially violates the dormant Commerce Clause?

3.      Did the district court properly determine that plaintiffs have no likelihood of success on the merits of their claim that the Shark Fin Prohibition facially violates the Supremacy Clause?

2

4.   Did the district court properly determine that plaintiffs have no likelihood of success on the merits of their 42 U.S.C. section 1983 claim?

5.   Did the district court properly determine that because plaintiffs had not established any likelihood of success on the merits of their claims, or any of the remaining preliminary injunction factors, their motion for preliminary injunction must be denied?

## STATEMENT OF THE CASE

Shark finning is a brutal practice: a shark's fin is cut off and the shark is then thrown back in the water to die, often by drowning.  Every year, tens of millions of sharks die from the practice of finning, and sharks are suffering from severe population declines.  2011 Cal. Stat., ch. 524 (AB 376), § 1(d).  The decline of sharks, in turn, poses a serious threat to the ocean ecosystem and biodiversity, and causes harmful cascade effects, such as "red tides" that threaten the health and the economies of coastal regions worldwide.  Joint Supplemental Excerpts of Record (SER) 39, 51-52, 208, 235, 243.

In order to address these problems and promote the conservation of sharks and protect the public health by, inter alia, eliminating the California market for fins, California enacted the Shark Fin Prohibition (Assembly Bills 376 and 853, codified as Fish and Game Code sections 2021 and

2021.5).  Prior to the enactment of the Shark Fin Prohibition, California

accounted for approximately 87 percent of all U.S. shark fin imports and 96

percent of all exports.  *See* SER 388-390.  The Shark Fin Prohibition makes

it illegal, subject to a few enumerated exceptions, to possess, sell, or trade

shark fins in California.

Plaintiffs, a nonprofit corporation/voluntary association and a political

action committee, are comprised of members who are "people of Chinese

origin who are engaged in cultural practices involving the use of shark fins

and in business practices involving the buying and selling of shark fins in

interstate commerce."  Appellants' Excerpts of Record (ER) 245.  On

July 18, 2012, plaintiffs sued defendant state officials[1] to enjoin the Shark

Fin Prohibition.  The Complaint alleges that the Shark Fin Prohibition

violates the Equal Protection Clause, the Commerce Clause, and the

Supremacy Clause of the U.S. Constitution, as well as 42 U.S.C. section

1983.  ER 243-56.

On August 9, 2012, plaintiffs moved the district court to preliminarily

enjoin the enforcement of the Shark Fin Prohibition.  By order dated January

---

[1] Defendants in this action include Governor Edmund G. Brown Jr., in his official capacity; Attorney General Kamala D. Harris, in her official capacity; and Charlton H. Bonham, Director of the California Department of Fish and Wildlife (formerly Fish and Game), in his official capacity.

4

2, 2013, the district court denied plaintiffs' motion.  ER 1-15.  The court held that plaintiffs had not met their burden to show either a likelihood of success on the merits or "serious questions" on their claims.  ER 9.

The district court first rejected plaintiffs' equal protection arguments, finding no evidence to support plaintiffs' contention that the Legislature had enacted the Shark Fin Prohibition for the purpose of discriminating against Chinese Americans.  ER 9, 11.  The district court found that plaintiffs had provided only "some anecdotal evidence that is unconnected to the reasons the Legislature passed the law" and had made "no showing that any member of the Legislature intended to 'target' Chinese Americans."  ER 9.  The court stated that merely because the Shark Fin Prohibition might "end up having a disparate impact on a group of Chinese-Americans – those who want to consume shark fin soup, or those who want to make a living selling shark fins to others who want to make or consume shark fin soup" – did not make the law invalid under the Equal Protection Clause.  ER 10.  In addition, the court found unpersuasive plaintiffs' argument that because federal and state laws already ban finning in United States waters, the Shark Fin Prohibition was not actually designed to protect sharks, but rather to discriminate against people of Chinese national origin.  The court noted that, unlike laws banning the practice of finning itself, the Shark Fin Prohibition aimed to regulate

5

local market conditions for shark fins, and thereby reduce the demand for shark fin that drives finning.  ER 10.  The district court concluded that because the Shark Fin Prohibition was facially neutral, not based on a discriminatory purpose, and rationally related to legitimate government interests, plaintiffs could not succeed on their equal protection claim.  ER 11.

The court next ruled that plaintiffs had failed to establish any likelihood of success as to their claims under the dormant Commerce Clause.  The court noted that the Shark Fin Prohibition is facially neutral, does not discriminate in favor of in-state interests, and does not regulate extraterritorially.  ER 12.  Accordingly, in order to prevail on their dormant Commerce Clause claim, plaintiffs would have to establish that any incidental burdens caused by the statute were clearly excessive relative to its putative benefits.  ER 12 (citing *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)).  The court determined that plaintiffs had failed to identify "a cognizable burden on interstate commerce," let alone a burden that was clearly excessive relative to the legitimate interests served by the Shark Fin Prohibition.  ER 12.

Although plaintiffs did not argue their Supremacy Clause and section 1983 claims, the district court found both to be meritless.  ER 11-13.  With respect to preemption, the district court held that federal law evinced no

6

congressional intent "to preempt state regulation of or relating to shark finning," and that plaintiffs had not established that it would be impossible to comply with both federal law and the Shark Fin Prohibition.  ER 13.  As to plaintiffs' section 1983 claim, the court found that they had failed to show any discriminatory conduct by any government official, and thus that they were not likely to succeed.  ER 13.

Finally, turning to the other preliminary injunction factors, the court ruled that because plaintiffs had failed to establish any likelihood of success or serious questions on their constitutional claims, they could not establish that they were likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tipped in their favor, or that an injunction was in the public interest.  ER 13-14.

The plaintiffs timely appealed.  ER 16-17.

## STATEMENT OF FACTS

### I.    THE SHARK FIN PROHIBITION

#### A.    Legislative Findings

The California Legislature has determined that the practice of shark finning causes tens of millions of sharks to die each year.  2011 Cal. Stat., ch. 524 (AB 376), § 1(d).  After being finned, sharks starve to death, are slowly eaten by other fish, or drown.  *Id.*

7

Sharks are particularly susceptible to decline due to overfishing because they are slow to reach reproductive maturity and birth small litters and thus cannot replenish their numbers quickly. *Id.* § 1(b). Sharks occupy the top of the marine food chain, and their decline severely affects the balance of species in the marine ecosystem and marine biodiversity. *Id.* § 1(c). Studies by federal and international agencies indicate a decline in shark populations worldwide. *Id.* § 1(e).

The Legislature found that California is a market for shark fin and "this demand helps drive the practice of finning. The market also drives shark declines." *Id.* § 1(f). Thus, by "impacting the demand for shark fins, California can help ensure that sharks do not become extinct as a result of shark finning." *Id.*

The Legislature also found that shark fin often contains high amounts of mercury, which has been proven dangerous to people's health. *Id*. § 1(g).

## B.   The Statutes

Fish and Game Code section 2021 makes it "unlawful for any person to possess, sell, offer for trade, trade, or distribute a shark fin." Cal. Fish & Game Code § 2021(b). Section 2021 enumerates three exceptions to this prohibition: (1) any person who holds a license or permit pursuant to Fish and Game Code section 1002 for scientific or educational purposes may

8

possess a shark fin or fins consistent with that license or permit; (2) any
person who holds a license or permit issued by the department to take or
land sharks for recreational or commercial purposes may possess a shark fin
or fins consistent with that license or permit; and (3) before January 1, 2013,
any restaurant may possess, sell, offer for sale, trade, or distribute a shark fin
possessed by that restaurant, as of January 1, 2012, that is prepared for
consumption. *Id.* § 2021(c)-(e).

Section 2021.5 includes additional exemptions, and delays the
implementation of a portion of the Shark Fin Prohibition until July 2013.
Specifically, section 2021.5 provides that "[b]efore July 1, 2013, any person
may possess, sell, offer for sale, trade, or distribute a shark fin possessed by
that person, as of January 1, 2012." *Id*. § 2021.5(a)(3). The Shark Fin
Prohibition was signed into law on October 7, 2011, and became effective
on January 1, 2012.

## SUMMARY OF ARGUMENT

The district court properly determined that plaintiffs could not meet
their burden to show a likelihood of success or a serious question on any of
their constitutional claims. Because the Shark Fin Prohibition is a facially
neutral law that does not, in purpose or effect, discriminate on the basis of
race, natural origin, or any other protected classification, and is rationally

9

related to legitimate state interests, it does not violate the Equal Protection Clause.  Similarly, plaintiffs' dormant Commerce Clause claims fail as the Shark Fin Prohibition neither discriminates against interstate commerce nor regulates extraterritorially and plaintiffs have failed to identify any cognizable burden on interstate commerce, let alone one that would clearly exceed the statutes' putative benefits.  Plaintiffs' Supremacy Clause claims are waived and are entirely baseless.  The Shark Fin Prohibition supplements federal legislation by regulating the market for shark fin, not federal waters or the practice of shark finning itself.  Moreover, Congress explicitly authorized state regulation of shark finning and plaintiffs have not demonstrated that it will be impossible to comply with both federal law and the Shark Fin Prohibition.

Because plaintiffs have no likelihood of success on the merits of any of their claims, and because in the absence of constitutional injury they cannot meet the standard required for a preliminary injunction, the district court properly denied the motion.  Thus, the order of the district court should be affirmed.

# ARGUMENT

## I.   STANDARD OF REVIEW

This Court reviews the grant or denial of a preliminary injunction for abuse of discretion. *Am. Trucking Ass'ns v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009).  On review it must be determined "whether the court employed the appropriate legal standards governing the issuance of a preliminary injunction and whether the district court correctly apprehended the law with respect to the underlying issues in the case." *A&M Records, Inc. v. Napster, Inc*., 239 F.3d 1004, 1013 (9th Cir. 2001).  "As long as the district court got the law right, it will not be reversed simply because the appellate court would have arrived at a different result if it had applied the law to the facts of the case." *Id.* (quoting *Gregorio T. v. Wilson*, 59 F.3d 1002, 1004 (9th Cir. 1995)) (internal quotation marks omitted).  The district court's findings of fact are reviewed for clear error. *Husain v. Olympic Airways*, 316 F.3d 829, 835 (9th Cir. 2002).  A district court's conclusions of law are reviewed de novo. *Freeman v. Allstate Life Ins. Co.*, 253 F.3d 533, 536 (9th Cir. 2001).

