No. 13-15188

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

CHINATOWN NEIGHBORHOOD ASSOCIATION, a nonprofit corporation, and ASIAN AMERICANS FOR POLITICAL ADVANCEMENT, a political action committee,

*Plaintiffs-Appellants,*

v.

EDMUND G. BROWN, Jr., Governor of the State of California; KAMALA HARRIS, Attorney General of the State of California; and CHARLTON H. BONHAM, Director of the California Department of Fish & Wildlife,

*Defendants-Appellees,*

and

THE HUMANE SOCIETY OF THE UNITED STATES; MONTEREY BAY AQUARIUM FOUNDATION; and ASIAN PACIFIC AMERICAN OCEAN HARMONY ALLIANCE,

*Intervenor-Defendants-Appellees.*

On Appeal from the United States District Court for the
Northern District of California
Case No. 4:12-cv-03759 PJH

**BRIEF OF PROPOSED *AMICUS CURIAE* NATURAL RESOURCES DEFENSE COUNCIL IN SUPPORT OF DEFENDANTS-APPELLEES**

Seth L. Atkinson
Natural Resources Defense Council
111 Sutter Street, 20th Floor
San Francisco, CA 94104
(415) 875-6100

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rules of Appellate Procedure 29(c)(1) and 26.1, proposed *Amicus Curiae* Natural Resources Defense Council submits that it has no parent corporations  and no publicly issued stock shares or securities.  As such, no publicly-held corporation holds stock in proposed *Amicus Curiae* Natural Resources Defense Council.

## AMICUS BRIEF AUTHORSHIP STATEMENT

Pursuant to Federal Rule of Appellate Procedure 29(c)(5), proposed *Amicus Curiae* Natural Resources Defense Council affirms that this brief was wholly authored by counsel for Natural Resources Defense Council, and was not authored in whole or in part by counsel for any party. Proposed *Amicus Curiae* Natural Resources Defense Council further affirms that no person (including parties, parties' counsel, or other persons) contributed money to the Natural Resources Defense Council that was intended to fund preparation or submittal of this brief.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT......................................................i

AMICUS BRIEF AUTHORSHIP STATEMENT ................................................ ii

TABLE OF AUTHORITIES.................................................................. v

INTRODUCTION .............................................................................1

STATEMENT OF FACTS ....................................................................2

I.      The Role of Sharks in Maintaining Healthy Ecosystems........................2

II.     The Importance of Healthy Marine Ecosystems to
        California's Economy ...................................................................3

III.    The Status of Shark Populations in California Waters
        and Worldwide .........................................................................4

IV.     Shark Fishing, Finning, and the Global Trade in Shark Fins ................8

V.      Why Jurisdictions Are Increasingly Banning Shark Fins ....................11

VI.     The Passage of California's Shark Fin Ban...............................14

ARGUMENT.................................................................................19

I.      The District Court Understood and Applied the Correct
        Legal Standard for a Preliminary Injunction...........................19

        A.      The District Court Discussed Both Formulations of
                the Likelihood of Success Prong ....................................19

        B.      The District Court's Conclusion of No Likelihood
                of Success Was Responsive to Both Formulations ....................20

II.    The District Court Was Correct in Finding Plaintiffs Had No
       Likelihood of Success on the Merits...........................................................21

       A.    Plaintiffs Cannot Succeed on Their Dormant
             Commerce Clause Claim...................................................................22

       B.    Plaintiffs Cannot Succeed on Their Equal
             Protection Claim ................................................................................29

III.   The District Court Adequately Analyzed the Remaining
       Prongs of the Preliminary Injunction Standard .....................................37

CONCLUSION ..........................................................................................................38

CERTIFICATE OF COMPLIANCE ....................................................................39

CERTIFICATE OF SERVICE ...............................................................................40

ADDENDUM...............................................................................................................41

# TABLE OF AUTHORITIES

**Cases**                                                                         **Page**

*Adams v. Shannon,*
    7 Cal. App. 3d 427 (1970) .........................................................................29

*Alliance for the Wild Rockies v. Cottrell,*
    632 F.3d 1127 (9th Cir. 2011)...........................................................20, 37

*Bayside Fish Flour Co. v. Gentry,*
    297 U.S. 422 (1936) ......................................................................................29

*Bronco Wine Co. v. Jolly,*
    129 Cal. App. 4th 988 (2006) .................................................................24

*Brown-Forman Distillers Corp. v. New York State Liquor Authority,*
    476 U.S. 573 (1986) .............................................................................22, 24

*Darensburg v. Metropolitan Transportation Commission,*
    636 F.3d 511 (9th Cir. 2011)...............................................................30, 33

*FCC v. Beach Communications, Inc.,*
    508 U.S. 307 (1993) .............................................................................34, 36

*Freedom Holdings, Inc. v. Spitzer,*
    357 F.3d 205 (2d Cir. 2004).......................................................................24

*Healy v. Beer Institute,*
    491 U.S. 324 (1989) ....................................................................................23

*McLaughlin v. Florida,*
    379 U.S. 184  (1964) ....................................................................................29

*National Association of Optometrists & Opticians v. Harris,*
    682 F.3d 1144 (9th Cir. 2012).....................................................25, 27, 28

**Cases (continued)** **Page**

*New York ex rel. Silz v. Hesterberg,*
    211 U.S. 31 (1908) ...............................................................29

*Nordlinger v. Hahn,*
    505 U.S. 1 (1992) .................................................................34

*Pacific Merchant Shipping Association v. Goldstene,*
    639 F.3d 1154 (9th Cir. 2011).............................................22

*Personnel Administrator of Massachusetts v. Feeney,*
    442 U.S. 256 (1979) .............................................................33

*Pike v. Bruce Church, Inc.,*
    397 U.S. 137 (1970) .......................................................25, 28

