No. 13-15188

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

CHINATOWN NEIGHBORHOOD ASSOCIATION, a nonprofit corporation
and ASIAN AMERICANS FOR POLITICAL ADVANCEMENT, a political
action committee,

Plaintiffs-Appellants,

v.

EDMUND G. BROWN, Jr., Governor of the State of California; *et al*.,

Defendants-Appellees,

THE HUMANE SOCIETY OF THE UNITED STATES; *et al*.,

Intervenors-Defendants-Appellees.

On Appeal from the United States District Court
For the Northern District of California
Case No. 4:12-cv-03759 PJH
The Honorable Phyllis J. Hamilton, District Judge.

REPLY BRIEF OF APPELLANTS (PRELIMINARY INJUNCTION APPEAL)

Joseph M. Breall
Jill L. Diamond
BREALL & BREALL, LLP
1550 Bryant Street, Suite 575
San Francisco, California 94103
(415) 345-0545

Counsel for Plaintiffs-Appellants CHINATOWN NEIGHBORHOOD
ASSOCIATION and ASIAN AMERICANS FOR POLITICAL ADVANCEMENT

## <u>TABLE OF CONTENTS</u>

**TABLE OF AUTHORITIES** ................................................................. iii

**INTRODUCTION** ................................................................................1

**STATEMENT OF ADDENDUM OF PRIMARY AUTHORITY** ......................3

**SUMMARY OF ARGUMENT** ............................................................3

**ARGUMENT** ....................................................................................4

I. Strict Scrutiny Must be Applied to Plaintiffs' Equal Protection Claim ............4

*A. The Shark Fin Law Suppresses Chinese Ceremonial Traditions and Has a Disparate Impact on Chinese Californians* .......................................................5

*B. The Shark Fin Law Was Intended to Target Chinese Californians Via Suppression of Their Ceremonial Cultural Traditions* .....................................8

*C. A Discriminatory Purpose Underlay the Passage of the Shark Fin Law* ...12

II. The District Court Committed Reversible Error in Its Analysis of Plaintiffs' Commerce Clause Claim ...................................................................................15

III. The Shark Fin Law Violates the Supremacy Clause and Is Preempted By Federal Law ......................................................................................................18

IV. Plaintiffs Should Succeed on Their § 1983 Claim .......................................23

V. The District Court Erred in Its Application of the Preliminary Injunction Test and Plaintiffs Satisfy the Test's Requirements ..................................................24

*A. The District Court Failed to Apply the "Serious Questions" Test* ............24

*B. Plaintiffs Satisfy the "Irreparable Injury", "Balance of the Hardships", and "Public Interest" Prongs of the Preliminary Injunction Test*..................26

VI. Conclusion ...................................................................................28

# TABLE OF AUTHORITIES

## CASES

*Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011) .. 24, 25, 26

*Bateman v. Gardner*, 716 F. Supp. 595 (S.D. Fla. 1989) .......................................20

*Batson v. Ky.*, 476 U.S. 79 (1986) ...........................................................................12

*Cavel Int'l Inc. v. Madigan*, 500 F.3d 551 (7th Cir. 2005),............................. 16, 17

*Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520 (1993) ........ passim

*City of Charleston, S.C. v. A Fisherman's Best, Inc.*, 310 F.3d 155 (4th Cir. 2002)
    ................................................................................................. 19, 20, 21, 22

*Daily Herald Co. v. Munro*, 838 F.2d 380 (1988). ..................................................24

*Darensburg v. Metro. Transp. Comm'n*, 636 F.3d 511 (9th Cir. 2011) ............. 7, 11

*Doran v. Salem Inn, Inc.*, 422 U.S. 922 (1975) ................................................. 27, 28

*El-Hakem v. BJY, Inc.*, 415 F.3d 1068 (9th Cir. 2005).........................................7, 9

*El Paso Natural Gas Co. v. Neztsosie*, 526 U.S. 473 (1999)................................2, 3

*Gomillion v. Lightfoot*, 364 U.S. 339 (1960) ................................................... 13, 14

*Healy v. Beer Inst.*, 491 U.S. 324 (1989). ..............................................................15

*Hunter v. Underwood*, 471 U.S. 222 (1985)...........................................................12

*Japan Line, Ltd. v. County of L.A.*, 441 U.S. 434 (1979). ......................................16

*Mitchum v. Foster*, 407 U.S. 225 (1972) ...............................................................24

*Pers. Adm'r v. Feeney,* 442 U.S. 256 (1979) .............................................................8

*Peterson v. Highland Music*, 140 F.3d 1313 (9th Cir. 1998). ..................................19

*Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970) ....................................................17

*Phany Poeng v. U.S.*, 167 F. Supp. 2d 1136 (S.D. Cal. 2001) ................................27

*R.G. v. Koller*, 415 F. Supp. 2d 1129 (D. Haw. 2006) ...........................................27

*Shell Offshore, Inc. v. Greenpeace*, 43 ELR 20051, No. 12-35332, 2013 U.S. App. LEXIS 5033 (9th Cir. Mar. 12, 2013). ......................................................... 12, 25

*Silkwood v. Kerr-Mcgee Corp.*, 464 U.S. 238 (1984) ............................................19

*Southeastern Fisheries Ass'n v. Chiles*, 979 F.2d 1504 (11th Cir. 1992)......... 20, 21

*Southeastern Fisheries Ass'n v. Mosbacher*, 773 F. Supp. 435 (D.D.C. 1991) ......21

*State v. Sterling*, 448 A.2d 785 (R.I. 1982) ............................................................21

*U.S. v. Am. Railway Express Co.*, 265 U.S. 425 (1924) ............................................3

*U.S. v. Nuesca*, 945 F.2d 254 (9th Cir. 1991). ........................................................10

*U.S. v. Raines*, 362 U.S. 17 (1960) ........................................................................28

*Vietnamese Fishermen Ass'n v. Cal. Dep't. of Fish & Game*, 816 F. Supp. 1468 (N.D. Cal. 1993)........................................................................................ 20, 21, 22

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977) .......5, 8

*Washington v. Davis*, 426 U.S. 229 (1976) ............................................................8, 9

*Yee v. City of Escondido*, 503 U.S. 519 (1992). ....................................................19

*Yu Cong Eng v. Trinidad*, 271 U.S. 500 (1926).......................................................7

## STATUTES AND REGULATIONS

42 U.S.C. § 1983 ("§ 1983")............................................................. passim

Magnuson-Stevens Fisheries Conservation and Management Act ("MSA")...passim

Lacey Act ...........................................................................................19

50 C.F.R. § 300.180 et seq.................................................................21

50 C.F.R. § 600.1201(c).....................................................................22

50 C.F.R. § 600.1203 .........................................................................21

50 C.F.R. § 600.1204 .........................................................................21

50 C.F.R. § 660.711 ...........................................................................21

Cal. Fish & Game Code § 2021 ..................................................... 1, 17

