**NO. 13-15188**

---

**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE NINTH CIRCUIT**

---

CHINATOWN NEIGHBORHOOD ASSOCIATION, a nonprofit corporation; and ASIAN AMERICANS FOR POLITICAL ADVANCEMENT, a political action committee,

Plaintiffs-Appellants,

v.

EDMUND BROWN, Governor, State of California, *et al*.

Defendants-Appellees,

THE HUMANE SOCIETY OF THE UNITED STATES, *et al*.,

Defendants-Intervenors-Appellees.

---

On Appeal from the United States District Court
for the Northern District of California
Case No. 4:12-cv-03759 PJH
The Honorable Phyllis J. Hamilton, District Judge

---

**RESPONSE BRIEF OF DEFENDANTS-INTERVENORS-APPELLEES TO AMICUS CURIAE BRIEF OF THE UNITED STATES**

---

BRUCE WAGMAN (CA Bar No. 159987)
BWagman@schiffhardin.com
SCHIFF HARDIN LLP
One Market, Spear Tower, 32nd Floor
San Francisco, California 94105
Telephone: 415-901-8700
Facsimile: 415-901-8701

RALPH HENRY (DC Bar No. 982586)
rhenry@humanesociety.org
THE HUMANE SOCIETY OF THE UNITED STATES
2100 L Street, NW
Washington, DC 20037
Telephone: (202) 452-1100
Facsimile: (202) 676-2357

*Attorneys for Defendants-Intervenors-Appellees*

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ........................................................................................ 1

II.   THE FEDERAL GOVERNMENT'S AMICUS BRIEF IS NOT INSTRUCTIVE WITH RESPECT TO THE COURT'S REVIEW OF THE DISTRICT COURT'S DECISION IN THIS INTERLOCUTORY APPEAL ....................................... 3

III.  THE FEDERAL FISHERY MANAGEMENT FRAMEWORK ESTABLISHED IN THE MAGNUSON-STEVENS ACT DOES NOT PREEMPT THE CALIFORNIA SHARK FIN LAW ................................................................ 7

      A.    The Magnuson-Stevens Act Principally Regulates Conduct On The Water And Up To The Point Of Landing; It Does Not Grant the Federal Government Exclusive Regulatory Authority After Landing............................. 10

      B.    California's Prohibition On Post-Landing Trade In Shark Fins Is Consistent With, And Not An Obstacle To, Accomplishment Of Federal Policy Goals ...................................................................................... 14

IV.   EVEN IF THE FEDERAL GOVERNMENT HAS RAISED SUBSTANTIAL QUESTIONS AS TO PREEMPTION, THE PRELIMINARY INJUNCTION REQUESTED BY THE PLAINTIFFS IS NOT WARRANTED ................................. 20

V.    CONCLUSION............................................................................................ 22

# TABLE OF POINTS AND AUTHORITIES

**Page**

## FEDERAL COURT CASES

*Air Conditioning and Refrigeration Institute v. Energy Resources Conservation and Development Com'n,*
410 F.3d 492 (9th Cir. 2005) ............................................................7

*Am. Trucking Ass'n v. City of Los Angeles,*
559 F.3d 1046 (9th Cir. 2009) .......................................................20

*Arizona v. U.S.,*
132 S. Ct. 2492 (2012) ...................................................................18

*Cavel Int'l v. Madigan,*
500 F.3d 551 (7th Cir. 2007) .........................................................11

*Chamberlan v. Ford Motor Co.,*
314 F. Supp. 2d 953 (N.D. Cal. 2004) ..........................................16

*Cipollone v. Liggett Group, Inc.,*
505 U.S. 504 (1992) ........................................................................16

*City of Charleston v. A Fisherman's Best,*
310 F.3d 155 (4th Cir. 2002) .........................................................11

*Coalition for Economic Equity v. Wilson,*
122 F.3d 692 (9th Cir. 1997) .........................................................20

*Crosby v. Nat'l Foreign Trade Council,*
530 U.S. 363 (2000) ..........................................................................8

*Dalton v. Little Rock Family Planning Services,*
516 U.S. 474 (1996) ........................................................................21

*DeHart v. Town of Austin, Ind.,*
39 F. 3d 718 (7th Cir. 1994) .............................................................9

*DISH Network Corp. v. F.C.C.,*
653 F.3d 771 (9th Cir. 2011) .........................................................20

*English v. General Elec. Co.,*
496 U.S. 72 (1990) ............................................................................8

*Fellner v. Tri-Union Seafoods, LLC,*
539 F.3d 237 (3rd Cir. 2008) ............................................... 5, 9, 19

*Florida Lime & Avocado Growers, Inc. v. Paul,*
373 U.S. 132 (1963) .....................................................................8, 11

## TABLE OF POINTS AND AUTHORITIES
(continued)

**Page**

*Fresnillo, S.A. de C.V., v. Curry,*
476 F.3d 326 (5th Cir. 2007) ...................................................11

*Hines v. Davidowitz,*
312 U.S. 52 (1941) ..............................................................6, 8

*Holk v. Snapple Beverage Corp.,*
575 F.3d 329 (3rd Cir. 2009) .................................................5, 11

*Jones v. Rath Packing Co.,*
430 U.S. 519 (1977) ...............................................................8

*Knetsch v. U.S.,*
364 U.S. 361 (1960) ................................................................4

*Medtronic, Inc. v. Lohr,*
518 U.S. 470 (1996) ...........................................................7, 19

*National Audubon Society, Inc. v. Davis,*
307 F.3d 835 (9th Cir. 2002) ...................................................21

*New York State Conf. of Blue Cross v. Travelers Inc.,*
514 U.S. 645 (1995) ..............................................................19

*NRDC v. Daley,*
209 F.3d 747 (D.C. Cir. 2000) .................................................16

*O'Melveny & Myers v. FDIC,*
512 U.S. 79 (1994) ...............................................................20

*Price v. Stevedoring Services of America, Inc.,*
697 F.3d 820 (9th Cir. 2012) ....................................................5

*Puerto Rico Dept. of Consumer Affairs v. Isla Petroleum Corp.,*
485 U.S. 495 (1988) ................................................................9

*Rice v. Santa Fe Elevator Corp.,*
331 U. S. 218 (1947) ...............................................................7

