13-15188

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

---

**CHINATOWN NEIGHBORHOOD ASSOCIATION; et al.,**

Plaintiffs-Appellants,

**v.**

**EDMUND G. BROWN JR., Governor of the State of California, in his official capacity; et al.,**

Defendants-Appellees,

**THE HUMANE SOCIETY OF THE UNITED STATES; et al.,**

Intervenors-Defendants-Appellees.

---

On Appeal from the United States District Court
for the Northern District of California

No. No. 4:12-cv-03759 PJH
The Honorable Phyllis J. Hamilton, Judge

## APPELLEES' REPLY TO AMICUS BRIEF OF THE UNITED STATES

KAMALA D. HARRIS
Attorney General of California
DOUGLAS J. WOODS
Senior Assistant Attorney General
TAMAR PACHTER
Supervising Deputy Attorney General
REI R. ONISHI
Deputy Attorney General

ALEXANDRA ROBERT GORDON
State Bar No. 207650
Deputy Attorney General
 455 Golden Gate Avenue, Suite 11000
 San Francisco, CA 94102-7004
 Telephone: (415) 703-5509
 Fax: (415) 703-5480
 Email:
 Alexandra.RobertGordon@doj.ca.gov
 *Attorneys for Defendants-Appellees*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................. 1

ARGUMENT ........................................................................ 2

I.      The United States Has Not Demonstrated That the
        District Court Abused Its Discretion ........................................ 2

II.     California's Shark Fin Prohibition Is Not Preempted by
        Federal Law ............................................................................ 6

        A.      The United States Fails to Apply Proper Conflict
                Preemption Analysis. ...................................................... 6

        B.      NMFS's Views on Preemption Are Not Entitled to
                Deference. ...................................................................... 10

        C.      There Is No Conflict Between the Shark Fin
                Prohibition and the Magnuson-Stevens Act. ................. 13

        D.      The Shark Fin Prohibition Does Not Present an
                Obstacle to the Management of Federal Shark
                Fisheries. ........................................................................ 17

        E.      There Is No Conflict Between the Shark Fin
                Prohibition and Federal Shark Fin Law ......................... 23

                1.      It is Possible to Comply with Both Federal
                        and State Shark Fin Law. ................................... 23

                2.      The Shark Fin Prohibition Does Not Present
                        an Obstacle to Any Purpose, Objective or
                        Method of Federal Shark Fin Law. .................... 24

        F.      There Is No Evidence of any Conflict Between
                Federal Law and the Shark Fin Prohibition. ................. 28

        CONCLUSION ...............................................................................

# TABLE OF AUTHORITIES

**Page**

## CASES

*A&M Records, Inc. v. Napster, Inc.*
239 F.3d 1004 (9th Cir. 2001) ............................................................. 3

*Arizona v. United States*
132 S. Ct. 2492 (2012)......................................................... 25, 26, 28

*Barrientos v. 1801-1825 Morton LLC*
583 F.3d 1197 (9th Cir. 2009) ...................................................... 27, 28

*Blue Water Fisherman's Assoc. v. Mineta*
122 F. Supp. 2d 150 (D.D.C. 2000)................................................... 16

*Bronco Wine Co. v. Jolly*
33 Cal. 4th 943 (Cal. 2004) ............................................................. 25

*Chevron U.S.A., Inc. v. Hammond*
726 F.2d 483 (9th Cir. 1984) ......................................... 9, 22, 28, 29

*Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*
321 F.3d 878 (9th Cir. 2003) ............................................................. 4

*Credit Suisse First Boston Corp. v. Grunwald*
400 F.3d 1119 (9th Cir. 2005) ........................................................... 7

*Earth Island Institute v. Carlton*
626 F.3d 462 (9th Cir. 2010) ............................................................. 3

*English v. General Elec. Co.*
496 U.S. 72 (1990)............................................................................ 6

*Fellner v. Tri-Union Seafoods, L.L.C.*
539 F.3d 237 (3d Cir. 2008) ........................................................... 13

*Fla. Lime & Avocado Growers, Inc. v. Paul*
373 U.S. 132 (1963)................................................................... 7, 23

## TABLE OF AUTHORITIES
### (continued)

Page

*Gade v. Nat'l Solid Wastes Mgmt. Ass'n*
  505 U.S. 88 (1992) ........................................................................... 15

*Geier v. American Honda Motor Co.*
  529 U.S. 861 (2000) ..................................................................... 9, 26

*Hillsborough County Fla. v. Automated Med Labs., Inc.*
  471 U.S. 707 (1985) ........................................................................ 8, 9

*Hines v. Davidowitz*
  312 U.S. 52 (1941) ............................................................................. 7

*International Paper Co. v. Ouellette*
  479 U.S. 481 (1987) ......................................................................... 29

*Jones v. Rath Packing Co.*
  430 U.S. 519 (1977) .......................................................... 12, 15, 16

*Louisiana Seafood Mngt. Council, Inc. v. Foster*
  917 F. Supp. 439 (E.D. Louisiana 1996) ........................................ 21

*Madeira v. Affordable Housing Found., Inc.*
  469 F.3d 219 (2nd Cir. 2006) ...................................................... 9, 22

*McDaniel v. Wells Fargo Investments, LLC*
  717 F.3d 668 (9th Cir. 2013) ............................................................ 7

*NRDC v. Daley*
  209 F.3d 747 (D. C. Cir. 2000) ...................................................... 14

*O'Melveny & Myers v. FDIC*
  512 U.S. 79 (1994) ........................................................................... 25

*Pacific Legal Foundation v. State Energy Resources Conservation &*
  *Development Comm.*
  659 F.2d 903 (9th Cir. 1981) .......................................................... 30

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Pharm. Research and Mfrs. of America v. Walsh*
538 U.S. 644 (2003)................................................................ 8

*Preservation Coalition, Inc. v. Pierce*
667 F.2d 851 (9th Cir. 1982) ................................................ 4

*Puerto Rico Dept. of Consumer Affairs v. Isla Petroleum Corp.*
485 U.S. 495 (1988)............................................................ 26

*Rice v. Santa Fe Elevator Corp.*
331 U.S. 218 (1947).............................................................. 6

*Sanchez–Trujillo v. INS*
801 F.2d 1571 (9th Cir.1986) ............................................... 4

*Skidmore v. Swift & Co.*
323 U.S. 134 (1944)............................................................ 13

*Southeastern Fisheries Assoc., Inc. v. Chiles*
979 F.2d 1504 (11th Cir. 1992) ............................ 19, 20, 21

*Southeastern Fisheries Assoc., Inc. v. Mosbacher*
773 F. Supp. 435 (D.D.C. 1991).......................... 19, 21, 22

*Sprietsma v. Mercury Marine, a Div. of Brunswick Corp.*
537 U.S. 51 (2002).............................................................. 25

*Sw. Voter Registration Educ. Project v. Shelley*
344 F.3d 914 (9th Cir.2003) ................................................. 3