II.   **THE DISTRICT COURT PROPERLY DETERMINED THAT PLAINTIFFS FAILED TO DEMONSTRATE ANY LIKELIHOOD OF SUCCESS ON THE MERITS**

### A.   The Shark Fin Prohibition Does Not Violate the Equal Protection Clause

The "Equal Protection Clause of the Fourteenth Amendment commands that no State shall deny to any person within its jurisdiction the equal protection of the laws, which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (internal citations omitted). Legislative provisions that arbitrarily or irrationally create discrete classes cannot withstand constitutional scrutiny under the Equal Protection Clause. *Romer v. Evans*, 517 U.S. 620, 623 (1996). However, courts must balance this principle with the "practical necessity that most legislation classifies for one purpose or another, with resulting disadvantage to various groups or persons." *Id*. at 631 (citations omitted). In an attempt to reconcile the promise of equal protection with the reality of lawmaking, courts apply the most searching constitutional scrutiny to those laws that burden a fundamental right or target a suspect class, such as those based on race, national origin, or religion. *Id.* With respect to protected classifications, the government is required to demonstrate that the classification is substantially

12

related to an important governmental objective. *See Clark v. Jeter*, 486 U.S. 456, 461 (1988). Laws that do not burden a protected class or infringe on a constitutionally protected fundamental right are subject to rational basis review. *Romer*, 517 U.S. at 631.

Plaintiffs insist that because the Shark Fin Prohibition "targets" the cultural practices of some Chinese Americans, it is discriminatory, subject to strict scrutiny, and invalid under the Equal Protection Clause. *See* Opening Brief of Appellant (AOB) 23-38. However, the Shark Fin Prohibition is facially neutral and plaintiffs have failed to prove that its purpose was "to discriminate against an identifiable class of persons on the basis of a protected classification." ER 9 (citing *Washington v. Davis*, 426 U.S. 229, 239 (1976)). Therefore, strict scrutiny does not apply and the Shark Fin Prohibition is subject to rational basis review. Because the Shark Fin Prohibition is rationally related to the State's legitimate interests in conservation and in protecting the environment and the public health and safety, it is constitutional. Accordingly, the district court properly determined that plaintiffs had failed to establish a likelihood of success or serious question on their Equal Protection Clause claim. ER 9-11.

### 1. The Shark Fin Prohibition is facially neutral and plaintiffs have not demonstrated discriminatory purpose

Plaintiffs do not dispute that the Shark Fin Prohibition is facially neutral: the statute uniformly prohibits all persons from possessing, selling, or trading shark fins in California. *See* Cal. Fish & Game Code § 2021. Thus, in order for strict scrutiny to apply, plaintiffs must prove that the intent and purpose of the law was to discriminate against an identifiable class of persons. *See Washington v. Davis*, 426 U.S. at 239; *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265-66 (1977). Plaintiffs cannot make this showing.

As a threshold matter, plaintiffs have not established that any distinction drawn by the Shark Fin Prohibition is "on the basis" of race, national origin, or any other protected classification. Plaintiffs assert baldly that the Shark Fin Prohibition discriminates based on national origin, AOB 23, but they have not demonstrated that the use of shark fin, (which is a luxury item that very few people can afford, SER 197, 200, 202, 213, 227), is necessarily linked to Chinese ancestry or is an "ethnic characteristic." *See St. Francis College v. Al–Khazraji*, 481 U.S. 604, 613 (1987). Indeed, the record shows that the vast majority of Chinese Americans do not use shark

fins.  *See, e.g.*, ER 179-182,185-199; SER 356-365.[2]  Perhaps because the

use of shark fin does not correlate with either race or national origin,

plaintiffs repeatedly characterize it as a Chinese cultural tradition, custom, or

practice.  *See* AOB 25-27, 29, 31 (stating, e.g., "targeting the market for

shark fin is synonymous with targeting a Chinese cultural tradition").

However, even assuming that this characterization is accurate, classifications

based on cultural practice, unlike those based on race or national origin, do

not receive heightened constitutional protection.  *See United States v.*

*Nuesca*, 945 F.2d 254, 257-58 (9th Cir. 1991) (holding that "culture" is not a

suspect classification and thus that strict scrutiny analysis did not apply to

equal protection challenge to Endangered Species Act).  The class consisting

of the subset of Chinese-Americans who wish to engage in the practice of

consuming and trading in shark fins, even for cultural reasons, is not a

---

[2] Plaintiffs' own evidence suggests that a mere three percent of Chinese Americans eat shark fins regularly.  *See* ER 185-197; *see also* SER 213-214.  While shark fin may be an "undeniable tradition" in Chinese culture, AOB 28, its use is not uniformly, let alone immutably, tied to being Chinese.  Although plaintiffs contend that evidence regarding the lack of uniformity in the Chinese-American community is "irrelevant," AOB 28, it bears on both the question of whether the Shark Fin Prohibition discriminates on the basis of a protected classification and whether the level of disparate impact caused by the statute raises an inference of discriminatory purpose.  *See Arlington Heights*, 429 U.S at 266-68; *Darensburg v. Metro. Transp. Comm'n*, 636 F.3d 511, 522-23 (9th Cir. 2011).

15

suspect or quasi-suspect class entitled to heightened scrutiny. *See, e.g.*, *Golinski v. U.S. Office of Pers. Mgt*, 824 F. Supp. 2d 968, 982-83 (N.D. Cal. 2012) (setting forth factors guiding determination of classifications and corresponding level of scrutiny).

Moreover, plaintiffs have not shown that the Shark Fin Prohibition was intended to discriminate against Chinese Americans. Evidence that the Shark Fin Prohibition disproportionately affects some Chinese Americans is insufficient. Discriminatory purpose requires more than a bare showing that a law has a disparate impact on an identifiable group. *Arlington Heights*, 429 U.S. at 264-65. Plaintiffs must show that the law was enacted "'because of,' not merely 'in spite of'" its disparate impact on that group. *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 272 (1979). The Supreme Court has made clear that:

> a law, neutral on its face and serving ends otherwise within the power of government to pursue, is [not] invalid under the Equal Protection Clause simply because it may affect a greater proportion of one race than of another. Disproportionate impact is not irrelevant, but it is not the sole touchstone of an invidious racial discrimination forbidden by the Constitution.

*Washington v. Davis*, 426 U.S. at 242.

16

This is not, as plaintiffs suggest, the rare case where they are excused from providing proof of discriminatory purpose because a "clear pattern unexplainable on grounds other than race [or other protected status], emerges from the effect of the state action." *Arlington Heights*, 429 U.S at 266. Accordingly, plaintiffs' reliance on *Yick Wo v. Hopkins*, 118 U.S. 356 (1886) is misplaced. In *Yick Wo*, the city of San Francisco passed an ordinance that made it unlawful for any person to maintain a laundry in wooden structures and then issued variances to almost every white applicant while denying variances to every Chinese applicant. *Id.* at 368, 373. The Supreme Court held that such a stark pattern of disparate enforcement established a denial of equal protection. *Id.* at 374. The Supreme Court subsequently stated that "such cases are rare" and that "[a]bsent a pattern as stark as that in . . . *Yick Wo*, impact alone is not determinative, and the Court must look to other evidence." *Arlington Heights*, 429 U.S at 266.[3] Here, there is no allegation that the Shark Fin Prohibition is being enforced in a

---

[3] *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520 (1993), on which plaintiffs rely, is also inapposite. In *Lukumi*, the ordinance regulating animal slaughter was not generally applicable because it applied only to animal sacrifice and not to hunting, or other secular practices to which the alleged concerns of animal cruelty and public health applied in equal force. *See* 508 U.S. at 542-46. In contrast to the ordinance in *Lukumi*, the Shark Fin Prohibition applies uniformly and does not selectively burden a particular group's ability to exercise a constitutionally protected right.

17

discriminatory manner. Accordingly, the impact of the Shark Fin

Prohibition does not support a finding of intentional discrimination. *See*

*Hispanic Taco Vendors of Washington v. City of Pasco*, 994 F.2d 676, 680

(9th Cir. 1993).

Plaintiffs also fail to provide any other meaningful evidence to support

their claim that the Shark Fin Prohibition was motivated by discrimination.

*See Arlington Heights*, 429 U.S at 267-68 (setting forth permissible evidence

of discriminatory intent, such as a law's historical background or

irregularities in its passage); *see also Darensburg*, 636 F.3d at 522-23.

Despite plaintiffs' repeated insistence that there "is no other explanation" or

reason for banning shark fins besides invidious discrimination, *see, e.g.*,

AOB 31, in fact there are many sound reasons to close the California market

for shark fins, all which are well documented. Specifically, sharks occupy

the top of the marine food chain and their decline constitutes a serious threat

to the ocean ecosystem and biodiversity; the practice of shark finning causes

tens of millions of sharks to die each year; and by eliminating an important

end market, and thereby impacting the demand for shark fins, California can

help ensure that sharks do not become extinct. *See* 2011 Cal. Stat., ch. 524

(AB 376), § 1. Against this clear expression of the Legislature's intent to

promote shark conservation and consequently to protect the health of our

oceans, plaintiffs offer only a few out-of-context statements by

Assemblyman Fong, Assemblyman Huffman, the Executive Director of

WildAid, and an unidentified "prominent San Francisco chef." *See* AOB

15-16; ER 138-39, 149.[4]

None of this evidence indicates any invidious intent. Assemblyman

Fong's statement, which includes a comparison to the practice of foot

binding, appears to reflect a belief that where cultural practices are injurious

they should and often do evolve. *See* ER 180, 184. Assemblyman

Huffman's remark that the Shark Fin Prohibition, in order "[t]o save [sharks]

from extinction, targets the demand for these shark fins by banning their sale

and possession here in California" is not an expression of animus. *See* ER

203. Rather, the statement simply describes the purpose of the Shark Fin

Prohibition, namely, to lessen the demand that drives finning by eliminating

---

[4] Before the district court, plaintiffs also submitted declarations from
their members opining that the Shark Fin Prohibition is "racist" and
discriminatory. *See, e.g.*, ER 216-17. Defendants objected to these
statements as they lack foundation and are improper legal conclusions. *See*
ER 113 (citing Fed. R. Evid. 402, 602, 701). On reply, plaintiffs also
submitted the Declaration of Senator Leland Yee. *See* ER 55-56.
Defendants objected to this declaration because, among other reasons, it was
improper new evidence first submitted in reply. *See* SER 32-35. The
district court does not appear to have considered this new evidence, though
even if it had done so, Senator Yee's declaration, like the rest of plaintiffs'
evidence, does not establish discriminatory purpose. *See Feeney*, 442 U.S.
at 279.

an important end market for shark fins. *See* ER 203; 2011 Cal. Stat., ch. 524 (AB 376), § 1.