*S.D. Myers, Inc. v. City & County of San Francisco,*
    253 F.3d 461 (9th Cir. 2001).............................................22

*Seariver Marine Financial Holdings, Inc. v. Mineta,*
    309 F.3d 662 (9th Cir. 2002)..............................................35

*UFO Chuting of Hawaii, Inc. v. Smith,*
    508 F.3d 1189 (9th Cir. 2007)............................................35

*Washington v. Davis,*
    426 U.S. 229 (1976) .............................................................30

*Winter v. Natural Resources Defense Council, Inc.,*
    555 U.S. 7 (2008) ..........................................................19, 37

**Statutes** **Page**

Cal. Fish & Game Code § 2021 ...........................................23, 29

**Other Authorities**                                                        **Page**

Assem. 376 § 1 (Cal. 2011) ...................................................................18, 34

Assem. 376 § 2(b) (Cal. 2011) ...............................................................14

Assem. 853 (Cal. 2011) ...........................................................................15

Shelley C. Clarke et al., *Global Estimates of Shark Catches*
      *Using Trade Records from Commercial Markets,*
      9 Ecology Letters 1115 (2006). ................................................. 8-9

Boris Worm et al., *Global Catches, Exploitation Rates, and*
      *Rebuilding Options for Sharks,*
      40 Marine Policy 194 (2013)........................................................8

vii

## INTRODUCTION

In 2011, the State of California took an important step in wildlife conservation by passing a law to ban the sale, possession, and trade of shark fins.  Shark fins—like rhinoceros horns, bear bile, elephant tusks, and tiger paws—are often derived from hunting practices that are extremely harmful to our natural environment.  Tens of millions of sharks worldwide are killed each year to feed the market for shark fins, with devastating ecological consequences.  The California legislature recognized this problem, deliberated thoroughly, and passed a well-crafted law designed to end California's contribution to the global shark fin trade.  The law regulates behavior only within California, carefully respecting the overlapping authority of the Federal Government and the limits of state jurisdiction.  The law also is grounded firmly in conservation science, with a clear goal of protecting our oceanic ecosystems and a well-established causal nexus for achieving that goal.

Any act of environmental protection, however, generates pushback from those profiting under the status quo.  Plaintiff-Appellants are a

1

collection of individuals who trade in shark fins.  These individuals deny

the well-established science on shark conservation, and instead view

California's law banning shark fins as a personal attack on themselves and

their businesses.  With essentially no evidence to support them, Plaintiff-

Appellants spun these beliefs into constitutional claims to challenge

California's shark fin law.  Denied a preliminary injunction by the District

Court, Plaintiff-Appellants now take their unfounded claims up on appeal.

## STATEMENT OF FACTS

### I.    The Role of Sharks in Maintaining Healthy Ecosystems

Most shark species are apex predators, meaning they occupy the

highest position in the marine food chain.  In this role, sharks exert a strong

"top-down" effect on marine ecosystems:  by preying on species lower in

the food chain, they keep populations of lower trophic-level species in

check, and thereby maintain balance in the ecosystem.  Supplemental

Excerpts of Record ("SER") 51.  Because sharks are so high in the food

chain, their prey species are often themselves predators, which makes the

effects of shark predation ripple downward through the ecosystem,

ultimately affecting even primary production such as marine plants and algae. *See, e.g.*, SER 52.

Scientific studies clearly establish that when populations of apex predators decline, ecosystems can be severely affected.  For example, recent research found that declining shark populations in an area of the Pacific Ocean led to an increase in rays (a lower trophic-level predator), which in turn decimated several shellfish species (the rays' prey).  SER 52.  This kind of "trophic cascade" can dramatically reshape marine communities.  SER 51.  Importantly, these ecosystem impacts do not require complete extirpation of sharks; they are well-documented even in situations of reduced shark abundance.  SER 52.

## II.    The Importance of Healthy Marine Ecosystems to California's Economy

California has the largest ocean-related economy in the United States, contributing billions of dollars to the state GDP.  SER 40.   Many aspects of California's ocean economy depend on healthy marine ecosystems.  SER 40-41.  For example, Californians spend significant amounts of money on tourism, diving, photography, commercial and recreational fishing, and

3

wildlife viewing, among other things.  SER 40-41.  Some of these activities directly involve sharks, like shark diving and underwater photography. SER 40-41.  Others depend more broadly on vibrant marine ecosystems, which in turn rely on the ecological balance maintained by sharks.  SER 41.

California's oceans also create tremendous non-monetized value. Among other things, our oceans provide vital ecosystem services, biodiversity reserves, and existence value; the sum of these non-market values may rival or even exceed the market value of California's oceans. SER 41.  Once again, healthy ocean ecosystems—and the ecological balance maintained by sharks—are critical for creating this value.  SER 41.

## III.  The Status of Shark Populations in California Waters and Worldwide

Between 41 and 44 species of shark are known to occur off the coast of California.  SER 48.  None of these species are unique to California, and many are worldwide in distribution.  SER 48.  Furthermore, sharks are highly migratory, and the majority of sharks found off California's coast will travel outside the 200-mile limit of U.S. waters at some point in their lives.  SER 48.

4

Due in part to these complex migrations and distribution patterns, the status of shark populations is not always known at the species level. None of the species off the coast of California have been definitively assessed, making species-level population estimates unavailable for many of these sharks. *See* SER 48. However, broader-level studies have established that shark populations are declining rapidly worldwide. SER 48. This is an important distinction: even though many individual shark species are data-poor on an level, it is well-understood that sharks are declining worldwide.