Cal. Fish & Game Code § 2021.5 ........................................................1

## OTHER AUTHORITIES

Cal. A.B. 376, 2011 Leg. (Ca. 2011) ("AB 376") ...............................1, 8

Cal. A.B. 853, 2011 Leg. (Ca. 2011) ...................................................1

Council Regulation No. 1185/2003, 2003 O.J. (L 167) 1 (EC)..............13

SEAGATE, Product Blog (Shark FIN Cartilage), *at*
    http://www.seagateproducts.com/shark-fin-cartilage.html (last accessed March
    28, 2013) ......................................................................................6

## CONSTITUTIONAL PROVISIONS

U.S. Const., amend. XIV, § 1 ("Equal Protection Clause") ........................... passim

U.S. Const., art. I § 8, cl. 3 ("Commerce Clause")........................................... passim

U.S. Const., art. VI, cl. 2 ("Supremacy Clause")............................................ passim

**INTRODUCTION**

This appeal pertains to the purposeful and unwarranted suppression of Chinese Californians' cultural ceremonial traditions via the enactment and enforcement of Cal. Fish & Game Code §§ 2021 and 2021.5 (collectively, "Shark Fin Law" or "Law"[1]).  The Shark Fin Law is a discriminatory means by which to sever Plaintiffs-Appellants'[2] members' links to their ancient cultural Chinese heritage.  Because of the Shark Fin Law, Plaintiffs' members have suffered violations of their constitutional right to the equal protection of the law.  The Shark Fin Law is also an unconstitutional restriction on commerce, is preempted by federal laws, regulations and policies, and it deprives Plaintiffs' members of their statutory rights, privileges, and immunities.

Defendants-Appellees' and Intervenors-Defendants-Appellees'[3] characterizations of the positions of the parties and the issues raised in this appeal

---

[1] Also refers to Cal. A.B. 376, 2011 Leg. (Ca. 2011) ("AB 376") and Cal. A.B. 853, 2011 Leg. (Ca. 2011), the California State Assembly Bills through which the Law was enacted.

[2] Plaintiffs-Appellants are Chinatown Neighborhood Association and Asian Americans for Political Advancement (collectively, "Plaintiffs")

[3] Defendants are Defendants-Appellees Edmund Brown, Governor of the State of California, Kamala Harris, Attorney General of the State of California, and Charles H. Bonham, Director, California Department of Fish and Wildlife [formerly Fish and Game] (collectively, "Government Defendants") and Intervenors-Defendants-Appellees the Humane Society of the United States, the Asian Pacific American

1

are erroneous.  This case does not involve a polarization of pro-environment and anti-environment positions as Defendants would have the Court believe.  Instead, Plaintiffs are disputing the prohibition on their use of fins from lawfully fished sharks, not fins from endangered shark species or fins obtained through unsustainable fishing practices.  Moreover, Plaintiffs are not villains who support the bloody practice of shark finning as Defendants imply.  In fact, as Defendants themselves point out, Plaintiffs agree that the practice of shark finning is inhumane and would support stronger bans on shark finning both domestically and internationally.

Defendants argue that the United State District Court, Northern District of California's ("district court") order denying Plaintiffs' motion for preliminary injunction should be affirmed[4] because the district court properly analyzed and

---

Ocean Harmony Alliance ("APAOHA") and the Monterey Bay Aquarium Foundation (collectively, "Intervenors-Defendants" and collectively with Government Defendants, "Defendants").  Although, Government Defendants and Intervenors-Defendants filed separate answering briefs, pursuant to Circuit Rule 28-5, Plaintiffs file this single reply and address Defendants' arguments collectively without formal distinction unless noted otherwise.

Natural Resources Defense Council ("NRDC") filed a brief of proposed *amicus curiae* and accompanying motion in this appeal.  NRDC makes arguments that are substantively identical to those advanced by Defendants.

[4] Intervenors-Defendants' request that the Court remand this lawsuit to the district court with instructions to dismiss with prejudice, Response Brief of Defendants-Intervenors-Appellees ("Int. Br.") 40-41, is both grossly unwarranted and procedurally improper.  *See El Paso Natural Gas Co. v. Neztsosie*, 526 U.S. 473,

evaluated Plaintiffs' claims.  Plaintiffs contend that the district court applied erroneous legal standards to Plaintiffs' claims, misevaluated the facts, and failed to recognize and remedy the irreparable constitutional and statutory harms that Plaintiffs' members have suffered as a result of the Shark Fin Law.

## STATEMENT OF ADDENDUM OF PRIMARY AUTHORITY

Except for the authorities included in the Addendum to Appellants' Reply Brief, all applicable statutes, rules, regulations, etc., are contained in the Addendum to Appellants' Opening Brief.

## SUMMARY OF ARGUMENT

The district court committed reversible error in denying Plaintiffs' motion for a preliminary injunction to enjoin the harms to Plaintiffs' members caused by the Shark Fin Law.  Defendants have failed to make a colorable showing to the contrary.  Specifically, Defendants have not refuted Plaintiffs' arguments that the district court employed an incorrect standard of scrutiny to evaluate Plaintiffs' claim that the Shark Fin Law violates Plaintiffs' members' rights under U.S. Const., amend. XIV, § 1 ("Equal Protection Clause") and that Plaintiffs have demonstrated a likelihood of success/raised serious questions on the merits of this claim.  Plaintiffs have also demonstrated a likelihood of success/raised serious

---

479 (1999) ("Absent a cross-appeal, an appellee … may not 'attack the decree with a view either to enlarging his own rights thereunder or of lessening the rights of his adversary.'") (quoting *U.S. v. Am. Railway Express Co.*, 265 U.S. 425, 435 (1924))).  The Court should refuse to consider it.

3

questions on the merits of their claim that the Shark Fin Law is 1) an unconstitutional restriction on interstate commerce in violation of U.S. Const., art. I § 8, cl. 3 ("Commerce Clause"); 2) is preempted by federal law and violates U.S. Const., art. VI, cl. 2 ("Supremacy Clause") and; 3) deprives Plaintiffs' members of their rights, privileges, and immunities in violation of 42 U.S.C. § 1983 ("§ 1983"). Defendants have not demonstrated otherwise.

The district court committed further reversible error in failing to fully and correctly apply the "serious questions" preliminary injunction test to Plaintiffs' claims and in failing to fully consider and apprehend the irreparable harm caused to Plaintiffs by the Shark Fin Law. The district court also erroneously declined to fully balance the hardships to the parties absent an injunction and failed to recognize that an injunction is in the public interest. Defendants have not raised sufficient arguments in favor of affirmation of the district court's decision. As such, the decision should be reversed and the Court should find that Plaintiffs are entitled to a preliminary injunction.