*Sanchez-Trujillo v. I.N.S.,*
801 F.2d 1571, 1581 n.9 (9th Cir. 1986) .....................................4

*Soriano v. U.S.,*
494 F.2d 681 (9th Cir. 1974) ...................................................12

*Southeastern Fisheries Ass'n v. Chiles,*
979 F.2d 1504 (11th Cir. 1992) ................................................11

# TABLE OF POINTS AND AUTHORITIES
(continued)

**Page**

*Southeastern Fisheries Association v. Mosbacher,*
   773 F. Supp. 435 (D.D.C. 1991) .......................................................................11

*Sprietsma v. Mercury Marine,*
   537 U.S. 51 (2002) ....................................................................................9, 18

*Steel Inst. of N.Y. v. City of N.Y.,*
   2013 U.S. App. LEXIS 9236 (2nd. Cir. May 7, 2013) .......................................7

*Viva! Intern. Voice for Animals v. Adidas Promotional Retail Operations,*
   *Inc.,*
   41 Cal. 4th 929 (Cal. 2007) ......................................................................8, 11

*Weinberger v. Romero–Barcelo,*
   456 U.S. 305 (1982) ...................................................................................20

*Winter v. Natural Resources Defense Council, Inc.,*
   555 U.S. 7 (2008) .......................................................................................20

*Wyeth v. Levine,*
   555 U.S. 555 (2009) ........................................................................... 6, 7, 16


## FEDERAL STATUTORY AUTHORITIES

16 U.S.C. §1801(b) ...........................................................................................16

16 U.S.C. §1801, et seq .............................................................................. 10, 11

16 U.S.C. §1802 (33) ........................................................................................14

16 U.S.C. §1802(33) ........................................................................................15

16 U.S.C. §1802(33) ........................................................................................16

16 U.S.C. §1851 ................................................................................................14

16 U.S.C. §1853(a)(1)(A) .................................................................................12

16 U.S.C. §1853(b) ...........................................................................................13

16 U.S.C. §1853(b)(3) ................................................................................ 13, 14

16 U.S.C. §1857(1)(G) ............................................................................... 12, 13

16 U.S.C. §1863(a) ...........................................................................................15

Magnuson-Stevens Act ("MSA"), 16 U.S.C. §1801, et seq .....................................1

# TABLE OF POINTS AND AUTHORITIES
(continued)

**Page**

Pub. L. No. 94-265, § 3(18)(B), 90 Stat. 331 (1976) ..............................................16

See Sustainable Fisheries Act, Pub. L. No. 104-297, § 102(7), 110 Stat. 3559 (1996) ................................................................................................16

# FEDERAL RULES AND REGULATIONS

50 C.F.R. § 600.5, et seq ..........................................................................................1

50 C.F.R. § 600.605, et seq ....................................................................................11

78 Fed. Reg. 25685 ..................................................................................................1

78 Fed. Reg. 36149  (June 13, 2013) .......................................................................4

# STATE RULES AND REGULATIONS

H.R. Rep. No. 104-171 (1995).................................................................................17

H.R. Rep. No. 106-650 (1999).................................................................................18

S. Rep. No. 109-229 (2006) ....................................................................................17

S. Rep. No. 111-124 (2010) ....................................................................................18

# LEGISLATIVE MATERIALS

146 Cong. Rec. H11570, H11571 (daily ed. Oct. 30, 2000) ...................................18

146 Cong. Rec. S11744 (daily ed. Dec. 7, 2000) ...................................................18

156 Cong. Rec. H8790 (daily ed. Dec. 21, 2010)...................................................17

S. Rep. No. 104-276 (1996) ....................................................................................17

## I.    <u>INTRODUCTION</u>

Contrary to the assertions in the federal government's late-filed amicus brief, the California shark fin law does not present an obstacle to the accomplishment and execution of the objectives of the federal fisheries management framework established by the Magnuson-Stevens Act ("MSA"), 16 U.S.C. § 1801, *et seq*., or its implementing regulations, 50 C.F.R. § 600.5, *et seq*.  The MSA seeks to conserve fisheries resources for the purpose of ensuring the continuation of healthy fisheries and preventing overfishing and depletion of fish populations.  Moreover, the specific shark finning provisions of the MSA (enacted through the Shark Finning Prohibition Act of 2000 and the Shark Conservation Act of 2010) are singularly focused on ending the cruel and unsustainable practice of "finning," where the fins of live sharks are cut off and the fish is thrown overboard to drown, bleed to death or be eaten alive.  The California shark fin law advances these federal goals, it does not undermine them.

The timing of the federal government's amicus submission is surprising given that the National Marine Fisheries Service ("NMFS") has recently suggested the specific preemption theory raised here in a *proposed* rulemaking published on May 2, 2013, <u>which has not been finalized</u>.  78 Fed. Reg. 25685.  Despite the fact that NMFS is still engaging states with shark fin laws and other stakeholders on the issue, the agency has rashly chosen to circumvent the deliberation and accountability of the rulemaking process by taking a position in this litigation that state shark fin laws like the California law at issue here must be preempted in order to accomplish federal goals.

While Congress clearly has not expressed an intent that states cannot regulate the wholly intrastate trade in fish parts and products after the fish are landed, NMFS nevertheless has claimed that state laws regulating such activity – at least as pertains to the "initial possession and first sale" of fish parts by fishermen

operating in federal waters – undermine the goal of obtaining "optimal yield" from federal fisheries. But the agency too narrowly, and incorrectly, summarizes this goal of the federal fisheries management scheme, overstating the importance of promoting the economic profitability of commercial fishing, and wholly ignoring the conservation-based goals of the MSA, including its specific shark finning provisions, which are given priority under the Act.

The MSA generally applies to conduct in federal waters and up to the point of landing. It does not guarantee a market for fisheries resources (or specific parts of those resources) and is not responsible for creating such a market. Nor should it do so. Otherwise states would be powerless to regulate in-state markets for sale of fish parts and products based on traditional state police power interests, such as combatting animal cruelty, conservation of the state's natural resources, and protection of public health.