*Swan v. Peterson*
6 F.3d 1373 (9th Cir.1993) ................................................... 4

*Tart v. Commonwealth of Massachusetts*
949 F.2d 490 (1st Cir. 1991)......................................... 16, 18

iv

# TABLE OF AUTHORITIES
## (continued)

Page

*Time Warner Entm't Co., v. FCC*
    56 F.3d 151 (D.C. Cir.1995)............................................................. 29

*Ting v. AT&T*
    319 F.3d 1126 (9th Cir. 2003) ...................................................... 6, 7

*Topa Equities, Ltd. v. City of Los Angeles*
    342 F.3d 1065 (9th Cir. 2003) ............................................................ 9

*United States v. Approximately 64,695 Pounds of Shark Fins*
    520 F.3d 976 (9th Cir. 2008) ............................................................ 24

*Viva! Intern. Voice for Animals v. Adidas Promotional Retail
    Operations, Inc.*
    41 Cal. 4th 929 (Cal. 2007) ............................................................ 18

*Wyeth v. Levine*
    555 U.S. 555 (2009)................................................................. passim

**STATUTES**

2011 Cal. Stat., Chapter 524 (AB 376)................................................. 19

California Fish & Game Code
    § 2021 ............................................................................... passim
    § 2021.5 ............................................................................. passim

Haw. Rev. Stat. Ann. § 188-40 ........................................................ 12

Shark Conservation Act of 2010, Pub. L. No. 111-348, 124 Stat. 3668
    (2010)........................................................... 4, 5, 6, 7, 12, 23, 24, 27

Shark Finning Prohibition Act of 2000, Pub .L. No. 106-557, 114 Stat.
    2772 (2000)............................................................... 4, 7, 23, 24, 27

United States Code, Title 5
    § 553 ..................................................................................... 11

v

# TABLE OF AUTHORITIES
## (continued)

**Page**

United States Code, Title 16

§ 1801 ................................................................ 14
§§ 1801-1882 ....................................................... 23
§§ 1801-1884 ......................................................... 4
§ 1802 ......................................................... 15, 19
§ 1811 ................................................................ 17
§ 1851 ................................................................ 14
§ 1852 ................................................................ 14
§ 1853 ................................................................ 19
§ 1856 ................................................ 6, 13, 18, 19

## OTHER AUTHORITIES

78 Fed. Reg. 25, 685 (May 2, 2013) ........................... 5, 10, 26

146 Cong. Rec. S11744 (daily ed. Dec. 7, 2000) ................... 27

156 Cong. Rec. H8790 (daily ed. Dec. 21, 2010) .................. 26

1976 U.S.C.C.A.N. 593 ....................................... 14

Code of Federal Regulations, Title 50

§ 100.10 ......................................................... 17
§ 600.1201 ................................................ 6, 12, 13
§ 600.1202 ......................................................... 17
§ 600.310 ......................................................... 16

Exec. Order No. 13,132, 64 Fed. Reg. 43, 255 (Aug. 10, 1999) ............ 11

H.R. 5461 ........................................................ 27

H.R. 5461, 106th Cong. (2000) ............................... 25

H.R. Rep. No. 104-171 (1995) ................................ 14

H.R. Rep. No. 106-650 (1999) ................................ 27

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

H.R. Rep. No. 94-445 (1975) ................................................................. 14

S. Rep. No. 104-276 (1996) ................................................................. 14

S. Rep. No. 109-229 (2006) ................................................................. 14

S. Rep. No. 111-124 (2010) ................................................................. 27

## INTRODUCTION

Although it begins its brief with a request that this Court "exercise restraint" in reviewing the district court's determination that plaintiffs had established no likelihood of success or serious question with respect to their Supremacy Clause claims, the United States then asks this Court to hold that California Fish and Game Code sections 2021 and 2021.5 (the "Shark Fin Prohibition"), which seek to end the devastating practice of finning, promote shark conservation and the consequent health of the marine ecosystem, and to protect the public health and safety, are preempted insofar as they conflict with and obstruct the purposes of federal law. Given that the United States' argument regarding preemption was never presented to the district court for evaluation and finds no support in law or fact, "restraint" (if not justice) requires rejecting this argument outright.

The United States asserts that the Shark Fin Prohibition is preempted on the grounds that it purportedly conflicts with the purposes and objectives of the Magnuson-Stevens Act and presents an "obstacle" to the National Marine Fisheries Service's exclusive authority to regulate federal fisheries. However, the federal government's position, if adopted, would represent an extraordinary extension of both federal authority under the Magnuson-Stevens Act and the principles of conflict preemption. The United States has

1

not identified any federal objective that is undermined by the Shark Fin Prohibition nor has it demonstrated that Congress intended to displace state laws relating to the intrastate possession and sale of shark fin or fish product generally. Moreover, the United States fails to show that the Shark Fin Prohibition actually conflicts with any federal purpose or scheme. In essence, it asks this Court to hold, without any statutory or evidentiary support, that the Magnuson-Stevens Act precludes a state from regulating any activity, including one within intrastate commerce, that could possibly have an effect, no matter how attenuated or remote, on fishing within federal waters.

The United States' position is as unsupportable as it is unprecedented. Accordingly, the United States, like plaintiffs, has failed to establish that the district court abused its discretion in denying the motion for preliminary injunction and the district court's order should be affirmed.

## ARGUMENT

### I. THE UNITED STATES HAS NOT DEMONSTRATED THAT THE DISTRICT COURT ABUSED ITS DISCRETION

At issue in this appeal is whether the district court abused its discretion in denying plaintiffs' motion for a preliminary injunction based on its determination that plaintiffs had not established any likelihood of success on

the merits of their claims, or any of the remaining preliminary injunction factors. *See Earth Island Institute v. Carlton*, 626 F.3d 462, 468 (9th Cir. 2010). A district court's decision regarding preliminary injunctive relief is subject to "limited and deferential" review. *Sw. Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 918 (9th Cir.2003) (en banc) (per curiam). "As long as the district court got the law right, it will not be reversed simply because the appellate court would have arrived at a different result if it had applied the law to the facts of the case." *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1013 (9th Cir. 2001) (quoting *Gregorio T. v. Wilson*, 59 F.3d 1002, 1004 (9th Cir. 1995)) (internal quotation marks omitted). As set forth in Appellees' Answering Brief, the district court "got the law right," *id.*, and properly denied plaintiffs' preliminary injunction motion. *See* Answering Brief of Appellees (Ans. Br.), ECF No. 19, 12-50.