Regardless of how one interprets these remarks, the "legitimate purposes" of the Shark Fin Prohibition are "not open to impeachment by evidence that [a legislator was] actually motivated by racial considerations." *Washington v. Davis*, 426 U.S. at 243 (citation omitted); *see also Hispanic Taco Vendors*, 994 F.2d at 680. Because plaintiffs failed to prove that the Shark Fin Prohibition was motivated by a discriminatory purpose,[5] the district court correctly concluded that rational basis rather than strict scrutiny is the applicable equal protection analysis in this case. *See Lee v. City of Los Angeles*, 250 F.3d 668, 686-87 (9th Cir. 2001).

---

[5] Accordingly, plaintiffs' subsidiary argument that the district court failed to recognize that where there is a discriminatory purpose, the existence of legitimate motives do not "nullify a constitutional violation" also fails. AOB 32-33. Even assuming that the district court did fail to appreciate this principle, unlike in the cases cited by plaintiffs, there is no "proof that a discriminatory purpose [was] a motivating factor" in enacting the Shark Fin Prohibition. *Arlington Heights*, 429 U.S. at 265-66; *see also Hunter v. Underwood*, 471 U.S. 222, 232 (1985) ("an additional purpose to discriminate against poor whites would not render nugatory the purpose to discriminate against all blacks, and it is beyond peradventure that the latter was a "but-for" motivation for the enactment of § 182").

20

### 2. The Shark Fin Prohibition is rationally related to a legitimate governmental purpose

Challenged legislation survives rational basis review as long as the legislature acts in pursuit of a permissible government interest and the law bears a rational relationship to that interest. *Heller v. Doe*, 509 U.S. 312, 319 (1993). When legislative judgment is called into question, the decision of the legislature must be upheld if "any state of facts either known or which could reasonably be assumed affords support for it." *United States v. Carolene Prods. Co.*, 304 U.S. 144, 154 (1938). The measure at issue "is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data." *Heller*, 509 U.S. at 320 (internal quotation marks omitted). Under rational basis review, a law is presumed constitutional and "[t]he burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it." *Id.* (internal quotation marks omitted). Further, a legislature's rationale may pass rational basis review "even when there is an imperfect fit between means and ends." *Id.* at 321. In sum, the measure need only have "arguable" assumptions underlying its "plausible rationales" to survive constitutional challenge. *Id.* at 333.

The Shark Fin Prohibition satisfies rational basis review.[6]  The protection of public health, wildlife, and the ecosystem are legitimate state interests.  *Merrifield v. Lockyer*, 547 F.3d 978, 986 (9th Cir. 2008) ("[T]he first aspect of the rational basis test is easily satisfied by the government's interests in public health and safety and consumer protection."); *Pacific Nw. Venison Producers v. Smitch*, 20 F.3d 1008, 1013 (9th Cir. 1994) (noting the protection of wildlife and other natural resources is "one of the state's most important interests").[7]

---

[6] To be clear, given that the State has compelling interests in protecting the environment and the public health and safety and that the Shark Fin Prohibition is narrowly drawn to serve those interests, it could pass any level of scrutiny.  *See Witt v. Dep't of Air Force*, 527 F.3d 806, 826 (9th Cir. 2008).  While plaintiffs suggest that other, more limited statutes would be preferable, they do not explain how these would address the interests the Legislature was trying to protect.  *See* AOB 35-37.  For example, plaintiffs suggest that the Shark Fin Prohibition should have excluded non-threatened, sustainably fished shark species from its prohibition on shark fins.  *See* AOB 35-36.  However, because once a fin is separated from the shark and/or dried and processed it is extremely difficult to determine from which species of shark the fin derives, bans limited to endangered sharks and/or exceptions for sustainably harvested sharks are infeasible.  SER 391-392.

[7] The State also has a legitimate interest in preventing cruelty to animals and sales involving animal cruelty.  *See Lukumi*, 508 U.S. at 538; *United States v. Stevens*, 130 S. Ct. 1577, 1585 (2010) ("the prohibition of animal cruelty itself has a long history in American law, starting with the early settlement of the Colonies").

Prohibiting the possession, sale, trade, and distribution of shark fins in California is rationally related to this interest. There is considerable evidence that the practice of finning is driven by demand for fins, and plays a dominant role in causing shark population declines. *See* SER 36-53, 240, 244, 274, 287, 296, 368-387. Prior to the enactment of the Shark Fin Prohibition, California accounted for approximately 87 percent of all U.S. shark fin imports and 96 percent of all exports. *See* SER 388-390. The rationale that eliminating such an important market for shark fins would decrease finning and promote shark conservation is more than "plausible." *Heller*, 509 U.S. at 333; *see also* SER 36-53.

Plaintiffs contend that the Shark Fin Prohibition does not actually further any objective related to the protection of sharks because it has no practical effect on finning and shark conservation. *See* AOB 34-37. The district court properly rejected this argument. *See* ER 11 ("As for plaintiffs' claim that the Law does nothing to protect sharks, the evidence . . . provides strong support for defendants' contention that the Law is intended to protect and conserve sharks and the marine ecosystems dependent on them by means of regulating local *market* conditions, which laws targeting the actual practice of shark finning in domestic waters do not address.") (emphasis in original).

23

Plaintiffs argue both that the Shark Fin Prohibition does not add to the protections afforded by federal legislation and that it is not narrowly tailored to achieve its purpose. *See* AOB 34-37. In support of these arguments, plaintiffs proffer a variety of evidentiary support for, among other things, the propositions that: (1) existing legislation is sufficient to protect the shark population; (2) the Shark Fin Prohibition is unnecessary, as some species of sharks, such as spiny dogfish, are not in danger of becoming extinct; (3) there may be a small number of shark species that can be/are sustainably harvested; and (4) United States fishermen do not engage in shark finning. This evidence is irrelevant.

"[E]qual protection analysis is not a license for courts to judge the wisdom, fairness, or logic of legislative choices." *FCC v. Beach Communications*, Inc., 508 U.S. 307, 313 (1993). "The judiciary may not sit as a super legislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines . . . ." *New Orleans v. Dukes*, 427 U.S. 297, 303 (1976) (per curiam) (internal citations omitted). Further, rational basis review does not give courts the option to speculate as to whether some other scheme could have better regulated the evils in question. *Mourning v. Family Publ'n Serv., Inc.*, 411 U.S. 356, 378, (1973). A court may not rule a

24

statute invalid simply because it may not succeed in bringing about the result it seeks to accomplish, or because the classifications it draws lack razor-sharp precision. *See Dandridge v. Williams*, 397 U.S. 471, 485 (1970). Here, the Legislature, based on considerable scientific evidence, has determined both that there is a dangerous decline in the shark population due to finning, and that a prohibition on the possession, trade, sale, and distribution of shark fins is an effective way to combat this problem. *See* 2011 Cal. Stat., ch. 524 (AB 376); SER 391-392. Because the Shark Fin Prohibition "advances legitimate goals in a rational fashion," plaintiffs' various attempts to second-guess the Legislature regarding the vulnerability of sharks and our marine ecosystem, the necessity and efficacy of the Shark Fin Prohibition, and/or the purported superiority of less restrictive legislation must be disregarded. *Schweiker v. Wilson*, 450 U.S. 221, 234 (1981).[8]

The district court correctly determined that plaintiffs cannot meet their burden of showing a likelihood of success on the merits of their equal

---

[8] In any event, plaintiffs' evidence was objectionable and highly subject to dispute. *See, e.g.*, ER 112:23-28 (defendants' objections to plaintiffs' evidence). For example, the record demonstrates that even in jurisdictions that have shark finning laws, they are under-enforced, and that a lot of finning continues to take place to the detriment of the shark population and the health of the oceans. *See* SER 40, 50, 377-390.

protection claim. *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Hispanic Taco Vendors*, 994 F.2d at 679-81.

**B.   The Shark Fin Prohibition Does Not Violate the Commerce Clause**

The district court also correctly determined that plaintiffs are unlikely to succeed on their Commerce Clause claim. *See* ER 11-12.  The Commerce Clause authorizes Congress to "regulate Commerce with foreign Nations, and among the several States . . . ."  U.S. Const. art. I, § 8, cl. 3.  It includes an implied limitation on the states' authority to adopt legislation that affects commerce.  This implied limitation is often referred to as the negative or dormant Commerce Clause.  *Healy v. Beer Inst.*, 491 U.S. 324, 326 n.1 (1989).  "Modern dormant Commerce Clause jurisprudence primarily 'is driven by concern about economic protectionism – that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors.'"  *Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1148 (9th Cir. 2012), *cert. denied*, 81 U.S.L.W. 3452 (U.S. Feb. 19, 2013) (No. 12-461) (quoting *Dep't of Revenue v. Davis*, 553 U.S. 328, 337-38 (2008)); *see also C & A Carbone, Inc. v. Town of Clarkstown, N.Y.*, 511 U.S. 383, 390 (1994).

26

The restrictions contained in the Commerce Clause are "by no means absolute" and "the States retain authority under their general police powers to regulate matters of legitimate local concern, even though interstate commerce may be affected." *Maine v. Taylor*, 477 U.S. 131, 138 (1986) (citations and quotations omitted). "As long as a State does not needlessly obstruct interstate trade or attempt to place itself in a position of economic isolation, it retains broad regulatory authority to protect the health and safety of its citizens and the integrity of its natural resources." *Id*. at 151 (citations and quotations omitted).

Courts apply a two-tiered analysis to dormant Commerce Clause claims. *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 578-79 (1986). First, a statute that directly regulates or discriminates against interstate commerce, or that favors in-state economic interests over out-of-state interests, is generally invalid per se. *Id*. at 579. Most regulations found to conflict with the dormant Commerce Clause are so discriminatory. *Nat'l Ass'n of Optometrists & Opticians*, 682 F.3d at 1148. Second, although a statute that regulates evenhandedly and has only indirect effects on interstate commerce generally does not offend the dormant Commerce Clause, in a limited class of these cases the Supreme Court has applied the "*Pike* test," in which it examines "whether the State's interest is

27

legitimate and whether the burden on interstate commerce clearly exceeds the local benefits." *Brown-Forman Distillers Corp.*, 476 U.S. at 579 (citing *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)). As set forth below, the Shark Fin Prohibition survives Commerce Clause review because it is not discriminatory, does not regulate commerce outside the State, and the *Pike* test does not apply and in any event would be satisfied.