The declining trend is severe, with one recent study estimating that global shark populations have decreased by 90% from their historical abundance. SER 48. Moreover, the steepness of the decline appears to be increasing. SER 48-49. The status of some individual species are known, and reflect the declining trend: IUCN experts classify great hammerhead (*Sphyrna mokarran*) and scalloped hammerhead (*Sphyrna lewini*) sharks as globally endangered, and classify smooth hammerhead (*Sphyrna zygaena*), great white (*Carcharodon carcharias*), basking (*Cetorhinus maximus*) and

5

oceanic whitetip (*Carcharhinus longimanus*) sharks, along with two species of mako shark (*Isurus* spp.) and three species of thresher shark (*Alopias* spp.), as vulnerable to extinction.  SER 49.

Because the decline of sharks is a worldwide trend, however, individual shark populations can be expected to be in very different conditions depending on species and area.  Some populations may still be relatively intact, while others, like those listed by the IUCN, are severely depleted and at risk of extinction.  Even if the current global decline continues, it is not likely that all species of shark in superorder *Selachimorpha* will ultimately disappear.  Rather, the results would be heterogeneous across geographic areas and species types:  some of the more resilient shark species would remain alive while others go extinct, and some areas with fewer stressors would retain shark populations while others experience local or regional extirpation.  Indeed, this scenario is already underway, as the IUCN Shark Specialist Group recently assessed the global conservation status of 64 species of open ocean (pelagic) sharks and rays and found 32 percent to be threatened with extinction.  SER 48-49.

6

To understand why sharks are declining rapidly around the world, it helps to understand certain features about shark biology and the fisheries that target them.  First, sharks tend to be large, solitary, slow-growing, and require a long time to reach sexual maturity.  Other fish species, by comparison, tend to be smaller, live in groups or schools, grow quickly, and reach sexual maturity more quickly.  This combination of characteristics makes shark species far less resilient to fishing pressure. SER 49.  Second, sharks produce relatively few young in each litter, using either live-birth or large egg reproductive strategies.  Other fish species, in contrast, tend to use reproductive strategies in which an adult female can produce thousands or even millions of eggs each reproductive cycle. Sharks' high-investment reproductive strategies make them vulnerable to overfishing, as they cannot replenish their numbers nearly as quickly as other fish species.  SER 49.  Third, fishing gears (hook and line, gillnets, and trawls) primarily target adult sharks, leaving only immature individuals alive.  This can dramatically decrease reproduction in a population of sharks, as the sharks that remain alive must grow to maturity before

7

contributing to the population's reproductive success.  SER 49-50.  Finally,

the boundaries between distinct shark populations are not well-

understood.  Recent genetic studies have found separate, non-

interbreeding populations, or multiple distinct species, where it was

previously believed to be a single wide-ranging species.  In these

situations, heterogeneous fishing pressure can cause local extirpation much

more easily than previously believed.  SER 50.  Taken together, these

features generally make sharks much more vulnerable to overfishing than

other species of fish, and help to explain the dramatic decline of sharks

worldwide in recent years.

## IV.   Shark Fishing, Finning, and the Global Trade in Shark Fins

Between 26 and 73 million sharks are killed by humans each year.[1]

SER 49.  The total catch is not distributed evenly around the world, but

_____

[1] This estimate may in fact be low; recent research suggests that
approximately 100 million sharks are killed per year.  *See*  Boris Worm et
al., *Global Catches, Exploitation Rates, and Rebuilding Options for Sharks*, 40
Marine Pol'y 194 (2013).  Authors of this new estimate, as well as past
estimates, conclude that global total shark mortality  is significantly
exceeding sustainable rates.  *See id.*; Shelley C. Clarke et al., *Global Estimates*

instead represents high—and unsustainable—catch numbers in some areas, and lower catch numbers in other areas.  As would be expected, industrialized countries with strong legal systems frequently have lower shark catches, while poorly-regulated jurisdictions like many developing countries and the high seas experience the highest catches.  Indeed, due to a lack of legal infrastructure and enforcement, shark fishing remains essentially open-access in many countries as well as on the high seas.  *See* SER 50.

Of the tens of millions of sharks killed per year, some are caught and landed for their meat, but far more are simply killed for their fins.  In the extraordinary brutal process of "finning," a shark's fins are cut off, often while the animal is still alive, and then the shark is thrown back into the water to die.  SER 39.  Finning is prohibited in U.S. waters, and some other countries similarly prohibit finning in their waters.  SER 50.  Enforcement varies widely, however, and significant illegal and unreported shark finning occurs even in the waters of countries like the United States that

_____

*of Shark Catches Using Trade Records from Commercial Markets*, 9 Ecology Letters 1115 (2006).

have banned finning. *See* SER 40, 50. Moreover, many countries have not yet banned shark finning, and international waters lack effective regulations with respect to finning. SER 50.

The global slaughter of sharks is driven primarily by demand for shark fins. In Asia and other parts of the world, shark fins can be sold at a very high price, fetching upwards of $100/kg. SER 38. This makes shark fins an extremely valuable commodity and incentivizes fishermen to kill sharks for their fins—especially in the developing world, where the amount of money brought in by a cargo-hold full of shark fins can be wildly out of proportion with the amount of money brought in by a similar cargo-hold full of fish. Accordingly, many artisanal fishermen either actively target sharks and fin them, or simply cut the fins off any sharks that come in as bycatch, instead of releasing those sharks unharmed. *See* SER 50.

After landing at a port, shark fins are generally sent to Hong Kong for processing. *See* SER 38-39, 50. Hong Kong handles a majority of the world's shark fin processing, with raw fins flowing in from around the

10

world, and processed fins flowing out to centers of consumption worldwide, where they are made into shark fin soup and other products. SER 38-39, 50-51. This global trade has the effect of laundering shark fins, as it can be nearly impossible to identify the species that a processed shark fin came from, much less the particular geographic area where the shark was caught. SER 51. Indeed, a recent study demonstrated that American consumers of shark fin soup are often unknowingly consuming at-risk and endangered species caught around the world. SER 51.