## **ARGUMENT**

### I. **Strict Scrutiny Must be Applied to Plaintiffs' Equal Protection Claim**

Defendants have not refuted Plaintiffs' arguments that the district court misapplied the legal standard applicable to Plaintiffs' claim under the Equal Protection Clause. Specifically, the district court failed to use a strict scrutiny

standard to evaluate whether the Shark Fin Law unconstitutionally discriminates against Chinese Californians. Despite Defendants claims to the contrary, it is clear that strict scrutiny applies because 1) the Shark Fin Law suppresses Chinese ceremonial traditions and has a disparate impact on Chinese Californians; 2) the Shark Fin Law was intended to target Chinese Californians via suppression of their ceremonial traditions; and 3) Plaintiffs have shown that a discriminatory purpose underlay the passage of the Shark Fin Law.

### A. The Shark Fin Law Suppresses Chinese Ceremonial Traditions and Has a Disparate Impact on Chinese Californians

Defendants reject even the irrefutable foundational facts evidencing that the Shark Fin Law disproportionately affects Chinese Californians in violation of the Equal Protection Clause, a position which is both ludicrous and untenable. As a threshold matter, Defendants attempt to minimize and even deny the significance of shark fins to Plaintiffs' members as Chinese Californians. *See* Answering Brief of Appellees [Government Defendants] ("Gov. Br.") 14 (alleging Plaintiffs have not demonstrated link between Chinese ancestry and shark fins). This is a factually erroneous position that Defendants take only because an acknowledgement that the consumption of shark fin soup is a distinctively Chinese ceremonial practice is an admission that the Shark Fin Law has a disparate impact on Chinese Californians in violation of their constitutional rights. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977).

5

In an attempt to deny the overwhelming disproportional impact that the Shark Fin Law will have on Chinese Californians' ceremonial cultural traditions, Defendants cite one lone example of a supposedly non-Chinese shark fin end product - a dietary supplement.  Int. Br. 21-22; Excerpts of Record ("ER") 071.[5] This is a reference truly made in desperation; Chinese shark fin soup is widely contemplated as the only significant end product for shark fins, as Defendants' own evidence illustrates.  *See* Supplemental Excerpts of Record ("SER") 0392 ("Driving this market for fins is the demand for shark fin soup.").  Defendants also attempt to diminish the importance of shark fin soup to Chinese culture by relying on the same faulty reasoning they used in the district court – alleging that, because some Chinese Californians do not engage in the consumption of shark fin soup, this entirely erases the cultural significance of a centuries' old ceremonial practice. *See e.g.* Gov. Br. 14-15; Int. Br. 5.  While some Chinese Californians may choose to exclude the ancient tradition of shark fin soup from their cultural practices, this does render the tradition any less distinctly Chinese for those who continue to follow it.  Nor is this relevant to a disparate impact analysis as Defendants assert, Gov. Br. 15 FN2, because the Shark Fin Law *only* affects the cultural traditions of

---

[5] Even the website for this dietary supplement (Defendants' cited source) mentions shark fin soup and states, "Oriental medicine has used the shark fin for treatment of a variety of afflictions for over 2,000 years."  *See* SEAGATE, Product Blog (Shark FIN Cartilage), *at* http://www.seagateproducts.com/shark-fin-cartilage.html (last accessed March 28, 2013).

Chinese Californians and does not have a cultural impact on any other groups. *See Darensburg v. Metro. Transp. Comm'n*, 636 F.3d 511, 519-20 (9th Cir. 2011) ("The basis for a disparate impact claim involves a comparison between two groups – those affected and those unaffected by the facially neutral policy.").

Analogously, not all Chinese Californians speak the Chinese language. This does not make the language any less Chinese, nor justify language-based discrimination against Chinese people. *See Yu Cong Eng v. Trinidad*, 271 U.S. 500, 528 (1926) (denial of equal protection to forbid Chinese merchants from bookkeeping in Chinese language); *see also El-Hakem v. BJY, Inc*., 415 F.3d 1068, 1073 (9th Cir. 2005) (language is an ethnic characteristic in a discrimination analysis). Furthermore, contrary to Defendants' contentions, it is also not significant that one of the lawmakers whom drafted the Shark Fin Law, Assemblyman Paul Fong, is of Chinese descent but eschews the tradition of shark fin soup. *See Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 540 (1993) (assertion of lawmaker of Cuban descent that [Cuban] Santeria practice was banned in Cuba and antithetical to Cuban values did not justify unconstitutional ordinance suppressing Santeria rituals). Defendants also assert that the fact that only a small percentage of Chinese Californians eat shark fin soup "regularly" is evidence of diminished importance of this tradition to Chinese Californians. Gov. Br. 15, FN2. Presuming the validity of this statistic, it only serves to bolster the

fact that shark fin soup is a ceremonial dish that is traditionally reserved for special occasions such as weddings and festivals.

In reality, the link between shark fin soup and Chinese culture is irrefutable as Defendants' own evidence demonstrates. *See e.g.* SER 0187, 0371 (legislative analyses noting importance to Chinese culture). The California State Assembly analysis of AB 376 (submitted by Defendants as evidence) noted that "[a]ccording to the San Francisco Chronicle …, shark fin soup has been a traditional Chinese dish going back to the Han Dynasty some 1,800 years." *Id.* Not only will the Shark Fin Law eradicate this Chinese ceremonial tradition, suppressing Chinese culture is in fact the Shark Fin Law's only noncommercial prohibitive impact. Thus, the Shark Fin Law dramatically disparately impacts Chinese Californians and discriminates against Chinese Californians in violation of the Equal Protection Clause. *See Washington v. Davis*, 426 U.S. 229, 242 (1976); *Arlington Heights*, 429 U.S. at 266; *Pers. Adm'r v. Feeney,* 442 U.S. 256, 275 (1979) (impact alone can evidence discrimination); *see also Lukumi*, 508 U.S. at 535 ("[A]part from the text, *the effect of law in its real operation* is strong evidence of its object.") (emphasis added)).

### B. The Shark Fin Law Was Intended to Target Chinese Californians Via Suppression of Their Ceremonial Cultural Traditions

Even assuming discriminatory impact alone is insufficient to merit application of strict scrutiny to the Shark Fin Law, the Court must nonetheless

8

apply this standard because discriminatory intent also clearly underlay the enactment of the Shark Fin Law. *See Davis*, 426 U.S. at 241-242. Yet Defendants also argue the alleged insignificance of shark fin soup to Plaintiffs as Chinese Californians to avoid the reality that lawmakers' intent to target the California market for shark fins meant targeting Chinese Californians. According to Defendants, although shark fin soup is a Chinese cultural tradition, it is not linked to race or national origin by virtue of ancestry or as an ethnic characteristic, and it does not receive heightened scrutiny when targeted. Gov. Br. 14-15. This argument is both unsupported and unsupportable. Defendants do not attempt to define what constitutes a group's ancestry or ethnic characteristics for discrimination purposes - they merely make the unfounded assertion that cultural traditions do not qualify. *See id.* But this Court has determined that a group's ancestry or ethnic characteristics, for purposes of a discrimination analysis, is much broader than physical traits and includes integral concepts such as language and names. *El-Hakem*, 415 F.3d at 1073. Key cultural practices, such as the ancient ceremonial tradition of shark fin soup, are also such concepts. Shark fin soup is integral to the culture of many Chinese Californians and inextricably tied to Chinese race and national origin.