Indeed, NMFS's nonsensically broad obstacle preemption position has no apparent bounds. Pursuant to the preemption theory articulated in the agency's proposed rule and the amicus brief filed here, states could not prohibit the trade in *any* product that contains *any* portion of *any* commercially valuable part of a fish, regardless of the state's purpose. Perhaps recognizing the absurd results that NMFS's broad preemption position could create, the amicus brief that the federal government hurriedly prepared for filing before the oral argument scheduled for next week admits that NMFS has not yet determined the limits of the purported preemptive effect of federal law. *See* Fed. Amicus Br. at 20-21, n.4. Yet the federal government nonetheless has asked this Court to adopt its current views on preemption of the California shark fin law in order to protect at least the "first sale" of shark fins by fishermen after the sharks have been landed and processed.

But the "narrow ruling" as to first sale of fins by fishermen requested by the federal government is not feasible (because once fins are detached from the shark

carcass there is no way to tell if they were obtained from a shark subjected to the cruel and rampant practice of live finning), and more importantly *fails entirely to address the remedy sought by the plaintiffs in this appeal*.  Plaintiffs – who are restaurant owners and other merchants, not fishermen – seek a facial invalidation of the California shark fin law that would allow sale and consumption of shark fin products (such as shark fin soup).  Even if adopted by this Court, NMFS's position as to obstacle preemption would not compel the relief sought by the plaintiffs.

In short, the position taken by the federal government is the subject of an open rulemaking process, misconstrues the scope and interrelation of the California shark fin law and the federal fisheries management scheme, and is irrelevant to the relief sought by plaintiffs here.  A preliminary injunction is an extraordinary remedy issued as a matter of discretion, and the district court did not abuse its discretion in denying an injunction based on both a failure of the plaintiffs to establish a likelihood of success on their claims, and a failure of the plaintiffs to establish irreparable harm outweighing the interests in implementation of the state law.  The district court's denial of the plaintiffs' request for a preliminary injunction should be upheld, irrespective of the merits (or lack thereof) of the position advanced in the federal government's amicus brief.

## II.    THE FEDERAL GOVERNMENT'S AMICUS BRIEF IS NOT INSTRUCTIVE WITH RESPECT TO THE COURT'S REVIEW OF THE DISTRICT COURT'S DECISION IN THIS INTERLOCUTORY APPEAL

The federal government's eleventh hour amicus brief seeks to frame the preemption issue very differently than the plaintiffs have in their briefing in the district court and on appeal.  As *merchants and distributors* of detached shark fins and fin products, the plaintiffs have brought a *facial* challenge to the California shark fin law seeking a ruling from the courts that the law unconstitutionally

conflicts with their ability to trade in detached and processed shark fins and fin products (such as shark fin soup).  Conversely, the federal government asks this Court to address a completely different and *narrower* question based on an obstacle preemption theory, seeking a "limited ruling" relating only to "the initial possession and first sale of shark fins" by *fishermen*.[1]  See Fed. Amicus Br. at 20-21, n.4.  But "[a]n amicus brief may not frame the questions to be resolved in an appeal."  *Sanchez-Trujillo v. I.N.S.*, 801 F.2d 1571, 1581 n.9 (9th Cir. 1986); *see also Knetsch v. U.S.*, 364 U.S. 361, 370 (1960) (appellate courts are generally constrained from addressing a specific argument made by *amicus curiae* where such an argument "has never been advanced by petitioners").  As such, the federal amicus brief is of limited use in determining whether the plaintiffs are entitled to a preliminary injunction on the specific claims they have brought, and whether the district court abused its discretion in denying such extraordinary relief.

It is also particularly troubling that the federal government is asserting the merits of a position that it recently advanced in a proposed rulemaking, which has not been finalized.  See 78 Fed. Reg. 36149 (June 13, 2013).  Indeed, at the time the federal government filed its amicus brief, NMFS was still collecting comments on the proposed rule and had indicated that it was seeking information from the states and other interested stakeholders for the purpose of determining if any state laws are preempted, and if so to what degree.  *See id.* (noting that "preemption is based on Congressional intent" and "will depend in part on how states interpret their laws," and extending the comment period to allow more input on this issue from the states and members of the public).  NMFS has even proposed to eliminate and replace the language of the current savings clause in federal regulations in order to effectuate its proposed interpretation as to preemption, and until the

---

[1] It is undisputed that plaintiffs represent restaurant owners and other merchants and distributors of shark fin products, not fishermen.

proposed rule is finalized the language of the current regulatory savings clause remains. *See* 78 Fed. Reg. at 25,689; *see also* Fed. Amicus Br. at 3 (stating that the agency's ability to assert its position on preemption was dependent on, *inter alia*, "NMFS's recent issuance of the notice of proposed rulemaking").

Absent clear Congressional intent to preempt state law via statutory language, courts have declined to give any weight to agency assertions of preemption that lack sufficient "fairness and deliberation" suggesting that Congress would approve of the agency's action as a binding and exclusive application of federal law. *Fellner v. Tri–Union Seafoods, L.L.C.*, 539 F.3d 237, 245 (3rd Cir. 2008) ("Regularity of procedure – whether it be the rulemaking and adjudicatory procedures of the APA or others which Congress may provide for a particular purpose – not only ensures that state law will be preempted only by federal "law," as the Supremacy Clause provides, but also imposes a degree of accountability on decisions which will have the profound effect of displacing state laws."); *see also Holk v. Snapple Beverage Corp*., 575 F.3d 329, 341 (3rd Cir. 2009) (declining to give preemptive weight to agency's informal policy defining "natural" foods where the agency "did not appear to consider all the comments received" before setting the policy and the "policy [was] without the benefit of public input"). "Furthermore, deferring to agencies' litigating positions interpreting statutes they are charged with administering would create a danger that agencies would avoid promulgating regulations altogether, given the comparative ease of announcing a new statutory interpretation in a brief rather than through formal rulemaking. This result would severely undermine the notice and predictability . . . that formal rulemaking is meant to promote." *Price v. Stevedoring Services of America, Inc*., 697 F.3d 820, 830 (9th Cir. 2012).

In addition, agency involvement in preemption litigation can introduce complexity in another regard as well – if the agency has a viewpoint on whether

state law should be preempted, courts must determine how much deference to give the agency's view. The Supreme Court recently explained in *Wyeth v. Levine*, 555 U.S. 555 (2009), that agency views should be factored into a court's preemption analysis only with a level of deference corresponding to the authority granted to the agency by Congress. Where, as here, Congress has neither explicitly granted nor denied the agency authority to determine the preemptive scope of federal fisheries management laws, the Court in *Wyeth* made clear that agency views should only receive "*Skidmore*" deference – meaning that no deference is given to the agency's legal conclusions, because "agencies have no special authority to pronounce on pre-emption absent delegation by Congress," but that "some weight" may be given to the agency's explanation of how state law interacts with federal law and any conflicts that may exist. *Id*. at 577, quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941).