The United States does not explain how the district court's determination that plaintiffs are not likely to prevail on the merits of their Supremacy Clause claim constitutes abuse of discretion. Instead, it improperly seeks to expand the scope of this appeal and asks this Court to hold, without the benefit of analysis by the district court or the development of any evidentiary record, that the Shark Fin Prohibition is an "obstacle" to the National Marine Fisheries Service's (NMFS) authority under the

3

Magnuson-Stevens Act, 16 U.S.C. §§ 1801-1884 (MSA) generally, and as amended by the Shark Finning Prohibition Act of 2000, Pub .L. No. 106-557, 114 Stat. 2772 (2000), and the Shark Conservation Act of 2010, Pub. L. No. 111-348, 124 Stat. 3668 (2010), and is thus preempted.  The United States' arguments are inappropriate and should be disregarded.  *See Swan v. Peterson*, 6 F.3d 1373, 1383 (9th Cir. 1993) ("Generally, we do not consider on appeal an issue raised only by an amicus."); *Sanchez–Trujillo v. INS*, 801 F.2d 1571, 1581 n.9 (9th Cir. 1986) (amicus may not frame the issues for appeal); *Preservation Coalition, Inc. v. Pierce*, 667 F.2d 851, 862 (9th Cir. 1982) (amicus may not assert arguments waived on appeal); *cf. Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 883 (9th Cir. 2003) ("This issue is ... raised for the first time on appeal, and we cannot entertain the argument because further factual development would be required.").

While it generally ignores the actual posture of this case and what is before this Court on appeal, the United States faults the district court for (1) "failing to appreciate" the conflict between federal law and the Shark Fin Prohibition; and (2) "fail[ing] to grapple with the conflicting means and goals of federal and California shark fishery management."  Brief for the United States as Amicus Curiae in Support of Plaintiffs-Appellants and

4

Reversal on the Supremacy Clause Claim (U.S. Br.) 22, 24.  However, any

"failure" of the district court to consider these issues is explained by the fact

that plaintiffs did not make any argument regarding (conflict or obstacle)

preemption in the district court and/or provide any analysis, authority, or

evidence in support of their Supremacy Clause claims.[1]  Indeed, as noted in

Appellee's Answering Brief, plaintiffs waived their preemption claims,

which are thus not properly before this Court on appeal.  *See* Ans. Br. 43-44

(citing *Peterson v. Highland Music, Inc.*, 140 F.3d 1313, 1321 (9th Cir.

1998)).  It is difficult to see how the district court could abuse its discretion

by not considering arguments and evidence that were not before it.[2]

Moreover, even if plaintiffs had raised the new issues that the United States

---

[1] Plaintiffs devoted a mere six lines to preemption in their opening brief before the district court and did not identify what type of preemption they were asserting let alone the provisions of federal law that supposedly conflict with the Shark Fin Prohibition.  *See* ER 121; 151.  Plaintiffs did not address preemption at all in their reply brief and abandoned their preemption claims at oral argument.  *See* SER 12-13.

[2] Similarly, although the United States references NMFS's May 2, 2013 notice of proposed rule making to implement the Shark Conservation Act of 2010, 78 Fed. Reg. 25, 685 (May 2, 2013), U.S. Br. 7-9, this proposed rulemaking did not exist, and thus the district court could not consider it, when it issued its order denying the motion for preliminary injunction on January 2, 2013.  Moreover, as discussed below, this proposed rule, like the United States' litigation position in its amicus brief, is not persuasive authority and is entitled to minimal, if any, deference.  *See Wyeth v. Levine*, 555 U.S. 555, 577-81 (2009).

5

seeks to interject into this appeal, these arguments are entirely without merit

and would not entitle plaintiffs to a preliminary injunction.

## II.   CALIFORNIA'S SHARK FIN PROHIBITION IS NOT PREEMPTED BY FEDERAL LAW

### A.   The United States Fails to Apply Proper Conflict Preemption Analysis.

The United States apparently concedes, as it must, that express and

field preemption do not apply here. U.S. Br. 15-24.[3]  Rather, it baldly

contends that the Shark Fin Prohibition is in conflict with and/or creates an

obstacle to NMFS's exclusive authority to manage federal fisheries and to

---

[3] Neither the MSA nor the Shark Conservation Act of 2010 contain express statements of preemption, and both contain savings clauses that preserve state authority within state waters.  *See* 16 U.S.C. § 1856(a)(1); 50 C.F.R. § 600.1201(c).  There can thus be no express preemption.  *See English v. General Elec. Co.*, 496 U.S. 72, 78-79 (1990).  Similarly, neither the MSA nor Federal Shark Fin Law are "so pervasive as to make reasonable the inference that Congress left no room for the States to supplement [them]." *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947).  Accordingly, and because state law unquestionably can and does play a role in the regulation of sale and trade of fish and fish products, "field preemption is not an issue."  *Ting v. AT&T*, 319 F.3d 1126, 1136 (9th Cir. 2003).

Although the United States asserts that the district court erred in determining that 16 U.S.C. section 1856(a)(1) and 50 C.F.R. section 600.1201(c) "exempt California's law from preemption," U.S. Br. 21, this is a mischaracterization of the district court's analysis.  The district court did not find that the State's authority to regulate shark finning and fishery resources in state waters "overrides" preemption principles; rather, it correctly found that in light of the State's concurrent authority, "there is no showing of any Congressional intent to preempt state regulation of or relating to shark finning."  ER 13; *see Ting v. AT&T*, 319 F.3d at 1136.

the achievement of "optimum yield," U.S. Br. 15, 26, and thus that it is preempted at least with respect to "the initial possession and first sale of shark fins." U.S. Br. 20, n.4. The United States further asserts that because the Shark Finning Prohibition Act of 2000 and the Shark Conservation Act of 2010 do not prohibit the sale of shark fins and California law does, that California's law "conflicts with Congressional judgment." U.S. Br. 24. These arguments, which have no basis in law or fact, must fail.

Notably, the United States fails to set forth or engage in a proper conflict preemption analysis. Conflict preemption requires that "compliance with both federal and state regulations is a physical impossibility," *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142-43 (1963), or that state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941). Conflict preemption "focuses on both the objective of the federal law and the method chosen by Congress to effectuate that objective, taking into account the law's text, application, history, and interpretation." *Ting v. AT&T*, 319 F.3d at 1137. As in all preemption cases, "the purpose of Congress is the ultimate touchstone.'" *McDaniel v. Wells Fargo Investments, LLC*, 717 F.3d 668, 674 (9th Cir. 2013) (quoting *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516 (1992)); *see also Credit Suisse First*

7

*Boston Corp. v. Grunwald*, 400 F.3d 1119, 1135 (9th Cir. 2005) ("This type of [conflict] preemption naturally requires us to look to Congressional intent").

Where as here, "Congress has legislated in a field which the States have traditionally occupied, we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Wyeth*, 555 U.S. at 565 (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)) (alterations and internal quotation marks omitted). A court must presume that a state statute is not preempted, and the moving party has the burden of overcoming that presumption. *Pharm. Research and Mfrs. of America v. Walsh*, 538 U.S. 644, 661-62 (2003); *Hillsborough County Fla. v. Automated Med Labs., Inc.*, 471 U.S. 707, 715-16 (1985) (presumption against preemption also applies with respect to regulations issued by federal agencies).