### 1.   The Shark Fin Prohibition does not discriminate against interstate commerce

For purposes of the dormant Commerce Clause, discrimination "simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Oregon Waste Sys., Inc. v. Dep't of Envtl. Quality*, 511 U.S. 93, 99 (1994). Plaintiffs do not, and cannot, allege that the Shark Fin Prohibition discriminates in favor of in-state interests. The law bans the possession, sale, trade, and distribution of shark fins in California. *See* Cal. Fish & Game Code § 2021(b). "An import ban that simply effectuates a complete ban on commerce in certain items is not discriminatory, as long as the ban on commerce does not make distinctions based on the origin of the items." *Pacific Nw. Venison Producers*, 20 F.3d at 1012; *see also Reynolds v. Buchholzer*, 87 F.3d 827, 831 (6th Cir. 1996) (upholding a state regulation precluding commercial

fishing of walleye where "statute and regulations in issue here cannot be interpreted as favoring local enterprise and intentionally discriminating against interstate commerce"). As the district court noted, the Shark Fin Prohibition regulates even-handedly and treats all shark fins, regardless of their point of origin, exactly the same. *See* ER 12; *see generally* Cal. Fish & Game Code §§ 2021 & 2021.5. Accordingly, it does not discriminate within the meaning of the dormant Commerce Clause. *See Pacific Nw. Venison Producers*, 20 F.3d at 1012.

### 2. The Shark Fin Prohibition does not regulate extraterritorially

By its terms, the Shark Fin Prohibition regulates the market for shark fin only within California's borders. Although plaintiffs, for the first time on appeal, contend that the Shark Fin Prohibition is unconstitutional because its purpose is to "target a market for shark fins obtained from sharks fished in waters outside of California's jurisdiction," AOB 40, this argument is baseless. A statute impermissibly regulates extraterritorial conduct in violation of the Commerce Clause where it "has the undeniable effect of controlling commercial activity occurring *wholly* outside the boundary of the State." *Healy*, 491 U.S. at 337 (emphasis added). Regardless of where shark fishing or finning may take place, the Shark Fin Prohibition only

29

regulates conduct – specifically, the possession, sale, distribution, and trade of shark fins – within California.  *See* Cal. Fish & Game Code § 2021(b).

The suggestion that the Shark Fin Prohibition has an impermissible "extraterritorial effect" is similarly unavailing.  *See* AOB 40-41; Brief of Amici Curiae Sustainable Fisheries Association, Inc., et al. (Amicus Br.) 9. "The mere fact that state action may have repercussions beyond state lines is of no judicial significance so long as the action is not within that domain which the Constitution forbids."  *Freedom Holdings Inc. v. Spitzer*, 357 F.3d 205, 220-21 (2d Cir. 2004).  The Shark Fin Prohibition does not directly, or indirectly, regulate or control commerce occurring wholly outside of California.  While the statute may, and hopefully will, reduce the global practice of finning, California has not "projected its regulatory regime" into other states.  *Healy*, 491 U.S. at 336-37 ("Generally speaking, the Commerce Clause protects against inconsistent legislation arising from the projection of one state regulatory regime into the jurisdiction of another State.").  Other states are free to take any action they deem appropriate with respect to the possession, sale, and trade of shark fins.  The Shark Fin Prohibition thus does not offend the dormant Commerce Clause.  *See Gerling Global Reinsurance Corp. of Am. v. Low*, 240 F.3d 739, 746 (9th Cir. 2001) (holding state law did not violate Commerce Clause where statute,

30

"on its face, does not regulate foreign insurance policies, or control the substantive conduct of a foreign insurer, or otherwise affect 'the business of insurance' in any other country"); *Pharm. Research v. Concannon*, 249 F.3d 66, 82 (1st Cir. 2001) (rejecting extraterritorial challenge to a state drug pricing law because despite out-of-state effects on prices, it did "not impose direct controls on a transaction that occurs wholly out-of-state"); *Illinois Rest. Ass'n v. City of Chicago*, 492 F. Supp. 2d 891, 899 (N.D. Ill. 2007) ("The court finds that the fact that the Ordinance has an economic effect on out-of-state foie gras production does not mean that it regulates or discriminates against interstate commerce.").[9]

### 3.  *Pike* balancing is not required, but even if it were, it weighs in favor of validity

Because the Shark Fin Prohibition neither discriminates against interstate commerce nor is an impermissible extraterritorial regulation, it is

---

[9] Plaintiffs cite *Brown-Forman Distillers Corp.*, 476 U.S. 573, in support of their argument that the Shark Fin Prohibition is an extraterritorial regulation.  AOB 40.  In that case, New York's price affirmation law impermissibly guaranteed New York customers the lowest prices and prevented sellers from changing their prices in other states after posting that month's prices in New York.  The "practical effect" of the law was thus to "project" New York's laws into other states and control liquor prices.  *Id.* at 582-83.  By contrast, the Shark Fin Prohibition does not regulate conduct or otherwise control the terms of transactions occurring wholly outside California.  *Brown-Forman Distillers Corp.* is thus inapt.

plaintiffs' burden to establish that any incidental burdens on interstate commerce caused by the Shark Fin Prohibition are clearly excessive in relation to the putative local benefits. *See Pike*, 397 U.S. at 142; *Pacific Nw. Venison Producers*, 20 F.3d at 1013. Plaintiffs have failed to meet this burden.

> ### a. The Shark Fin Prohibition does not place a substantial burden on interstate commerce.

This Court has held that a "state regulation does not become vulnerable to invalidation under the dormant Commerce Clause merely because it affects interstate commerce." *Nat'l Ass'n of Optometrists & Opticians*, 682 F.3d at 1148. Rather, "[a] critical requirement for proving a violation of the dormant Commerce Clause is that there must be a *substantial burden* on *interstate commerce*." *Id.* (emphasis in original). Such "significant burden[s]" generally involve "inconsistent regulation of activities that are inherently national or require a uniform system of regulation." *Id.* Burdens on commerce that result from regulations pursuant to the State's police power to protect the public health and safety are generally not regarded as significant even if they involve some loss of trade. *See id.* (citing *Great Atl. & Pac. Tea Co. v. Cottrell*, 424 U.S. 366, 371 (1976)). Indeed, the Supreme Court "generally has supported the rights of states to 'impose even

burdensome regulations in the interest of local health and safety.'" *Id.* (quoting *H.P. Hood & Sons, Inc. v. Du Mond*, 336 U.S. 525, 535 (1949)).[10]

Plaintiffs have not shown that the regulation of shark fins is "inherently national" or that the shark fin trade requires a "uniform system of regulation." *Nat'l Ass'n of Optometrists & Opticians*, 682 F.3d at 1148; *see also Pac. Nw. Venison Producers*, 20 F.3d at 1014 (finding importation of wildlife was "not a matter in which national uniformity is important" because most states and Canadian provinces ban some species of wildlife and the species vary).[11]  Although plaintiffs assert that the "federal government intends federal waters to be controlled entirely by federal law," AOB 48, this argument fails.  As discussed herein, the relevant federal laws explicitly allow concurrent state regulation of shark fishing/finning.  *See,*

---

[10] The Supreme Court has noted that many cases that have "purported to apply the undue burden test (including *Pike* itself) arguably turned in whole or in part on the discriminatory character of the challenged state regulations." *General Motors Corp. v. Tracy*, 519 U.S. 278, 299 n.12 (1997).  "Because the purpose of the Commerce Clause is to protect the nation against economic Balkanization, legitimate regulations that have none of these effects [of discriminating against or regulating interstate commerce] arguably are not subject to invalidation under the Commerce Clause." *Pac. Nw. Venison Producers*, 20 F.3d at 1015 (internal citations omitted).

[11] Several states, including Oregon, Hawaii, Washington, and Illinois, and the U.S. territories of Guam, American Samoa, and the Northern Marianna Islands have banned shark fins.  SER 38, 42.

*e.g.*, 50 C.F.R. § 600.1201(c); 16 U.S.C §§ 1856(a)(1) & (3), 1856(b); *see also People v. Weeren*, 26 Cal. 3d 654, 669 (1980). Moreover, and of greater significance, the Shark Fin Prohibition does not regulate federal waters at all, but only California's market for shark fins.

Plaintiffs also have not established any burden on interstate commerce, let alone one that is substantial. At most, plaintiffs have shown that the Shark Fin Prohibition will be damaging to them and their industries. *See, e.g.*, ER 156-161, 164-165, 213-214. However, the point of the dormant Commerce Clause is to prevent local economic protectionism at the expense of out-of-state interests, not to protect the economic interests of businesses engaged in interstate commerce. *See Carbone*, 511 U.S. at 390. Indeed, the Commerce Clause "protects the interstate market, not particular interstate firms, from prohibitive or burdensome regulations." *Exxon Corp. v. Governor of Md.*, 437 U.S. 117, 127-28 (1978); *see also Nat'l Optometrists*, 682 F. 3d at 1152 & n.11 ("the dormant Commerce Clause does not protect a particular company's profits"); SER 408-410 (order in *Cramer v. Brown*, No. CV-3130-JFW (C.D. Cal. September 12, 2012), dismissing Commerce Clause challenge to Proposition 2, stating that "the mere fact that the price of eggs may increase or that egg production may shift from in-state egg farmers to out-of-state farmers" is not a significant burden on interstate commerce).

34

On appeal, plaintiffs suggest that because the shark fin trade is national

and international, and because California has prohibited shark fins, there

necessarily must be an unconstitutional burden on interstate commerce.  *See*

AOB 40-41.  However, as discussed above, the complete restriction of trade

is entirely permissible under the Commerce Clause.  *Pacific Nw. Venison*

*Producers*, 20 F.3d at 1012.  The exclusion of California from the shark fin

trade does not amount to a substantial or significant burden on interstate

commerce.[12]  *See Nat'l Ass'n of Optometrists & Opticians*, 682 F.3d at

1148-49; *Pac. Nw. Venison Producers*, 20 F.3d at 1015 ("Evidence that

---

[12] The decision in *Raymond Motor Transp., Inc. v. Rice*, 424 U.S. 429 (1978), on which plaintiffs rely, is not to the contrary.  Plaintiffs cite to *Raymond* for the proposition that "the Commerce Clause prevents the States from erecting barriers to the free flow of interstate commerce."  AOB 40 (citing *Raymond*, 434 U.S. at 440).  However, *Raymond* was a "discrimination case."  *Nat'l Ass'n of Optometrists & Opticians*, 682 F.3d at 1155 n.14.  The challenged regulation required that no vehicles more than 55 feet long could operate on Wisconsin State highways.  The Supreme Court found that this restriction placed a substantial burden on the interstate movement of goods and services and interfered with the speed of truck transportation by forcing longer trucks to drive around the State of Wisconsin to get to other states.  In so finding, the Court noted that the regulation contained a number of exceptions that discriminated in favor of in-state industries and that the State had failed to make even a colorable showing that the regulation contributed to highway safety.  *Raymond*, 434 U.S. at 445-47.  By contrast, the Shark Fin Prohibition does not involve an inherently national enterprise, such as transportation, does not discriminate against out-of-state commerce, and is rationally related to the State's interests in protecting the environment and the public health and safety. *Raymond* is thus inapposite.