## V.    Why Jurisdictions Are Increasingly Banning Shark Fins

Global awareness of the need for shark conservation has increased in recent years. As more and more studies have found shark populations to be declining, news media and internet sources are increasingly covering the issue. Furthermore, ecosystem impacts from shark removal are already being experienced in some areas, including trophic cascades and altered marine communities. SER 51. Astute observers also recognize that declining shark populations have implications for the entire world, not just people living in areas where sharks are disappearing. Due to the highly

11

migratory nature of sharks, a population decline in one area can spread to other areas, or can act as a sink for healthier populations. For this reason, a shark killed in one place can affect the ecosystem in a wholly different location, and even jurisdictions that tightly regulate their own waters have cause for concern. *See* SER 39-40.

The problem of declining shark populations is difficult to address, however, due to the nature of the shark fin trade. With a high price of fins driving the global fishery, and shark finning taking place largely in poorly-regulated jurisdictions (or illegally in better-regulated jurisdictions), traditional regulatory measures have not been effective in arresting the decline of shark populations. *See* SER 40. The lack of fin traceability further complicates things, making it impossible to selectively regulate fins that come from depleted shark stocks.

In the face of these challenges, jurisdictions are increasingly turning to market solutions for shark conservation, and in particular, shark fin bans. *See* SER 38, 44. By closing off outlets for the sale of shark fins, a fin ban is able to reduce demand, and thereby help reduce both the volume of

12

trading and price on the global shark fin market.  Ultimately, lower

demand leads to fewer sharks being killed for their fins, and an improved

conservation outcome.

Each jurisdiction's fin ban may have only a small individual impact

on the global market, but fin bans must be viewed in the context of a

collective global effort.  More and more jurisdictions are moving to ban

shark fins, similar to the way international consensus gradually formed in

the past to ban tiger products, rhino horns, and other such wildlife

products.  To date, several U.S. states have enacted shark fin bans,

including California, Hawaii, Oregon, Washington, and Illinois.  SER 38,

44.  The U.S. territories of Guam and the Northern Mariana Islands also

banned shark fins.  SER 38.  These island territories are important as both

are situated in the Pacific Ocean, a center of shark finning.  Various

municipalities around the world have similarly instituted controls on shark

fins, most recently Toronto and several other Canadian cities.  SER 38.

Private companies, including major hotel and restaurant chains, are

increasingly taking similar measures, by removing shark fin products from their operations.  SER 44.

In addition to their indirect effect on global finning, shark fin bans also have the direct effect of discouraging illegal shark fishing and finning in the jurisdiction's own waters.  Shark poaching is well-documented— even in U.S. water—and is driven by the high price of shark fins.  SER 40. Once the poached fins are landed, they enter the stream of commerce and it becomes impossible to identify them.  SER 40, 51.  By prohibiting the possession and sale of shark fins, a ban makes illegal shark fishing or finning much more difficult, because the fins cannot be landed at the jurisdiction's own ports.  Thus, fin bans reduce both the feasibility and profit generated from illegal shark fishing and finning activity.

## VI.    The Passage of California's Shark Fin Ban

On February 14, 2011, Assemblymembers Fong and Huffman introduced Assembly Bill 376, which proposed to make it "unlawful for any person to possess, sell, offer for trade, trade, or distribute a shark fin." Assem. 376 § 2(b) (Cal. 2011).  This bill, together with a companion bill

providing an implementation period and safe harbor provisions,[2] is commonly referred to as the "Shark Fin Ban."

Even before its introduction, a broad coalition of stakeholders supported the Shark Fin Ban. SER 41-42. The coalition of supporters included conservation groups, humane organizations, cultural heritage groups, community leaders, restaurants, divers, and fisherman. SER 41-42. Supporters worked with legislators to draft the bill—including conducting legal analysis about potential federal constitutional issues—and participated in a coordinated launch effort designed to move the legislation forward. SER 41-42.

The coalition of Shark Fin Ban supporters included numerous organizations and individuals from the Asian-American community. In fact, an umbrella organization was formed explicitly to give voice to and recognize Asian-American supporters of the fin ban. SER 42. That organization, the Asian Pacific American Ocean Harmony Alliance

---

[2] The companion bill, Assembly Bill 853, provided several carve-outs and exceptions to the shark fin prohibition contained in AB 376, and was explicitly made contingent on the passage of AB 376. *See* Assem. 853 (Cal. 2011).

(APAOHA), includes many community leaders and elected officials.  SER 42-43.  APAOHA and its supporters view banning shark fins as a way of honoring ancient tenets of Asian philosophy that emphasize the importance of harmony between nature and humanity.  SER 42.  APAOHA was and remains part of the coalition of Shark Fin Ban supporters, and during the passage of the Shark Fin ban, other members of the coalition deferred to APAOHA on cultural issues and questions.  SER 42.

Throughout 2011, the coalition worked to educate policymakers and the public on the need for shark conservation, the role of shark fins in contributing to the decline of sharks worldwide, and the connection between the worldwide decline of sharks and the health of California's ocean ecosystems.  SER 42.  The Shark Fin Ban gathered broad support, with polls showing that 76% of all Californians were in favor of the ban, including 70% of Chinese Californians surveyed.  SER 42.

Advocates of the Shark Fin Ban made clear that the bill's purpose was to promote shark conservation and healthy ocean ecosystems.  SER 42.  Legislators and staff, in turn, demonstrated that they understood marine

16

conservation to be the goal of the Shark Fin Ban.  For example, the committee report on AB 376 from the Assembly Committee on Water, Parks and Wildlife explicitly stated shark conservation as the basis for the legislation.  SER 43.