Defendants' assertion that discrimination specifically targeting a cultural practice of a protected class is constitutionally acceptable is not supported by their

cited case, *U.S. v. Nuesca*, 945 F.2d 254 (9th Cir. 1991). In *Nuesca*, this Court held that Equal Protection did not invalidate a statute exempting native Alaskans, but not native Hawaiians, from prohibitions on hunting endangered species. *Id.* at 257-58. The ruling was based on the fact that Native Hawaiians and Native Alaskans were not similarly circumstanced because there was no evidence that hunting such species was a traditional aspect of Native Hawaiian life; thus there was no racial discrimination. *Id. Nuesca* does *not* stand for the proposition that discriminatory statutes are acceptable provided they target a protected class via cultural traditions.

In reality, the Shark Fin Law unconstitutionally targets Chinese Californians and was intended to sever the link between Chinese culture and shark fin soup as shown by relevant evidence in the record. *See Lukumi,* 508 U.S. at 540 ("Relevant evidence [of discriminatory intent] includes, among other things, the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements made by members of the decisionmaking body."). The legislative history and bill analyses that led to the enactment of the Shark Fin Law indicate as such. *See e.g.* SER 0187 ("While

recognizing that shark finning[6] has been important to Chinese culture for centuries,

supporters assert collapse of ocean ecosystems must take precedence over cultural

culinary heritage."). Lawmakers and supporters of the Shark Fin Law made

blatant statements showing the intention to target Chinese Californians. *See* ER

180, 184 (statements by Fong comparing shark fin soup to foot binding); ER 192

(statement by Peter Knights, Executive Director of WildAid, about regulating

Chinatown). Defendants, lawmakers and even the district court also have

repeatedly asserted that the Shark Fin Law was intended to "target the market" for

shark fins, which is clearly synonymous for targeting the Chinese tradition of shark

fin soup. *See Lukumi*, 508 U.S. at 534 (use of non-specific words such as

"sacrifice" and "ritual" did not obscure purpose of ordinance to target Santeria

religion). All of these indicators and statements are evidence of the clear

discriminatory intent that underlay the passage of the Shark Fin Law. *See id.* at

540 (legislative intent established by both direct and circumstantial evidence);

*Darensburg*, 636 F.3d at 522-23 (Even without direct evidence, plaintiff can show

discriminatory intent by disparate impact, historical background, procedural

---

[6] This statement also perpetuates the misconception that Plaintiffs' members, as Chinese Californians, support finning. They do not. Shark fins, not shark finning, are important to Chinese culture.

irregularities or legislative history including lawmakers contemporaneous statements).[7]

### C. A Discriminatory Purpose Underlay the Passage of the Shark Fin Law

A totality of the circumstances analysis reveals that the Shark Fin Law was based on a discriminatory purpose in violation of the Equal Protection Clause. *See Davis*, 426 U.S. at 241-42; *Batson v. Ky.*, 476 U.S. 79, 94 (1986). Even accepting that legitimate purposes also motivated the Shark Fin Law, the existence of a discriminatory purpose is sufficient to render the Law unconstitutional. *See Hunter v. Underwood*, 471 U.S. 222, 232 (1985); *see also Lukumi*, 508 U.S. at 535 (ordinance that implicated multiple legitimate concerns nonetheless unconstitutional). For strict scrutiny to apply, Plaintiffs need not show a vast legislative and public conspiracy to enact the Law for the sole purpose of discriminating against the Chinese as Defendants would have the Court believe. *See* Int. Br. 20. Moreover, Defendants' assertion that the Court must refrain entirely from examining legislative intent if any non-discriminatory purpose is

---

[7] Defendants rely heavily on merits-based decisions for their assertions that Plaintiffs have not provided sufficient evidence of discriminatory intent. *See e.g.* Int. Br. 21-25. This Court recently cautioned against reliance on merits-based decisions in preliminary injunction analyses because success is a "probabilistic inquiry" in preliminary injunction decisions which are "rendered without benefit of a fully developed factual record." *Shell Offshore, Inc. v. Greenpeace*, 43 ELR 20051, No. 12-35332, 2013 U.S. App. LEXIS 5033 at *17-18 (9th Cir. Mar. 12, 2013).

alleged is not valid.  *See e.g.* Gov. Br. 20.  While federal judicial deference to state

government decisions is generally appropriate, there is no insulation for state

actions when "used as an instrument for circumventing a federally protected right."

*Gomillion v. Lightfoot*, 364 U.S. 339, 347-348 (1960).

The Shark Fin Law is also highly suspect in an Equal Protection Clause

analysis because of both its over-inclusivity (banning the use of fins from

sustainably fished sharks) and under-inclusivity (targeting a Chinese ceremonial

tradition in the name of conservation and the public health while having no effect

on other fish high in mercury or on the use of other parts of the shark).  *See*

*Lukumi*, 508 U.S. at 544-45.  As to the Law's over-inclusivity, Defendants appear

to argue that sustainable shark fishing is impossible, an assertion that is

contradicted by fishermen and experts, ER 167, 170, 172-73, 175, 205, 212, 222-

23, 235,[8] as well as by Defendants' own evidence.[9]  *See* SER 0159 ("[C]ertain

---

[8] Sustainable shark fishing is also discussed in detail in the Brief of *Amici Curiae*
Sustainable Fisheries Association, Inc., et al.

[9] Defendants' own evidence and the evidence submitted by their supporting *amicus
curiae* in the district court, also supports Plaintiffs' position that strict worldwide
finning bans exist and that many shark fins are humanely obtained.  *See e.g.* SER
0303 ("Today, nine RFMOs [Regional Fisheries Management Organizations]
whose fisheries take sharks have adopted mandatory prohibitions on finning,
making finning illegal in most international waters of the world.").  For example,
according to their evidence, one-third of fins imported to Hong Kong come from
Europe (largely Spain).  SER 0050.  The EU has a strict shark finning ban,
meaning that fins imported from Europe would not come from finned sharks.  *See*
Council Regulation No. 1185/2003, 2003 O.J. (L 167) 1 (EC).