Here, the federal government's explanation of how the California shark fin law interacts with federal fisheries law should be given no weight at all, as it is clear from the amicus brief that the federal government does not yet fully understand the scope and impact of the California law. By example, the amicus brief repeatedly states that the California law prohibits fishermen from possessing and utilizing the fins from sharks they caught in federal waters. *See*, *e.g*., Fed. Amicus Br. at 18 ("At the moment the fisher removes a shark fin . . . the fisher is arguably in possession of a detached fin in violation of California law."); *id*. at 19 ("[T]he fisher is prohibited from fully utilizing the shark because the fisher's possession and sale of the shark fin, while permitted under federal law, is prohibited under California law."); *see also id*. at 15, 17, 22 and 26. Contrary to these assertions, the California law explicitly allows licensed fishermen to possess and use detached shark fins from sharks they have caught. Cal. Fish & Game Code § 2021(d). Given that the only value of a federal agency's litigation position as to

obstacle preemption lies in the "agency's explanation of how state law affects the [federal] regulatory scheme," *Wyeth*, 555 U.S. at 576; *see also Steel Inst. of N.Y. v. City of N.Y.*, 2013 U.S. App. LEXIS 9236, at *22 (2nd. Cir. May 7, 2013) (same), the evidence of significant agency confusion over the impact of the California law indicates that the federal government's input here is of limited value at this time.

Finally, the federal government's dilatory application to participate in this litigation, made well after plaintiffs filed an appeal of the denial of their motion for a preliminary injunction, effectively denied the district court any opportunity to address the specific obstacle preemption arguments presented in the amicus brief. Thus, the federal government is essentially asking this Court to review matters <u>not considered by</u> the district court. Defendants-intervenors respectfully submit that it would be most prudent and most equitable for the Court to decline to consider the federal government's views as to obstacle preemption at this time. The federal government, which is here concerned about impacts to fishermen and not the merchant plaintiffs in this case, will have the opportunity to raise their obstacle preemption arguments if and when such a claim is actually pursued by the plaintiffs and the district court has an opportunity to review the issue on the merits.

## III. <u>THE FEDERAL FISHERY MANAGEMENT FRAMEWORK ESTABLISHED IN THE MAGNUSON-STEVENS ACT DOES NOT PREEMPT THE CALIFORNIA SHARK FIN LAW</u>

Preemption analysis begins with a presumption that the historic police powers of the states are not to be superseded unless there is a clear and manifest intent on the part of Congress to do so. *See Rice v. Santa Fe Elevator Corp.*, 331 U. S. 218, 230 (1947); *Air Conditioning and Refrigeration Institute v. Energy Resources Conservation and Development Com'n*, 410 F.3d 492, 496 (9th Cir. 2005); *see also Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (noting the presumption against preemption is strongest in areas of traditional state regulation).

From this starting presumption, there are two ways that federal law may preempt state law. Express preemption occurs when a federal statute explicitly states Congress's intent to preempt state law. *See English v. General Elec. Co.*, 496 U.S. 72, 78-79 (1990) ("[W]hen Congress has made its intent known through explicit statutory language, the court's task is an easy one."). Implied preemption, by contrast, is an inference drawn by the courts based on a federal statute's structure and purpose, suggesting that Congress intended state law to be displaced in the situation at hand. *See Jones v. Rath Packing Co.*, 430 U.S. 519, 525 (1977).

There are two kinds of implied preemption: preemption due to an intent by Congress to "occupy the field" of regulation, and preemption due to a conflict between state law and federal law. *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000) (internal quotation omitted). The latter, preemption based on an actual conflict, typically only occurs when "compliance with both federal and state regulations is a physical impossibility." *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142-43 (1963). However, a state law may also be preempted if it creates an absolute obstacle to the achievement of Congress's policy objectives. *Hines v. Davidowitz*, 312 U.S. 52, 66-67 (1941). Only this last form of preemption – obstacle preemption – has been raised in the federal government's amicus brief. *See* Fed. Amicus Br. at 15-16.

In sum, the federal government's obstacle preemption position is based entirely on the observation that "federal law *allows* for possession and sale [of shark fins] so long as the shark is landed in compliance with federal law." Fed. Amicus Br. at 25 (emphasis added); *see also id.* at 12, 15, 19 (similar). But fundamentally, "[t]here is a difference between (1) not making an activity unlawful, and (2) making that activity lawful." *Viva! Intern. Voice for Animals v. Adidas Promotional Retail Operations, Inc.*, 41 Cal. 4th 929, 952 (Cal. 2007) (upholding a California ban on the importation of kangaroo products even after the

federal government removed the species from the endangered species list, which gave California control over the importation of kangaroo products); *see also DeHart v. Town of Austin, Ind.*, 39 F. 3d 718, 722 (7th Cir. 1994) (rejecting a claim that the existence of federal and state laws regulating humane handling and care of exotic animals somehow *requires* that possession of exotic animals be allowed, and that a municipal prohibition against such possession was thus preempted).

Given the presumption against preemption, *a failure to regulate* by the federal government should only preempt the operation of state law where the federal government considered and rejected a policy *with the clear intent that states not adopt it either*. *See, e.g., Puerto Rico Dept. of Consumer Affairs v. Isla Petroleum Corp.*, 485 U.S. 495, 503 (1988) (mere statements by legislators or the implementing agency will not suffice to draw a negative inference of preemption, absent strong textual or structural support for a finding of preemption in the law); *Sprietsma v. Mercury Marine*, 537 U.S. 51, 65 (2002) (a "decision not to adopt a regulation" simply means there is no federal regulation; it is not treated as "the functional equivalent of a regulation prohibiting all States and their political subdivisions from adopting such a regulation"); *Fellner v. Tri-Union Seafoods, LLC*, 539 F.3d 237, 247 (3rd Cir. 2008) ("[W]e find no support for the proposition that an agency's informal explanation for its decision not to regulate can alone imbue such a decision with preemptive force; in all cases concerning alleged federal determinations that an area is best left unregulated, the [courts] have inquired whether some extant law or regulation evinced an authoritative message of federal policy that an issue is to remain free of state regulation . . . .") (internal quotations and citations omitted).