The United States appears to proceed on the assumption that a state law that could possibly have an effect on any activity even notionally relating to a federal scheme is an impermissible conflict in violation of the Supremacy Clause. However, a party asserting "conflict" preemption "must . . . present a showing . . . of a conflict between a particular local provision and the federal scheme, that is strong enough to overcome the presumption that state

8

and local regulation . . . can constitutionally coexist with federal regulation." *Hillsborough County*, 471 U.S. at 716.  Absent a claim that it is physically impossible to comply with both federal and state law, "the 'pertinent question [ ]' is whether the state law 'sufficiently injure[s] the objectives of the federal program to require nonrecognition.'"  *Topa Equities, Ltd. v. City of Los Angeles*, 342 F.3d 1065, 1071 (9th Cir. 2003) (brackets in original) (citation omitted).  "The mere fact of 'tension' between federal and state law is generally not enough to establish an obstacle supporting preemption, particularly when the state law involves the exercise of traditional police power."  *Madeira v. Affordable Housing Found., Inc.*, 469 F.3d 219, 241 (2nd Cir. 2006) (citing *Silkwood v. Kerr-McKee Corp.*, 464 U.S. 238, 256 (1984)).  Moreover, preemption is not properly found absent "clear evidence of a conflict" of the requisite magnitude.  *Geier v. American Honda Motor Co.*, 529 U.S. 861, 885 (2000); *accord Chevron U.S.A., Inc. v. Hammond*, 726 F.2d 483, 488 (9th Cir. 1984) ("[I]f we are left with a doubt as to congressional purpose, we should be slow to find preemption . . . .).

The United States has not demonstrated, and cannot demonstrate, any such conflict.  Indeed, it has presented no statutory authority or evidence in support of its assertion that the Shark Fin Prohibition conflicts with or

9

obstructs federal law or policies relating to shark finning or the management of federal fisheries.

### B.   NMFS's Views on Preemption Are Not Entitled to Deference.

As a threshold matter, this Court must determine how much, if any, deference is warranted for NMFS's views on the preemptive effect of federal law on the Shark Fin Prohibition, as stated both in its proposed rulemaking, *see* 78 Fed. Reg. 25, 685, and the United States' amicus brief.  With respect to NMFS's mere conclusions that the Shark Fin Prohibition is preempted, the Supreme Court has made clear that these are not entitled to deference. *See Wyeth*, 555 U.S. at 577 ("We have not deferred to an agency's *conclusion* that state law is pre-empted." (emphasis in original)).  Absent a specific delegation by Congress, which is lacking here, "agencies have no special power to pronounce on pre-emption." *Id.*  Instead, issues of preemption ultimately must be resolved by the judiciary. *See id.* at 576 (noting that even when agency regulations explicitly state the view that state law is preempted, "the Court has performed its own conflict determination, relying on the substance of state and federal law and not on agency proclamations of preemption").

Regarding NMFS's views as to the alleged conflict between federal and state law and the effect of the Shark Fin Prohibition on the federal regulatory scheme, "the weight we accord the agency's explanation of state law's impact on the federal scheme depends on its thoroughness, consistency, and persuasiveness." *Id.* at 577; *see also id.* at 580 (noting that the Court considers the agency's explanation only after it performs its own preemption analysis). Because NMFS's position is neither thorough, nor consistent, nor persuasive, it does not merit deference. *See id.* at 577, 581.

As discussed more fully below, NMFS and the United States have provided no meaningful analysis of the Shark Fin Prohibition's impact beyond asserting that it "may" have an effect on shark fishing in federal waters. *See, e.g.*, U.S. Br. 18.[4] Although the NMFS maintains that its "view

---

[4] NMFS's failure to provide any meaningful analysis is likely due to the fact that it could not have relevant data to evaluate the interaction between state and federal law. NMFS has not yet consulted with California as it is required to do. *See* Exec. Order No. 13,132, 64 Fed. Reg. 43, 255 (Aug. 10, 1999) (directing federal agencies to engage in a consultation process with states when an agency action has to potential to preempt state law). The United States also did not have the benefit of California's comments to its proposed rule, as it filed its amicus brief before the end of the notice and comment period. *See* 5 U.S.C. § 553(c) (agency must receive and consider fully all comments on proposed rulemaking from the public and stakeholders); *Wyeth*, 555 U.S. at 577 (stating that agency's views on preemptive effect of federal regulation are "inherently suspect in light of this procedural failure."). As the United States acknowledges, "the rulemaking

(continued…)

11

regarding state and federal authority has not changed since 2002," U.S. Br. 7

(citing 78 Fed. Reg. at 25, 687), there is no evidence to support this

statement.  There is no indication that NMFS has a long-standing, consistent

view of how state shark fin bans, the first of which was adopted in May

2010, *see* Haw. Rev. Stat. Ann. § 188-40, obstruct federal regulation of

shark finning or fishery management.[5]  Rather, its current position appears to

---

(…continued)

proceedings may generate information that sheds light on how downstream actors and activities are affected by federal and state shark fin regulations." U.S. Br. 21, n.4.

Moreover, California's Department of Fish and Wildlife has not yet interpreted the Shark Fin Prohibition to such a degree as to allow consideration of how the state law will interact with federal law in practice. *See Jones v. Rath Packing Co*., 430 U.S. 519, 526 (1977) (In making a conflict preemption determination, the Court "consider[s] the relationship between state and federal laws as they are interpreted and applied, not merely as they are written.").

[5] It is not clear whether the view to which NMFS refers is reflected in subsection 600.1201(d) of its Proposed Rule, which reads, "State and territorial statutes that address shark fins are preempted if they are inconsistent with the Magnuson-Stevens Act as amended by the Shark Conservation Act of 2010, regulations under this part, and applicable federal fishery management plans and regulations."  50 C.F.R. § 600.1201(d) (proposed).  This view, however, is merely a restatement of well-settled law regarding preemption, is tautological, and falls far short of the required explanation of how state law would undercut federal objectives.  *See Wyeth*, 555 U.S. at 577.

be new and at odds with years of concurrent federal and state regulation. *See, e.g.*, 16 U.S.C. § 1856(a)(1); 50 C.F.R. § 600.1201(c).

Given that NMFS provides minimal thoroughness in setting forth its preemption arguments, and that these arguments are novel and entirely unsupported, they are not persuasive. Accordingly, no deference is due the agency's viewpoint in this case. *See Wyeth*, 555 U.S. at 577; *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944); *Fellner v. Tri-Union Seafoods, L.L.C.*, 539 F.3d 237, 251-52 (3d Cir. 2008).