35

interstate and foreign commerce is in some way affected by the regulations is not enough to meet [plaintiffs'] burden"); *Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 109 (2d Cir. 2001) ("For a state statute to run afoul of the *Pike* standard, the statute, at a minimum, must impose a burden on interstate commerce that is qualitatively or quantitatively different from that imposed on intrastate commerce.").

### b.   Because there is no burden on interstate commerce, *Pike* balancing is not required.

Plaintiffs contend that the district court erred by failing to apply the *Pike* balancing test to their Commerce Clause claim.  AOB 41-45.  However, this Court recently has clarified that where, as here, a regulation "does not impose a significant burden on interstate commerce, it follows that there can not be a burden on interstate commerce that is 'clearly excessive in relation to the putative local benefits' under *Pike*," and therefore that *Pike* balancing is not required.  *Nat'l Ass'n of Optometrists & Opticians*, 682 F.3d at 1155; *see also Nat'l Paint Coatings Ass'n v. City of Chicago*, 45 F.3d 1124, 1132 (7th Cir. 1995) ("[T]he ordinance affects interstate shipments, but it does not discriminate against interstate commerce in either terms or effect.  No disparate treatment, no disparate impact, no problem under the dormant commerce clause.").  Plaintiffs identified no significant burden on interstate

36

commerce associated with the Shark Fin Prohibition. *See* ER 12.

Accordingly, the district court was not required to weigh its benefits against

non-existent burdens. *See Nat'l Ass'n of Optometrists & Opticians*,

682 F.3d at 1155-56; *see also Illinois Rest. Ass'n*, 492 F. Supp. 2d. at 904-

05.

> **c.    Even under *Pike* balancing, the Shark Fin Prohibition serves a legitimate local purpose and its benefits outweigh any burden on interstate commerce.**

Even if *Pike* balancing were appropriate, the benefits of the Shark Fin

Prohibition would outweigh any burdens on interstate commerce. "A

facially neutral statute may violate the Commerce Clause if 'the burdens of

the statute . . . so outweigh the putative benefits as to make the statute

unreasonable or irrational.'" *UFO Chuting of Haw., Inc. v. Smith*, 508 F.3d

1189, 1196 (9th Cir. 2007) (quoting *Alaska Airlines, Inc. v. City of Long

Beach*, 951 F.2d 977, 983 (9th Cir. 1991) (per curiam)). A statute is

unreasonable or irrational when "the asserted benefits of the statute are in

fact illusory or relate to goals that evidence an impermissible favoritism of

in-state industry over out-of-state industry." *Id.* That is not the case here.[13]

---

[13] Amicus advances the argument that, despite failing to demonstrate any cognizable burden on interstate commerce, the Shark Fin Prohibition

(continued…)

37

The purpose of the Shark Fin Prohibition is to protect the marine ecosystem and biodiversity by promoting the conservation of sharks, which according to legislative findings is a "top predator" essential to the health of our oceans. By eliminating the California market for shark fins, the Shark Fin Prohibition seeks to reduce the incentives underlying the pernicious practice of shark finning. The Shark Fin Prohibition also protects the public health and safety by eliminating a food product containing high levels of mercury. *See* 2011 Cal. Stat., ch. 524 (AB 376), § 1. As discussed above, the protection of the public health and safety, wildlife, and the ecosystem are legitimate state interests. *Merrifield v. Lockyer*, 547 F.3d at 986; *Pacific Nw. Venison Producers*, 20 F.3d at 1013. The Shark Fin Prohibition thus carries "a strong presumption" of constitutional validity that plaintiffs have failed to rebut. *Pacific Nw. Venison Producers,* 20 F.3d at 1014; *see also*

---

(…continued)

"clearly places an excessive burden" in relation to any putative benefits because it is duplicative of existing legislation. *See* Amicus Br. 12; ER 151. In fact, the Shark Fin Prohibition fills a gap left by existing legislation and is neither duplicative nor overbroad. Specifically, current federal and California laws regarding shark finning do not address the issue of the shark fin trade. *Compare* Cal. Fish & Game Code §§ 2021, 2021.5, *with* 16 U.S.C. §§ 1801-1882. However, even if it the Shark Fin Prohibition were duplicative, and it is not, this would be irrelevant to the dormant Commerce Clause analysis. *See CTS Corp. v. Dynamics Corp. of America*, 481 U.S. 69, 92 (1987).

38

*Nat'l Ass'n of Optometrists & Opticians*, 682 F.3d at 1156 (where no constitutionally significant burden on interstate commerce has been shown, courts give even greater deference to the asserted benefits of a state law or regulation).

Plaintiffs concede that the protection of the environment and the public health and safety are legitimate interests, but argue that protecting sharks outside of California waters is not a "local" interest or benefit for purposes of Commerce Clause analysis. AOB 43-44. It is certainly true that some of purposes and putative benefits of the Shark Fin Prohibition, such as protecting the health of the ocean, are not limited to California. However, plaintiffs cite no authority for the proposition that an interest or benefit must be exclusively local to survive scrutiny under the dormant Commerce Clause. To the contrary, the courts have recognized the interests of states in combating global threats to the environment and thus to the health and safety of their citizens:

> It is now generally recognized that the destruction or disturbance of vital life cycles or of the balance of a species of wildlife, even though initiated in one part of the world, may have a profound effect upon the health and welfare of people in other distant parts. We have come to appreciate the interdependence of different forms of life. We realize that by killing certain species in one area we may sound our own death knell. For these reasons, ecology has become everyone's business.

39

> Like pollution, it does not cease to be of vital concern
> merely because the problem is created at a distant point.

*People v. Sakai*, 56 Cal. App. 3d 531, 535-36 (1970); *see also Massachusetts v. EPA*, 549 U.S. 497, 519, 522 (2007) ("That these climate-change risks are widely shared does not minimize Massachusetts' interest in the outcome of this litigation."); *Pac. Merchant Shipping Ass'n v. Goldstene*, 639 F.3d 1154, 1180 -81 (9th Cir. 2011) ("California clearly has an especially powerful interest in controlling the harmful effects of air pollution").

There are considerable local benefits to the citizens of California from the Shark Fin Prohibition, as indicated in the Legislative findings. 2011 Cal. Stat., ch. 524 (AB 376), § 1; *see also* SER 46-53, 195-196, 209-210, 236, 245, 368-392. Because of the highly migratory nature of sharks, a population decline in one area can spread to other areas or trigger a decline in healthier populations. SER 39-40. Accordingly, a decline in the shark population globally will inevitably effect California's shark populations and the health of California's oceans and 800-plus miles of coastline. SER 39-40, 46, 51-52. Thus, it is in California's interest to safeguard the health of its own marine community by helping to protect sharks and promote the health of the ocean worldwide and there are considerable local benefits from doing so. The fact that some these benefits may also be global simply does

not mean that they are not local or legitimate for purposes of the dormant Commerce Clause.

Plaintiffs also argue that the benefits of the Shark Fin Prohibition are "illusory" because the statute does not actually advance the public health or shark conservation. *See* AOB 41-44. With respect to the public health, plaintiffs posit that because the Shark Fin Prohibition only restricts consumption of the shark fin and not the rest of the shark, it is does not prevent overconsumption of mercury. AOB 42-43. However, there is considerable evidence that shark products other than the fin are in low demand and that most people who consume shark do not eat parts other than the fin. SER 380-381, 388-390. Accordingly, it was rational for the Legislature to address overconsumption of mercury by limiting the prohibition to shark fin. *UFO Chuting*, 508 F.3d at 1196; *see also New Orleans v. Dukes*, 427 U.S. at 303 (noting that the legislature may tackle a problem piecemeal, "adopting regulations that only partially ameliorate a perceived evil and deferring complete elimination of the evil to future regulations").

In regard to shark conservation, plaintiffs assert that the demand for shark fins in the United States is "negligible" and thus the Shark Fin Prohibition will not have a significant impact. AOB 43. As a threshold

41

matter, where as here, a law is not discriminatory and does not impose a significant, if any, burden on interstate commerce, courts do "not determine the constitutionality of the challenged laws based on [their] assessment of the benefits of those laws and the State's wisdom in adopting them." *Id.* at 1156 (citations omitted); *see also CTS Corp.*, 481 U.S. at 92 (in context of dormant Commerce Clause analysis, courts should not "second guess the empirical judgments of lawmakers concerning the utility of legislation").

Even if this type of inquiry were permissible, the issue is not the total demand for shark fin in the United States, but the demand for shark fin in California, which as noted earlier, accounts for more than three quarters of shark fin imports in the United States.  SER 388-392.  Thus, the Shark Fin Prohibition, while not eliminating the global shark fin trade, particularly as it operates in conjunction with similar laws adopted by other jurisdictions, "can help ensure that sharks do not become extinct."  2011 Cal. Stat., ch. 524 (AB 376), § 1(f).  Accordingly, plaintiffs have failed to show "overwhelmingly one-sided evidence that there are no real benefits to the challenged law." *Nat'l Optometrists & Opticians*, 682 F. 3d at 1156 n.17.[14]

---

[14]  Moreover, the State has a "legitimate interest in guarding against imperfectly understood environmental risks, despite the possibility that they may ultimately prove to be negligible.  The constitutional principles

(continued…)

The district court thus properly determined that plaintiffs did not establish any likelihood of success on the merits of their Commerce Clause claim. *See* ER 12; *see also Pacific Nw. Venison Producers,* 20 F.3d at 1014.[15]

### C.    The Shark Fin Prohibition Is Not Preempted by Federal Law

Plaintiffs assert that the Shark Fin Prohibition is preempted by the Magnuson Stevens Act, 16 U.S.C. §§ 1801-1884 ("MSA"), as amended by the Shark Finning Prohibition Act of 2000, and the Shark Conservation Act of 2010 (collectively, the "Federal Shark Fin Law").[16] *See* AOB 45-51.  As

---

(…continued)

underlying the commerce clause cannot be read as requiring the State . . . to sit idly by and wait until potentially irreversible environmental damage has occurred . . . before it acts to avoid such consequences." *Maine v. Taylor*, 477 U.S. at 148 (internal citation and quotation omitted).