Certain commercial interests—those involved in the trading and sale of shark fins—were opposed to the Shark Fin Ban, and they received significant media coverage.  *See* SER 43.  Some opponents argued that the Shark Fin Ban was an attack on Asian culture.  SER 43.  Attitudes among the Asian-American community were generally positive, though, and polling showed that only 18% of Chinese-American voters surveyed opposed the Shark Fin Ban, while 12% had no opinion.  SER 43.  Numerous Asian Americans spoke up in favor of the ban during its passage, and many prominent individuals in the Asian-American community joined APAOHA in order to express their support for shark conservation and the Shark Fin Ban.  SER 43.

Ultimately, the bill was propelled through committees and floor votes in the Assembly and Senate by the breadth of the coalition in

17

support, and the strength of the policy arguments for a shark fin ban.  SER

43.  The Assembly voted 65-8 in favor of the ban on May 23, 2011, and the

Senate voted 25-9 in favor on September 6, 2011.  SER 43.  The voting

records reflect very strong bipartisan support, as well as support from

Asian Pacific American legislators.  SER 43.

The text of AB 376 as passed demonstrates the legislature's concern

with shark conservation, as the findings section extensively discusses the

need for shark conservation and the importance of sharks to marine

ecosystems.  *See* Assem. 376 § 1 (Cal. 2011).  The bill contains no text

suggesting an intent to harm Chinese-Americans or Asian culture.  *Id.*

Governor Brown signed the bill on October 7, 2011, clearly

recognizing that the purpose of the legislation was to protect sharks and

ocean ecosystems.  Governor Brown stated:  "The practice of cutting the

fins off of living sharks and dumping them back in the ocean is not only

cruel, but it harms the health of our oceans. . . . Researchers estimate that

some shark populations have declined by more than 90 percent,

portending grave threats to our environment and commercial fishing.  In

the interest of future generations, I have signed this bill."  SER 44.

## ARGUMENT

## I.    The District Court Understood and Applied the Correct Legal Standard for a Preliminary Injunction

Plaintiff-Appellants argue the District Court in this case mis-applied

the legal standard for preliminary injunctions.  Appellants' Opening Brief

("AOB") 21.  They are wrong.

### A.    The District Court Discussed Both Formulations of the Likelihood of Success Prong

In the U.S. District Courts, a preliminary injunction will only issue if

the plaintiff shows "(1) a strong likelihood of success on the merits, (2) the

possibility of irreparable injury to plaintiff if preliminary relief is not

granted, (3) a balance of hardships favoring the plaintiff, and (4) that an

injunction is in the public interest."  *Winter v. Natural Res. Def. Council, Inc.*,

555 U.S. 7, 20 (2008).

The Ninth Circuit has created a variant on the preliminary injunction

standard, in which the likelihood of success factor is scaled against the

19

balance of hardships factor, such that the probability of success required

decreases as the balance of hardships tilts more and more strongly in the

plaintiff's favor.  *See Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127

(9th Cir. 2011).  All four factors from *Winter*, however, must always be met;

this "sliding scale" approach simply allows the first and third factors to

substitute for each other to a limited degree.  *See id.* at 1134-35.

The District Court in this case understood and clearly stated the

elements of the typical *Winter* legal standard for issuance of a preliminary

injunction.  Excerpts of Record ("ER") 6.  The District Court then discussed

the Ninth Circuit sliding scale approach.  ER 6-7.

## B.    The District Court's Conclusion of No Likelihood of Success Was Responsive to Both Formulations

After reviewing Plaintiff-Appellants' Equal Protection claim, the

District Court concluded Plaintiff-Appellants "cannot meet their burden of

showing a likelihood of success on the merits of the equal protection

claim."  ER 11.  The District Court made similar findings for the rest of

Plaintiff-Appellants' claims.  ER 11-13.  Plaintiff-Appellants seize on these

words as indicating that the District Court failed to apply the sliding scale

20

approach, and only analyzed their claims under the traditional *Winter*

formula.  AOB 21-22.

Plaintiff-Appellants are wrong, for the District Court explicitly stated

at the outset that it was analyzing their claims under both formulas:

> With regard to likelihood of success, the court agrees with
> defendants that plaintiffs have not met their burden, whether
> under the *Winter* formulation, or under the "serious questions"
> modification stated in *Cottrell*.

ER 9.  Given this statement, it was not necessary to reiterate in the opinion,

every time the court analyzed the likelihood of success prong, that both the

*Winter* and "serious questions" formulations were being considered.  When

the District Court found Plaintiff-Appellants could not show a likelihood of

success, that conclusion was intended to encompass both formulations.

ER 9.

## II.    The District Court Was Correct in Finding Plaintiffs Had No
Likelihood of Success on the Merits

Plaintiff-Appellants argue the District Court erred in finding no

likelihood of success or serious questions on the merits of their claims.

AOB 23-53.  Again, they are wrong.  We limit our discussion here to

21

Plaintiff-Appellants' Dormant Commerce Clause and Equal Protection claims, as we did in our amicus brief before the district court.

### A. Plaintiffs Cannot Succeed on Their Dormant Commerce Clause Claim

The "central rationale" of dormant Commerce Clause jurisprudence is to avoid economic protectionism. *S.D. Myers, Inc. v. City & County of San Francisco*, 253 F.3d 461, 466 (9th Cir. 2001). To that end, dormant Commerce Clause analysis starts by asking whether the law in question "directly regulates or discriminates against interstate commerce, or [whether] its effect is to favor in-state economic interests over out-of-state interests." *Brown-Forman Distillers Corp. v. New York State Liquor Auth.*, 476 U.S. 573, 579 (1986). If the law does discriminate, it is often held invalid. *Id.*; *Pac. Merch. Shipping Ass'n v. Goldstene*, 639 F.3d 1154, 1177 (9th Cir. 2011).

In this case, the District Court correctly found that the Shark Fin Ban does not discriminate against interstate commerce, or favor in-state economic interests over out-of-state interests. ER 12. The ban regulates even-handedly, prohibiting the sale and possession of shark fins anywhere

in California, regardless of where the fins came from and who is selling them.  *See* Cal. Fish & Game Code § 2021 (codifying the Shark Fin Ban).