13

artisanal fisheries appear to be sustainable and are of high socioeconomic value."). In an attempt to circumvent the problem of the Shark Fin Law's under-inclusivity, Defendants argue that continued legalization of the rest of the shark is a non-issue because use of other shark parts (such as meat) is not significant. *See e.g.* ER 075. This is also contradicted by both Plaintiffs' and Defendants' evidence. ER 172, 205, 181; SER 0300 (discussing demand for shark products such as meat, skeletons and teeth). The Shark Fin Law's over-inclusive and under-inclusive contradictions, which result in the singling out of Chinese Californians, run afoul of the Equal Protection Clause. *See Gomillion*, 364 U.S. at 346 (unconstitutional to "single[] out a readily isolated segment of a racial minority for special discriminatory treatment").

Plaintiffs have shown that the Shark Fin Law was motivated by a discriminatory purpose, warranting the application of strict scrutiny. Pursuant to this standard, the Shark Fin Law cannot pass constitutional muster and Plaintiffs have demonstrated a likelihood of success/raised serious questions on the merits of their Equal Protection Clause claim. The district court incorrectly applied a rational basis test[10] to Plaintiffs' Equal Protection Clause claim and as such the district court's decision must be reversed.

---

[10] Defendants make much of the fact that Plaintiffs do not address the application of rational basis scrutiny to the Shark Fin Law. Int. Br. 25. Plaintiffs argued at the

## II.  **The District Court Committed Reversible Error in Its Analysis of Plaintiffs' Commerce Clause Claim**

The District Court erred in determining that Plaintiffs would not succeed on the merits of their Commerce Clause claim and Defendants have not made a successful showing to the contrary.  Specifically, Defendants have failed to refute Plaintiffs' argument that the Shark Fin Law impermissibly regulates shark fishing and the shark fin trade outside of California's borders.  Defendants argue that a statute only impermissibly regulates extraterritorially if the statute pertains to activity wholly outside of a state's borders.  *See* Gov. Br. 29 (citing *Healy v. Beer Inst.*, 491 U.S. 324, 337 (1989)).  This argument is not well-founded.  The "wholly outside the boundary of the State" assessment articulated in *Healy* was fact-specific and on a list of factors prefaced by the Supreme Court's statement that "our cases concerning the extraterritorial effects of state economic regulation stand *at a minimum* for the following propositions…"  *Id.* at 336 (emphasis added).  The *Healy* Court went on to explain that "[t]he critical inquiry is whether the practical effect of the regulation is to control conduct beyond the boundaries of the State."  *Id.*

---

district court level that the Shark Fin Law cannot pass muster even under the rational basis test.  ER 030.  Plaintiffs do not discuss this argument on appeal because they contend that the Court need not conduct a rational basis analysis as strict scrutiny must be applied to Plaintiffs' Equal Protection Clause claim.

15

The "practical effect" of the Shark Fin Law is to regulate out-of-state conduct including shark fishing, trade, and distribution of shark fins. In fact, the Shark Fin Law was supposedly enacted as a means by which to regulate fishing practices and the shark fin trade outside of California's jurisdiction – the concern that outside jurisdictions are not subject to existing state and/or federal laws was the alleged justification for the Law. *See* ER 010-11, 073, 079-80. Yet Defendants now argue that the Shark Fin Law does not regulate extraterritorially. Defendants' "have their cake and eat it too" approach to the Shark Fin Law's extraterritorial effects cannot withstand judicial constitutional scrutiny.

The Seventh Circuit's decision in *Cavel Int'l Inc. v. Madigan*, 500 F.3d 551 (7th Cir. 2005), on which Defendants also rely in their attempt to refute Plaintiffs' Commerce Clause claims, Int. Br. 28-32, is dissimilar. The *Cavel* court acknowledged that, even absent discrimination, unjustifiable burdens on interstate commerce are invalid and that "[f]oreign commerce is preeminently a matter of national concern." *Id.* at 557-58 (quoting *Japan Line, Ltd. v. County of L.A.*, 441 U.S. 434, 448-51 (1979)). However, the court rejected appellant Cavel's Commerce Clause claim because Cavel, a slaughterhouse owner, did not provide information regarding the effect on commerce of a state ban on horse slaughter for human consumption and on the distribution of horsemeat. *Id.* at 558.

16

*Cavel* is distinguishable from the instant case on two bases. First, *Cavel* did not involve allegations of improper extraterritorial regulation on industry; instead the case pertained to an in-state slaughterhouse and the effect of the ban on this business. 441 U.S. 434. Second, although the challenged ban in *Cavel* included prohibitions on the import and export of horsemeat, there was no indication that the asserted primary underlying purpose was to restrict trade with out-of-state jurisdictions. *See id.* In contrast, the Shark Fin Law was intended to restrict cross-border trade by suppressing the California market for shark fins.

Plaintiffs have successfully demonstrated that the Shark Fin Law is an unconstitutional restriction on trade under the balancing test articulated in *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970), because the Law imposes a substantial burden on interstate commerce and this burden does not outweigh the Law's putative benefits. The plain language of the Shark Fin Law includes a restriction on trade, *see* Cal. Fish & Game Code § 2021, and the Law burdens commerce by regulating extraterritorially. Pursuant to *Pike,* the district court should have weighed these burdens against the putative local benefits of the Shark Fin Law, but it improperly failed to properly conduct this balancing.

Employing the *Pike* standard, the illusory putative benefits of the Shark Fin Law do not outweigh the Law's burden. Moreover, Defendants' asserted putative benefit that the Shark Fin Law furthers the state's interest in moral cleansing is

17

offensive and misplaced.  *See* Int. Br. 32.  Once again, this is not a moral issue:

Plaintiffs are not advocating for the use of inhumanely obtained shark fins or fins

obtained from endangered species.  It is not valid for California to restrict lawful

fishing and commercial dealings in fins from legally and sustainably caught sharks

on alleged "moral" conservation and humane treatment grounds that are only

selectively applicable; instead the Law should have addressed any morally

problematic grounds directly and even-handedly.  *See Lukumi*, 508 U.S. at 539

("With regard to the city's interest in ensuring the adequate care of animals,

regulation of conditions and treatment … is the logical response … if the city has a

real concern that other methods [of slaughter] are less humane … the subject of the

regulation should be the method of slaughter itself…").

Defendants cannot refute Plaintiffs' Commerce Clause challenge by relying

on inapposite case law and defective reasoning.  The district court failed to conduct

a full analysis of this claim and committed reversible error in determining that

Plaintiffs could not demonstrate a likelihood of success on the merits.