Contrary to the perplexing position taken in the federal government's hastily filed amicus brief, *nothing* in the federal fishery management framework indicates an intent that states cannot regulate the intrastate trade in any product from any

part of any type of fish that is allowed to be caught in a federally-managed fishery.[2]  Moreover, California's shark fin law actually *supports*, and does not stand as an obstacle to, the federal policy goals of the Magnuson-Stevens Act and particularly the singular conservation-minded objective underlying the shark finning provisions of the Act.

    **A.**    **The Magnuson-Stevens Act Principally Regulates Conduct On The Water And Up To The Point Of Landing; It Does Not Grant the Federal Government Exclusive Regulatory Authority After Landing**

The Magnuson-Stevens Act ("MSA") sets forth a framework for managing fisheries in U.S. waters.  *See* 16 U.S.C. § 1801, *et seq*.  Under this framework, NMFS works with the states and other stakeholders in Regional Fishery Management Councils to create Fishery Management Plans and set federal regulations for fish stocks in U.S. waters that require conservation and management.  *Id*. §§ 1852-53.  Thus, fisheries regulation is well-established as an area of cooperative federalism.  The states have historically exercised management authority in their territorial waters, and federal law has established the United States' Exclusive Economic Zone ("EEZ"), which extends 200 nautical miles from state boundaries, and the federal government typically exercises management authority in the EEZ.  *See id*. § 1856(a)(1).  From this starting point, the MSA provides a mechanism to transfer jurisdiction over a fishery from federal to state managers, and vice versa.  *Id*. § 1856(a)(3), (b).

With this highly integrated structure, it is no surprise that the MSA contains a savings clause indicating Congress intended that "nothing in this [Act] shall be construed as extending or diminishing the jurisdiction of any State within its

---

[2] The federal government's argument, by its own terms, is not limited to sharks. The Magnuson-Stevens Act creates a fisheries management framework that applies to all fish species caught in federal waters.

boundaries." *Id*. § 1856(a)(1).  A few exceptions to the savings clause are provided, *see id*. 1856(a)(3), (b); 50 C.F.R. § 600.605, *et seq*., but none are relevant here.  Moreover, the cooperative nature of federal and state fisheries management makes abundantly clear that the federal government has not occupied the field of fisheries management as a whole.[3]  *See Crosby*, 530 U.S. at 372.

The vast majority of the MSA regulates fishing in federal waters up to the point of landing, *not* post-landing sale of fish parts and products.[4]  Thus, the federal government's heavy reliance on cases that involve preemption of state laws that prohibited the *landing* of fish is inapposite.  *See* Fed. Amicus Br. at 17-19, citing *Southeastern Fisheries Association v. Mosbacher*, 773 F. Supp. 435, 440 (D.D.C. 1991) ("in effect, [the challenged regulations] told commercial fishermen that they may catch the fish, but that they *may not land them*") (emphasis added); *Southeastern Fisheries Association v. Chiles*, 979 F.2d 1504, 1510 (l1th Cir. 1992) (finding that Florida's daily *landing limit* for mackerel was likely preempted); *City of Charleston v. A Fisherman's Best*, 310 F.3d 155, 169 (4th Cir. 2002) ("[The City's resolution was] a means to deny access to the docks by longline vessels, and denial of access was a means . . . to discourage non-local vessels from coming to

---

[3] With respect to the narrower issue of fisheries management *solely within the EEZ*, some precedent exists for the idea that the field is preempted by federal law and no state action is acceptable.  *See Southeastern Fisheries Ass'n v. Chiles*, 979 F.2d 1504, 1509 (11th Cir. 1992) ("We think . . . Congress must have intended to occupy the field of fishery management within the EEZ.").  Whether or not this is true is immaterial, however, as California's shark fin law does not regulate fishing in the federal EEZ.  Rather, the state law regulates the sale and trade of products *within state borders*, and regulating the trade in goods (including animal parts and products) in intrastate commerce is a long-standing area of state *authority.  See, e.g., Cavel Int'l v. Madigan*, 500 F.3d 551, 554 (7th Cir. 2007); *Empacadora de Carnes de Fresnillo, S.A. de C.V., v. Curry*, 476 F.3d 326, 336 (5th Cir. 2007); *Holk*, 575 F.3d at 329; *Viva! Intern. Voice for Animals*, 41 Cal. 4th at 952.  The MSA has never been viewed as occupying the entire field of fisheries management.

[4] This distinction establishes that there is no traditional "conflict preemption" where compliance with both state and federal law is impossible, *see Florida Lime & Avocado Growers, Inc*., 373 U.S. at 142-43, because the California shark fin law fills a regulatory void left unaddressed by the federal fisheries management scheme.

fish in those waters.").

These cases are distinguishable from the instant matter. The California shark fin law does not prevent landing of sharks. In fact, the California law allows the post-landing sale of whole sharks, with fins naturally attached, which is the form in which federal law requires that sharks be landed. Further, the California law allows possession and personal use (*e.g.,* for consumption, taxidermy, etc.) of detached fins by fishermen. Pointing the Court to cases concerning state and local laws that precluded fishermen from *landing* fish, as the federal government has done in its amicus submission, is entirely unhelpful in the context of litigation over a state law that only precludes fishermen from engaging in the *post-landing sale* of a specific part of a fish.

Landing fish at the dock and selling certain detached fish parts after processing are two entirely different behaviors (the latter of which can, but does not always, follow from the former). Further, NMFS's ability to regulate these two activities is addressed separately in the MSA. The power to regulate landing of fish falls within the agency's main grant of authority to set measures that are "necessary and appropriate for the conservation and management of the fishery." 16 U.S.C. § 1853(a)(1)(A). NMFS's much more limited power to regulate the sale of fish, by contrast, is set forth separately, and is restrained by specific conditions. Given the different grants of authority, the fact that state laws affecting the *landing* of federally-caught fish have at times been found preempted has no bearing on the degree to which the agency is empowered to regulate the *sale* of fish.