### C. There Is No Conflict Between the Shark Fin Prohibition and the Magnuson-Stevens Act.

The United States posits that the Shark Fin Prohibition interferes with NMFS's "mandate" under the MSA "to manage federal fisheries [in the Exclusive Economic Zone] to ensure sustainable, optimum yields for commercial fishing." U.S. Br. 15. However, the United States mischaracterizes the purpose of the MSA and then overstates scope of NMFS's authority pursuant to it.

The main objectives of the MSA are to preserve the nation's fishery resources and protect valuable species from overfishing by extending the exclusive fisheries zone of the United States from 12 to 200 miles and to provide for management of fishing within the 200-mile zone, known as the

Exclusive Economic Zone (EEZ).[6]  *See generally*, H.R. Rep. No. 94-445,

94th Cong., 2nd Sess. 1976, 1976 U.S.C.C.A.N. 593, 614 -16; 16 U. S C. §

1801(a), (b).  The MSA has been amended several times, and each round of

amendments has emphasized and strengthened its goal of conservation and

sustainability.  *See, e.g.*, S. Rep. No. 104-276 (1996); H.R. Rep. No. 104-

171 (1995); S. Rep. No. 109-229 (2006).

    While the United States correctly notes that one directive of the MSA is

to minimize negative economic effects on commercial fishing, it greatly

overstates the importance of this objective.  Indeed, the United States

ignores the fact that the goal of managing the impact on commercial fishing

is secondary to and confined by the MSA's central purpose of promoting

conservation.  *See NRDC v. Daley*, 209 F.3d 747, 753 (D. C. Cir. 2000)

(noting that conservation purpose of the MSA takes priority over the Act's

other purposes); 16 U.S.C. § 1801(b); 1851(a)(8) (goal of minimizing

---

    [6] The MSA sets forth a framework for managing fisheries in U.S.
waters.  *See* 16 U.S.C. § 1801 et seq.  It establishes eight Regional Fishery
Management Councils, each of which has the authority and responsibility to
govern conservation and management of the fisheries under its geographical
jurisdiction.  Under this framework, NMFS works with Regional Fishery
Management Councils to create Fishery Management Plans and set federal
regulations for fish stocks in U.S. waters that require conservation and
management.  *Id.* §§ 1852-53.  Management decisions are designed to meet
multiple statutory goals, set forth in ten "National Standards."  *Id.* § 1851.

14

adverse impact on fishing communities need only be achieved "to the extent practicable").  Examining the MSA as a whole, the objective of safeguarding commercial fishing is ancillary to the statute's purpose and insufficient to establish preemption.  *See Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 99 (1992) (in determining Congress's intent, "we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law") (citation and alteration omitted).[7]

Similarly, while the United States claims that the Shark Fin Prohibition interferes with the achievement of "optimum yield," (a term it does not define), from federal shark fisheries, "optimum yield" does not, as the United States suggests, reflect a balance between competing interests in conservation and commercial fishing.  *See* U.S. Br. 16, 20, 24, 26.  It does not refer to the volume of sales of commercially caught fish nor does it require a particular catch.  *See* 16 U.S.C. § 1802(33).  Rather, "optimum yield" refers to the amount of fish that

---

[7] Moreover, even if the United States could identify a statutory purpose, the purposes and objectives of Congress, standing alone, cannot preempt state law.  Rather, preemption analysis requires a concrete agency action accomplishing and executing the statutory purposes before any question of state law interference can be examined.  *See, e.g.*, *Jones*, 430 U.S. at 526.  The United States has not identified any such agency action here.

(B) is prescribed on the basis of the maximum sustainable yield[8] from the fishery, *as reduced by* any relevant social, economic, or ecological factor; and

(C) in the case of an overfished fishery, provides for rebuilding to a level consistent with producing the maximum sustainable yield in such fishery.

*Id*. (emphasis added). "Optimum yield" is a one-way adjustment down from the maximum amount of stock that can be taken without risking depletion of a species. *See id*. It is a value that is calculated by surveying economic, social, and ecological factors, and accounting for them with *reductions* in catch if necessary. The mandate to achieve "optimum yield" thus does not indicate Congressional intent to maximize commercial fishing nor does it require a state to provide a market for fish products, particularly those prohibited pursuant to the State's power to protect its natural resources and the public health and safety. *Cf. Tart v. Commonwealth of Massachusetts*, 949 F.2d 490, 500-01 (1st Cir. 1991); *Blue Water Fisherman's Assoc. v. Mineta*, 122 F. Supp. 2d 150, 161-63 (D.D.C. 2000). Accordingly, and in light of the lack of support in the MSA for the notion that Congress intended to ensure a particular amount of commercial (shark) fishing, the United

---

[8] "Maximum sustainable yield" is "the largest long-term average catch or yield that can be taken from a stock or stock complex under prevailing ecological, environmental conditions." 50 CFR § 600.310(e)(1)(i)(A).

States has failed to identify any cognizable purpose or objective of the MSA that could be frustrated by the Shark Fin Prohibition.

### D.   The Shark Fin Prohibition Does Not Present an Obstacle to the Management of Federal Shark Fisheries.

Equally unavailing is the assertion that the Shark Fin Prohibition presents an obstacle to NMFS's exclusive authority to manage federal fisheries "at least to the extent that it reaches fishing in the EEZ and activities ancillary to fishing, including commercial fishers' ability to land the fish and place it into the stream of commerce."  U.S. Br. 15.  While there is no dispute that Congress claimed "sovereign rights and exclusive fishery management authority over all fish" located within the EEZ, *see* 16 U.S.C. § 1811(a), the Shark Fin Prohibition, as the United States concedes, does not regulate shark fisheries in the EEZ.  *See* U.S Br. 15.  In fact, as the district court noted, the Shark Fin Prohibition does not regulate any activity, such as the taking and landing of sharks, that occurs within the EEZ.[9]  *See* ER 11,13. Instead, the Shark Fin Prohibition prohibits the possession, sale, trade, and

---

[9] "Landing" "means to begin offloading fish, to offload fish, or to arrive in port or at a dock, berth, beach, seawall, or ramp."  50 C.F.R. § 100.10; *see also* 50 C.F.R. § 600.1202.  The Shark Fin Prohibition places no restrictions on the ability to land sharks.  *See* Cal. Fish & Game Code § 2021.  For this reason, the United States' argument that the Shark Fin Prohibition is an obstacle to the ability to land sharks lawfully caught in the EEZ fails.

distribution of shark fins *in California*. *See* Cal. Fish & Game Code §§ 2021 & 2021.5.

While the Shark Fin Prohibition obviously impacts the ability of fishermen to sell and trade shark fin within California, this is not a matter of federal concern and does not run afoul of the MSA.[10] The United States' suggestion that the MSA confers authority on NMFS over the ability to place what is caught in the EEZ into commerce is wholly unfounded. *See* U.S. Br. 4.[11] The United States identifies the source of its authority as 16 U.S.C. section 1856(b)(3), which allows, but does not require, Fishery Management Councils to include in their Fishery Management Plan (FMP):

> specified limitations which are necessary and appropriate for the conservation and management of the fishery on the --
> . . .
> (B) sale of fish caught during commercial, recreational, or charter fishing, consistent with any applicable Federal and State safety and quality requirements.