[15] Plaintiffs and amicus suggest that the Shark Fin Prohibition violates the dormant Commerce Clause because there are other less restrictive statutes, such as Oregon's shark fin statute that exempts spiny dogfish from the ban on possession, trade, and sale of shark fins. *See* AOB 44; Amicus Br. 12-15.  Regardless of the wisdom of such an alternative, where, as here, a statute is facially neutral and does not impose a significant burden on interstate commerce, the Court does not consider less restrictive alternatives. *See National Optometrists*, 682 F. 3d at 1156-57.

[16]  To the extent that plaintiffs contend that the Shark Fin Prohibition also is preempted by the Lacey Act, this is incorrect.  The Lacey Act is a "federal tool to aid states in enforcing their own fish and wildlife laws by imposing federal sanctions for interstate or foreign commerce in fish and

(continued…)

a threshold matter, the Court need not consider plaintiffs' preemption

arguments, as they are made for the first time on appeal, and thus waived.

*See Peterson v. Highland Music, Inc.*, 140 F.3d 1313, 1321 (9th Cir. 1998).

In any event, these arguments are entirely without merit.

Plaintiffs do not make clear which type(s) of preemption they contend

apply here. Federal law may preempt state law in one of three ways, none of

which apply in this case. First, Congress may expressly state its intent to

preempt state law in the direct language of a statute. *Jones v. Rath Packing

Co.*, 430 U.S. 519, 525 (1977). Second, Congressional intent to preempt

state law can be inferred when Congress "occupies the field" by passing a

comprehensive legislative scheme that leaves "no room" for supplemental

regulation. *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947).

Third, federal law may preempt state law to the extent that state law directly

conflicts with federal law. *See Fla. Lime & Avocado Growers, Inc. v. Paul*,

373 U.S. 132, 141-43 (1963). Conflict preemption requires that

---

(…continued)

wildlife that have been taken, possessed, transported, or sold in violation of
any state, federal, or foreign law." *United States v. McDougall*, 25 F. Supp.
2d 85, 89 (N.D.N.Y. 1998) (citation omitted); 16 U.S.C. § 3372. The Lacey
Act does not preempt state fish and wildlife laws; rather, it was designed to
"strengthen and support" them. *United States v. Cameron*, 888 F.2d 1279,
1284 (9th Cir. 1989) (citing S.Rep. No. 123, 97th Cong., 1st Sess. 2, 4,
*reprinted in* 1981 U.S.Code Cong. & Admin.News 1748, 1751).

44

"compliance with both federal and state regulations is a physical impossibility," *id.* at 142-43, or that state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Pac. Gas & Electric Co. v. State Energy Res. Cons. & Dev. Comm.*, 461 U.S. 190, 204 (1983).

Congressional intent is the "ultimate touchstone" in every preemption case. *Retail Clerks Int'l Ass'n v. Schermerhorn*, 375 U.S. 96, 103 (1963). Preemption analysis "starts with the assumption that the historic police powers of the States [are] not to be superseded by [a] Federal Act unless that was the clear and manifest purpose of Congress." *Rice*, 331 U.S. at 230; *see also Fla. Lime & Avocado Growers*, 373 U.S. at 142 ("[F]ederal regulation of a field of commerce should not be deemed preemptive of state regulatory power in the absence of persuasive reasons – either that the nature of the regulated subject matter permits no other conclusion, or that the Congress has unmistakably so ordained."). A court must presume that a state statute is not preempted, and the moving party has the burden of overcoming that presumption. *Pharm. Research and Mfrs. of America v. Walsh*, 538 U.S. 644, 661-62 (2003); *Chem. Specialties Mfrs. Ass'n v. Allenby*, 958 F.2d 941, 943 (9th Cir. 1992).

45

Here, as the district court noted, there is no evidence that Congress intended to preempt state regulation of or relating to shark finning.  ER 13. To the contrary, the implementing regulations of the Federal Shark Fin Law invite state regulation.  Specifically, Code of Federal Regulations section 600.1201(c) contains a savings clause, which provides that "[n]othing in this regulation supersedes more restrictive state laws or regulations regarding shark finning in state waters."  50 C.F.R. § 600.1201(c).  With respect to the MSA generally, while Congress claimed "sovereign rights and exclusive fishery management authority over all fish" located within the United States Exclusive Economic Zone ("EEZ"),[17] *see* 16 U.S.C. § 1811(a), states retain jurisdiction over their own waters and limited concurrent authority over fishing activities in federal waters.  *See, e.g.*, 16 U.S.C §§ 1856(a)(1) & (a)(3), 1856(b); *see also People v. Weeren*, 26 Cal. 3d at 669.  Thus, because the Federal Shark Fin Law explicitly demonstrates Congressional intent to allow concurrent state regulation, there is no express and/or field preemption here.  *See, e.g.*, *Ting v. AT&T*, 319 F.3d 1126, 1136 (9th Cir. 2003).

To the extent that plaintiffs suggest conflict preemption applies, this also fails.  Plaintiffs have not demonstrated that it will be physically

---

[17] The EEZ is the 200 nautical mile zone extending from the outer boundary of each state's territorial waters.  *See* 16 U.S.C. § 1802.

46

impossible to comply with both the Federal Shark Fin Law and the Shark

Fin Prohibition. *See Florida Lime & Avocado Growers*, 373 U.S. at 142-43.

In fact, compliance with the Shark Fin Prohibition has no effect on

compliance with the Federal Shark Fin Law, as these laws predominantly

regulate different activities. The Federal Shark Fin Law primarily addresses

the act of finning and the taking and landing of sharks within the EEZ. *See*

16 U.S.C. §§ 1801-1882. The Shark Fin Prohibition, by contrast, prohibits

the possession, sale, trade, and distribution of shark fins in California. *See*

Cal. Fish & Game Code §§ 2021 & 2021.5. The Shark Fin Prohibition does

not, as plaintiffs claim, attempt to regulate the shark fishing industry in

federal waters. AOB 48. The statute does not interfere with federal

management of the EEZ, nor does it affect landing activities or any conduct

taking place on the water.[18] Where there is overlap between the federal and

---

[18] Accordingly, plaintiffs' extensive reliance on *City of Charleston, S.C. v. A Fisherman's Best, Inc.*, 310 F.3d 155 (4th Cir. 2002) is misplaced. In that case, the city of Charleston enacted a resolution prohibiting the docking at its Maritime Center of longline vessels that fished for swordfish in federal waters. *See* 310 F.3d at 159. The *City of Charleston* court, noting that there were no other adequate docking facilities for longline vessels within 100 miles of the Maritime Center, concluded that the city's resolution would effectively prohibit the use of longline gear in direct contravention of federal law, which designated longline as the authorized gear for catching Atlantic swordfish. *Id.* at 170-174, 177. Here, no such conflict exists. The Shark Fin Prohibition does not interfere with the fishing or landing of sharks

(continued…)

47

state statutes, with respect to the prohibition on the possession, sale, and trade of illegally obtained fins, the statutes are entirely consistent, and consequently compliance with one entails compliance with the other. *Compare* 16 U.S.C. § 1857(1)(G) *and* 50 C.F.R. §§ 600.1203(a)(5) & 1204(e)(1) *with* Cal. Fish & Game Code §§ 2021, 2021.5.  It is thus entirely possible to comply with both federal and state regulations.

Similarly, plaintiffs cannot establish that the Shark Fin Prohibition would frustrate the purpose of Congress.  Plaintiffs have not identified any "significant federal regulatory objective" that is impaired by the Shark Fin Prohibition.  *See Williamson v. Mazda*, 131 S. Ct. 1131, 1134, 1136-37 (2011).  Although plaintiffs state that federal law allows for the trade of legally obtained shark fins, AOB 49, this is not the "objective" of the Federal Shark Fin Law.  Rather, Congress enacted the Federal Shark Fin Law for the purpose of "eliminat[ing] shark finning." *United States v. Approximately 64,695 Pounds of Shark Fins*, 520 F.3d 976, 982 (9th Cir. 2008) (citing Pub. L. 106-557, 114 Stat. 2772 (2000)); *see also* AOB 49

---

(…continued)

in compliance with federal law.  Contrary to plaintiffs' assertions, *see* AOB 49, and unlike in *City of Charleston*, federal law does not explicitly authorize or require that the sale of detached shark fins be permitted.  *See* 50 C.F.R. §§ 600.1203, 600.1204.

(stating that Federal Shark Fin Law is "intended to eliminate the wasteful and unsportsmanlike practice of shark finning.") (citing H.R. 5461, 106th Cong. (2000)). The Shark Fin Prohibition is consistent with this purpose.

Plaintiffs' argument that the Shark Fin Prohibition conflicts with the federal policy, as evidenced by fishery management plans, of "promoting sustainability while allowing sharks to be harvested" is also unfounded. AOB 46-49. The Shark Fin Prohibition, by lessening demand for shark fins and thereby curtailing finning, promotes sustainability. It also allows sharks to be harvested, and allows commercial activities involving shark fins that are still attached to whole shark carcasses. *See* Cal. Fish & Game Code § 2021. There is thus no conflict with federal law, regulations, or management plans.

Plaintiffs cannot overcome the strong presumption against preemption, and they have no likelihood of success on their preemption claim. *See Ting v. AT&T*, 319 F.3d at 1137, 1152.

### D.  Plaintiffs' 42 U.S.C. Section 1983 Claim Fails

The district court properly concluded that plaintiffs could not succeed on the merits of their section 1983 claim. ER 13. Notably, plaintiffs made no argument before the district court regarding their section 1983 claim. On appeal, they contend that because the Shark Fin Prohibition violates their

49

rights under the Equal Protection and Commerce Clauses, the district court "committed legal error." AOB 53. Even assuming that this argument is not waived, *see Peterson v. Highland Music, Inc.*, 140 F.3d at 1321, it is without merit. Plaintiffs' section 1983 claims fail along with their underlying constitutional claims, on which they are dependent. *See West v. Atkins*, 487 U.S. 42, 48 (1988).

### III. BECAUSE PLAINTIFFS FAILED TO DEMONSTRATE ANY LIKELIHOOD OF SUCCESS ON THE MERITS, THE DISTRICT COURT PROPERLY DENIED THE MOTION FOR PRELIMINARY INJUNCTION

#### A. The District Court Employed the Correct Legal Standard

A "preliminary injunction is an extraordinary remedy never awarded as a matter of right." *Winter*, 555 U.S. at 24 (internal quotations and citations omitted). To justify a preliminary injunction, the moving party must establish by a "clear showing" "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20, 22. Alternatively, "[a] preliminary injunction is appropriate when a plaintiff demonstrates . . . that serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1131, 1134-35 (9th Cir. 2011) (internal citation omitted). Even

50

under the alternative sliding scale test, however, plaintiffs must satisfy all four *Winter* factors. *Id*. at 1135.