A separate route for finding a law invalid under the dormant Commerce Clause is to argue that it constitutes an extraterritorial regulation.  *See Healy v. Beer Inst.*, 491 U.S. 324, 336 (1989).  Plaintiffs failed completely to make this argument at the district court level, but the District Court correctly noted in passing that even if they had, it would have been meritless.  ER 12.

The Shark Fin Ban by its own terms only applies to transactions within California.  Although the ban is indeed intended to influence shark finning worldwide, it produces a market-mediated effect—influencing behavior via the subtle drivers of price and demand —and this type of impact on conduct elsewhere has been upheld consistently by courts under dormant Commerce Clause extraterritoriality analysis.  *See, e.g.*, *Healy*, 491 U.S. at 345 (Scalia, J., concurring in part and concurring in the judgment) (noting that pricing effects alone are not a reason to invalidate a law under the dormant Commerce Clause, as "innumerable valid state laws affect

23

pricing decisions in other States"); *Freedom Holdings, Inc. v. Spitzer*, 357 F.3d 205, 220 (2d Cir. 2004) ("The extraterritorial effect described by appellants amounts to no more than the upstream pricing impact of a state regulation."); *Bronco Wine Co. v. Jolly*, 129 Cal. App. 4th 988, 1019 (2006) ("While [the law] will undoubtedly affect interstate commerce because of its upstream impact on the price and volume of [product] ultimately shipped to out-of-state markets, it does not directly regulate those markets.").

By contrast, the type of extraterritorial regulation typically invalidated under the dormant Commerce Clause either involves direct commands of action outside the state's boundaries, or regulations that virtually force actors outside the state to comply—like "[f]orcing a merchant to seek regulatory approval in one State before undertaking a transaction in another." *Brown-Forman Distillers Corp.*, 476 U.S. at 582. With this as context, the District Court's passing comment that "plaintiffs have not shown (and cannot show) that the Shark Fin Law . . . regulates extraterritorially" is clearly correct. ER 12.

24

Given that the Shark Fin Ban does not discriminate against out-of-state interests, or regulate extraterritorially, the District Court correctly proceeded to analyze it under the *Pike* balancing test.  ER 12; *see also Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970) ("Where [a] statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.").

To apply the *Pike* test, courts generally examine two issues.  First, courts assess the burden on interstate commerce, attempting to gauge its magnitude and type.  *See Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F. 3d 1144, 1150 (9th Cir. 2012) ("The threshold issue . . . is whether Plaintiffs have produced sufficient evidence that the challenged laws, though non-discriminatory, impose a significant burden on interstate commerce.").  It is not enough for a plaintiff to merely claim that some commerce will be lost; rather, the magnitude of the effect must be high.  As this Court has stated, "[A] state regulation does not become vulnerable to

25

invalidation under the dormant Commerce Clause merely because it affects interstate commerce.  A critical requirement for proving a violation of the dormant Commerce Clause is that there must be a *substantial burden on interstate commerce.*" *Id.* at 1148 (internal citation omitted) (emphasis in original).

In addition to having a significant magnitude, the burden on commerce generally must be of a certain type—one that implicates national uniformity or broader systemic issues.  *See id.* ("[S]ignificant burdens on interstate commerce generally result from inconsistent regulation of activities that are inherently national or require a uniform system of regulation.").  Burdens on commerce resulting from laws that deal with typical state issues like land use, or health and welfare, are generally not regarded as significant even if they curtail business to some degree.  *See id.* (citing *Great Atl. & Pac. Tea Co. v. Cottrell*, 424 U.S. 366, 371 (1976)).

In this case, the District Court correctly found that the alleged burden on burden on interstate commerce is not significant under the dormant Commerce Clause.  ER 12.  Plaintiff-Appellants provided a handful of

26

declarations describing potential loss in trade and reduction in revenue for certain shark fin trading companies in California, but even reading those declarations to their full extent, the burden is not of the magnitude or type that would make it significant under the dormant Commerce Clause. Read generously, Plaintiff-Appellants' declarations show no more than a few million dollars in lost revenues. *See id.* In the context of California's nearly two-trillion-dollar economy, where environmental and health and safety regulations routinely affect the flow of commerce to the tune of hundreds of millions of dollars—with no dormant Commerce Clause problems— Plaintiff-Appellants' claimed losses cannot be called significant. Furthermore, the alleged burden does not implicate national uniformity or broader systemic issues, and therefore is not of the type that courts find "significant" under the dormant Commerce Clause. *See Nat'l Ass'n of Optometrists*, 682 F.3d at 1148. Because the Shark Fin Ban creates a garden-variety loss of trade and does not implicate national uniformity, and because the magnitude of its commercial impact is small, the District Court

27

was absolutely correct in concluding that "Plaintiffs have identified no cognizable burden on interstate commerce."  ER 12.

The District Court's dormant Commerce Clause analysis properly stopped here.  ER 12.  Precedent from this Court states that without a substantial burden on interstate commerce, "it follows that there cannot be a burden on interstate commerce that is 'clearly excessive in relation to the putative local benefits' under *Pike*."  *Nat'l Ass'n of Optometrists*, 682 F.3d at 1155 (quoting *Pike*, 397 U.S. at 142).  Therefore the District Court had no need to proceed further in the *Pike* balancing test and analyze the putative benefits of the Shark Fin Ban, or to balance those putative benefits with the burden.  In fact, doing so, as Plaintiff-Appellants urge, would be inappropriate.  *See id.* at 1156 ("Because the challenged laws are not discriminatory and do not impose a significant burden on interstate commerce, it would be inappropriate for us to determine the

28

constitutionality of the challenged laws based on our assessment of the

benefits of those laws and the State's wisdom in adopting them.").[3]

### B.    Plaintiffs Cannot Succeed on Their Equal Protection Claim

Under the Equal Protection Clause of the United States Constitution,

a statute is subject to strict scrutiny if it facially discriminates on the basis

of race.  *McLaughlin v. Florida*, 379 U.S. 184, 191 (1964).  The District Court

correctly noted that the Shark Fin Ban does not facially discriminate on the

basis of race.  ER 9.  It does not discriminate at all, nor does it ever mention

race.  It simply prohibits all persons uniformly from possessing, selling, or

trading shark fins in California.  *See* Cal. Fish & Game Code § 2021.