**III.  <u>The Shark Fin Law Violates the Supremacy Clause and Is Preempted By Federal Law</u>**

Defendants assert multiple faulty arguments to avoid the fact that the Shark

Fin Law is preempted by federal law, regulations and policy.[11]  First, Defendants

---

[11] Contrary to Defendants' unsupportable contentions, Plaintiffs' Supremacy
Clause/preemption argument is not addressed for the first time on appeal.  *See*

attack on the applicability of *City of Charleston, S.C. v. A Fisherman's Best, Inc.*,

310 F.3d 155 (4th Cir. 2002) is groundless. *Charleston* does not solely apply to

situations in which federal and state fishing laws are in direct conflict as

Defendants assert, Gov. Br. 47, FN18, nor is direct conflict required for the

preemption doctrine to apply. *See Silkwood v. Kerr-Mcgee Corp.*, 464 U.S. 238,

248 (1984) (state law can be preempted "where the state law stands as an obstacle

to the accomplishment of the full purpose and objectives of Congress."). Instead

*Charleston* stands for the broader proposition that a state cannot exercise its

---

Gov. Br. 42; 49; Int. Br. 32-33 FN20. This argument was set forth in the district
court briefing and ruled upon by the district court. *See* ER 012-13. It was thus
preserved for appeal and is properly before this Court. Furthermore, Defendants'
implication that Plaintiffs are not entitled to appellate review of their Supremacy
Clause/preemption claim, as well as their § 1983 claim, because they did not
address these claims at oral argument in the district court is not well-taken. At the
commencement of oral argument, the district court advised counsel for Plaintiffs
that he "need not repeat everything in the papers", SER 003, and counsel
responded with further argument on salient points of the Equal Protection Clause
and Commerce Clause challenges to the Shark Fin Law. SER 0003-13.

Plaintiffs have properly raised their Supremacy Clause/preemption claim in this
Court even accepting Defendants' contention that this claim was framed differently
in the district court. Plaintiffs have consistently made the claim that the Shark Fin
Law is preempted by federal fish and wildlife laws, policies, and regulations,
including the Magnuson-Stevens Fisheries Conservation and Management Act
("MSA") and the Lacey Act. "Once a federal claim is properly presented, a party
can make any argument in support of that claim; parties are not limited to the
precise arguments made below." *Yee v. City of Escondido*, 503 U.S. 519, 534
(1992). Moreover, the case cited by Defendants for the boldface assertion that
Plaintiffs waived their Supremacy Clause and § 1983 arguments is irrelevant
because it stands for the dissimilar proposition that arguments "not presented or
developed" at the district court level are normally waived on appeal. *See* Gov. Br.
42; 49; *Peterson v. Highland Music*, 140 F.3d 1313, 1321 (9th Cir. 1998).

19

authority over state waters, and over the landing and trade of fish at its docks, in order to impose regulations on the fishing industry in federal waters that are not similarly restricted. 310 F.3d at 175, 177. This is particularly true when there is a federal fisheries management plan ("FMP") in effect and state law acts to obstruct the FMP federal objectives. *See id.* at 177. Other cases have held similarly; in *Vietnamese Fishermen Ass'n v. Cal. Dep't. of Fish & Game*, 816 F. Supp. 1468, 1475 (N.D. Cal. 1993), the court determined that a California statute prohibiting the use of gill and trammel nets to take rockfish was preempted in the federal Exclusive Economic Zone ("EEZ") by the MSA/an FMP which permitted the use of gill nets by its *silence* on such a ban. *Southeastern Fisheries Ass'n v. Chiles*, 979 F.2d 1504, 1509 (11th Cir. 1992) stands for the similar principle that the MSA was intended by Congress to occupy the fisheries management field, and encroaching state laws are preempted. *See also Bateman v. Gardner*, 716 F. Supp. 595, 598 (S.D. Fla. 1989) (state law banning shrimp harvest preempted where federal law permitted harvesting of shrimp in disputed area); *State v. Sterling*, 448 A.2d 785, 787 (R.I. 1982) (conflicting state provision imposing a landing-possession limit on flounder preempted by federal law).

20

The MSA clearly and explicitly regulates shark fishing.[12]  *See e.g.* 50 C.F.R. §§ 600.1203; 600.1204; 660.711.  Yet, the MSA contains no prohibitions on landing, possessing, purchasing and selling fins from legally fished sharks with corresponding carcasses.  *See id.*  Thus, federal law makes it *completely lawful* to engage in such activities and, to the extent, that the Shark Fin Law attempts to regulate federally permissible fishing and trade activities, state law must necessarily be preempted.  *See e.g. Charleston*, 310 F.3d at 175, 177; *Chiles*, 979 F.2d at 1267-68; *Vietnamese Fishermen,* 816 F. Supp. at 1475; *Southeastern Fisheries Ass'n v. Mosbacher*, 773 F. Supp. 435, 440 FN11 (D.D.C. 1991) (federal General Counsel's interpretation of MSA stated "a properly promulgated regulation will supersede conflicting state regulation – *direct or indirect* – of [EEZ] fishing.") (citation omitted)  (emphasis added)).  Defendants' position that the MSA must expressly authorize the activities that the Shark Fin Law prohibits in order for preemption to apply is untenable.  *See Vietnamese Fishermen,* 816 F. Supp. at 1475.  Moreover, sharks are managed under federal FMPs, the requirements of which take precedence over state law in a Supremacy Clause analysis.  *See Charleston*, 310 F.3d at 177; *Vietnamese Fishermen,* 816 F. Supp. at 1475.

---

[12] Federal law also explicitly regulates international trade in shark fins.  *See* 50 C.F.R. § 300.180 et seq. (International Trade Documentation and Tracking Programs for Highly Migratory Species, regulations providing a federal permit for, among others, the international trade in shark fins).

In addition to being unfounded, Defendants' preemption arguments are also contradictory and confusing. For instance, Defendants take the position that the Shark Fin Law does not affect "any conduct taking place on the water." Gov. Br. 47. Yet this follows Defendants' *repeated explicit assertion throughout this case* that the Shark Fin Law was enacted to prevent the practice of finning, which is clearly "conduct taking place on the water." This assertion also conflicts with Defendants' claim that the Shark Fin Law is authorized by the MSA "savings clause", 50 C.F.R. § 600.1201(c), permitting states to enact more restrictive laws regarding the conduct of finning in state waters. *See* Gov. Br. 46. It comes down to the fact that either the Shark Fin Law is meant to regulate finning or it is not: Defendants cannot have it both ways. If the Law was not meant to regulate finning, all of Defendants' claims about the Law's purpose are called into question and preemption applies because the Law still regulates possession and trade of fish caught in federal waters. If the Shark Fin Law is meant to regulate finning, it is further preempted by federal law in the EEZ because the MSA "savings clause" only applies to *state* waters. *See* 50 C.F.R. § 600.1201(c) (emphasis added).

Defendants also incorrectly argue that the Shark Fin Law does not conflict with federal fisheries policy. *See* Gov. Br. 49. As articulated by the National Oceanic and Atmospheric Administration, federal policy promotes management of "shark populations to maintain productive and sustainable fisheries" so that

22

"fishermen can harvest sharks, providing benefits to both the U.S. fishing industry and seafood consumers."  ER 043.  A blanket ban on a fisheries product that disregards whether the product comes from a sustainable source does not promote sustainable fishing.  Moreover, Defendants' assertion that the Shark Fin Law is consistent with federal policy goals because it "allows commercial activities involving shark fins that are still attached to whole shark carcasses" is ludicrous. *See* Gov. Br. 49.  A paradoxical statute that, in theory, allows the use of the [attached] fin up until the point that an individual must detach the fin to actually use it is not prudent sustainable fishing policy.  Instead it is wasteful because it criminalizes a fishing product as soon as it is converted into a useable form.