Only two very specific and limited grants of authority empower NMFS to regulate sales of fish under the MSA.[5] The first is in 16 U.S.C. § 1857(1)(G),

---

[5] Unlike the states, which have general police power authority, federal agencies do not have police power authority and cannot regulate on a particular subject matter without being given specific authority by statute. *See Soriano v. U.S.*, 494 F.2d 681, 683 (9th Cir. 1974) ("[A]n administrative agency is a creature of statute,

which prohibits the sale, trade, and possession of fish taken in violation of the MSA. This statutory section does not provide NMFS with authority to establish a general ban on sales of shark fins – any prohibition on fin sales using § 1857(1)(G) authority would be limited to fins from sharks caught in violation of federal law. The second grant of authority to regulate sales of fish is found in 16 U.S.C. § 1853(b)(3), where Congress described various optional provisions that Councils can choose to put in their Fishery Management Plans, including specific "limitations which are necessary and appropriate for the conservation and management of the fishery, on the * * * (B) sale of fish caught during commercial, recreational, or charter fishing, consistent with any applicable Federal and State safety and quality requirements."

In its amicus brief, the federal government directs the Court's attention to 16 U.S.C. § 1853(b) on several occasions. *See, e.g*., Federal Amicus Brief at 4 ("The [Magnuson-Stevens Act] gives the federal government authority to regulate not only the harvesting of fish, but also possession, landing, and sale of fish catch." (citing 16 U.S.C. § 1853(b)(3))). However, while this provision provides some authority for NMFS to create restrictions on sales of fish, it by no means grants the federal government exclusive authority as to sales of fish catch.

Moreover, this singular MSA provision concerning sales of fish catch can only be exercised in the context of a Fishery Management Plan and through the Council process (which is a forum where states have a voice and can explain the merits of their policy decisions to their colleague states prior to the promulgation of federal regulations), and is explicitly subject to state safety and quality laws. Notably, the California shark fin law was enacted out of concern, *inter alia*, that shark fins "often contain high amounts of mercury, which has been proven

---

having only those powers expressly granted to it by Congress or included by necessary implication from the Congressional grant.").

dangerous to consumers' health." Cal. Stats. 2011, Ch. 524 (A.B. 376) § 1(a)-(g). Thus, NMFS could not use § 1853(b)(3) as a source of authority to preempt California's shark fin law, which would qualify as a state safety and quality requirement.

In sum, while NMFS has substantial (and in some cases exclusive) authority with respect to fisheries management on the water and up to the point of landing, the agency does not have similarly broad authority with respect to the post-landing sale of fish, fish parts and fish products. In fact, absent some amendment to the current language of the MSA, NMFS lacks the authority to unilaterally regulate the post-landing sale of fish, and therefore cannot itself preempt state laws that currently do so.

### B.   California's Prohibition On Post-Landing Trade In Shark Fins Is Consistent With, And Not An Obstacle To, Accomplishment Of Federal Policy Goals

In support of its obstacle preemption argument, the federal government asserts that the California law is in "actual conflict" with "the MSA's mandate to manage federal fisheries to ensure sustainable, optimum yields for commercial fishing." Fed. Amicus Br. at 15. In making this argument, the government's brief simply parrots the assertions made in NMFS's May 2, 2013 proposed rule, discussed *infra*. Compare 78 FR 25689 *with* Fed. Amicus Br. at 15-26. NMFS's proposed interpretation of the MSA too narrowly, and incorrectly, summarizes the goals of the federal fisheries management scheme in general, and the goal of the federal shark fin-related laws specifically.

The goals of the MSA, as embodied in its ten national standards, are for the purpose of ensuring effective conservation and management of fisheries in order to prevent overfishing and to promote optimal yield. 16 U.S.C. § 1851; 16 U.S.C. § 1802 (33). In its proposed rule and amicus brief, NMFS focuses entirely on the

goal of promoting "optimal yield" and appears to suggest that this goal requires that every marketable part of a fish be salable. *See, e.g.*, 78 FR 25686 (state shark fin laws like California's law "constrain the ability of federal fishery participants to make use of those sharks for commercial and other purposes"; Fed. Amicus Br. at 18 (the California law "prevents fishers from obtaining a significant part of the economic value of the shark").

This myopic view of the goals of the MSA is inaccurate for two reasons. First, the term "optimum yield" in the MSA refers to "*the amount of fish*" removed from the ocean (by both commercial and recreational fishermen), it does not refer to the amount of revenue commercial fishermen receive from buyers for their catch, or the volume of sales of commercially-caught fish. 16 U.S.C. § 1802(33) (emphasis added). Indeed, while the MSA's goal of optimizing yield is intended, *inter alia*, to ensure the long-term conservation and continuation of fisheries resources, it does not guarantee a market for fisheries resources (or specific parts of those resources), and is not responsible for creating such a market.[6]  In fact, "optimum yield" is measured not only by economic interests, but also "social" and "ecological" interests. *Id.*  Nevertheless, the federal government's brief simply *assumes* that any state law restriction that might decrease economic returns to fishermen *necessarily* undermines the goal of "optimum yield," without providing any evidence that such a state law will actually affect the amount of removals at sea, and without any evaluation or discussion of the potential social and ecological benefits of the state law.  Put another way, the federal government's brief merely speculates that the California shark fin law will negatively influence one factor of

---

[6] There is a provision in the MSA for investing in opportunities for fisheries in the Northwest Atlantic to develop a market for *underutilized* species.  See 16 U.S.C. §1863(a).  This provision is limited in scope and does not apply to the market for shark fins.

the several factors that define "optimal yield."[7]  However, "[s]peculative or hypothetical conflict is not sufficient: only state law that 'actually conflicts' with federal law is preempted*." Chamberlan v. Ford Motor Co*., 314 F. Supp. 2d 953, 957 (N.D. Cal. 2004) (quoting *Cipollone v. Liggett Group, Inc*., 505 U.S. 504, 516 (1992)).