---

[10] To the contrary, the regulation of sale and trade of products within state borders (including animal parts and products) is a long-standing area of state authority. *See*, *e.g.*, *Tart*, 949 F.2d at 501; *Viva! Intern. Voice for Animals v. Adidas Promotional Retail Operations, Inc.*, 41 Cal. 4th 929, 952 (Cal. 2007).

[11] Moreover, the Shark Fin Prohibition applies only to the fin. It allows sharks to be harvested, and allows commercial activities involving shark fins that are still attached to shark carcasses. *See* Cal. Fish & Game Code § 2021. Accordingly, commercial fishermen can still place sharks lawfully caught in the EEZ into commerce.

16 U.S.C. § 1853(b)(3).  However, the fact that NMFS has discretion, under certain circumstances, to limit the sale of fish though a FMP does not translate into a free-standing grant to regulate any and all commerce relating to fish and fish parts originating in the EEZ.  Indeed, NMFS's ability limit the sale of fish is explicitly circumscribed by the requirement to be consistent with State safety and quality laws.  *See* 16 U.S.C. § 1853(b)(3)(B).[12]  Accordingly, the narrow amount of discretion relating to sales contained in 16 U.S.C. section 1856(b)(3) does not support the United States' contention that NMFS has exclusive authority over the sale of federally-caught fish and fish parts (within California).[13]

The cases relied upon by the United States are not to the contrary.  In support of its conflict preemption arguments, the United States cites *Southeastern Fisheries Assoc., Inc. v. Chiles*, 979 F.2d 1504 (11th Cir. 1992) and *Southeastern Fisheries Assoc., Inc. v. Mosbacher*, 773 F. Supp. 435

---

[12] The Shark Fin Prohibition, which, among other things, protects the public health and safety by eliminating a food product containing high levels of mercury, *see* 2011 Cal. Stat., ch. 524 (AB 376), § 1, is one such law.

[13] To the extent that the United States relies upon 16 U.S.C sections 1802(4) and (14) as conferring authority over sales on NMFS, this also fails.  *See* U.S. Br. 15.  Sections 1802(4) and (14) set forth the definition of "commercial fishing" and "regional fishery association" respectively.  16 U.S.C. § 1802(4) & (14).  Neither of these definitions constitute a grant of authority over the sale and trade of fish.

(D.D.C. 1991), both of which are inapposite.  In *Chiles*, plaintiff challenged state fishing regulations that limited the number of pounds of Spanish Mackerel a commercial vessel could bring into a state port on any given day. The court found that there was likely a direct conflict between the state regulation and the federal FMP, and that it could be "impossible for plaintiffs to land their catch in compliance with both state and federal law." 979 F.2d at 1510; *see also* 979 F.2d at 1508 ("Under the FMP, [plaintiff] may take Spanish Mackerel up to 2.99 million pounds in the Gulf of Mexico and 3.14 million pounds in the Atlantic, while under the Florida regulation he may not.").  The court further determined that "Congress must have intended to occupy the field of fishery management *within the EEZ*," and that the state statute was an improper attempt to regulate within the EEZ.  *Id.* at 1509-10 (emphasis added).  However, because there was an insufficient record on which to evaluate the preemption claim, the court vacated the district court's order and remanded for further factual findings, including how the state regulation was enforced and whether there was any coordination between the state and federal governments.  *Id.* at 1510.[14]

---

[14] Such factual findings are conspicuously absent both in the record before the district court and in the United States' amicus brief.

At most, *Chiles* establishes that a state law may be preempted if it (1) directly regulates conduct within the EEZ; and/or (2) is in direct conflict with federal law, such as state laws that establish inconsistent catch limits. *Chiles* does not support the United States' notion that state law may not interfere with a commercial fisher's ability to place a fish product lawfully caught in the EEZ into the stream of commerce, nor does it suggest that a state law that restricts the ability to sell such a fish product is invalid. *See* U.S. Br. 19, 25. Because the Shark Fin Prohibition does not regulate within the EEZ and because it is not inconsistent with federal law, *Chiles* does not apply here. *See, e.g.*, *Louisiana Seafood Mngt. Council, Inc. v. Foster*, 917 F. Supp. 439, 443-44 (E.D. Louisiana 1996) (distinguishing *Chiles* and holding that MSA did not preempt statute that "only attempts to regulate activity and possession of finfish in the state").

*Mosbacher* is also unpersuasive. The court in *Mosbacher* determined that an amendment to a FMP for redfish, which closed various areas for fishing and established quotas in the EEZ, but which expressly provided for the application of state landing and possession laws to redfish, created a conflict, and such laws could not "coexist in the federal scheme." 773 F. Supp. at 441. The court reasoned that the administrative failure to expressly supersede state law was arbitrary and an abuse of agency discretion. *Id.* at

21

440.  Although the court in *Mosbacher* did mention that some of the state laws in question involved the sale of federally-caught fish, its finding of a conflict focused solely on the state's restriction of landing activities.  *See id.* It reasoned that the officials, in effect, had told commercial fishers that they could catch the fish, but that they might not land them.  *Id.*  "This makes no sense, and creates a conflict that is impermissible."  *Id.*

Plainly, there is a significant difference between regulations, such as those at issue in *Mosbacher*, which prohibit a fisher from landing a lawfully caught fish and a law like the Shark Fin Prohibition that allows the fisher to land, possess, and sell the fish, but prohibits the sale of one fish part, a detached fin.  The former creates a fairly obvious obstruction to a federal scheme: federal law allows you to catch a fish in the EEZ, but state law tells you that you cannot bring it to shore and unload it.  The latter has no necessary effect on fishing in the EEZ, and thus cannot be assumed to create a conflict or obstacle supporting preemption.  *See Madeira*, 469 F.3d at 241; *see also Hammond*, 726 F.2d at 495-96.  The United States' reliance on *Mosbacher* is thus misplaced.

### E.    There Is No Conflict Between the Shark Fin Prohibition and Federal Shark Fin Law.

#### 1.    It Is Possible to Comply with Both Federal and State Shark Fin Law.

"Impossibility preemption is a demanding defense." *Wyeth*, 555 U.S. at 573.  As noted above, in order for it to apply, "compliance with both federal and state regulations [must be] a physical impossibility." *Fla. Lime & Avocado Growers*, 373 U.S. at 142-43.  The impossibility must be clear and immediate; it is not enough that a speculative future event could create impossibility.  *See Wyeth*, 555 U.S. at 568-73.  As the district court properly determined, it is not physically impossible to comply with the Shark Finning Prohibition Act of 2000 and the Shark Conservation Act of 2010 while at the same time complying with the Shark Fin Prohibition, as these statutes predominantly regulate different activities.  *See* ER 10-11, 13; Ans. Br. 46-49; *compare* 16 U.S.C. §§ 1801-1882 *and* Cal. Fish & Game Code §§ 2021 & 2021.5.