Plaintiffs contend that the district court erred by failing to apply the balancing test set forth in *Cottrell*, and by not adequately considering the remaining preliminary injunction factors. AOB 21-23, 53-57. As an initial matter, plaintiffs have not demonstrated any cognizable injury and/or that the balance of hardships in this case tips so strongly in their favor as to justify use of the *Cottrell* standard. *See Cottrell*, 632 F.3d at 1131-35. Moreover, the district court properly determined that plaintiffs had not satisfied their burden to demonstrate a likelihood of success on the merits under any standard. *See* ER 9 ("With regard to likelihood of success, the court agrees with defendants that plaintiffs have not met their burden, whether under the *Winter* formulation, or under the "serious questions" modification stated in *Cottrell*.").

Under either test, a movant must satisfy all four *Winter* factors. *Cottrell*, 632 F.3d at 1135; *see also Winter*, 555 U.S. at 23 (failure to establish any one "of these factors alone requires denial of the requested injunctive relief"). Thus, where, as here, the moving party has failed to establish a showing of likelihood of success on the merits or a "serious question," a court need not consider the remaining factors at all. *Pimentel v.*

51

*Dreyfus*, 670 F.3d 1096, 1111 (9th Cir. 2012); *DISH Network Corp. v. FCC*, 653 F.3d 771, 776-77 (9th Cir. 2011) ("because we agree with the district court that DISH has failed to satisfy its burden of demonstrating it has met the first element, we need not consider the remaining three"); *see also Winter*, 555 U.S. at 23 (declining to address remaining factors where plaintiffs could not overcome the public policy and strong government interests that weighed against granting the injunction). Here, the district court did address the remaining factors, even though it was unnecessary to do so, and concluded that plaintiffs had failed to establish them. *See* ER 13-14. Thus, the district court "employed the appropriate legal standards" governing the issuance of a preliminary injunction. *See A&M Records, Inc. v. Napster, Inc.*, 239 F.3d at 1013.

### B. Plaintiffs Cannot Meet Their Burden to Demonstrate Irreparable Harm, or Demonstrate That the Balance of Harms and the Public Interest Weigh in Favor of an Injunction

In the absence of constitutional injury, plaintiffs cannot meet the standard for injunctive relief; their remaining assertions of harm are unfounded. Plaintiffs appear to concede that, as the district court noted, monetary harm or loss of revenue is not sufficient to establish irreparable injury. *See* ER 13 (citing *Oakland Tribune, Inc. v. Chronicle Pub. Co., Inc.*,

762 F.2d 1374, 1376 (9th Cir. 1985)); *see also Sampson v. Murray*, 415 U.S. 61, 90 (1974) ("The key word in this consideration is irreparable. Mere injuries, however substantial, in terms of money, time and energy necessarily expended . . . are not enough."). Plaintiffs argue instead that absent a preliminary injunction, the Shark Fin Prohibition will cause them to suffer substantial business injuries, such as bankruptcy and financial ruin, that would be irreparable. *See* AOB 54-55. However, as the district court noted, plaintiffs did not produce any evidence to support these claims. *See* ER 13-14 ("Plaintiffs have cited no other type of economic harm, apart from the unsupported claims by two declarants that if the Shark Fin Law is not overturned, they will 'lose [their] livelihood entirely.'"). Such speculative and unsubstantiated assertions of harm do not constitute irreparable injury. *See Goldie's Bookstore, Inc. v. Superior Court of State of Cal.*, 739 F.2d 466, 472 (9th Cir. 1984).

Plaintiffs also claim injury because they are unable to engage in "important traditions involving shark fin soup." AOB 54, 56-57. However, even assuming that the (temporary) loss or alteration of these traditional practices, despite having no constitutional right to pursue them, amounts to irreparable harm, it is not sufficient to outweigh the injury an injunction would cause to the State. "Any time a State is enjoined by a court from

53

effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 133 S. Ct. 1, 2 (2012) (quotation and citation omitted). Here the injury is more than just a presumption; the record demonstrates the very real and dangerous harms to the environment and the public health and safety from the continued finning and overfishing of sharks.

Ultimately, as the district court correctly determined, plaintiffs have not demonstrated that "the future inability to obtain shark fins by the relatively small percentage of the population that actually wants to do so, or the loss of profits by a small group of merchants, importers, or restaurateurs, outweighs the interests of the Legislature in protecting the marine ecosystem by eliminating a product that drives the pernicious practice of finning." ER 14. Whatever harm plaintiffs may suffer, it pales in comparison to the harms to the oceans caused by the decline of sharks. *See Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1124 (9th Cir. 2005) (irreparable injury found because "once the desert is disturbed, it cannot be restored"). Thus, the compelling public interest in conserving sharks and protecting the health of our oceans outweigh the purported harms to plaintiffs. *See Fed. Trade Comm'n v. Affordable Media, LLC*, 179 F.3d 1228, 1236 (9th Cir. 1999) ("[W]hen a district court balances the hardships of the public interest against

54

a private interest, the public interest should receive greater weight.")

(citation omitted).

Accordingly, the law, the balance of harms, and the public interest all

weigh decisively against entry of a preliminary injunction in this matter.

## CONCLUSION

For the foregoing reasons, defendants respectfully request that the

Court affirm the decision of the district court.

Dated:  March 25, 2013            Respectfully Submitted,

KAMALA D. HARRIS
Attorney General of California
DOUGLAS J. WOODS
Senior Assistant Attorney General
TAMAR PACHTER
Supervising Deputy Attorney General

*/s/ Alexandra Robert Gordon*
ALEXANDRA ROBERT GORDON
Deputy Attorney General
*Attorneys for Defendants-Appellees*

13-15188

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

**CHINATOWN NEIGHBORHOOD ASSOCIATION, et al.,**

Plaintiffs-Appellants,

v.

**EDMUND G. BROWN JR., et al.,**

Defendant-Appellee,

,

**STATEMENT OF RELATED CASES**

To the best of our knowledge, there are no related cases.

Dated:  March 25, 2013                Respectfully Submitted,

                                      KAMALA D. HARRIS
                                      Attorney General of California
                                      DOUGLAS J. WOODS
                                      Senior Assistant Attorney General
                                      TAMAR PACHTER
                                      Supervising Deputy Attorney General

                                      */s/ Alexandra Robert Gordon*
                                      ALEXANDRA ROBERT GORDON
                                      Deputy Attorney General
                                      *Attorneys for Defendants-Appellees*

# CERTIFICATE OF COMPLIANCE
## PURSUANT TO FED.R.APP.P 32(a)(7)(C) AND CIRCUIT RULE 32-1
## FOR 13-15188

I certify that:  (check (x) appropriate option(s))

[x]  1.  Pursuant to Fed.R.App.P. 32(a)(7)(C) and Ninth Circuit Rule 32-1, the attached **answering** brief is

[x]  Proportionately spaced, has a typeface of 14 points or more and contains 12, 404 words (opening, answering and the second and third briefs filed in cross-appeals must not exceed 14,000 words; reply briefs must not exceed 7,000 words

or is

[ ]  Monospaced, has 10.5 or fewer characters per inch and contains ____ words or ___ lines of text (opening, answering, and the second and third briefs filed in cross-appeals must not exceed 14,000 words or 1,300 lines of text; reply briefs must not exceed 7,000 words or 650 lines of text).

[ ]  2.  The attached brief is **not** subject to the type-volume limitations of Fed.R.App.P. 32(a(7)(B) because

[ ]  This brief complies with Fed.R.App.P 32(a)(1)-(7) and is a principal brief of no more than 30 pages or a reply brief of no more than 15 pages.

or

[ ]  This brief complies with a page or size-volume limitation established by separate court order dated _____ and is

[ ]  Proportionately spaced, has a typeface of 14 points or more and contains _____ words,

or is

[ ]  Monospaced, has 10.5 or fewer characters per inch and contains __ pages or __ words or __ lines of text.

[ ]  3.  Briefs in **Capital Cases**.
This brief is being filed in a capital case pursuant to the type-volume limitations set forth at Circuit Rule 32-4 and is

[ ]  Proportionately spaced, has a typeface of 14 points or more and contains _____ words (opening, answering and the second and third briefs filed in cross-appeals must not exceed 21,000 words; reply briefs must not exceed 9,800 words).

or is

[ ]  Monospaced, has 10.5 or fewer characters per inch and contains __ words or __ lines of text (opening, answering and the second and third briefs filed in cross-appeals must not exceed 75 pages or 1,950 lines of text; reply briefs must not exceed 35 pages or 910 lines of text).

☐  4. **Amicus Briefs**.

☐  Pursuant to Fed.R.App.P 29(d) and 9th Cir.R. 32-1, the attached amicus brief is proportionally spaced, has a typeface of 14 points or more and contains 7,000 words or less,

or is

☐  Monospaced, has 10.5 or few characters per inch and contains not more than either 7,000 words or 650 lines of text,

or is

☐  Not subject to the type-volume limitations because it is an amicus brief of no more than 15 pages and complies with Fed.R.App.P. 32 (a)(1)(5).

March 25, 2013
_____
Dated

*/s/ Alexandra Robert Gordon*
_____
Alexandra Robert Gordon
Deputy Attorney General

59

**APPENDIX**



West's Ann.Cal.Fish & G.Code § 2021 Page 1

**c**

**Effective: January 1, 2012**

West's Annotated California Codes Currentness
   Fish and Game Code (Refs & Annos)
      Division 3. Fish and Game Generally
         Chapter 1. Taking and Possessing in General (Refs & Annos)
         ➡➡ **§ 2021. Shark fins; unlawful possession, sale, offer for sale, trading, or distribution; exceptions**

(a) As used in this section "shark fin" means the raw, dried, or otherwise processed detached fin, or the raw, dried, or otherwise processed detached tail, of an elasmobranch.

(b) Except as otherwise provided in subdivisions (c), (d), and (e), it shall be unlawful for any person to possess, sell, offer for sale, trade, or distribute a shark fin.

(c) Any person who holds a license or permit pursuant to Section 1002 may possess a shark fin or fins consistent with that license or permit.

(d) Any person who holds a license or permit issued by the department to take or land sharks for recreational or commercial purposes may possess a shark fin or fins consistent with that license or permit.

(e) Before January 1, 2013, any restaurant may possess, sell, offer for sale, trade, or distribute a shark fin possessed by that restaurant, as of January 1, 2012, that is prepared for consumption.

CREDIT(S)

(Added by Stats.2011, c. 524 (A.B.376), § 2.)