---

[3] Even if the analysis were to continue, the Shark Fin Ban would pass the *Pike* test.  Under *Pike*, the burden is weighed against the putative benefits of the statute—which in this case are significant.  The Shark Fin Ban is well-grounded in conservation science, acting to protect populations of apex predators and in turn helping to protect the health of marine ecosystems and the coastal economies that depend on them, both in California and worldwide.  SER 38-44, 48-52.  Protecting natural resources is a long-established valid state interest, *see, e.g.*, *Bayside Fish Flour Co. v. Gentry*, 297 U.S. 422, 426 (1936); *New York ex rel. Silz v. Hesterberg*, 211 U.S. 31 (1908); *see also Adams v. Shannon*, 7 Cal. App. 3d 427, 432 (1970), and protecting the environment similarly is a valid state interest, *see Pac. Merch. Shipping Ass'n*, 639 F.3d at 1180-81.  Given the significant benefit of the Shark Fin Ban, any burden established by Plaintiff-Appellants' evidence burden would easily be outweighed.

A facially neutral state law like the Shark Fin Ban can also be subject to strict scrutiny under the Equal Protection Clause if it has a disparate impact on a protected class and was motivated by an intent to discriminate against that class. *Washington v. Davis*, 426 U.S. 229, 239-243 (1976). Plaintiff-Appellants continue to argue the Shark Fin Ban has a disparate impact on Chinese-Americans and was motivated by an invidious intent to discriminate against them, and accordingly should be subject to strict scrutiny. AOB 23-38.

The District Court, however, correctly found no intent to discriminate existed, and therefore strict scrutiny does not apply. ER 9-10. To show discriminatory intent, a plaintiff can use various types of evidence:

> [A] plaintiff may articulate discriminatory intent through evidence of (1) discriminatory impact; (2) [t]he historical background of the decision . . . particularly if it reveals a series of official actions taken for invidious purposes; (3) irregularities in the passage of legislation such as departures from normal procedural sequence; and (4) legislative or administrative history such as contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports.

*Darensburg v. Metro. Transp. Comm'n*, 636 F.3d 511, 522-23 (9th Cir. 2011) (internal quotations omitted) (alterations in original).

30

Plaintiff-Appellants in this case offer only a few weak quotations taken out of context, to establish discriminatory intent. First, they point to statements by Assemblymember Paul Fong comparing shark fin soup to foot binding. Assemblymember Fong's statements, however, in no way express an intent to harm Chinese-American people. Fong is himself Chinese-American, and his statements simply show that within the Chinese-American community, there are heterogeneous views about the value of shark fin soup. Indeed, polling during the law's passage showed that Fong's views were shared by a majority of Chinese-Americans—70% of those surveyed supported the Shark Fin Ban. SER 42. If anything, this undercuts Plaintiff-Appellants' effort to establish discriminatory intent, rather than helps it.

Second, Plaintiff-Appellants point to a statement made by Peter Knights of WildAid, a wildlife conservation group, in which Knights said, "[M]y profession has been investigating illegal wildlife trade. Seeing how people get [a]round the regulations. . . . [It's] very difficult to regulate something that's going [on] out on the boat in Indonesia in the middle of

31

the ocean.  It's very easy to regulate if something is happening in

Chinatown here.  Very easy, go around restaurants and find out who's

having what."   According to Plaintiff-Appellants, this statement somehow

implies an invidious intent to discriminate.  It does no such thing.  Rather,

it just illustrates the rationale for using a California-based shark fin ban:

the vast majority of shark mortality occurs outside of California waters and

therefore outside the reach of California regulations, but by banning shark

fins within the state, it is possible to affect the market, and ultimately

reduce total shark mortality.  Knights was simply explaining why it makes

sense for concerned Californians to focus on their own state, rather than

attempting to directly regulate or engage with fishermen abroad.

Third, Plaintiff-Appellants believe discriminatory intent can be

imputed from a statement made by Assemblymember Huffman, where he

said, "Sharks are the top predators in ocean ecosystems around the world.

. . . Removing them by this senseless act of finning can seriously destabilize

the food chain.  To save them from extinction, our bill targets the demand

for these shark fins by banning their sale and possession here in

California."   It is not clear where Plaintiff-Appellants think discriminatory intent can be found in this statement.  Huffman's words obviously express that conservation was the purpose behind the law.

None of Plaintiff-Appellants' proffered evidence comes close to establishing discriminatory intent.  As the this Court has noted,  "Plaintiffs must present evidence based upon which any reasonable fact-finder could conclude [the defendants] acted 'at least in part *because of*, not merely in spite of, its adverse effects upon an identifiable group,'"  *Darensburg*, 636 F.3d at 523 (quoting *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979)) (emphasis added).   Several of the statements highlighted by Plaintiff-Appellants do show a recognition that shark fins are primarily consumed by Asian-Americans, and that a shark fin ban would therefore affect Chinese-Americans more than other people, but none of them demonstrate any intent to pass the Shark Fin Ban *because of* that fact.  Rather, all of the statements show shark conservation and the protection of marine ecosystems as the driving factors behind the law.