Plaintiffs have demonstrated a likelihood of success/raised serious questions on the merits of their preemption/Supremacy Clause claim and the district court's determination should be reversed.

## IV.  Plaintiffs Should Succeed on Their § 1983 Claim

In addressing Plaintiffs' § 1983 challenge, Defendants rely on the cursory argument that this claim should fail because Plaintiffs cannot succeed on their claims that the Shark Fin Law violates their constitutional rights.  *See* Gov. Br. 49-50; Int. Br. 36.  But both Defendants and the district court incorrectly determined that Plaintiffs could not succeed the merits of the underlying claims based on misapplications of the law and misinterpretations of the facts.  Because Plaintiffs

23

have demonstrated a likelihood of success/raised serious questions on the merits of the underlying claims, Plaintiffs also have demonstrated a likelihood of success/raised serious questions that Defendants have deprived Plaintiffs' members of their rights, privileges and immunities under §1983.

Defendants reiterate the district court's flawed argument that, because the Shark Fin Law has not been enforced against Plaintiffs in a discriminatory manner, § 1983 is not implicated.  Int. Br. 36, FN22.  However, it is the enactment and enforcement of an inherently unconstitutional statute that causes harm to Plaintiffs in violation of § 1983, not the discriminatory enforcement of the Shark Fin Law. *See Mitchum v. Foster*, 407 U.S. 225, 240 (1972) (citation omitted) (§ 1983 claim may be based on legislative action); *Daily Herald Co. v. Munro*, 838 F.2d 380, 383, 389 (1988).  As such, Defendants' argument must fail.

## V.  <u>The District Court Erred in Its Application of the Preliminary Injunction Test and Plaintiffs Satisfy the Test's Requirements</u>

### A. The District Court Failed to Apply the "Serious Questions" Test

The district court failed to fully and properly apply the legal test for a preliminary injunction to Plaintiffs' motion and Defendants arguments do not serve to redeem the faulty decision.  Defendants appear not to dispute the fact that, although the district court preliminarily referenced the "serious questions" modification of the preliminary injunction standard articulated in *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-32 (9th Cir. 2011), there is no

24

further mention of this test in the district court's specific evaluation of Plaintiffs' claims. Defendants contend, however, that the district court's analysis of the "serious questions" modification was clearly implied from what Defendants argue was the district court's implied determination that Plaintiffs could show "*no likelihood of success whatsoever*" on the merits of their claims. Int. Br. 17 FN10. This implication upon implication is not supported by the record and is based on an illogical premise. The district court never stated that Plaintiffs established "*no likelihood of success whatsoever*" on the merits of their claims despite Defendants' fanciful interpretation. Moreover, were the Court to accept Defendants' circular reasoning that: 1) the denial of a preliminary injunction based on a determination that a plaintiff was not likely to succeed on the merits; 2) really means that there is *no* likelihood of success on the merits; 3) which then translates to mean that no serious questions were raised on the merits, it would render the "serious questions" test duplicative of the "likelihood of success" test and superfluous. However, *Cottrell* has made it clear that these are distinct tests that should be applied separately. *See* 632 F.3d at 1134-36; *see also Shell Offshore,* 2013 U.S. App. LEXIS 5033 at *22 ("But if a plaintiff can only show that there are 'serious questions going to the merits" – *a lesser showing than likelihood of success on the merits* – then a preliminary injunction may still issue…") (citing *Cottrell*, 62 F.3d at 1135) (emphasis added)).

25

The fact remains that the district court erroneously failed to adequately apply the "serious questions" test to Plaintiffs' claims. The district court also did not explicitly balance the hardships as required under the sliding scale analysis in *Cottrell*. *See* 632 F.3d at 1131-32. According to Defendants, the district court need not have considered the balance of the hardships because it found that Plaintiffs did not raise any serious questions on the merits of their claims. Gov. Br. 51, Int. Br. 17. This is a baseless contention given that the district court did not even explicitly apply the "serious questions" test to Plaintiffs' claims. The inquiry could not stop when it never even properly began and the district court committed reversible error.

### B. Plaintiffs Satisfy the "Irreparable Injury", "Balance of the Hardships", and "Public Interest" Prongs of the Preliminary Injunction Test

It is undisputed by the district court, Defendants, and Plaintiffs that a deprivation of constitutional rights constitutes irreparable injury. *See e.g.* ER 014 (citations omitted). Here, because Plaintiffs' members have suffered constitutional harm as a result of the Shark Fin Law, the irreparable injury prong of the preliminary injunction test requires no further analysis.[13] Plaintiffs' members have

---

[13] Defendants argue (and the district court accepted) that, as an organization of Asian Americans, APAOHA will be deprived of its constitutional rights should the Shark Fin Law be enjoined because APAOHA's members have cultural interests in "harmony", "conservation" and "human treatment of all life" that deserve protection. Int. Br. 38-39. Plaintiffs will not mirror Defendants by insulting and

also suffered business injuries, aside from pure minor economic harm, that are irreparable.  In declarations in the district court, restaurant owners and merchants explained the importance of shark fin soup to their customers' cultural traditions and ceremonial banquets to demonstrate the loss of business goodwill that they will suffer and the large amount of business they stand to lose absent an injunction.  *See* ER 161, 214, 217, 238, 240, 242, 240.  Importers also explained that they would lose their livelihoods entirely because of the Shark Fin Law, which clearly constitutes irreparable harm.  ER 165, 233; *see also Doran v. Salem Inn*, *Inc.*, 422 U.S. 922, 932 (1975); *Phany Poeng v. U.S.*, 167 F. Supp. 2d 1136, 1143 (S.D. Cal. 2001) ("[A] loss of at least thirty percent of a plaintiff's business can constitute irreparable harm.").

Because of the clear irreparable harm and deprivation of constitutional rights that Plaintiffs will suffer absent enjoinment of the Shark Fin Law, the balance of the hardships tips sharply in Plaintiffs' favor.  *See R.G. v. Koller*, 415 F. Supp. 2d 1129, 1162 (D. Haw. 2006) ("[P]rotection of constitutional rights … weighs heavily in the balancing of the harms …") (citation omitted)).  Moreover, because constitutional rights are implicated, an injunction is in the "highest public interest."

attempting to diminish the importance of these values to APAOHA's members except to state that these are general moral values that are not culturally-specific. It is also highly offensive to Plaintiffs to suggest that Plaintiffs' members are diametrically opposed to these values. *See* Int. Br. 39. As Plaintiffs have repeatedly stated, they oppose inhumane treatment of sharks and do not want to consume endangered species.