Second, the federal government's amicus brief overstates the importance of promoting the economic profitability of commercial fishing under the MSA, *and wholly ignores the fact that conservation is also a major goal of the Act*.  The MSA has numerous goals, and promoting commercial fishing is only one of them.  *See* 16 U.S.C. § 1801(b) (describing seven legislative purposes, the first and second of which primarily relate to conservation).  Indeed, the text of the MSA clearly makes the goal of promoting commercial fishing subject to the Act's conservation purposes.  *Id; see also NRDC v. Daley*, 209 F.3d 747, 753 (D.C. Cir. 2000) (noting that the conservation purpose of the MSA takes priority over the Act's other

---

[7] Contrary to NMFS's views, "optimum yield" explicitly is not a balancing exercise.  "Optimum yield" is a one-way adjustment from the starting point of "maximum sustainable yield."  *See* 16 U.S.C. §1802(33) (defining "optimum yield" as an amount of fish that is set "on the basis of the maximum sustainable yield from the fishery*, as reduced by* any relevant economic, social, or ecological factor" (emphasis added)).  In the original version of the MSA, "optimum yield" was allowed to move both ways – up and down – from the "maximum sustainable yield."  *See* Pub. L. No. 94-265, § 3(18)(B), 90 Stat. 331 (1976) (defining "optimum yield" as an amount of fish set "on the basis of the "maximum sustainable yield" from such fishery, *as modified by any* relevant economic, social, or ecological factor" (emphasis added)).  After two decades of failure under that system, however, Congress in 1996 amended the definition of "optimum yield" to its current form.  *See* Sustainable Fisheries Act, Pub. L. No. 104-297, § 102(7), 110 Stat. 3559 (1996).  The change transformed the nature of "optimum yield." Formerly a balancing situation, "optimum yield" is now a value that is calculated by surveying economic, social, and ecological factors, and accounting for them with *reductions* in catch if needed.  Accordingly, there is simply no increase in catch that NMFS could authorize in an effort to optimize economic returns to fishermen that a state shark fin ban could compete against or otherwise conflict with.  As a system that only allows one-way adjustments to *reduce* catch, federal law forms "a floor upon which States [can] build" with no concern about obstacle preemption, rather than a "ceiling as well as a floor" that state law cannot deviate from.  *See Wyeth*, 555 U.S. at 577, 582.

purposes). The federal government's brief ignores the effect of several rounds of amendments to the MSA which have which have repeatedly strengthened and made more central the goal of conservation. *See, e.g.,* S. Rep. No. 104-276 (1996); H.R. Rep. No. 104-171 (1995); S. Rep. No. 109-229 (2006).

The California shark fin law is not only consistent with the prioritization of conservation in the MSA generally, but it is also consistent with the singular underlying goal of the MSA's specific shark finning provisions (enacted through the Shark Finning Prohibition Act of 2000, 114 Stat. 2772, and the Shark Conservation Act of 2010, 124 Stat. at 3670) – namely to eliminate the cruel and unsustainable practice of shark finning. In both its proposed rule and the amicus brief, NMFS describes Congress's enactment of these provisions as representing a balance between competing policy goals. *See* 78 Fed. Reg. at 25,686 (the Shark Conservation Act of 2010 "reflects a balance between addressing the wasteful practice of shark finning and preserving opportunities to land and sell sharks harvested consistent with the Magnuson-Stevens Act"); Fed. Amicus Br. at 24 ("Congress chose a circumscribed approach to addressing the practice of shark finning that did not include a total ban on the possession, sale, and trade of fins from sharks that were legally harvested in federal waters."). But this characterization is grossly inaccurate.

Both text and legislative history of the Shark Finning Prohibition Act and the Shark Conservation Act clearly indicate that the shark finning provisions of the MSA are not the product of striking a compromise between competing policy goals. Throughout the legislative process to enact these laws, Congress clearly and repeatedly stated its intent to protect and conserve shark populations worldwide, and explained that its concern for sharks was based on the animals' important ecological role, their vulnerability to fishing pressure, and the worldwide increase in shark mortality driven by the demand for fins. *See, e.g*., 156 Cong. Rec. H8790

(daily ed. Dec. 21, 2010); S. Rep. No. 111-124 (2010); 146 Cong. Rec. S11744 (daily ed. Dec. 7, 2000); H.R. Rep. No. 106-650 (1999).  While there was some debate on species-specific exemptions and landing processes, there was *no debate* over whether to ban or permit the post-landing sale of detached shark fins and fin products.[8]  Congress never considered – much less rejected – an inland shark fin ban.

In the face of clear evidence that regulating the trade in shark fins was not among the objectives of the Shark Finning Prohibition Act and the Shark Conservation Act, the federal government again retreats to its base argument that "[w]hile the federal Finning Prohibition Act does not affirmatively permit trade in shark fins, it does not prohibit it."  Fed. Amicus Br. at 24.  But to establish obstacle preemption there must be unambiguous evidence that Congress considered and rejected the specific policy, and the rejection must also make clear that state and local jurisdictions are not permitted to adopt the policy either.  *See, e.g., Arizona v. U.S.,* 132 S. Ct. 2492, 2504 (2012); *id*. at 2520 (Scalia, J., concurring in part and dissenting in part) (noting that Congress's failure to adopt a policy "was most likely expressive of what inaction ordinarily expresses:  nothing at all"); *Sprietsma*, 537 U.S. at 65-66.

---

[8] In its brief, the federal government highlights a lone statement by Rep. George Miller on the floor of the House to suggest that Congress affirmatively rejected any regulation of trade in shark fins.  See Federal Amicus Brief at 5-6, citing 146 Cong. Rec. H11570, H11571 (daily ed. Oct. 30, 2000) ("The Shark Finning Prohibition Act will not prevent United States fishermen from harvesting sharks, bringing them to shore, and then using the fins or any other part of the shark.  Instead, it would simply prevent the cutting off of the fins and the disposal of the carcass at sea, or the transport or landing of fins harvested in this manner by another fishing vessel.").  This statement simply acknowledges that, as of the year 2000, fishermen could do whatever they wanted with shark fins after landing them and the Shark Finning Prohibition Act would not change that.  The statement does not provide any indication that Congress (or even Rep. Miller himself) considered the idea of an inland shark fin ban and rejected it, much less any suggestion Congress intended states to be precluded from doing so as well.  *See Puerto Rico Dept. of Consumer Affairs*, 485 U.S. at 503 (mere statements by legislators do not create inference of preemption).