The United States does not really assert impossibility preemption except to suggest that there is uncertainty regarding whether a fisher could detach and discard the fin of a shark caught in the EEZ without being in illegal possession of the fin pursuant to the Shark Fin Prohibition.  U.S. Br. 26 n.5.  This concern easily is addressed by reference to California Fish and

Game Code sections 2021(d) and 2021.5(a)(1), which exempt fishers from the ban on possession. *See* Cal. Fish & Game Code §§ 2021(d) & 2021.5(a)(1). Accordingly, and as set forth in the Answering Brief, it is entirely possible to comply with both federal and state regulations. *See* Ans. Br. 47-48.

### 2. The Shark Fin Prohibition Does Not Present an Obstacle to Any Purpose, Objective or Method of Federal Shark Fin Law.

The purpose of the Shark Finning Prohibition Act of 2000 and the Shark Conservation Act of 2010 is "eliminat[ing] shark finning." *United States v. Approximately 64,695 Pounds of Shark Fins*, 520 F.3d 976, 982 (9th Cir. 2008) (citing Pub. L. 106-557, 114 Stat. 2772 (2000)). While the United States does not seriously dispute that Congress enacted this legislation to protect and conserve shark populations worldwide, and that the Shark Fin Prohibition is entirely consistent with this objective, it argues that the Shark Fin Prohibition conflicts with "Congressional judgment." U.S. Br. 24. Specifically, the United States asserts that "Congress chose a circumscribed approach to addressing the practice of shark finning that did not include a total ban on the possession, sale and trade of fins from sharks that were legally harvested in federal waters," U.S. Br. 24, and, ostensibly that the Shark Fin Prohibition conflicts with this method of eliminating the

24

"wasteful and unsportsmanlike practice of shark finning."  H.R. 5461, 106th

Cong. (2000).  The United States reasons that while federal law "does not

affirmatively permit trade in shark fins, it does not prohibit it."  U.S. Br. 24.

However, in general, the "decision not to adopt a regulation" simply

means there is no federal regulation; it is not treated as "the functional

equivalent of a regulation prohibiting all States and their political

subdivisions from adopting such a regulation."  *Sprietsma v. Mercury

Marine, a Div. of Brunswick Corp.*, 537 U.S. 51, 65 (2002); *see also Arizona

v. United States*, 132 S. Ct. 2492, 2504 (2012); *id.* at 2520 (Scalia, J.,

concurring in part and dissenting in part) (noting that Congress's failure to

adopt a policy "was most likely expressive of what inaction ordinarily

expresses:  nothing at all." (internal quotation omitted); *O'Melveny & Myers

v. FDIC*, 512 U.S. 79, 85 (1994) ("matters left unaddressed in [a federal]

scheme are presumably left subject to the disposition provided by state

law"); *Bronco Wine Co. v. Jolly*, 33 Cal. 4th 943, 992 (Cal. 2004) ("There is

a difference between (1) not making an activity unlawful, and (2) making

that activity lawful.") (citation omitted).  In order to establish a conflict

meriting preemption, the United States must demonstrate that the choice to

prohibit the possession, sale, and trade of shark fins is one that Congress

specifically rejected or would not have sanctioned. *See, e.g.*, *Arizona*, 132 S. Ct. at 2504; *Geier*, 529 U.S. at 874-78.

The United States cannot make this showing. It provides no evidence that Congress ever considered a ban on possession and trade of shark fin procured in compliance with federal law, let alone explicitly rejected it.[15] Similarly, the text and the legislative history of federal shark fin law contain no support for the notion that Congress chose not to prohibit possession and trade in shark fin in an effort to balance competing goals of conservation and shark utilization. *See* Proposed Rule, 78 Fed. Reg. at 25,686. Rather, the legislative record reveals that Congress enacted federal shark fin law for the singular purpose of conserving and protecting shark populations by eliminating finning. *See, e.g.*, 156 Cong. Rec. H8790 (daily ed. Dec. 21,

---

[15]   The United States cites one lone statement by Congressman Miller on the floor of the House. Congressman Miller stated, "The Shark Finning Prohibition Act will not prevent United States fishermen from harvesting sharks, bringing them to shore, and then using the fins or any other part of the shark. Instead, it would simply prevent the cutting off of the fins and the disposal of the carcass at sea, or the transport or landing of fins harvested in this manner by another fishing vessel." U.S. Br. (citing 146 Cong. Rec. H11570, H11571 (daily ed. Oct. 30, 2000)). This statement, which merely describes how federal law will function, is not a rejection of a conflicting policy choice. Moreover, the statement of one legislator is insufficient to establish Congressional intent to preclude states from regulating. *See*, *e.g.*, *Puerto Rico Dept. of Consumer Affairs v. Isla Petroleum Corp.*, 485 U.S. 495, 503 (1988).

2010); S. Rep. No. 111-124 (2010); 146 Cong. Rec. S11744 (daily ed. Dec. 7, 2000); H.R. Rep. No. 106-650 (1999).  No countervailing concerns were articulated and no indication exists that Congress was attempting a compromise between competing policy goals.

There is also no evidence that Congress intended federal shark fin law to be comprehensive and/or to provide both a "floor" and a "ceiling" for regulation of finning.  *See Wyeth*, 555 U.S. at 575; *Barrientos v. 1801-1825 Morton LLC*, 583 F.3d 1197, 1210-11 (9th Cir. 2009).  To the contrary, Congress apparently viewed the Shark Finning Prohibition Act of 2000 and the Shark Conservation Act of 2010 as an initial effort to address the problem of shark population decline.  *See, e.g.*, 146 Cong. Rec.  S11744 (daily ed. Dec. 7, 2000) (statement of Sen. Hollings) (describing the bill as "legislation to begin, and I stress the word begin, to ensure the conservation of sharks, including addressing the causes and consequences of shark finning," and noting that "H.R. 5461 does take an important first step to end the practice of finning, but it is only the first step"); *id.* at S11745 (statement of Sen. Kerry) (noting that "the passage of this legislation is only the beginning of national efforts to protect sharks and their marine ecosystems," and characterizing the Shark Finning Prohibition Act as "a start, but only a start").  It thus appears that in enacting federal shark finning law, Congress

27

"desired to maintain a uniform federal floor below which protections for [sharks] could not drop, not a ceiling above which they could not rise." *See Barrientos*, 583 F.3d at 1211. Accordingly, there is no "irreconcilable conflict" between the Shark Fin Prohibition, which provides additional measures to stop the pernicious practice of finning, and federal law. *See, e.g.*, *Wyeth*, 555 U.S. at 575-76; *Hammond*, 726 F.2d at 501.[16]

### F. There Is No Evidence of Any Conflict Between Federal Law and the Shark Fin Prohibition.

Even if the United States could establish a legitimate federal purpose, objective, or method that the Shark Fin Prohibition could theoretically obstruct, it has failed to show that the Shark Fin Prohibition actually does so. Indeed, the most that the United States offers in support of its conflict preemption arguments is that: (1) the Shark Fin Prohibition "*may* make it infeasible or economically impractical for a fisher to sell a shark;" and (2) the Shark Fin Prohibition "*may* effectively shut down shark fishing because

---

[16] Finally, there is no plausible argument that the Shark Fin Prohibition undercuts the methods of the federal law. If anything, it reinforces the federal at-sea prohibition on finning, because they act together to reduce the incentives for illegal finning in U.S. waters: if fishers are not able to sell the fins from sharks they catch, there is no incentive to skirt federal law and covertly practice finning. As the methods of state and federal law are compatible, no obstacle can be found based on a conflict of methods. *See Arizona*, 132 S. Ct. at 2504-05.