HISTORICAL AND STATUTORY NOTES

2013 Electronic Pocket Part Update

2011 Legislation

Sections 1 and 3 of Stats.2011, c. 524 (A.B.376), provide:

"SECTION 1. The Legislature finds and declares all of the following:

"(a) Sharks, or elasmobranchs, are critical to the health of the ocean ecosystem.

"(b) Sharks are particularly susceptible to decline due to overfishing because they are slow to reach reproductive maturity and birth small litters, and cannot rebuild their populations quickly once they are overfished.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

"(c) Sharks occupy the top of the marine food chain. Their decline is an urgent problem that upsets the balance of species in ocean ecosystems and negatively affects other fisheries. It constitutes a serious threat to the ocean ecosystem and biodiversity.

"(d) The practice of shark finning, where a shark is caught, its fins cut off, and the carcass dumped back into the water, causes tens of millions of sharks to die each year. Sharks starve to death, may be slowly eaten by other fish, or drown because most sharks need to keep moving to force water through their gills for oxygen.

"(e) Data from federal and international agencies show a decline in shark populations worldwide.

"(f) California is a market for shark fin and this demand helps drive the practice of shark finning. The market also drives shark declines. By impacting the demand for shark fins, California can help ensure that sharks do not become extinct as a result of shark finning.

"(g) Shark fin often contains high amounts of mercury, which has been proven dangerous to consumers' health."

"SEC. 3. No reimbursement is required by this act pursuant to Section 6 of Article XIII B of the California Constitution because the only costs that may be incurred by a local agency or school district will be incurred because this act creates a new crime or infraction, eliminates a crime or infraction, or changes the penalty for a crime or infraction, within the meaning of Section 17556 of the Government Code, or changes the definition of a crime within the meaning of Section 6 of Article XIII B of the California Constitution."

CROSS REFERENCES

   Shark fins, sale or possession of shark carcass, skin, or fin for taxidermy purposes not prohibited by this section, see Fish and Game Code § 2021.5.

West's Ann. Cal. Fish & G. Code § 2021, CA FISH & G § 2021

Current with all 2012 Reg.Sess. laws, Gov.Reorg.Plan No. 2 of 2011-2012, and all propositions on 2012 ballots.

(C) 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

END OF DOCUMENT



**C**

**Effective: January 1, 2012**

West's Annotated California Codes Currentness
    Fish and Game Code (Refs & Annos)
        Division 3. Fish and Game Generally
            Chapter 1. Taking and Possessing in General (Refs & Annos)
        ➔➔ **§ 2021.5. Shark fins; possession or donation by persons holding license or permit to take or land sharks for recreational or commercial purposes; possession, sale, offer for sale, trade, or distribution of shark fins possessed as of Jan. 1, 2012; sale or possession for taxidermy purposes; annual report to Legislature**

(a) Notwithstanding Section 2021, all of the following provisions apply:

(1) Any person who holds a license or permit issued by the department to take or land sharks for recreational or commercial purposes may possess, including for purposes of consumption or taxidermy, or may donate to a person licensed or permitted pursuant to Section 1002, a shark fin or fins consistent with that license or permit.

(2) Before July 1, 2013, any person may possess, sell, offer for sale, trade, or distribute a shark fin possessed by that person, as of January 1, 2012.

(3) Nothing in Section 2021 prohibits the sale or possession of a shark carcass, skin, or fin for taxidermy purposes pursuant to Section 3087.

(b)(1) The Ocean Protection Council shall submit an annual report to the Legislature that lists any shark species that have been independently certified to meet internationally accepted standards for sustainable seafood, as defined in Section 35550 of the Public Resources Code, and adopted by the Ocean Protection Council pursuant to Section 35617 of the Public Resources Code, including chain of custody standards.

(2) A report to be submitted pursuant to paragraph (1) shall be submitted in compliance with Section 9795 of the Government Code.

CREDIT(S)

(Added by Stats.2011, c. 525 (A.B.853), § 1.)

HISTORICAL AND STATUTORY NOTES

2013 Electronic Pocket Part Update

2011 Legislation

Section 2 of Stats.2011, c. 525 (A.B.853), provides:

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

"SEC. 2. This act shall become operative only if Assembly Bill 376 [Stats.2011, c. 524] of the 2011-12 Regular Session is enacted and takes effect on or before January 1, 2012."

West's Ann. Cal. Fish & G. Code § 2021.5, CA FISH & G § 2021.5

Current with all 2012 Reg.Sess. laws, Gov.Reorg.Plan No. 2 of 2011-2012, and all propositions on 2012 ballots.

(C) 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

END OF DOCUMENT

**Assembly Bill No. 376**

CHAPTER 524

An act to add Section 2021 to the Fish and Game Code, relating to sharks.

[Approved by Governor October 7, 2011. Filed with
Secretary of State October 7, 2011.]

LEGISLATIVE COUNSEL'S DIGEST

AB 376, Fong. Shark fins.

Existing law makes it unlawful to possess any bird, mammal, fish, reptile, or amphibian, or parts thereof, taken in violation of any of the provisions of the Fish and Game Code, or of any regulation made under it.

This bill, except as specified, would make it unlawful for any person to possess, sell, offer for sale, trade, or distribute a shark fin, as defined.

The bill, by creating a new crime, would impose a state-mandated local program.

The California Constitution requires the state to reimburse local agencies and school districts for certain costs mandated by the state. Statutory provisions establish procedures for making that reimbursement.

This bill would provide that no reimbursement is required by this act for a specified reason.

*The people of the State of California do enact as follows:*

SECTION 1.  The Legislature finds and declares all of the following:

(a) Sharks, or elasmobranchs, are critical to the health of the ocean ecosystem.

(b) Sharks are particularly susceptible to decline due to overfishing because they are slow to reach reproductive maturity and birth small litters, and cannot rebuild their populations quickly once they are overfished.

(c) Sharks occupy the top of the marine food chain. Their decline is an urgent problem that upsets the balance of species in ocean ecosystems and negatively affects other fisheries. It constitutes a serious threat to the ocean ecosystem and biodiversity.

(d) The practice of shark finning, where a shark is caught, its fins cut off, and the carcass dumped back into the water, causes tens of millions of sharks to die each year. Sharks starve to death, may be slowly eaten by other fish, or drown because most sharks need to keep moving to force water through their gills for oxygen.

(e) Data from federal and international agencies show a decline in shark populations worldwide.

95

(f)  California is a market for shark fin and this demand helps drive the practice of shark finning. The market also drives shark declines. By impacting the demand for shark fins, California can help ensure that sharks do not become extinct as a result of shark finning.

(g)  Shark fin often contains high amounts of mercury, which has been proven dangerous to consumers' health.

SEC. 2.  Section 2021 is added to the Fish and Game Code, to read:

2021.  (a)  As used in this section "shark fin" means the raw, dried, or otherwise processed detached fin, or the raw, dried, or otherwise processed detached tail, of an elasmobranch.

(b)  Except as otherwise provided in subdivisions (c), (d), and (e), it shall be unlawful for any person to possess, sell, offer for sale, trade, or distribute a shark fin.

(c)  Any person who holds a license or permit pursuant to Section 1002 may possess a shark fin or fins consistent with that license or permit.

(d)  Any person who holds a license or permit issued by the department to take or land sharks for recreational or commercial purposes may possess a shark fin or fins consistent with that license or permit.

(e)  Before January 1, 2013, any restaurant may possess, sell, offer for sale, trade, or distribute a shark fin possessed by that restaurant, as of January 1, 2012, that is prepared for consumption.

SEC. 3.  No reimbursement is required by this act pursuant to Section 6 of Article XIII B of the California Constitution because the only costs that may be incurred by a local agency or school district will be incurred because this act creates a new crime or infraction, eliminates a crime or infraction, or changes the penalty for a crime or infraction, within the meaning of Section 17556 of the Government Code, or changes the definition of a crime within the meaning of Section 6 of Article XIII B of the California Constitution.

O

95

## Assembly Bill No. 853

### CHAPTER 525

An act to add Section 2021.5 to the Fish and Game Code, relating to sharks.

[Approved by Governor October 7, 2011. Filed with
Secretary of State October 7, 2011.]

LEGISLATIVE COUNSEL'S DIGEST

AB 853, Fong. Sharks.

Existing law makes it unlawful to possess any bird, mammal, fish, reptile, or amphibian, or parts thereof, taken in violation of any of the provisions of the Fish and Game Code, or of any regulation made under it.

This bill would create exemptions from a shark fin prohibition proposed by AB 376. The bill would require the Ocean Protection Council to submit an annual report to the Legislature that lists any shark species that have been independently certified to meet internationally accepted standards for sustainable seafood, as provided. The provisions of the bill would become operative only if AB 376 is enacted and takes effect on or before January 1, 2012.

*The people of the State of California do enact as follows:*

SECTION 1.   Section 2021.5 is added to the Fish and Game Code, to read:

2021.5.   (a)   Notwithstanding Section 2021, all of the following provisions apply:

(1)   Any person who holds a license or permit issued by the department to take or land sharks for recreational or commercial purposes may possess, including for purposes of consumption or taxidermy, or may donate to a person licensed or permitted pursuant to Section 1002, a shark fin or fins consistent with that license or permit.

(2)   Before July 1, 2013, any person may possess, sell, offer for sale, trade, or distribute a shark fin possessed by that person, as of January 1, 2012.

(3)   Nothing in Section 2021 prohibits the sale or possession of a shark carcass, skin, or fin for taxidermy purposes pursuant to Section 3087.

(b)   (1)   The Ocean Protection Council shall submit an annual report to the Legislature that lists any shark species that have been independently certified to meet internationally accepted standards for sustainable seafood, as defined in Section 35550 of the Public Resources Code, and adopted by

93

the Ocean Protection Council pursuant to Section 35617 of the Public Resources Code, including chain of custody standards.

(2) A report to be submitted pursuant to paragraph (1) shall be submitted in compliance with Section 9795 of the Government Code.

SEC. 2. This act shall become operative only if Assembly Bill 376 of the 2011–12 Regular Session is enacted and takes effect on or before January 1, 2012.

O

# CERTIFICATE OF SERVICE

Case Name: **Chinatown Neighborhood Ass'n, et al. v.**       No. **13-15188**
**Edmund G. Brown Jr., et al. (Appeal of Denial**
**of PI)**

I hereby certify that on <u>March 25, 2013,</u> I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

## ANSWERING BRIEF OF APPELLEES

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on <u>March 25, 2013,</u> at San Francisco, California.

|  |  |
|---|---|
| N. Newlin | /s/ N. Newlin |
| Declarant | Signature |

20681454.doc