Plaintiff-Appellants fail to show discriminatory intent for the simple reason that there was none. The conservation purpose of the law was clear throughout the process, *see* SER 41-44, and is well-documented in the statute itself, *see* Assem. 376 § 1 (Cal. 2011) (listing legislative findings). As such, the District Court properly concluded that discriminatory intent was lacking, and therefore applied rational basis review to the Shark Fin Ban. ER 10; *see also FCC v. Beach Comms., Inc.*, 508 U.S. 307, 314 (1993) (noting rational basis review applies when discriminatory intent is lacking).

Under rational basis review, a law is upheld so long as it is rationally related to a legitimate government interest. *See Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992). Laws receive a "strong presumption of validity," *FCC*, 508 U.S. at 315, and "must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification," *id.* at 314. It is the job of those attacking the law "to negative every conceivable basis which might support it." *Id.* at 315 (internal quotation omitted).

34

The District Court properly upheld the Shark Fin Ban under rational basis review, noting that the law was passed to further the government interests of environmental protection and wildlife conservation. ER 10. These interests are core state regulatory goals, and constitute legitimate government interests for the purposes of Equal Protection analysis. *See, e.g., UFO Chuting of Hawaii, Inc. v. Smith*, 508 F.3d 1189 (9th Cir. 2007) (finding the protection of humpback whales to be a legitimate government interest under rational basis review); *Seariver Mar. Fin. Holdings v. Mineta*, 309 F.3d 662, 679-80 (9th Cir. 2002) (upholding legislation under Equal Protection rational basis review, where the law was based on the government interest of protecting the marine environment from oil spills).

Banning the sale, trade, and possession of shark fins is rationally related to the legitimate government interest of shark conservation because sharks are apex predators and thereby help maintain a crucial balance in marine ecosystems; shark populations worldwide are declining due to overfishing; shark overfishing is driven by the demand for shark fins; many sharks are transboundary species, and shark population declines

35

outside California waters can affect California ecosystems; shark fin bans contribute to a reduction in price and trading volume on the global shark fin market; reduced price and trading volume can be expected to lead to a reduction in finning; and by banning shark fins, California can directly reduce illegal shark fishing and finning in its waters. *See* SER 38-44, 48-52. The District Court precisely acknowledged this causal chain in its opinion, in explaining why the statute is rationally related to a legitimate government interest. ER 10-11.

Plaintiff-Appellants have offered nothing to dispute the connection between the Shark Fin Ban and the goal of wildlife conservation. Plaintiff-Appellants briefly criticize the ban as unnecessary in light of federal law (illustrating their failure to understand the ban and its purpose), as well as being overbroad (illustrating their lack of knowledge about shark fin traceability and laundering issues), but these are merely policy quibbles, and do not go to the core of the law. *See FCC*, 508 U.S. at 314 ("[E]qual protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices."). Because the Shark Fin Ban is rationally related to

the legitimate government interest of wildlife conservation, the District

Court's conclusion that Plaintiff-Appellants' Equal Protection claim had no

likelihood of success or serious questions on the merits was absolutely

correct.

## III.   The District Court Adequately Analyzed the Remaining Prongs of the Preliminary Injunction Standard

Having found no likelihood of success on the merits (nor serious

questions raised), it was not necessary for the District Court to proceed

further with the preliminary injunction analysis.  A plaintiff must always

show some likelihood of success on the merits for an injunction to issue, *see*

*Winter*, 555 U.S. at 20; *Cottrell*, 632 F.3d at 1134-35, and Plaintiff-Appellants

failed to do this.  ER 9.

Even though further analysis was unnecessary, the District Court

diligently ran through the remaining prongs of the preliminary injunction

standard.  *See* ER 13-14.  Plaintiff-Appellants dispute the District Court's

analysis of the remaining prongs of the preliminary injunction standard,

AOR 53-57, but their arguments are misguided.  Given that the District

Court found no likelihood of success on the merits, its treatment of the

remaining prongs of the preliminary injunction standard was more than

adequate—since the court was not required to address them at all.

## CONCLUSION

For the foregoing reasons, as well as the reasons articulated in

Defendant-Appellees' and Intervenor-Defendant-Appellees' briefs, this

Court should affirm the District Court's denial of Plaintiffs' motion for

preliminary injunction.


Dated:        April 1, 2013              Respectfully submitted,

                                         s/ Seth L. Atkinson
                                         Seth L. Atkinson
                                         Natural Resources Defense Council
                                         *Attorney for Amicus Curiae Natural*
                                         *Resources Defense Council*

# CERTIFICATE OF COMPLIANCE

I certify that the attached brief of *Amicus Curiae* Natural Resources Defense Council complies with Federal Rules of Appellate Procedure 29(c)-(d) and 32(a)(7), because it has been prepared in a proportionally spaced typeface using Microsoft Office Word 2010 and 14-point Palatino Linotype font, and contains 6,837 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

Dated:      April 1, 2013           s/ Seth L. Atkinson
                                    Seth L. Atkinson
                                    Natural Resources Defense Council
                                    *Attorney for Amicus Curiae Natural*
                                    *Resources Defense Council*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk

of the Court for the United States Court of Appeals for the Ninth Circuit by

using the appellate CM/ECF system on April 1, 2013.

I certify that all participants in the case are registered CM/ECF users

and that service will be accomplished by the appellate CM/ECF system.


Dated:        April 1, 2013              s/ Seth L. Atkinson
                                         Seth L. Atkinson
                                         Natural Resources Defense Council
                                         *Attorney for Amicus Curiae Natural*
                                         *Resources Defense Council*

## ADDENDUM

Pursuant to Federal Rule of Appellate Procedure 28(f) and Ninth Circuit Rule 28-2.7, proposed *Amicus Curiae* Natural Resources Defense Council affirms that the relevant authorities for determining the issues presented in this case have been set forth in the addenda of the briefs of Plaintiff-Appellants, Defendant-Appellees, and Intervenor-Defendant-Appellees.