*See id.*; *U.S. v. Raines*, 362 U.S. 17, 27 (1960) ("[T]here is the highest public interest in the due observance of all the constitutional guarantees, including those that bear the most directly on private rights…").

## VI. <u>Conclusion</u>

The district court committed reversible error in denying Plaintiffs' motion for a preliminary injunction to restrain the constitutional and statutory harms suffered by Plaintiffs as a result of the Shark Fin Law.  Defendants have failed to demonstrate otherwise.  Based on the foregoing, Plaintiffs respectfully renew their request that the Court reverse the district court's ruling.


Dated: April 8, 2013                              Respectfully submitted,

                                                          BREALL & BREALL, LLP
                                                          JOSEPH M. BREALL
                                                          JILL L. DIAMOND


                                                          By:  s/ Joseph M. Breall
                                                                  Joseph M. Breall

                                                          Attorneys for Plaintiffs-Appellants

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Fed. R. App. P. 32(a)(7)(c) and Ninth Circuit Rule 32-1, the

undersigned certifies that the attached reply brief is proportionally spaced, has a

type face of 14 points or more and contains 6,787 words, exclusive of the matters

that may be omitted under Rule 32(a)(7)(B)(iii).


Dated: April 8, 2013                    By:  <u>s/ Joseph M. Breall</u>
                                              Joseph M. Breall

                                         Attorney for Plaintiffs-Appellants

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on April 8, 2013.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.


s/ Joseph M. Breall

30

No. 13-15188

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

CHINATOWN NEIGHBORHOOD ASSOCIATION, a nonprofit corporation
and ASIAN AMERICANS FOR POLITICAL ADVANCEMENT, a political
action committee,

Plaintiffs-Appellants,

v.

EDMUND G. BROWN, Jr., Governor of the State of California; *et al*.,

Defendants-Appellees,

THE HUMANE SOCIETY OF THE UNITED STATES; *et al*.,

Intervenors-Defendants-Appellees.

On Appeal from the United States District Court
For the Northern District of California
Case No. 4:12-cv-03759 PJH
The Honorable Phyllis J. Hamilton, District Judge.

ADDENDUM TO APPELLANTS' REPLY BRIEF

Joseph M. Breall
Jill L. Diamond
BREALL & BREALL, LLP
1550 Bryant Street, Suite 575
San Francisco, California 94103
(415) 345-0545

Counsel for Plaintiffs-Appellants CHINATOWN NEIGHBORHOOD
ASSOCIATION and ASIAN AMERICANS FOR POLITICAL ADVANCEMENT

## <u>TABLE OF CONTENTS</u>

**Magnuson-Stevens Fisheries Conservation and Management Act .........1**

50 C.F.R. § 300.180 et seq. ……………………………………… 1

50 C.F.R. § 660.711……………………………………………… 3

**Magnuson-Stevens Fisheries Conservation and Management Act**

50 C.F.R § 300.180 et seq.

In Pertinent Part:

Subpart M—International Trade Documentation and Tracking Programs for Highly Migratory Species

§ 300.180 Purpose and scope.

The regulations in this subpart are issued under the authority of the Atlantic Tunas Convention Act of 1975 (ATCA), Tuna Conventions Act of 1950, and Magnuson-Stevens Act. The regulations implement the recommendations of the International Commission for the Conservation of Atlantic Tunas (ICCAT) for the conservation and management of tuna and tuna-like species in the Atlantic Ocean and of the Inter-American Tropical Tuna Commission (IATTC) for the conservation and management of highly migratory fish resources in the Eastern Tropical Pacific Ocean, so far as they affect vessels and persons subject to the jurisdiction of the United States.

§ 300.181 Definitions. …

*Fish or fish products* regulated under this subpart means bluefin tuna, frozen bigeye tuna, southern bluefin tuna and swordfish and all such products of these species, except parts other than meat (e.g., heads, eyes, roe, guts, and tails), and shark fins. …

*Shark fin*, for purposes of this sub-part, means any fin removed from a shark, which is an animal of the Linnaean taxonomic superorder Selachimorpha, subclass Elasmobranchii, class Chondrichthyes. …

§ 300.182 HMS international trade permit.

  (a) *General.* An importer, entering for consumption fish or fish products regulated under this subpart from any ocean area into the United States, or an exporter exporting or re-exporting such product, must possess a valid trade permit issued under this section. Importation of fish or fish products regulated under this subpart by non-resident corporations is restricted to those entities authorized under 19 CFR

141.18. A resident agent or resident corporate surety provider, as specified under 19 CFR 141.18, must possess a valid trade permit when acting on behalf of a nonresident corporation when entering for consumption, exporting, or re-exporting fish or fish products regulated under this subpart from any ocean area.

(b) *Application.* A person must apply for a permit in writing on an appropriate form obtained from NMFS. The application must be completed, signed by the applicant, and submitted with required supporting documents, at least 30 days before the date on which the applicant wants to have the permit made effective. Application forms and instructions for their completion are available from NMFS.

(c) *Issuance.* NMFS will notify the applicant of any deficiency in the application, including failure to provide information or reports required under this subpart. If the applicant fails to correct the deficiency within 30 days following the date of notification, the application will be considered abandoned.

(d) *Duration.* Any permit issued under this section is valid for the period specified on it, unless suspended or revoked.

(e) *Alteration.* Any permit that is substantially altered, erased, or mutilated is invalid.

(f) *Replacement.* NMFS may issue replacement permits. An application for a replacement permit is not considered a new application. An appropriate fee, consistent with paragraph (j) of this section, may be charged for issuance of a replacement permit.

(g) *Transfer.* A permit issued under this section is not transferable or assignable; it is valid only for the permit holder to whom it is issued.

(h) *Inspection.* The permit holder must keep the permit issued under this section at his/her principal place of business. The permit must be displayed for inspection upon request of any authorized officer, or any employee of NMFS designated by NMFS for such purpose.

**Magnuson-Stevens Fisheries Conservation and Management Act**

50 C.F.R § 660.711

In Pertinent Part:

General catch restrictions.

(a) *Prohibited species.* HMS under the FMP for which quotas have been achieved and the fishery closed are prohibited species. In addition, the following are prohibited species:

(1) Any species of salmon.

(2) Great white shark.

(3) Basking shark.

(4) Megamouth shark.

(5) Pacific halibut.

(b) *Incidental landings.* HMS caught by gear not authorized by this subpart may be landed in incidental amounts as follows:

(1) Drift gillnet vessels with stretched mesh less than 14 inches may land up to 10 HMS per trip, except that no swordfish may be landed.

(2) Bottom longline vessels may land up to 20 percent by weight of management unit sharks in landings of all species, or 3 individual sharks of the species in the management unit, whichever is greater.

(3) Trawl and pot gear vessels may land up to 1 percent by weight of management unit sharks in a landing of all species or 2 individual sharks of the species in the management unit, whichever is greater.