NMFS's "as long as the federal government doesn't prohibit it, states can't prohibit it either" approach should be soundly rejected by the Court. Despite the federal government's assertion that it believes a "limited ruling" as to the "initial possession and first sale" of shark fins by fishermen is appropriate, and that it is currently undecided as to whether federal fisheries law preempts activities farther "downstream" (such as a subsequent sale or consumption), see Fed. Amicus Br. at 20-21 n.4, the federal government's extremely broad theory of obstacle preemption appears on its face to have no bounds. If adopted by the Court in its current nebulous form, the agency's position would prohibit states from regulating the trade in *any* product that contains *any* portion of *any* commercially valuable part of any fish that could be caught in the U.S. EEZ, regardless of the state's purpose, so long as absent state regulation a fisherman could sell all or part of the fish for more money. This absurdly broad theory could prohibit a whole host of state laws governing the sale of end-use products, from controls on dietary supplements containing shark fin cartilage, to sales tax assessments on shark meat.

In sum, the cherry-picking exercise that the federal government has engaged in here – in which it highlights one of the goals of the federal fisheries management scheme while ignoring others – shows the danger inherent in findings of preemption by implication. Individual statements of statutory or regulatory purpose alone cannot establish obstacle preemption – there must be clear evidence of interference with the actual accomplishment and execution of authoritative federal objectives. *See Fellner*, 539 F.3d 237. Preemption of otherwise valid state laws should never simply be inferred without finding a "clear and manifest purpose of Congress" to establish preemption. *New York State Conf. of Blue Cross v. Travelers Inc.*, 514 U.S. 645, 655 (1995); *see also Medtronic*, 518 U.S. at 485 (1996) ("Because the states are independent sovereigns in our federal system, we have long presumed that Congress does not cavalierly pre-empt state law.");

*O'Melveny & Myers v. FDIC*, 512 U.S. 79, 85-88 (1994) (any matters left unaddressed by federal law, even in an otherwise comprehensive and detailed federal scheme, are available for regulation by the states).

## IV. EVEN IF THE FEDERAL GOVERNMENT HAS RAISED SUBSTANTIAL QUESTIONS AS TO PREEMPTION, THE PRELIMINARY INJUNCTION REQUESTED BY THE PLAINTIFFS IS NOT WARRANTED

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Resources Defense Council, Inc*., 555 U.S. 7, 22 (2008). Further, a preliminary injunction "is not a remedy which issues as of course." *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 311 (1982). Issuance of a preliminary injunction is always a matter of equitable discretion, see *Winter*, 555 U.S. at 22, and the denial of a preliminary injunction is reviewed under the deferential abuse of discretion standard. *See Am. Trucking Ass'n v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009).

Because all four elements of the test for a preliminary injunction must be met, if a party has not shown one element, a preliminary injunction should not issue. *See, e.g., Coalition for Economic Equity v. Wilson*, 122 F.3d 692, 710 (9th Cir. 1997); *DISH Network Corp. v. F.C.C.,* 653 F.3d 771, 776-77 (9th Cir. 2011). Thus, even if the federal government's amicus brief raises substantial questions as to the merits of plaintiffs' preemption claim (which it does not), the district court's decision here should be not be overturned when it correctly held that the plaintiffs had not shown irreparable harm as to their business interests (the record evidence of which was limited to loss of revenue and unsubstantiated claims of future "business injury"), and that their claims of unconstitutional harm to certain Chinese cultural interests (eating shark fin soup) were counterbalanced by

evidence of harm to other citizens' Chinese cultural interests (harmonizing humanity and nature) – represented by the members of defendant-intervenor Asian Pacific Americans for Ocean Harmony Alliance, and to the public interest in implementation of the law.[9]  ER 013-014.

Finally, the federal government suggests that only a "narrow ruling" addressing the "initial possession and first sale" *by fishermen* is needed here.  Fed. Amicus Br. at 20-21 n.4.  In that case, an injunction narrowly tailored to remedy the supposed constitutional defect raised by the federal government would not even address the interests of merchants and downstream distributors represented by plaintiffs.  Even where preemption is found, courts can invalidate only the aspects of state laws that are in actual conflict and "impose[] obligations inconsistent with federal law."  *Dalton v. Little Rock Family Planning Services*, 516 U.S. 474, 476-77 (1996); *see also National Audubon Society, Inc. v. Davis*, 307 F.3d 835 (9th Cir. 2002) (invalidating certain applications of a California ban on trapping and poisoning of wildlife where use of these devices by federal wildlife managers is necessary to carry out mandatory duties under federal law, but otherwise allowing the state law to stand).

Therefore, even if this Court, or the district court in a final ruling on the merits, agrees with the obstacle preemption theory presented by the federal government, a tailored injunction addressing activities of fishermen operating in the U.S. EEZ would not remedy any harm alleged by the plaintiffs and thus could not form the basis for the injunctive relief they seek.

---

[9] Defendants-intervenors addressed the validity of the district court's decision as to these equitable considerations in more detail in their opening response brief.  See HSUS Br. at 37-40.

## V.    **CONCLUSION**

The federal fishery management framework established in the MSA does not preempt the California shark fin law.  The MSA principally regulates conduct on the water and up to the point of landing; it does not grant NMFS exclusive authority after landing.  Moreover, federal law does not guarantee a market for fisheries resources (or specific parts of those resources) and is not responsible for creating such a market.  In fact, the federal role for regulation of post-landing trade in fisheries products is explicitly limited under the MSA.  And most importantly, California's prohibition on post-landing trade in shark fins is consistent with, and not an obstacle to, accomplishment of federal policy goals.

In addition, because the federal government's brief is based on a position suggested in a *proposed* rulemaking that has not been finalized, and also displays a misunderstanding of the California law at issue, it is of limited use in deciding this appeal.  This appeal concerns a motion for a preliminary injunction by restaurant owners and other merchants whose operations are, as the federal government readily admits, clearly downstream of the specific subset of fishermen whose interests the federal government is apparently anxious to shield from state regulation.  Thus, the tenuous preemption position asserted by the federal government in its amicus brief does nothing to suggest that the injunction requested by the plaintiffs should be granted, and there is absolutely no basis for a finding that the district court abused its discretion with respect to the consideration of a preemption argument that the plaintiffs never raised, and that the federal government conspicuously chose not to present until this late moment.

Dated:  August 8, 2013                    By: _s/ Bruce A. Wagman_____

                                               Bruce A. Wagman
                                               Ralph E. Henry
                                                 *Attorneys for Defendants-*
                                               *Intervenors-Appellees*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on August 8, 2013.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*s/ Bruce A. Wagman*
Bruce A. Wagman

35026-0008
SF\320756293.1