28

it prevents fishers from obtaining a significant part of the economic value of the shark." U.S. Br. 18 (emphasis added).[17] The obvious corollary to this supposition is that the Shark Fin Prohibition *may not* have any of these effects.

This argument is based entirely on speculation, and the United States' complete failure to offer any concrete evidence of how the Shark Fin Prohibition conflicts with federal law is fatal to its preemption argument. A state law is preempted to the extent it actually interferes with the "methods by which the federal statute was designed to reach [its] goal." *International Paper Co. v. Ouellette*, 479 U.S. 481, 494 (1987). In applying preemption analysis, the court "distinguish[es] those situations in which the concurrent exercise of a power by the Federal Government and the States . . . *may possibly* lead to conflicts and those situations where conflicts *will necessarily* arise." *Hammond*, 726 F.2d at 501 (internal citation and quotation omitted) (emphasis in original); *see also Time Warner Entm't Co., v. FCC*, 56 F.3d 151, 195 (D.C. Cir. 1995) ("[W]hether a state regulation unavoidably conflicts with national interests is an issue incapable of

---

[17] The United States also posits that it "is likely not a viable option for a fisher to sell a shark fin by shipping a whole shark to a state that allows the possession and sale of fins." This is but one example of the unsubstantiated, extra-record facts asserted in its amicus brief.

resolution in the abstract.")  In the absence of facts and thus any meaningful analysis about the interrelationship of federal and state law, a determination regarding preemption is both premature and unwarranted.  *See Pacific Legal Foundation v. State Energy Resources Conservation & Development Comm.*, 659 F.2d 903, 925 n.35 (9th Cir. 1981) ("There is no necessary conflict between [state] and federal law, and it will be time to consider any future conflicts if and when they arise.") (citing *Rice*, 331 U.S. at 237).

## CONCLUSION

For the foregoing reasons, the Shark Fin Prohibition is not preempted by federal law and the district court properly determined that plaintiffs had not shown a likelihood of success on their Supremacy Clause claims. Accordingly, this Court should affirm the district court's order denying the motion for preliminary injunction.

Dated:  August 8, 2013                    Respectfully Submitted,

KAMALA D. HARRIS
Attorney General of California
DOUGLAS J. WOODS
Senior Assistant Attorney General
TAMAR PACHTER
Supervising Deputy Attorney General
s/ *Alexandra Robert Gordon*
ALEXANDRA ROBERT GORDON
Deputy Attorney General
*Attorneys for Defendants-Appellees*

30

# CERTIFICATE OF COMPLIANCE
# PURSUANT TO FED.R.APP.P 32(a)(7)(C) AND CIRCUIT RULE 32-1
# FOR 13-15188

I certify that:  (check (x) appropriate option(s))

☐     1.  Pursuant to Fed.R.App.P. 32(a)(7)(C) and Ninth Circuit Rule 32-1, the attached **opening/answering/reply/cross-appeal** brief is

    ☐   Proportionately spaced, has a typeface of 14 points or more and contains _____ words (opening, answering and the second and third briefs filed in cross-appeals must not exceed 14,000 words; reply briefs must not exceed 7,000 words

or is

    ☐   Monospaced, has 10.5 or fewer characters per inch and contains _____ words or ____ lines of text (opening, answering, and the second and third briefs filed in cross-appeals must not exceed 14,000 words or 1,300 lines of text; reply briefs must not exceed 7,000 words or 650 lines of text).

☒     2.  The attached brief is **not** subject to the type-volume limitations of Fed.R.App.P. 32(a(7)(B) because

    ☐   This brief complies with Fed.R.App.P 32(a)(1)-(7) and is a principal brief of no more than 30 pages or a reply brief of no more than 15 pages.

or

    ☒   This brief complies with a page or size-volume limitation established by separate court order dated <u>July 25, 2013</u> and is 30 pages

    ☐   Proportionately spaced, has a typeface of 14 points or more and contains _____ words,

or is

    ☐   Monospaced, has 10.5 or fewer characters per inch and contains __ pages or __ words or __ lines of text.

☐     3.  Briefs in **Capital Cases**.
This brief is being filed in a capital case pursuant to the type-volume limitations set forth at Circuit Rule 32-4 and is

    ☐   Proportionately spaced, has a typeface of 14 points or more and contains _____ words (opening, answering and the second and third briefs filed in cross-appeals must not exceed 21,000 words; reply briefs must not exceed 9,800 words).

or is

    ☐   Monospaced, has 10.5 or fewer characters per inch and contains __ words or __ lines of text (opening, answering, and the second and third briefs filed in cross-appeals must not exceed 75 pages or 1,950 lines of text; reply briefs must not exceed 35 pages or 910 lines of text).

31

☐  4.  **Amicus Briefs**.

☐  Pursuant to Fed.R.App.P 29(d) and 9th Cir.R. 32-1, the attached amicus brief is proportionally spaced, has a typeface of 14 points or more and contains 7,000 words or less,

or is

☐  Monospaced, has 10.5 or few characters per inch and contains not more than either 7,000 words or 650 lines of text,

or is

☐  Not subject to the type-volume limitations because it is an amicus brief of no more than 15 pages and complies with Fed.R.App.P. 32 (a)(1)(5).

| August 8, 2013 | s/ *Alexandra Robert Gordon* |
|---|---|
| Dated | Alexandra Robert Gordon<br>Deputy Attorney General |

# CERTIFICATE OF SERVICE

Case Name:    **Chinatown Neighborhood Ass'n,**          No.    **13-15188**
              **et al. v. Edmund G. Brown Jr.,**
              **et al. (Appeal of Denial of PI)**

I hereby certify that on <u>August 8, 2013</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

**APPELLEES' REPLY TO AMICUS BRIEF OF THE UNITED STATES**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on <u>August 8, 2013</u>, at San Francisco, California.

|  N. Newlin  |  s/ N. Newlin  |
|:-----------:|:--------------:|
|  Declarant  |   Signature    |

20718973.doc